## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.,
40 Rector St., 5th Floor
New York, NY 10006

                Plaintiff,

    v.

WILLIAM P. BARR, in his official capacity
as Attorney General of the United States
U.S. Department of Justice;
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

UNITED STATES DEPARTMENT OF
JUSTICE, an agency of the United States;
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

PRESIDENTIAL COMMISSION ON LAW
ENFORCEMENT AND THE
ADMINISTRATION OF JUSTICE, an
advisory committee established and utilized
by Attorney General William Barr;

PHIL KEITH, in his official capacity as
Chair of the Presidential Commission on Law
Enforcement and the Administration of
Justice;
U.S. Dep't of Justice, Off. of Cmty. Oriented
Policing Programs
145 N. Street, NE
Washington, DC 20530

KATHARINE SULLIVAN, in her official
capacity as Vice Chair of the Presidential
Commission on Law Enforcement and the
Administration of Justice;
U.S. Dep't of Justice, Off. of Justice Programs
810 Seventh Street NW
Washington, DC 20531

             Defendants.

Civil Action No. 20-1132

**COMPLAINT**

## PRELIMINARY STATEMENT

Plaintiff the NAACP Legal Defense and Educational Fund, Inc. brings this action against William Barr, in his official capacity as Attorney General of the United States, the United States Department of Justice, the Presidential Commission on Law Enforcement and the Administration of Justice ("Commission"), Phil Keith, in his official capacity as Chair of the Commission, and Katharine Sullivan, in her official capacity as Vice Chair of the Commission. Plaintiff seeks mandamus relief compelling Defendants to comply with the nondiscretionary requirements of the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2 §§ 1-16, a declaration that Defendants have violated FACA, and declaratory and injunctive relief pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

Defendants have violated FACA in three broad respects. *First*, Defendants have violated requirements under § 5 of FACA, 5 U.S.C. app. 2 § 5, that an advisory committee's membership be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee," *id*. § 5(b)(2); and that "appropriate provisions" be made "to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment[,]" *id*. § 5(b)(3). The Commission's stated purpose is to "study issues related to law enforcement and the administration of justice and make recommendations to the Attorney General." Exec. Order 13,896 § 3(a). Specifically, the Commission is directed to study numerous areas including "refusals by State and local prosecutors to enforce laws or prosecute categories of crimes" and "the need to promote public respect for the law and law enforcement." Exec. Order 13,896 § 3(a)(iv) & (vi).

The Commission was established for the purpose of supporting President Trump's and Attorney General Barr's unfounded yet repeated public assertions that there is widespread lack of respect for law enforcement in light of recent efforts to reform the criminal justice system. That purpose is evident in the composition of the Commission, which is stacked with members that are exclusively from a law enforcement background. Not a single member of the commission is a defense attorney, criminologist or other relevant academic, public-health practitioner, mental health or addiction-recovery treatment provider, offender reentry coordinator, social worker, or formerly incarcerated individual. Not a single member of the commission represents a civil rights organization, a community-based organization, a labor or business group, or a religious institution, or has experience in studying or working on issues of police violence against vulnerable communities. Further, no provisions whatsoever have been made to insulate the Commission's advice and recommendations from inappropriate influence by the person who appointed the Commission's members—i.e., Attorney General Barr himself—or from particular special interests.

*Second*, Defendants have already violated, and absent relief, will continue to violate, the non-discretionary transparency and public access requirements of § 10 of FACA, 5 U.S.C. app. 2 § 10. The Commission has held three hearings over fifteen days without public notice; without making that meeting open to the public; and without timely notice in the Federal Register, *id*. § 10(a). It has also failed to make all "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by" the Commission "available for public inspection," *id*. § 10(b). Plaintiff has only learned of the Commission's meetings after they are held and are described on the Department of Justice website days later.

*Third*, Defendants have violated—and continue to violate—the oversight provisions of FACA and its interpreting regulations by failing to prepare and file a charter for the Commission with all necessary political bodies, including but not limited to the Congressional committees that would otherwise exercise oversight responsibility over the Commission. *Id.* § 9(c). Nor have Defendants assigned a Designated Federal Officer to the Commission to "[e]nsure compliance with FACA, and any other applicable laws and regulations."[1] In other words, Defendants have completely shielded the Commission from any meaningful oversight.

In sum, despite benefiting from the "political legitimacy" that comes with invoking an official advisory committee, *Cummock v. Gore*, 180 F.3d 282, 292 (D.C. Cir. 1999), Defendants have shirked nearly all FACA requirements.

Defendant Barr has asserted that FACA does not apply to the Commission. He is wrong. There are only very limited categories of federal commissions that do not need to comply with FACA. This Commission is not among them.

The Commission is not "composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government," nor is it "created by the National Academy of Sciences or the National Academy of Public Administration." 5 U.S.C. app. 2 § 3(2). The Commission also fails to meet the FACA exemption for intergovernmental committees under the Unfunded Mandates Reform Act. That exemption applies only when participants are comprised "exclusively [of] Federal officials and elected officers of State, local, and tribal governments (or their designated employees . . .)." 2 U.S.C. § 1534(b)(1). The Commission's hearings have, by contrast, included numerous participants who are not elected officials of any kind. Further, the Executive Order

---

[1] United States Gen. Servs. Admin., The Federal Advisory Committee Act (FACA) Brochure (Feb. 26, 2019), https://www.gsa.gov/policy-regulations/policy/federal-advisory-committee-management/advice-and-guidance/the-federal-advisory-committee-act-faca-brochure.

establishing the Commission, and the hearings it has conducted, demonstrate that the Commission does not meet the substantive limitation required by this exemption. Specifically, the Commission does not exist "solely" to discuss the "management or implementation of Federal programs established pursuant to public law that explicitly or inherently share intergovernmental responsibilities or administration." 2 U.S.C. § 1534(b)(2). Instead, it addresses an array of general policy issues concerning law enforcement, such as substantive federal criminal law; state and local court procedures; and amendments to the Federal Rules of Evidence.

For all these reasons, Plaintiff respectfully requests that this Court enjoin further operation of the Commission.

## **PARTIES**

1.     Plaintiff NAACP Legal Defense & Educational Fund, Inc. (LDF) is a nonprofit 501(c)(3) corporation established under the laws of the State of New York. LDF is the nation's oldest civil and human rights law organization, founded in 1940 by Thurgood Marshall. Since its inception, LDF has used legal, legislative, public education and advocacy strategies to eliminate the arbitrary role of race on the criminal justice system by challenging laws, policies, and practices that discriminate against African Americans and other communities of color. In furtherance of its mission, LDF has been involved in landmark litigation relating to police reform, as counsel of record or *amicus curiae* in such matters as *Tennessee v. Garner*, 471 U.S. 1 (1985) (barring use of deadly force by police officers unless suspect poses a threat of serious harm) and *Brown v. City of Oneonta, N.Y.*, 235 F.3d 769 (2d Cir. 2000) (challenging the role of race in police stops).  LDF has also engaged in litigation on behalf of Black law enforcement officers challenging discrimination in hiring decisions and promotions. *See e.g.*, *Waisome v. Port Authority of N.Y. and N.J.*, 999 F.2d

711 (2d Cir. 1993) (class action on behalf of Black police officers at the Port Authority regarding discrimination in promotions).

2.      In addition, LDF has worked for decades to promote unbiased and accountable policing through litigation, policy advocacy, and community engagement at the national and local levels. LDF has engaged in litigation challenging unconstitutional policing practices, filed briefs in the United States Supreme Court in cases involving challenges to the constitutional parameters of law enforcement conduct, issued public statements about unconstitutional policing practices, and has worked with a range of stakeholders to develop and implement policing reforms through court-ordered federal consent decrees. LDF has testified before the U.S. Congress, state and local legislatures, and testified in 2015 before the President's Tasks Force on 21st Century Policing in Washington, D.C.

3.      On March 31, 2020, LDF sent a letter to the Commission expressing a number of concerns about the Commission's structure and operations.

4.      Specifically, LDF raised concerns that the Commission is not providing interested members of the public, including LDF itself, a meaningful opportunity to participate in Commission hearings by failing to provide timely notice of each hearing and inexplicably shortening the period for submission of public comment in the middle of the ongoing Coronavirus Disease 2019 (COVID-19) pandemic.

5.      In addition, LDF noted that the Commission was overwhelmingly comprised of law enforcement officials, raising questions about the fairness and balance of the Commission. LDF urged Defendant Barr to appoint additional commissioners, including "academics, civil rights leaders, persons directly impacted by the policing practices, and public health experts that have

worked through litigation, advocacy, and community organizing to promote police accountability and remedying police violence" to widen the range of expertise on the Commission.

6.     LDF has a direct interest in the integrity, balance, and legitimacy of the Commission, and in preventing the proposal or enactment of any policies that would disproportionately burden African Americans in the criminal justice system.

7.     Defendant William P. Barr is Attorney General of the United States. After President Donald J. Trump issued Executive Order 13,896 on November 1, 2019, Defendant Barr established the Commission through an internal memorandum on January 21, 2020 ("Implementation Memo").[2] Under Executive Order 13,896, Defendant Barr is responsible for appointing the members of the Commission, selecting certain topics for the Commission to study, and overseeing the Commission's operations. He is being sued in his official capacity only.

8.     Defendant Department of Justice ("DOJ") is the federal agency of the United States in which the Commission is housed. The Commission is subject to oversight by DOJ employees, who exercise decision-making authority over matters related to the Commission's work. Under Executive Order 13,896, one of the purposes of the Commission is to build on DOJ's "historically important role in helping to develop, identify, and establish best practices for law enforcement . . . ." Exec. Ord. No. 13,896 § 1.

9.     Defendant Presidential Commission on Law Enforcement and the Administration of Justice is an advisory committee established by Defendant Barr on January 21, 2020 and subsequently and continuously utilized by Defendant Barr and the Defendant DOJ.

---

[2] Att'y Gen. William P. Barr, *Implementation Memorandum for Heads of Department Components re: Commission on Law Enforcement and the Administration of Justice* 1 (Jan. 21, 2020), https://www.justice.gov/ag/page/file/1236906/download (hereinafter, "Implementation Memo").

10.     Executive Order 13,896 directs the Commission to "study issues related to law enforcement and the administration of justice and make recommendations to the Attorney General." *See* Exec. Order 13,896 § 3(a).

11.     The Implementation Memo directs the Commission to study 15 topics and prepare a report containing a summary of findings and recommendations for the Attorney General by no later than October 28, 2020. Implementation Memo at 6.

12.     The Implementation Memo further provides that the Commission's recommendations must be made "in consultation with the Deputy Attorney General." Implementation Memo at 2.

13.     Defendant Phil Keith is Chair of the Commission. He is being sued in his official capacity only.

14.     Defendant Katharine Sullivan is Vice Chair of the Commission. She is being sued in her official capacity only.

## JURISDICTION AND VENUE

15.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1361 and 5 U.S.C. § 704.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (e) because all Defendants reside in this district, where a substantial part of the acts and omissions giving rise to this action took place.

## FACTS

### I.     Statutory and Regulatory Framework

17.     FACA was intended to address congressional concern with the growing number and utility of advisory committees. Congress found, among other things, that committees "should be established only when they are determined to be essential" and that "Congress and the public"

should be kept abreast of their activities. 5 U.S.C. app. 2 § 2(b). "FACA's principal purpose was to establish procedures aimed at enhancing public accountability of federal advisory committees."[3]

18.     FACA applies to "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof . . . established or utilized by one or more agencies . . . in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government," denominating such groups as "advisory committees." 5 U.S.C. app. 2 § 3(2).

19.     Only those committees that are "composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government" or "created by the National Academy of Sciences or the National Academy of Public Administration" fall outside the definition of "advisory committee" under the Act. 5 U.S.C. app. 2 § 3(2). And all of the provisions of FACA apply to advisory committees except when an "Act of Congress establishing any such advisory committee specifically provides otherwise." 5 U.S.C. app. 2 § 4(a).

20.     FACA requires that in establishing an advisory committee, the agency heads "shall" follow the guidelines of the statute, 5 U.S.C. app. 2 § 5(c), including that the directive establishing the advisory committee must, among other things, "require the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee" and "contain appropriate provisions to assure that the advice and recommendations of the advisory committee will not be

---

[3] *Ctr. for Law & Educ. v. U.S. Dep't of Educ.*, 209 F. Supp. 2d 102, 113 (D.D.C. 2002), *aff'd*, 396 F.3d 1152 (D.C. Cir. 2005); *see also Food Chem. News, Inc. v. Davis*, 378 F. Supp. 1048, 1051 (D.D.C. 1974) (purpose of FACA is "to control the advisory committee process and to open to public scrutiny the manner in which government agencies obtain advice from private individuals").

inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment." 5 U.S.C. app. 2 § 5(b)(2)-(3).

21.     FACA's implementing regulations, promulgated by the General Services Administration, require each advisory committee to have a plan to attain fairly balanced membership. The plan must "ensure that, in the selection of members for the advisory committee, the agency will consider a cross-section of those directly affected, interested, and qualified, as appropriate to the nature and functions of the advisory committee. Advisory committees requiring technical expertise should include persons with demonstrated professional or personal qualifications and experience relevant to the functions and tasks to be performed." 41 C.F.R. § 102-3.60(b)(3).

22.     The charter of each advisory committee must be filed by the "Committee Management Officer designated in accordance with section 8(b) of the Act, or . . . another agency official designated by the agency head." 41 C.F.R. § 102-3.70.

23.     No advisory committee "shall meet or take any action until an advisory committee charter has been filed with . . . the head of the agency to whom any advisory committee reports and with the standing committees of the Senate and of the House of Representatives having legislative jurisdiction of such agency." 5 U.S.C. App. § 9(c). The advisory committee charter must also be filed with the Library of Congress and the Secretariat. *See* 41 C.F.R. § 102-3.70(a)(3)–(4).

24.     Each advisory committee must also have a Designated Federal Officer ("DFO") designated by the agency head. 41 C.F.R. § 102-3.120. A committee's DFO is responsible for calling meetings of the committee, approving the agenda for all committee meetings, attend

meetings, adjourn any meeting when they determine it to be "in the public interest," and chair the meeting when directed by the agency head. *Id.*

25.     FACA demands transparency in the procedures and meetings of advisory committees. All advisory committee meetings must be open to the public and must be timely noticed in the Federal Register. 5 U.S.C. app. 2 § 10(a)(1)-(2). Meetings must be noticed in the Federal Register at least fifteen days before the meeting is to be held. 41 C.F.R. § 102-3.150(a).

26.     Interested members of the public must "be permitted to attend, appear before, or file statements with any advisory committee," subject only to "reasonable" regulations set by the Administrator of General Services. *Id.* § 10(a)(3). Although portions of meetings may be closed where the President determines that closure is provided for pursuant to 5 U.S.C. § 552b(c) (the federal Open Meetings statute), any such determination must be made in a writing that sets forth the reasons for the conclusion. 5 U.S.C. app. 2 § 10(d).

27.     Each advisory committee meeting must be "held at a reasonable time and in a manner or place reasonably accessible to the public," and in a place sufficient to accommodate "a reasonable number of interested members of the public." 41 C.F.R. § 102-3.140(a)-(b). If an advisory committee meeting is held via teleconference, videoconference, or other electronic medium, it still must be made accessible to the public. 41 C.F.R. § 102-3.140(e).

28.     Subject to the provisions of the Freedom of Information Act, 5 U.S.C. § 552, "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports." 5 U.S.C. app. 2 § 10(b).

29.     FACA mandates that "[d]etailed minutes of each meeting of each advisory committee shall be kept and shall contain a record of the persons present, a complete and accurate description of matters discussed and conclusions reached, and copies of all reports received, issued, or approved by the advisory committee. The accuracy of all minutes shall be certified to by the chairman of the advisory committee." 5 U.S.C. app. 2 § 10(c). Advisory committees must make available copies of transcripts of advisory committee meetings to "any person" at only the "actual cost of duplication." 5 U.S.C. app. 2 § 11(a).

30.     These requirements reflect FACA's goal of ensuring that "agencies should seek to be as inclusive as possible." 41 C.F.R. § 102-3.95(d).

31.     Each of the requirements of FACA is mandatory on the appointing authority, in this case, Attorney General Barr, and on the advisory committee itself.

**II.     Offices and Logistics of the Commission**

32.     Upon information and belief, Defendant Barr has not appointed a DFO for the Commission as required by FACA. 41 C.F.R. § 102-3.120.

33.     Upon information and belief, the Commission's staff has not been made public.

34.     The Commission is also comprised of working groups that assist the Commission in its deliberation and provide "advice, counsel, and support on the various law enforcement issues the Commission subjects to review and recommendation." Each of the 15 working groups focus on a specific law enforcement subject relevant to issues for which the Commission shall review and make recommendations. Implementation Memo at 4–6.

35.     Upon information and belief, no Defendant has filed an advisory committee charter with the DOJ, Senate Judiciary Committee, House Judiciary Committee, Library of Congress, or Secretariat.

36.     Upon information and belief, the Commission has been operating and holding meetings without a charter.

### III.     Commission Membership is Blatantly Skewed and Inappropriately Influenced

37.     Section 5(b) of FACA requires that any advisory committee, including this Commission (i) be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee," (ii) "not be inappropriately influenced by the appointing authority," and (iii) "not be inappropriately influenced . . . by any special interest." 5 U.S.C. App. 2 § 5(b)(2)-(3).

38.     The present Commission's stacked membership, far from being fairly balanced, reveals that only *one* viewpoint is represented: that of an unrepresentative sample of the law enforcement community.

39.     Further, Defendant Barr, the appointing authority, has an inappropriate degree of influence on the Commission. This has been made clear, for example, in his description of several of the Commission's "working group subjects" and their scope and substance in a manner that suggests the working group should take a particular view of an issue. For example, Defendant Barr has created a "Respect for Law Enforcement" working group, tasked to "focus on the trend of diminished respect for law enforcement and the laws they enforce." Implementation Memo at 5. The group is further directed to "evaluate how under-enforcement of the criminal law in certain jurisdictions" affects public safety and police morale. *Id.*

40.     In reality, there is no factual support for the assertion of a "trend of diminished respect for law enforcement and the laws they enforce" or "under-enforcement of the criminal law."

41.     Defendant Barr thanked and credited the International Association of Chief of Police ("IACP") and the Fraternal Order of Police for their role in establishing the Commission. Upon information and belief, law enforcement organizations such as the IACP have been involved in the selection of Commission members, reflecting that "special interests" have inappropriate influence over the Commission.[4]

42.     The Commission's membership is skewed in at least two ways, it: (1) includes exclusively the viewpoints of an unrepresentative sample of law enforcement officials, and (2) fails to reflect the diversity of opinions actually held by American law enforcement professionals and other relevant experts on these issues of national significance, as it must for an objective and competent deliberative process.

**A.     *The Commission's Lack of Balance in Viewpoints and Functions to be Performed.***

43.     Despite having 18 members, the present Commission represents only *one* institutional viewpoint: that of law enforcement. This shortcoming renders the Commission's membership imbalanced and unfit for the function it has been directed to perform.

44.     Executive Order No. 13896, which authorized the Attorney General to establish the Commission, granted Defendant Barr discretion to "determine the composition" and membership of the Commission, Exec. Ord. No. 13896, § 2(b)-(c), and to "designate an individual" to serve as its chair, *id.* §2(a).

---

[4] Int'l Assoc. of Chiefs of Police, *Commission on Law Enforcement and the Administration of Justice begins its work*, IACP Blog (Jan. 24, 2020), https://www.theiacp.org/news/blog-post/commission-on-law-enforcement-and-the-administration-of-justice-begins-its-work (IACP President stating: "This historic Commission was created thanks to close collaboration between the White House, the U.S. Department of Justice, Attorney General Barr, and the IACP and should inspire hope for meaningful criminal justice reform and advancements in the policing profession").

45.     Defendant Barr exercised his discretion to appoint a Commission that is strikingly imbalanced, unrepresentative, and unsuited for its function.

46.     Specifically, the Implementation Memo appoints the following 18 individuals to the Commission:

a.   *Chair:* Phil Keith, Retired Police Officer and Director, Office of Community Oriented Policing Services;

b.   *Vice Chair:* Katharine Sullivan, Principal Deputy Assistant Attorney General, Office of Justice Programs;

c.   *Commissioners:*

- David Bowdich, Deputy Director, Federal Bureau of Investigation;

- James Clemmons, Sheriff of Richmond County, North Carolina;

- Chris Evans, Chief of Operations, Drug Enforcement Administration;

- Frederick Frazier, City Councilman at Large of McKinney, Texas;

- Robert Gualtieri, Sheriff of Pinellas County, Florida;

- Gina Hawkins, Chief of the Fayetteville, North Carolina Police Department;

- Regina Lombardo, Acting Director, Bureau of Alcohol, Tobacco, Firearms, and Explosives;

- Erica MacDonald, United States Attorney for the District of Minnesota;

- Ashley Moody, Florida Attorney General;

- Nancy Parr, Commonwealth's Attorney, Chesapeake, Virginia;

- Craig Price, South Dakota Secretary of Public Safety;

- Gordon Ramsay, Chief of the Wichita, Kansas Police Department;

- David Rausch, Director of the Tennessee Bureau of Investigation;

- John Samaniego, Sheriff of Shelby County, Alabama;

- James Smallwood, Police Officer, Metropolitan Nashville Police Department; and

- Donald Washington, Director, United States Marshals Service.

47.     Each of the Commission members are current or former law enforcement. Specifically:

a.    **Thirteen (72%)** are current or former police officers, sheriffs, state troopers, or special agents;[5]

b.    **Six (33%)** are current officials in leadership positions of federal or state law enforcement agencies;[6] and

c.    **Five (28%)** are current or former prosecutors.[7]

48.     Of the Commission's 18 members, **none (0%)** is a defense attorney, criminologist or other relevant academic, public-health practitioner, mental health or addiction-recovery

---

[5] These 13 members include: Chair Phil Keith (retired police officer), Commissioner David Bowdich (former FBI special agent), Chris Evans (former DEA special agent), Commissioner James Clemmons (Sheriff, Richmond County, NC), Commissioner Frederick Frazier (police officer), Commissioner Robert Gualtieri (Sheriff, Pinellas County, FL), Commissioner Gina Hawkins (Chief of Police, Fayetteville, NC), Regina Lombardo (former ATF special agent) Commissioner Craig Price (former state trooper), Commissioner Gordon Ramsay (Chief of Police, Wichita, KS), Commissioner David Rausch (former police officer), Commissioner John Samaniego (Sheriff, Shelby County, AL), and Commissioner James Smallwood (police officer).
[6] These six members include: Commissioner David Bowdich (Deputy Director, FBI), Commissioner Chris Evans (COO, DEA; also listed above as a former DEA special agent), Commissioner Regina Lombardo (Acting Director, ATF; also listed above as a former ATF special agent), Commissioner Craig Price (Cabinet Secretary, SD Department of Public Safety; also listed above as a former state trooper), Commissioner David Rausch (Director, TN Bureau of Investigation; also listed above as a former police officer), and Commissioner Donald Washington (Director, United States Marshals Service).
[7] These five members include: Vice Chair Katharine Sullivan (former state prosecutor), Commissioner Erica MacDonald (U.S. Attorney, D. Minn.), Commissioner Ashley Moody (former federal prosecutor), Commissioner Nancy Parr (Commonwealth's Attorney, Chesapeake, VA), and Commissioner Donald Washington (former U.S. Attorney, W.D. La.; also listed above as Director, United States Marshals Service)

treatment provider, offender reentry coordinator, social worker, or formerly incarcerated individual.

49.     Of the Commission's 18 members, **none (0%)** represents a civil rights organization or community-based organization.

50.     Further, even the Commission's law enforcement perspective is skewed; the Commission does not include any chiefs from the nation's largest cities. The biggest city represented by a police chief on the commission is Wichita, the 51st-largest city in the United States with a population of less than 400,000 people.[8]

51.     Large cities face unique policing challenges, especially in terms of crime and relationship-building with law enforcement.[9]

52.     According to President Trump's Executive Order creating the Commission, the "function" of the present Commission is to "study issues related to law enforcement and the administration of justice and make recommendations to the Attorney General, who shall submit a report and recommendations to the President on actions that can be taken to prevent, reduce, and control crime, increase respect for the law, and assist victims." Exec. Ord. No. 13896, § 3(a).

53.     The specific topics for study identified in the Executive Order include, among others, the effectiveness of law enforcement training methods and "challenges . . . associated with mental illness, homelessness, substance abuse, and other social factors that influence crime . . . ." *See id.* § 3(a)(xi); *id.* § 3(a)(xii); *id.* § 3(a)(i).

---

[8] Tom Jackman, *Attorney general launches presidential commission on law enforcement*, Wash. Post (Jan. 22, 2020), https://www.washingtonpost.com/crime-law/2020/01/22/attorney-general-barr-launches-presidential-commission-law-enforcement/.
[9] *Id.*

54.     To have a fair balance of viewpoints and competent deliberation based on functions such as law enforcement training methods, there must be representatives not only from law enforcement professionals, but also from public health and treatment professionals, individuals directly impacted by the criminal justice system, advocates for civil rights and civil liberties, and from organizations or individuals that advocate on behalf of citizens who have been victimized by law enforcement—many of whom contend that law enforcement training to expand accountability is essential, not only to protect victims of law enforcement violence but to build community trust and to reduce crime and assist victims.

55.     There is also a need for balanced representation from people and organizations, such as civil rights groups, who are experienced with the prevention of hate crimes targeting individuals based on race, religion, sex, LGBTQ status, and other protected categories.

56.     The need for a fair balance of viewpoints, competencies, and backgrounds is also clear for questions such as mental health and substance abuse, which, according to the Executive Order, "influence crime." *id.*

57.     As Commissioner Parr herself conceded in testimony before the U.S. House of Representatives regarding opioid addiction, "all of the disciplines involved in this have to be at the table because I am a prosecutor, I am not a therapist."[10]

58.     Commissioner Parr then admitted: "I don't know what therapies work."[11]

59.     Defendant Barr similarly affirmed the need for a fair balance of viewpoints, competencies, and backgrounds, stating in the memo creating the Commission: "A diversity of

---

[10] America's Growing Heroin Epidemic: Hearing Before the Subcomm. On Crime, Terrorism, Homeland Security, and Investigations, 114 Cong. 45 (2015) (Testimony of Nancy G. Parr), https://www.govinfo.gov/content/pkg/CHRG-114hhrg95685/html/CHRG-114hhrg95685.htm.
[11] *Id.*

backgrounds and perspectives is important for gaining an effective understanding of these problems and formulating sound solutions." Implementation Memo at 2.

60.     Nevertheless, the Commission includes no such "diversity of backgrounds and perspectives." No appointed member of the Commission, as presently constituted, is functionally capable of providing "input and information" on behalf of "community organizations, civic leadership, civil rights and victim's rights organizations, criminal defense attorneys, academia, social service organizations, and other entities that regularly interact with American law enforcement and study the issues impacting the administration of justice in the United States," Implementation Memo at 2.

**B.      The Commission's Lack of Balance in Terms of Deliberative Diversity.**

61.     The individuals selected for membership on the present Commission also fail to reflect a fair balance of the diverse opinions on issues of law enforcement, police reform, and evidence-based policy-making necessary for an effective deliberative process.

62.     Instead, many of the present Commissioners' public statements echo the views of President Trump and Defendant Barr regarding zero-tolerance law enforcement and skepticism of criminal-justice reform efforts. For example:

   a.   Commissioner Frederick Frazier, a self-described "opinionated law enforcement voice" and "fugitive hunter,"[12] declared on April 23, 2020, via Twitter that "[a]ll County judges and criminal defense organizations need to be held accountable for the release of . . . dangerous criminals" during the coronavirus pandemic, referring to individuals awaiting trial (who are legally innocent) as "dangerous" or "hardened criminals."[13]

   b.   In addition, in April 2015, Commissioner Frazier, in his capacity as first vice president of the Dallas Police Association, was quoted as supporting a Texas bill

---

[12] Frederick Frazier (@Frazier7324), Twitter, https://twitter.com/Frazier7324.
[13] Frederick Frazier @Frazier7324 (Apr. 23, 2020, 11:28 a.m.),
https://twitter.com/Frazier7324/status/1253345117005635585.

that would have prohibited filming within 25 feet of police activity.[14] Members of the public should not film police officers, Frazier suggested, because the officers could "be disciplined, ridiculed on social media and possibly killed."[15]

c. In October of 2019, Commissioner Gualtieri spoke in support of a deputy sheriff who caused the death of an unarmed Latino man by shooting him with a Taser.[16] "What are you supposed to do when somebody runs from you[?]" Commissioner Gualtieri was quoted as saying in the deputy's defense. [17] "What are you supposed to do[,] say bye?"[18]

d. Commissioner Gualtieri has also collaborated closely with President Trump's administration to develop and implement practices enabling his sheriff's department to participate in the arrest and detention of people suspected by the federal government of being undocumented immigrants.[19]

e. In an official press release by the Pinellas County Sheriff's Office, Commissioner Gualtieri stated that his intention was to "help ICE keep criminal illegal aliens in

---

[14] Dallas News Administrator, *Bill to limit filming of police activity is dropped*, The Dallas Morning News (Apr. 10, 2015), https://www.dallasnews.com/news/politics/2015/04/11/bill-to-limit-filming-of-police-activity-is-dropped/.

[15] *Id.*

[16] Wendi Lane, *Death of man injured in Pinellas deputies' custody ruled accidental*, ABC Action News WFTS (Oct. 31, 2019), https://www.abcactionnews.com/news/region-pinellas/death-of-man-injured-in-pinellas-deputies-custody-ruled-accidental.

[17] *Id.*

[18] *Id.* Importantly, the Supreme Court has squarely held that "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

[19] Kathryn Varn & Tony Marrero, *Sheriff launches training program enabling Pinellas jail to hold immigration detainees*, Tampa Bay Times (May 6, 2019), https://www.tampabay.com/news/publicsafety/pinellas-sheriffs-office-is-among-first-to-launch-new-program-to-honor-immigration-detainer-20190506/; Bianca Padro Ocasio, *Jail deputies serve immigration warrants for ICE under new program*, Orlando Sentinel (May 8, 2019), https://www.orlandosentinel.com/news/breaking-news/os-ne-immigration-cooperation-florida-sheriffs-20190508-7nfexq52jbajxerr46u3mbfru4-story.html; *How Basic Ordering Agreements Came to Be*, Southern Poverty Law Center, https://www.splcenter.org/how-basic-ordering-agreements-came-be (last visited Apr. 29, 2020).

jail and off the street by serving ICE arrest warrants,"[20] echoing talking points by Defendant Barr.[21]

    f.    Further, under Commissioner Gualtieri's tenure, the Pinellas County Sheriff's Office has maintained the largest facial-recognition database in the nation, and allowed 273 "partner agencies," including ICE, to access it.[22]

    g.    Commissioner Parr has also positioned herself within the "zero tolerance," "tough on crime" approach to policing and prosecution that Defendant Barr and President Trump have espoused. For example, after a 911 call saved the life of a woman in Chesapeake County who was unconscious after overdosing on fentanyl, Parr charged the woman with felony drug possession, obtaining a conviction.[23]

    h.    Further, the National District Attorneys Association, the organization of which Commissioner Parr is the president-elect,[24] has expressed skepticism of criminal justice reform measures, including by arguing against a limitation on certain types of forensic evidence that lack scientific rigor.[25]

63.    Defendant Barr could easily have appointed law enforcement professionals whose

viewpoints on such issues would fairly balance the Commission's membership. Many law

---

[20] *19-074 Joint Press Conference- ICE launches program to strengthen immigration enforcement*, Pinellas County Sheriff's Office, https://www.pcsoweb.com/19-074-sheriffs-press-conference--ice-launches-program-to-strengthen-immigration-enforcement (last visited Apr. 29, 2020).

[21] U.S. Att'y Gen. William P. Barr, Remarks At the National Sheriffs' Association Winter Legislative and Technology Conference (Feb. 10, 2020), https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-remarks-national-sheriffs-association-winter.

[22] Joey Roulette, *ICE, FBI among agencies searching Florida's driver's licenses for facial recognition, records show*, South Florida Sun Sentinel (July 12, 2019), https://www.sun-sentinel.com/news/crime/article_bfc02409-29d3-5733-a53e-a260b910b5cf.html.

[23] Margaret Matray, *Chesapeake public defender: Drug overdose law unclear about whom it protects*, The Virginian Pilot (Feb. 12, 2016), https://www.pilotonline.com/news/crime/article_bfc02409-29d3-5733-a53e-a260b910b5cf.html.

[24] Press Release, Nat'l District Attorneys Assoc., *National District Attorneys Association Applauds the Department of Justice's Establishment of the President's Commission on Law Enforcement and the Administration of Justice* (Jan. 22, 2020), https://ndaa.org/wp-content/uploads/NDAA-Press-Release-on-Crime-Commission_Final.pdf.

[25] Jessica Pishko, *Prosecutors Are Banding Together to Prevent Criminal Justice Reform*, The Nation (Oct. 18, 2017), https://www.thenation.com/article/archive/prosecutors-are-banding-together-to-prevent-criminal-justice-reform/.

enforcement professionals and other qualified criminal justice experts hold perspectives that are diametrically opposed to those espoused by the above-quoted Commission members and Defendant Barr, and yet such opposing viewpoints are not even nominally represented on the Commission.

64.     For example, Denver Police Chief Paul Pazen has expressed skepticism of "[t]he old way of just locking people up and moving on to the next one," adding: "[W]e've seen how that has gone."[26]

65.     Police Chief Pazen has also stated: "Our whole job is based on public trust. . . . We are given authority by community members. If we do something that erodes public trust, we need to hold everybody accountable, including myself, to address it."[27]

66.     In addition, the Major Cities Chiefs Association, an association of law enforcement professionals, has expressed concern about the enforcement of federal immigration law by local police departments, in part because "[i]t undermines the trust and cooperation with immigrant communities which are essential elements of community oriented policing."[28] This contrasting viewpoint, publicly held by members of the professional law enforcement community, is not represented among the Commission's membership.

67.     On August 16, 2019, seventy (70) current and former police chiefs, sheriffs, state attorneys general, state and federal prosecutors, U.S. attorneys, state and federal judges, state

---

[26] Noelle Phillips, *Buzzwords aside, new Denver police chief Paul Pazen wants the department to become more progressive*, The Denver Post (July 30, 2018), https://www.denverpost.com/2018/07/30/denver-police-chief-paul-pazen-progressive-department/.
[27] *Id.*
[28] Major Cities Chiefs Assoc., Immigration Policy (2013), https://www.majorcitieschiefs.com/pdf/news/2013_immigration_policy.pdf.

supreme court justices, and U.S. Justice Department officials signed onto an open letter expressing concern about Defendant Barr's positions on criminal justice reform.[29]

68.     The law enforcement professionals' letter disagreed with Defendant Barr's perspective, stating they "did not view [their] jobs as waging a 'war' against 'criminal predators.'" They further applauded "initiatives of criminal justice leaders across the nation who advocate for diverting more individuals from the justice system; using discretion to redirect precious law enforcement resources better spent on public health and prevention than punishment; and improving fairness and accountability."[30] These officials supported humane, data-driven criminal justice reform.

69.     Defendant Barr chose not to appoint any of the 70 law enforcement officials who signed this letter as members of the Commission or its working groups—nor, on information and belief, has any one of them been invited to participate in or testify at a Commission meeting. Defendant Barr also has not appointed any other individuals whose viewpoints differ from the positions that he, President Trump, and members of the Commission have publicly espoused.

C.     ***This Commission's Stark Imbalance Contrasted with Previous Federal Commissions That Studied Issues Related to Law Enforcement.***

70.     Unlike previous committees that studied law enforcement, this Commission is improperly imbalanced.

71.     Defendant Barr's Implementation Memo explicitly situates the Commission as a successor to the 1967 National Advisory Commission on Civil Disorders ("Kerner

---

[29] Press Release, Fair & Just Prosecution, Statement in Response to Attorney General Barr's Remarks to the Fraternal Order of Police (Aug. 16, 2019), https://fairandjustprosecution.org/wp-content/uploads/2019/08/Barr-Remarks-Sign-On-Statement.pdf.
[30] *Id.*

Commission").[31] But this comparison only serves to underline the extent to which the present Commission is imbalanced in its membership and unfit for its function.

72.     The Kerner Commission was established by President Lyndon B. Johnson by executive order on July 29, 1967.[32] President Johnson's executive order tasked the commission with the function of investigating and proposing recommendations on the following subjects:

- The origins of the recent major civil disorders in our cities, including the basic causes and factors leading to such disorders and the influence, if any, of organizations or individuals dedicated to the incitement or encouragement of violence.

- The development of methods and techniques for averting or controlling such disorders, including the improvement of communications between local authorities and community groups, the training of state and local law enforcement and National Guard personnel in dealing with potential or actual riot situations, and the coordination of efforts of the various law enforcement and governmental units which may become involved in such situations;

- The appropriate role of the local, state and Federal authorities in dealing with civil disorders; and

- Such other matters as the President may place before the Commission.[33]

73.     In light of the complex function it was called to perform and the broad array of considerations relevant to the study of these questions, and of law enforcement policy in general, the Kerner Commission drew its members from diverse sources, each of which contributed to the balance of viewpoints represented on the commission and established its functional competence. The Kerner Commission's members included a law enforcement professional, four legislators, a

---

[31] Implementation Memo at 1.
[32] Exec. Ord. No. 11,365, 32 Fed. Reg. 11,111 (July 29, 1967).
[33] *Id.* §2.

governor and a mayor, business and labor leaders, a state commerce commissioner, and the executive director of the NAACP, the nation's oldest civil rights and racial justice organization.[34]

74.     In his remarks upon signing the executive order that established the Kerner Commission and appointed its members, President Johnson stated:

> One thing should be absolutely clear: This matter is far, far too important for politics. It goes to the health and safety of all American citizens--Republicans and Democrats. It goes to the proper responsibilities of officials in both of our parties. It goes to the heart of our society in a time of swift change and of great stress.[35]

75.     In keeping with these considerations, of the six elected officials whom Johnson appointed to the Kerner Commission, three were Republicans[36] and three were Democrats.[37]

76.     "I think the composition of this Commission," Johnson declared, "is proof against any narrowness or partisanship."[38]

77.     Unlike the Kerner Commission, however, the present Commission's composition is skewed in terms of the viewpoints represented among its members, and of the functions its members are capable of performing.

---

[34] Susan T. Gooden & Samuel L. Myers, *The Kerner Commission Report Fifty Years Later: Revisiting the American Dream*, RSF: Russell Sage Foundation J. Soc. Sciences, Sept. 2018, at 4.
[35] Pres. Lyndon B. Johnson, *Remarks Upon Signing Order Establishing the National Advisory Commission on Civil Disorders*, UC Santa Barbara: The American Presidency Project, https://www.presidency.ucsb.edu/documents/remarks-upon-signing-order-establishing-the-national-advisory-commission-civil-disorders.
[36] N.Y.C. Mayor John V. Lindsay (the commission's vice chair), U.S. Senator Edward W. Brooke, and U.S. Representative William M. McCulloch were serving in offices to which they had been elected as Republicans at the time of their appointment to the commission.
[37] Illinois Governor Otto Kerner (the commission's chair), U.S. Senator Fred R. Harris, and U.S. Representative James C. Corman were serving in offices to which they had been elected as Democrats at the time of their appointment to the commission.
[38] Johnson, *Remarks Upon Signing Order Establishing the National Advisory Commission on Civil Disorders*, *supra* n. 35.

78.     The Commission's lack of balance is also highlighted when compared to another analogous recent advisory committee, the President's Task Force on 21st Century Policing ("Task Force").

79.     The Task Force was an advisory committee established by former President Barack Obama.[39] Its purpose was to "identify best practices and otherwise make recommendations to the President on how policing practices can promote effective crime reduction while building public trust."[40]

80.     The Task Force's membership comprised eleven commissioners with backgrounds in law enforcement, academia, community organizing, and civil rights. Its meetings were both streamed live and made accessible online thereafter in recorded format.

81.     As Cedric Alexander, the former president of the National Organization of Black Law Enforcement Executives and a member of the Task Force noted, incorporating views from civil rights and human rights community would add valuable insight into the present Commission's mission.[41]

### D.     *The Influence of Attorney General Barr, President Trump, and Law Enforcement Organizations on the Commission.*

82.     Compounding these errors, the Commission has been inappropriately influenced by both Defendant Barr and a variety of other entities, including President Trump and law enforcement organizations. This influence reflects a "law-and-order" perspective and suggests that

---

[39] *Committee Members, Meetings, and Advisory Reports*, FACADatabase.gov, https://www.facadatabase.gov/FACA/FACAPublicViewCommitteeDetails?id=a10t0000001h0gJAAQ (last visited Apr. 29, 2020).

[40] The President's Task Force on 21st Century Policing, *Final Report of the President's Task For on 21st Century Policing* iii (May 2015), https://cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf.

[41] Jackman, *supra* n.9.

the Commission should reach preordained conclusions with respect to the issues it is supposed to be studying.

83.     Defendant Attorney General Barr has dismissed police reform efforts and signaled the intended Commission recommendations.

84.     Defendant Barr has on multiple occasions criticized any attempts of reform in the criminal justice system. This includes criticizing duly elected District Attorneys who championed criminal justice reform as "'social justice' reformers, who spend their time undercutting the police, letting criminals off the hook, and refusing to enforce the law."[42] He claimed that such prosecutors have become "dangerous to public safety."[43]

85.     He has also criticized President Obama's criminal justice reform efforts, complaining the administration "showed little interest in prosecuting the fight against dangerous drugs. A tsunami built up and has been crashing over the country, bringing death and destruction."[44]

86.     During a Justice Department awards ceremony for police officers, Defendant Barr again criticized those who seek police reform, insisting that the American people must focus on the "sacrifice and the service that is given by our law enforcement officers. And they have to start showing, more than they do, the respect and support that law enforcement deserves."[45] Defendant

---

[42] U.S. Att'y Gen. William P. Barr, Remarks At the Grand Lodge Fraternal Order of Police's 64th National Biennial Conference (Aug. 12, 2019),
https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-remarks-grand-lodge-fraternal-order-polices-64th.
[43] *Id.*
[44] *Id.*
[45] Sean Collins, *William Barr said certain "communities" should show police more respect, ignoring the reasons why they don't*, Vox (Dec. 4, 2019), https://www.vox.com/policy-and-politics/2019/12/4/20995074/william-barr-police-protest-shootings-consent-decree.

Barr went so far as suggest that certain "communities" who failed to show such respect and support could find themselves stripped of police protection.[46]

87.     In a separate speech, Defendant Barr argued for expansive police authority, and stated that when members of the public are given instructions by the policy, they must "[c]omply first, and, if warranted, complain later."[47]

88.     Defendant Barr has also stressed that "[w]e must have zero tolerance for resisting police."[48]

89.     Defendant Barr also made clear that respect for law enforcement was his primary concern when he established the Commission. In his statement establishing the Commission he stated that the "[m]ost troubling" issue he was directing the Commission to study was the "continued lack of trust and respect for law enforcement that persists in many communities."[49] Defendant Barr specifically directed the Commission to study "the cause of diminished respect for law enforcement and the laws they enforce[.]"[50]

90.     One of the Commission's subgroups is the "Respect for Law Enforcement" working group, which "focus[es] on the trend of diminished respect for law enforcement and the laws they enforce" and "how under-enforcement of the criminal law in certain jurisdictions affects: [p]ublic safety [and] [p]ublic perception of law enforcement and the laws they enforce . . . ."[51]

---

[46] *Id.*

[47] Barr, Remarks At the Grand Lodge Fraternal Order of Police's 64th National Biennial Conference, *supra* n. 42.

[48] *Id.*

[49] U.S. Att'y Gen. William P. Barr, Statement on the Establishment of the Commission (Jan. 22, 2020), https://www.justice.gov/ag/presidential-commission-law-enforcement-and-administration-justice.

[50] *Id.*

[51] Implementation Memo at 5.

91.     After forming the Commission, Defendant Barr discussed his goals for the Commission. He specifically noted his concern that "[i]t is becoming common in some corners to scapegoat the police and disrespect police officers and disparage the vital role law enforcement plays."[52]

92.     President Donald J. Trump has also made his position on law enforcement and police reform known. Indeed, while running for president, he repeatedly criticized prior federal efforts to reform policing in America. He claimed without basis that, due to federal police reform efforts, "[r]ight now, our police, in many cases, are afraid to do anything."[53]

93.     He has also defended New York City's "stop-and-frisk" program, which was declared unconstitutional by a federal court for, in part, its encouragement of racial profiling.[54] Then-candidate Trump praised the program, asserting that it "worked very well."[55] He went on to criticize the federal judge who oversaw the stop-and-frisk litigation, calling her "a very against-police judge."[56]

94.     In reality, the stop and frisk program had in fact been found unconstitutional and ineffective because it operated as "indirect racial profiling."[57] In 2013, the New York Attorney General released a report detailing the failure of New York City's stop-and-frisk program.

---

[52] U.S. Att'y Gen. William P. Barr, *Remarks at the International Association of Chiefs of Police Officer Safety and Wellness Symposium* (Feb. 27, 2020), https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-remarks-international-association-chiefs-police.
[53] *Id.*
[54] *Floyd v. City of New York*, 959 F. Supp. 2d 540, 562 (S.D.N.Y. 2013).
[55] *Donald Trump: We have to bring back law and order*, CNN Politics, https://www.cnn.com/videos/politics/2016/09/27/clinton-trump-debate-hofstra-stop-and-frisk-sot-five.cnn/video/playlists/2016-presidential-debate-donald-trump-hillary-clinton/ (last visited Apr. 29, 2020).
[56] *Id.*
[57] *Floyd*, 959 F. Supp. 2d at 562.

95.     The report's findings were striking: just 1.5% of stops conducted pursuant to the program resulted in any sort of criminal conviction. Even fewer—approximately 0.1% of stops—led to the recovery of an unlawful firearm.[58] Nor did the program have any deterrent effect on crime.[59]

96.     Candidate Trump also criticized the Black Lives Matter movement, which was founded to protest police mistreatment of Black people, as a "threat" to police that needed to be investigated by the Department of Justice.[60]

97.     After being elected, President Trump has encouraged law enforcement to be "rough" with arrestees, urging "Please, don't be too nice."[61] Specifically, he suggested that police officers should not protect the heads of suspects when they are arrested. Rather than shielding a suspect's head when they are "thrown into the back of a paddy wagon," President Trump told the room of law enforcement officers that they "can take the hand away." His comments were rebuked by numerous senior law enforcement officials.[62]

98.     President Trump has also criticized President Obama's administration for blocking sales of military equipment to police departments.[63]

---

[58] N. Y. State Office of the Att'y Gen., A Report on Arrests Arising From the New York City Police Department's Stop-And-Frisk Practices 1 (Nov. 2013), https://ag.ny.gov/pdfs/OAG_REPORT_ON_SQF_PRACTICES_NOV_2013.pdf.

[59] *See* Brentin Mock, *The Data Can't Be Ignored: 'Stop and Frisk' Doesn't Work*, CityLab (Aug. 8, 2016), https://www.citylab.com/equity/2016/08/the-data-can-no-longer-be-ignored-stop-and-frisk-doesnt-work/494996/.

[60] Jeremy Diamond, *Trump: Black Lives Matter has helped instigate police killings*, CNN (July 19, 2016), https://www.cnn.com/2016/07/18/politics/donald-trump-black-lives-matter/index.html.

[61] Ray Sanchez, *Police push back against Trump's law and order speech*, CNN (July 31, 2017), https://www.cnn.com/2017/07/29/politics/trump-police-remarks-reaction/index.html.

[62] *Id.*

[63] David A. Graham, *Trump's Fantasy Vision of Police*, The Atlantic (Feb. 14, 2019), https://www.theatlantic.com/politics/archive/2019/02/trumps-strange-relationship-police/582754/.

99.     President Trump has similarly made clear his goals for the Commission's recommendations. Indeed, he signed Executive Order 13,896 at a meeting held before thousands of law enforcement officers.

100.    Immediately upon formation of the Commission, prior to the appointment of any members, the President stated that the Commission's conclusions were foregone, stating: "[a]fter the commission issues its recommendations next year — they'll have them soon, because most of them know many of the answers before they begin."[64]

101.    Based on both President Trump's and Defendant Barr's statements, the Commission was created with an anticipated outcome. Their insistence of diminished respect for law enforcement coupled with their belief that attempts at law enforcement reform result in scapegoating of police officers and diminished public safety, the intended goal is clear: recommendations that will give more power and protection to law enforcement, reinvigorate tough-on-crime measures, and cut down on the rights of citizens.

102.    President Trump's stated desire to undo police reform and restore racially discriminatory and ineffective policies such as "stop and frisk," coupled with his insistence that the conclusions of the Commission have already been decided, send a clear message to the Commission that it should make recommendations expanding the authority of law enforcement.

---

[64] *Read the official transcript of President Trump's remarks at the International Association of Chiefs of Police convention in Chicago*, Chicago Tribune (Oct. 28, 2019), https://www.chicagotribune.com/politics/ct-donald-trump-chicago-police-chiefs-speech-text-20191028-njvjdf3pzjbpnid7xvyvzmlw2y-story.html

103.    Contrary to both President Trump's and Defendant Barr's assertions, however, recent polling has consistently found that police remain largely trusted by Americans, with little change having taken place between 2007 and the present.[65]

104.    Black communities report lower levels of trust in police than members of other races.[66] But the source of this lower level of trust within the Black community underscores the need for balanced views among any Commission studying the relationship between law enforcement and the community where they work. Black people are twice as likely to be cursed at, and twice as likely to be physically mistreated, by police as compared to white people.[67] DOJ itself has found that, across the country, police departments are disproportionately likely to use force against Black individuals without justification.[68]

105.    Furthermore, upon information and belief, the establishment of the Commission, including in appointment of Commission members, has been influenced almost exclusively by law enforcement officers and organizations.

---

[65] Lydia Saad, *Military, Small Business, Police Still Stir Most Confidence*, Gallup (June 28, 2018), https://news.gallup.com/poll/236243/military-small-business-police-stir-confidence.aspx.
[66] Emily Ekins, *Policing in America: Understanding Public Attitudes Toward the Police. Results from a National Survey*, Cato Institution (Dec. 7, 2016), https://www.cato.org/survey-reports/policing-america.
[67] *Id.*
[68] *See, e.g.*, DOJ, Investigation of the Ferguson Police Department 28, 62 (2015), https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/03/04/ferguson_police_department report.pdf) (noting that African Americans, just 67% of the Ferguson population, were the victims of 88% of police use of weapons); DOJ, Investigation of the New Orleans Police Department 39 (2011), https://www.justice.gov/sites /default/files/crt/legacy/2011/03/17/nopd_report.pdf,) (finding that African Americans in New Orleans were the subject of 84% of uses of force despite being only 59% of the total population).

106.    In remarks commemorating the establishment of the Commission, Defendant Barr stated that without the IACP, "we would not be here today" inaugurating the Commission.[69]

107.    On January 24, 2020—two days after the establishment of the Commission—IACP President Steven Casstevens stated: "This historic Commission was created thanks to close collaboration between the White House, the U.S. Department of Justice, Attorney General Barr, and the IACP . . . ."[70]

108.    Indeed, the Commission's first hearing, on February 27, 2020 was held at the same time and at the same venue as the IACP Officer Safety and Wellness Symposium.[71] Defendant Barr delivered opening remarks at the symposium, during which the "Commissioners [were] seated in [the] front row."[72]

109.    After Barr's remarks on February 27, the Commissioners moved to the adjacent ballroom to for the next phase of their first meeting.[73]

110.    In a welcome message printed in the February 27-29 IACP symposium program, Casstevens stated: "We are proud to have the U.S. President's Commission on Law Enforcement

---

[69] U.S. Att'y Gen. William P. Barr, DOJ, Remarks at the Presidential Commission on Law Enforcement and the Administration of Justice Opening Ceremony (Jan. 22, 2020), https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-remarks-presidential-commission-law-enforcement.

[70] *Commission on Law Enforcement and the Administration of Justice begins its work,* IACP: Blog (Jan. 24, 2020), https://www.theiacp.org/news/blog-post/commission-on-law-enforcement-and-the-administration-of-justice-begins-its-work.

[71] DOJ, President's Commission on Law Enforcement and the Administration of Justice: Hearing on Officer Safety and Wellness 1 (2020), https://www.justice.gov/ag/page/file/1268541/download.

[72] *Id.*

[73] *Id.*; *see also* Karli Barnett, *US Attorney General William Barr Addresses Law Enforcement At Miami Symposium*, CBS Miami (Feb. 27, 2020),https://miami.cbslocal.com/2020/02/27/us-attorney-general-william-barr-in-miami/; Charles Rabin, *William Barr criticizes 'disrespect' of cops at 'police wellness' gathering in Miami*, Miami Herald (Feb. 27, 2020), https://www.miamiherald.com/news/local/crime/article240685131.html.

and the Administration of Justice here at the IACP Officer Safety and Wellness Symposium for its first formal convening. The creation of this commission has been a priority of the IACP for over two decades."[74]

111.    Chief Casstevens then participated as a panelist in the Commission's February 27 hearing.[75]

112.    Both Commissioner Price and Commissioner Rausch sit on the IACP's Board of Directors, the association's governing body.[76] Commissioner Price is the IACP's "General Chair S&P," and Commissioner Rausch is a member at large.[77]

113.    In addition, Commissioner Bowdich is the IACP's "Federal Liaison."[78]

114.    During the Commission's February 27, 2020 meeting, Patrick Yoes, the national president of the FOP, also participated as a panelist, providing written and oral testimony and answering questions.[79] In his written testimony submitted, Yoes stated that "[t]he FOP was proud to have played a pivotal role in [the Commission's] establishment."[80]

---

[74] IACP, *Officer Safety and Wellness Symposium* 1 (2020), https://www.theiacp.org/sites/default/files/2020%20OSW%20Web%20Schedule%20FINAL%20 2.20.20.pdf.

[75] DOJ, President's Commission on Law Enforcement and the Administration of Justice Summary: Hearing One on Officer Safety and Wellness 5 (2020), https://www.justice.gov/ag/page/file/1259216/download.

[76] *Id.*; *IACP Board of Directors*, IACP, https://www.theiacp.org/iacp-board-of-directors (last visited Apr. 2927, 2020).

[77] *Id.; IACP* https://www.theiacp.org/iacp-board-of-directors.

[78] *Id.*

[79] DOJ, President's Commission on Law Enforcement and the Administration of Justice Summary: Hearing One on Officer Safety and Wellness 5 (2020), https://www.justice.gov/ag/page/file/1259216/download.

[80] DOJ, President's Commission on Law Enforcement and the Administration of Justice: Hearing on Officer Safety and Wellness (2020), https://www.justice.gov/ag/page/file/1268541/download (written testimony of Patrick Yoes).

115.    During the same Commission meeting, Cory Nooner, the co-chair of the Commission's "Police Officer Health" working group, identified himself "[a]s a representative of the Fraternal Order of Police."[81]

116.    Commissioner Smallwood is the president of the Andrew Jackson Lodge #5 of the Nashville Fraternal Order of Police.[82]

## IV.    Activities of the Commission

117.    As Defendant Attorney General Barr acknowledged, it is important that the Commission "hear[s] from voices and consult perspectives outside of law enforcement."[83] He also pledged that "[c]ivil rights organizations, civic leaders, defense bar associations, victims' rights organizations, and community organizations" would "have opportunities to provide advice, counsel and input to the Commission in its study of the relevant issues and solutions."[84] Nevertheless, despite these assurances, the Commission has operated in a way that has largely shut the public out from meaningful participation.

118.    Thus far, the Commission has held three hearings focusing on various subjects but has failed to provide any advance notice of any of these meetings, precluding attendance by the public and media. Further, the Commission has failed to provide all agendas, witness bios, meeting minutes, transcripts, and record evidence from all of its hearings.

---

[81] *Id.* (written testimony of Corey Nooner).
[82] *Officers & Staff*, Nashville Fraternal Order of Police, Andrew Jackson Lodge #5, https://www.nashvillefop.org/index.cfm?zone=/unionactive/officers.cfm (last visited Apr. 29,27 2020).
[83] William Barr, Att'y Gen., DOJ, Statement on the Establishment of the Presidential Commission on Law Enforcement and the Administration of Justice (Jan. 22, 2020), https://www.justice.gov/ag/presidential-commission-law-enforcement-and-administration-justice.
[84] *Id.*

119.    The Commission held its first hearing on February 27, 2020 in Miami, Florida during an IACP meeting at the Hyatt Regency Hotel.[85] The hearing focused on "Officer Safety and Wellness."

120.    Immediately prior to the first meeting, Defendant Attorney General Barr delivered remarks at the International Association of Chiefs of Police Officer Safety and Wellness Symposium. They symposium focused on "maintaining the physical and mental health of officers."[86] After the Attorney General's remarks, the Commission held its first meeting in an adjacent ballroom. Dallas Police Department Lieutenant and chief medical officer Alexander Eastman participated in this meeting.[87]

121.    This meeting of Commission was not noticed in the Federal Register, nor did the Commission otherwise provide advance notice to the public. Upon information and belief, this meeting was not held open to the public. The transcripts and minutes of the February 27 hearing have not been made public.

122.    As such, neither LDF nor the public has had *any* access to the substance of the February 27 hearing, whether by attending the hearing or reviewing a complete and accurate transcript.

123.    The Commission held its second hearing on March 24-26, 2020, focusing on "Social Problems Impacting Public Safety – Mental Illness." This meeting of Commission was not noticed in the Federal Register, nor did the Commission take any other steps to provide advance notice of the hearing to the public. Upon information and belief, because these hearings were held

---

[85] Rabin, *supra* n.73.
[86] Karli Barnett, *US Attorney General William Barr Addresses Law Enforcement At Miami Symposium*, CBS 4 Miami (Feb. 27, 2020), https://miami.cbslocal.com/2020/02/27/us-attorney-general-william-barr-in-miami/.
[87] Rabin, *supra* n.73.

on a secure teleconference line, even members of the public who were aware of the meeting could not listen in to or participate in the hearing.

124.   The transcripts and minutes of the March 24-26 hearing have not been made public. Although transcripts for these hearings have been made available online, certain portions of the exchanges appear to have been omitted due to "crosstalk"[88] or marked as "inaudible."[89]

125.   The Commission held a second part of the second hearing on March 31-April 2, 2020, focusing on "Social Problems Impacting Public Safety – Homelessness, Federal Programming, and Substance Abuse." This meeting of Commission was not noticed in the Federal Register. Upon information and belief, because these hearings were held on a secure teleconference line, even if members of the public had been aware of the meeting, they could not have listened in to or participated in the hearing.

126.   The agendas, witness bios, and written testimonies for these hearings have not been made publicly available. Although transcripts for these hearings have been made available online, certain portions of the exchanges appear to have been omitted due to "crosstalk"[90] or marked as "inaudible."[91]

127.   As such, neither LDF nor the public has had meaningful access to the substance of the March 24-26 and March 31-April 2 hearing, whether by attending any portion of the hearing or reviewing a complete and accurate transcript.

128.   The Commission held its third hearing on April 7-9, 2020, April 14-16, 2020, and April 21-22, 2020, focusing on "Crime Reduction." This meeting of Commission was not noticed

---

[88] 3/24 Hr'g Tr. at 38; 3/25 Hr'g Tr. at 2, 9, 23, 30, 32-35.
[89] 3/24 Hr'g Tr. at 1-2, 4, 12, 17, 19- 23, 33, 35, 37-39; 3/25 Hr'g Tr. at 2; 3/26 Hr'g Tr. at 2, 4-5, 14, 21, 27
[90] 3/31 Hr'g Tr. at 28; 4/1 Hr'g Tr. at 26; 4/2 Hr'g Tr. at 31
[91] 3/31 Hr'g Tr. at 2, 10, 22, 26; 4/1 Hr'g Tr. at 1, 7-8; 4/2 Hr'g Tr. (134 instances).

in the Federal Register, nor did the Commission otherwise provide the public with advance notice of the hearing. Upon information and belief, because these hearings were held on a secure teleconference line, even if members of the public had been aware of the meeting, they could not have listened in to or participated in the hearing.

129.    The agendas, witness bios, and written testimonies for this hearing have not been made publicly available. Although transcripts for the April 7-9 and April 14-16 portions of this hearing have been made available online, certain portions of the exchanges appear to have been omitted due to "crosstalk"[92] or marked as "inaudible."[93] The transcripts of the April 21-22 portions of this hearing have not yet been made available.

130.    As such, neither LDF nor the public has had meaningful access to the substance of the April 7-9, April 14-16, and April 21-22 hearing, whether by attending any portion of the hearing or reviewing a complete and accurate transcript.

131.    The Commission began its fourth hearing on April 23, 2020. This meeting of the Commission was not noticed in the Federal Register, nor did the Commission take any other steps to provide the public with advance notice of the hearing. The agendas, witness bios, written testimonies, transcripts, and record evidence[94] for this hearing have not been made publicly available.

132.    As such, neither LDF nor the public has had any access to the substance of the April 22, 2020 hearing.

---

[92] 4/7 Hr'g Tr. at 19, 32, 37; 4/9 Hr'g Tr. at 11, 18

[93] 4/7 Hr'g Tr. at 1, 6, 14, 23; 4/9 Hr'g Tr. at 20, 31, 35- 37

[94] At least one white paper was submitted as evidence into the record at this hearing. Jennifer Lynch, *EFF Testifies Today on Law Enforcement Use of Face Recognition Before Presidential Commission on Law Enforcement and the Administration of Justice*, Electronic Frontier Foundation (Apr. 22, 2020), https://www.eff.org/deeplinks/2020/04/eff-testifies-law-enforcement-use-face-recognition-presidential-commission-law.

## V.      The Commission is Not an Intergovernmental Commission Exempted From FACA

133.    It is clear the Commission is not complying with FACA. As established in paragraphs 32-132, the Commission (1) does not employ the required DFO as required by 41 C.F.R. § 102-3.120; (2) has not filed a charter with any necessary entity before conducting Commission business as required by 5 U.S.C. App. § 9(c); (3) is not comprised of fairly balanced Commission members as required by 5 U.S.C. App. § 5(b)(2); (4) has failed to provide timely notice of its hearings in any way as required by 5 U.S.C. App. § 10(a)(2) and 41 C.F.R. § 102-3.150(a); and (5) has prevented the public from attending the hearings or obtaining the relevant agendas, witness bios, transcripts, and record evidence, as required by  5 U.S.C. app. 2 §§ 10(a)(1) and 10(b). In each respect, therefore, the Commission is violating FACA.

134.    The Commission does not fall within either of the two exemptions contemplated by FACA, as it is not "composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government" nor is it "created by the National Academy of Sciences or the National Academy of Public Administration[.]" 5 U.S.C. app. 2 § 3(2).

135.    Nor is the Commission an intergovernmental committee exempt from FACA's provisions under the Unfunded Mandates Reform Act.

136.    To qualify as an intergovernmental committee, the Commission must satisfy two conditions.

137.    First, the Commission's meetings must be "held *exclusively* between Federal officials and elected officers of State, local, and tribal governments (or their designated employees with authority to act on their behalf) acting in their official capacities." 2 U.S.C. § 1534(b)(1) (emphasis added).

138.     Second, the committee's meetings must be "*solely* for the purposes of exchanging views, information, or advice *relating to the management or implementation of Federal programs* established pursuant to public law that *explicitly or inherently share intergovernmental responsibilities or administration*." 2 U.S.C. § 1534(b)(2) (emphasis added).

139.     None of the hearings held by the Commission to date have complied with either, let alone both, of these requirements.

140.     At the Commission's first hearing, the participants included numerous individuals who are not elected officials (nor their designees), such as Patrick Yoes, the National President of the Fraternal Order of Police; Alexa James, Executive Director of the National Alliance on Mental Illness-Chicago; Steve Casstevens, President of the International Association of Chiefs of Police; William King, Professor of Criminal Justice at Boise State University; Michael McHale, National President of the National Association of Police Organizations, Karen Solomon, President of Blue H.E.L.P., Inc.; Janice McCarthy, President of Care of Police Suicide Survivors; and Stephanie Samuels, Director of Copline, Inc.

141.     The participants during the first hearing also discussed matters unrelated to existing Federal programs that share intergovernmental responsibilities or administration, including but not limited to supporting pending legislation making violence against police officers a federal crime;[95] best practices for mental health screening by local law enforcement agencies;[96] amending the

---

[95] DOJ, President's Commission on Law Enforcement and the Administration of Justice: Hearing on Officer Safety and Wellness (2020), https://www.justice.gov/ag/page/file/1268541/download (written testimony of Patrick Yoes).

[96] *Id*. (written testimony of Alexa James).

Federal Rules of Evidence to shield certain officer statements from use in federal proceedings;[97] and supporting legislation mandating emotional wellness training.[98]

142.    Similarly, participants at both parts of the Commission's second hearing included numerous individuals who are not elected officials (nor their designees). During the first part of the hearing on March 24-26, 2020, such participants included John Snook, CEO of Treatment Advocacy Center; Dr. Shannon Robinson, Principal of Health Management Associates; and Dr. Keith Humphreys, Professor and Section Director for Mental Health Policy in the Department of Psychiatry and Behavioral Sciences at Stanford University.

143.    During this hearing, participants discussed matters unrelated to existing Federal programs that share intergovernmental responsibilities or administration, including but not limited to training for officers on responding to situations involving mentally ill persons;[99] amendments to state-level civil commitment statutes;[100] opposing any efforts to decriminalize drug crimes;[101] and supporting state legislation establishing sobriety programs.[102]

144.    During the second part of the hearing on March 31 – April 2, 2020, the participants included numerous individuals who are not elected officials (nor their designees), such as John Ashmen, President of Citygate Network; and Carson Fox, CEO of the National Association of Drug Court Professionals.

---

[97] *Id*. (written testimony of Mick McHale).
[98] *Id*. (written testimony of Janice McCarthy).
[99] DOJ, President's Commission on Law Enforcement and the Administration of Justice: Mental Illness and Mental Health (2020), https://www.justice.gov/ag/page/file/1269421/download (written testimony of John Snook)
[100] *Id*. (written testimony of Sarah Shimko).
[101] *Id*. (written testimony of Donald Barnes).
[102] *Id*. (written testimony of Keith Humphreys).

145.     The participants at these hearing discussed matters unrelated to existing Federal programs that share intergovernmental responsibilities or administration, including but not limited to creation of new state departments for managing homelessness;[103] development of location-specific training modules for officers;[104] establishment of multidisciplinary teams within police departments;[105] and the establishment of drug courts at the local and state level.[106]

146.     Similarly, during the third Commission hearing, the participants included numerous individuals who are not elected officials (nor their designees), such as Robert Mateo, President of the National Alliance of Gang Investigators Associations; Kim Garrett, CEO of Palomar; and Chuck Cohen, Vice President of the National White Collar Crime Center, and Jennifer Lynch, Surveillance Litigation Director at the Electronic Frontier Foundation.

147.     The participants at this hearing discussed matters unrelated to existing Federal programs that share intergovernmental responsibilities or administration, including but not limited to trends and patterns in crime;[107] federal prosecution priorities;[108] methods of building trust between communities and police;[109] conditions and services offered at local jails;[110] and facial recognition technology, privacy laws, and the impacts of law enforcement technology on people of color.[111]

---

[103] 3/31 Hr'g Tr. at 5-8.
[104] *Id.* at 8-12.
[105] 4/1 Hr'g Tr. at 5-8.
[106] 4/2 Hr'g Tr. at 4-7.
[107] 4/7 Hr'g Tr. at 5-6.
[108] *Id.* at 7-11.
[109] *Id.* at 19-24.
[110] *Id.* at 32-33.
[111] *See* Lynch, *supra* n.96.

148.    At the portion of the fourth hearing held on April 23, 2020, the Commission again invited participants who are not elected officials or their designees, including John Koufos, the National Director of Reentry Initiatives, Right on Crime.

149.    The participants at these hearings discussed matters unrelated to existing Federal programs that share intergovernmental responsibilities or administration, including but not limited to programming in state and local prisons.

150.    The breadth of the Commission's meetings reflects what it was tasked with doing in both the President's Executive Order directing Defendant Barr to create the Commission, and in Defendant Barr's memorandum creating the Commission. Rather than focus "solely . . . on the management or implementation of Federal programs established pursuant to public law that explicitly or inherently share intergovernmental responsibilities or administration," the Commission was directed to study, among other things, "police officer health," "respect for law enforcement," and other topics unrelated to the management or implementation of existing Federal programs.

## VI.    **Defendants Continue to Violate FACA Even After Plaintiff Raised Concerns About its Unbalanced Composition and Lack of Notice for its Hearings**

151.    In January 2020, the Commission posted a notice on its website offering interested members of the public, including LDF, the opportunity to submit comments regarding any aspect of the Commission's work through May 31, 2020.

152.    However, on March 16, 2020, the Commission—abruptly, without explanation, and in the midst of the nationwide crisis caused by the outbreak of the Novel Coronavirus Disease 2019 (COVID-19) pandemic—shortened the comment window by two full months, asking for all submissions to be made by March 31, 2020.

153.    LDF learned the date had changed only because it happened to check the Commission website, just days before the new deadline. The change of this deadline was not posted in the Federal Register, nor, upon information and belief, was it otherwise advertised.

154.    Upon information and belief, no Defendant took any effort to otherwise publicize or explain the shortened comment window.

155.    Upon information and belief, other interested entities and persons who wished to submit comments were unable to do so because of the abrupt shortening of the public comment period.

156.    On March 31, 2020, Plaintiff LDF submitted a letter to the Commission, raising numerous questions about the Commission's failure to provide meaningful opportunities for public engagement.

157.    LDF expressed concern that the Commission had significantly shortened the window for submission of public comments without notice or explanation, leaving many interested stakeholders unable to participate.

158.    LDF also pointed out that the Commission had held numerous hearings without prior notice, further frustrating public involvement.

159.    LDF finally challenged the balance of the Commission, noting that its membership and the witnesses called to date were overwhelmingly comprised of law enforcement officials but lacked views from academics, civil rights leaders, persons directly impacted by the policing practices, and public health experts who have worked through litigation, advocacy, and community organizing to promote police accountability to remedy police violence.

160.    On April 14, 2020, Defendants Keith and Sullivan responded to LDF in a one-paragraph letter stating that the public comment window had been re-opened to allow for submissions until April 31, 2020.

161.    This new deadline for public comment has not been posted on the Commission's website, nor has it been entered in the Federal Register.

162.    Defendants Keith and Sullivan did not respond to the other concerns LDF expressed in its letter, including the lack of public notice of the Commission's hearings and its skewed composition. Nor did Defendants Keith and Sullivan present any reasons why the Commission was not required to adhere to these requirements.

163.    Since the submission of LDF's letter on March 31, the Commission has continued to hold hearings without any prior notice. LDF did not learn about of these hearings until *after* they have been conducted. Had these hearings been duly noticed in the Federal Register and open to the public, as FACA requires, LDF would have attended and participated in all hearings.

164.    Because no hearing was properly noticed in the Federal Register at any point prior to its occurrence, however, Plaintiff has been unable to attend, listen to, or otherwise participate in any of the hearings before the Commission.

165.    On April 29, 2020, Plaintiff LDF submitted another letter to the Commission, again raising concern that the Commission had shortened the deadline for providing public comment and had not provided public notice of this deadline change.

166.    LDF also highlighted concerns about the focus of three Commission working groups – Respect for Law Enforcement, Grant Programs, and Data and Reporting – and offered guidance on how to address these concerns.

## COUNT I
### Mandamus, 28 U.S.C. § 1361
### Violation of FACA – Fairly Balanced Commission Free of Inappropriate Influence

167.     Plaintiff incorporates the allegations in paragraphs 1-166 by reference as if fully set forth herein.

168.     The Commission was established to "study issues related to law enforcement and the administration of justice and to make recommendations to the Attorney General, who shall submit a report and recommendations to the President, on actions that can be taken to prevent, reduce, and control crime, increase respect for the law, and assist victims." Exec. Ord. No. 13,896 § 3.

169.     Because the Commission is a "Commission . . . established or utilized by one or more agencies, in the interest of obtaining advice or recommendations for . . . one or more agencies or officers of the Federal Government," 5 U.S.C. app. 2 § 3(2), it is an "advisory committee" as defined in FACA.

170.     The Commission is not an "intergovernmental committee" exempted from FACA's requirements.

171.     Each Commission hearing has included participants who are neither federal officials nor state or local elected officials (or their designees).

172.     The Commission's participants have regularly discussed matters beyond the implementation of existing federal programs that share intergovernmental responsibilities or administration.

173.     Because the Commission is not exempted from FACA's requirements, it must be "fairly balanced in terms of the points of view represented and the functions to be performed." 5 U.S.C. app. 2 § 5(b)(2).

174.    As set forth above, the Commissioners appointed by Defendant Barr are not fairly balanced in terms of their points of view on the issues being studied and addressed by the Commission. The Commission includes exclusively the viewpoints of an unrepresentative sample of law enforcement officials, and fails to reflect the diversity of opinions actually held by American law enforcement professionals and others with relevant experience.

175.    Not a single Commissioner is a defense attorney, criminologist or other relevant academic, public-health practitioner, mental health or addiction-recovery treatment provider, offender reentry coordinator, social worker, or formerly incarcerated individual. Nor do any Commissioners represent a civil rights organization or community-based organization that has experience in studying or working on issues of police violence against vulnerable communities and focus on criminal justice reform. Such expertise is necessary for an objective and competent deliberative process.

176.    Further, to comply with FACA, committees have a nondiscretionary duty to "not be inappropriately influenced by the appointing authority or by any special interest." *Id.* § 5(b)(3).

177.    Defendant Barr and President Trump have "inappropriately influenced" the Commission through repeated public statements about the purposes and goals of the Commission, Specifically, both President Trump and Defendant Barr have repeatedly asserted—at best, without, and at worst, contrary to, evidence—that disrespect for law enforcement is increasing and that violent crime is at a record high.

178.    President Trump has explicitly stated that the Commission's conclusions are foregone, promising that "most of [the Commissioners] know many of the answers before they begin," reflecting both an inappropriate influence and a lack of fair balance among the Commissioners.

179.    In addition, Defendant Barr has allowed the Commission to be inappropriately influenced by special interests including law enforcement associations such as IACP and the FOP.

## COUNT II
### Mandamus, 28 U.S.C. § 1361
### Violation of FACA – Charter Filing

180.    Plaintiff incorporates the allegations in paragraphs 1-166 by reference as if fully set forth herein.

181.    FACA states that "[n]o advisory committee shall meet or take any action until an advisory committee charter has been filed with . . . the head of the agency to whom any advisory committee reports and with the standing committees of the Senate and of the House of Representatives having legislative jurisdiction of such agency." 5 U.S.C. app. 2 § 9(c).

182.    The Commission reports to DOJ and is subject to the legislative jurisdiction of the Senate Judiciary Committee and the House Judiciary Committee.

183.    The Commission has a nondiscretionary duty to file an advisory committee charter with DOJ, the Senate Judiciary Committee, and the House Judiciary Committee prior to "meet[ing] or tak[ing] any action."

184.    The Commission has not filed an advisory committee charter with DOJ, the Senate Judiciary Committee, or the House Judiciary Committee.

185.    FACA's implementing regulations further require that an advisory committee charter be filed with the Library of Congress and the Secretariat. *See* 41 C.F.R. § 102-3.70(a)(3)–(4).

186.    The Commission has not filed an advisory committee charter with the Library of Congress, nor has it filed a charter with the Secretariat.

187.    The Commission has regularly met without filing such a charter.

## COUNT III
### Mandamus, 28 U.S.C. § 1361
### Violation of FACA – Public Notice and Access

188.     Plaintiff incorporates the allegations in paragraphs 1-166 by reference as if fully set forth herein.

189.     FACA requires that "[e]ach advisory committee meeting shall be open to the public." 5 U.S.C. app. 2 § 10(a)(1).

190.     The Commission thus has a nondiscretionary duty to ensure its meetings are open to the public.

191.     Because the Commission has conducted teleconferenced hearings without providing the public with the opportunity to participate or listen in, its hearings have not been "open to the public."

192.     FACA further requires that "timely notice of each such meeting shall be published in the Federal Register, and the Administrator shall prescribe regulations to provide for other types of public notice . . . ." *Id.* § 10(a)(2).

193.     In order to provide "timely notice," the Commission's notice must be published in the Federal Register at least 15 days prior to the hearing, and must include: (1) the name of the advisory committee; (2) the time, date, and place of the hearing; (3) a summary of the agenda and topics to be discussed; (4) a statement of whether any parts of the meeting will be closed, along with an explanation for such closure; and (5) contact information for a designated officer for those who wish to learn more information. 41 C.F.R. § 102-3.150(a).

194.     The Commission has a nondiscretionary duty to publish notice of its meetings and hearings in the Federal Register at least 15 days prior to any such meeting or hearing.

195.    Defendants have failed to provide timely notice of any of the Commission's hearings.

196.    Defendants have failed to otherwise provide public notice of any kind for any of the hearings conducted to date.

197.    FACA also requires that "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports." 5 U.S.C. app. 2 § 10(b).

198.    Defendants thus have a nondiscretionary duty to make all documents "available to or prepared for or by" the Commission, including meeting agendas, witness bios, hearing transcripts, and record evidence, available to the public.

199.    Defendants have failed to make all necessary documents publicly available.

**COUNT IV**
**Administrative Procedure Act; 5 U.S.C. § 706**
**Appointment of Commissioners and Public Notice and Access in Violation of FACA**

200.    Plaintiff incorporates the allegations in paragraphs 1-166 by reference as if fully set forth herein.

201.    Defendant Barr is the agency head responsible for appointing members to the Commission.

202.    FACA requires that Defendant Barr ensure that the membership of the Commission is "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee." 5 U.S.C. app. 2 § 5(b)(2).

203.    Defendant Barr has appointed members that are exclusively from a law enforcement background. Not a single member of the commission is a defense attorney, criminologist or other relevant academic, public-health practitioner, corrections officer, mental health or addiction-recovery treatment provider, offender reentry coordinator, social worker, or formerly incarcerated individual. Not a single member of the commission represents a civil rights organization, a community-based organization, a labor or business group, or a religious institution, or has experience in studying or working on issues of police violence against vulnerable communities.

204.    FACA requires that Defendant Barr, as head of the agency to which the Commission reports, "designate a Federal officer . . . to be the [Designated Federal Officer]" for the Commission, 41 C.F.R. § 102-3.120.

205.    Defendant Barr has not appointed a DFO for the Commission.

206.    FACA requires that "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at . . . the agency to which the advisory committee reports until the advisory committee ceases to exist."

207.    Defendant DOJ has failed to ensure that the documents made available to, prepared for, or prepared by the Commission are available through its offices.

208.    By violating FACA, Defendant Barr and Defendant DOJ are (a) acting without observance of procedure required by law; and (b) acting in a manner that is arbitrary, capricious, and contrary to law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (B) and (D).

209.    Defendants' violations of FACA and the APA have injured Plaintiff by limiting Plaintiff's ability and right to have a representative voice on the Commission on an issue with which Plaintiff is engaged.

210.    These injuries to Plaintiff are likely to continue as long as Defendants continue to operate and direct the operation of the Commission out of compliance with FACA.

Each of these failures to comply with FACA's requirements constitutes final agency action under the APA. 5 U.S.C. § 706.

**COUNT V**
**Declaratory Judgment Act, 28 U.S.C. § 2201**
**Defendants Are in Violation of FACA**

211.    Plaintiff incorporates the allegations in paragraphs 1-166 by reference as if fully set forth herein.

212.    Where statutory duties are violated, courts may also act pursuant to the Declaratory Judgment Act, including as an alternative or in addition to granting mandamus relief. *Citizens for Responsibility & Ethics in Wash. v. Cheney*, 593 F. Supp. 2d 194, 222 (D.D.C. 2009).

213.    All Commission hearings must be noticed in advance in the Federal Register; by conducting at least four hearings, without notice, Defendants have violated § 10(a)(2) of FACA.

214.    All meetings of the Commission, including those conducted through an electronic medium, must be open to the public; by failing to grant public access to its hearings, Defendants have violated § 10(a)(1), (3) of FACA.

215.    By not ensuring that the "membership of the advisory committee . . . be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee," Defendant Barr has violated § 5(b)(2) of FACA.

216.    By failing to make any "appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the

appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment," Defendants have violated § 5(b)(3) of FACA.

217.    By undertaking Commission hearings prior to filing of the Commission charter, Defendants have violated § 9(c) of FACA.

218.    By failing to make available all "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by" the Commission Defendants violate § 10(b) of FACA.

219.    By failing to make transcripts of each Commission hearing available, Defendants have violated § 11 of FACA.

220.    Plaintiff is entitled to a declaration under 28 U.S.C. § 2201 that the foregoing conduct violates FACA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment in its favor and against Defendants, and:

a.  Declare that Defendant Presidential Commission on Law Enforcement and the Administration of Justice is an advisory committee subject to the requirements of the Federal Advisory Committee Act, 5 U.S.C. app. 2 §§ 1-16;

b.  Declare that Defendants have violated FACA by (1) failing to ensure that the Commission's membership is fairly balanced and without undue influence; (2) failing to file an advisory committee charter with all required entities; (3) failing to appoint necessary officers for oversight; (4) failing to provide members of the public with timely notice of the Commission's hearings; and (5) failing to make

agendas, minutes, transcripts, witness bios, and other record evidence available to the public;

c.   Declare the Commission is not properly constituted and any report or recommendation does not reflect the views of a lawfully constituted advisory committee.

d.   Permanently enjoin Defendants Keith, Sullivan, and the Commission, and all of its working groups, from holding further meetings, sessions, or hearings, or conducting any official business whatsoever on behalf of the Commission, whether remotely or in person;

e.   Permanently enjoin Defendants Barr, DOJ and the Commission from submitting, accepting, publishing, employing, or relying upon any report or recommendations produced by the Presidential Commission on Law Enforcement and the Administration of Justice for any official purpose whatsoever, directly or indirectly; and

f.   Grant such other relief as may be just and proper.

Dated:      April 30, 2020
              New York, NY                 Respectfully submitted,

                                     /s/ Samuel Spital
                                     Samuel Spital, Bar No. SS4839
                                     Natasha C. Merle*
                                     Ashok Chandran*
                                     **NAACP LEGAL DEFENSE &**
                                   **EDUCATIONAL FUND, INC.**
                                   40 Rector St., 5th Floor
                                   New York, NY 10006
                                   Tel.: (212) 965-2200
                                   Fax.: (212) 226-7592
                                   sspital@naacpldf.org
                                   nmerle@naacpldf.org
                                   achandran@naacpldf.org

                                   *pro hac vice application forthcoming*