**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.,

      Plaintiff,

  v.

WILLIAM P. BARR, in his official capacity
as Attorney General of the United States,

UNITED STATES DEPARTMENT OF
JUSTICE, an agency of the United States,

PRESIDENTIAL COMMISSION ON LAW
ENFORCEMENT AND THE
ADMINISTRATION OF JUSTICE, an
advisory committee established and utilized
by Attorney General William Barr,

PHIL KEITH, in his official capacity as
Chair of the Presidential Commission on Law
Enforcement and the Administration of
Justice, and

KATHARINE SULLIVAN, in her official
capacity as Vice Chair of the Presidential
Commission on Law Enforcement and the
Administration of Justice,

      Defendants.

Civil Action No. 20-1132 (JDB)

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................. iv

PRELIMINARY STATEMENT ............................................................................ 1

FACTUAL BACKGROUND ................................................................................ 2

I.      ESTABLISHMENT OF THE COMMISSION ........................................ 2

II.     THE COMMISSIONS'S OPERATIONS ................................................. 3

LEGAL STANDARD ........................................................................................... 4

ARGUMENT ....................................................................................................... 6

I.      THE COMMISSION IS AN "ADVISORY COMMITTEE" SUBJECT TO FACA ........ 7

        A.      The Commission Has Sufficient Structure and Formality to Constitute an
                Advisory Committee. ........................................................................ 8

        B.      Defendant Barr "Established" the Commission. ................................. 8

        C.      None of the FACA's Exceptions Apply to the Commission. ............. 9

        D.      The Commission Is Not an "Intergovernmental" Committee Exempt
                from FACA. ...................................................................................... 10

                1.      The Commission's Meetings are Not Held "Exclusively Between"
                        Covered Officials. ................................................................ 11

                2.      The Commission's Hearings and Substantive Areas of Inquiry Are
                        Not Solely Related to the Management or Administration of Federal
                        Programs .............................................................................. 14

II.     THE COMMISSION'S COMPOSITION AND OPERATIONS VIOLATE FACA ........ 18

        A.      No Genuine Factual Dispute Exists That the Commission's Membership Is
                Not "Fairly Balanced." ..................................................................... 18

        B.      There Is No Genuine Factual Dispute that the Commission Has Failed to
                Comply with the Federal Oversight Requirements of FACA. ............ 24

1.    The Commission Has Not Filed Its Charter with Necessary Entities ........................................................................................... 24

2.    The Commission Does Not Employ a Designated Federal Official. ........ 25

C.    The Commission Has Failed to Provide Adequate Notice of any of its Hearings in the Federal Register. ................................................................. 26

CONCLUSION ............................................................................................................. 28

## **TABLE OF AUTHORITIES**

**PAGE(S)**

## **CASES**

*Akzo-Nobel, Inc. v. United States*,
   No. 00-30834, 2001 WL 34772206 (5th Cir. May 25, 2001) ..................................................25

*Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*,
   541 F. Supp. 2d 95 (D.D.C. 2008) ........................................................................................24

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*,
   997 F.2d 898 (D.C. Cir. 1993) ...............................................................................................7

*Cargill, Inc. v. United States*,
   173 F.3d 323 (5th Cir. 1999) ................................................................................................25

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ................................................................................................................5

*Clean Air Carolina. Nat. Res. Def. Council, Inc. v. U.S. Dep't of Transp.*,
   No. 17-5779, 2017 WL 5157469 (S.D.N.Y. Sept. 14, 2017) ..................................................5

*Ctr. for Arms Control & Non-Proliferation v. Lago*,
   No. 05-682, 2006 WL 3328257 (D.D.C. Nov. 15, 2006), *aff'd sub nom. Ctr.
   for Arms Control & Non-Proliferation v. Pray*, 531 F.3d 836 (D.C. Cir. 2008) ......................1

*Duncan v. Walker*,
   533 U.S. 167 (2001) ..............................................................................................................15

*Elec. Privacy Info. Ctr. v. Drone Advisory Comm.*,
   369 F. Supp. 3d 27 (D.D.C. 2019) ........................................................................................26

*Freedom Watch, Inc v. Obama*,
   807 F. Supp. 2d 28 (D.D.C. 2011) ..........................................................................................8

*Freedom Watch, Inc. v. Obama*,
   930 F. Supp. 2d 98 (D.D.C. 2013), *aff'd*, 559 F. App'x 1 (D.C. Cir. 2014) ...........................8

*Heartwood, Inc. v. U.S. Forest Serv.*,
   431 F. Supp. 2d 28 (D.D.C. 2006) ..........................................................................................9

*Herron v. Fannie Mae*,
   No. 10-943, 2012 WL 13042852 (D.D.C. Mar. 28, 2012) ......................................................6

*Idaho Wool Growers Ass'n v. Schafer*,
   637 F. Supp. 2d 868 (D. Idaho 2009) ..............................................................................11, 12

iv

## **TABLE OF AUTHORITIES**
(CONTINUEED)

**PAGE(S)**

## **CASES**

*Judicial Watch, Inc. v. U.S. Dep't of Commerce*,
    736 F. Supp. 2d 24 (D.D.C. 2010) .......................................................................9, 10

*Kennedy-Jarvis v. Wells*,
    195 F. Supp. 3d 230 (D.D.C. 2016) .............................................................................6

*United States ex rel. Landis v. Tailwind Sports Corp.*,
    234 F. Supp. 3d 180 (D.D.C. 2017) .............................................................................5

*Miccosukee Tribe of Indians of Fla. v. Southern Everglades Restoration All.*,
    304 F.3d 1076 (11th Cir. 2002) ...................................................................................9

*Miccosukee Tribe of Indians of Fla. v. United States*,
    No. 08-21747-CIV, 2008 WL 11332079 (S.D. Fla. Sept. 26, 2008) .......................11

*Mickelsen Farms, LLC v. Animal & Plant Health Inspection Serv.*,
    No. 15-0143, 2018 WL 4259225 (D. Idaho Sept. 6, 2018) .....................................26

*Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Private Sector Survey on
    Cost Control*,
    711 F.2d 1071 (D.C. Cir. 1983) .....................................................................18, 19, 20

*Nw. Forest Res. Council v. Espy*,
    846 F. Supp. 1009 (D.D.C. 1994) .............................................................................27

*Physicians for Soc. Responsibility v. Wheeler*,
    956 F.3d 634 (D.C. Cir. 2020) ...................................................................................19

*Pub. Citizen v. U.S. Dep't of Justice*,
    491 U.S. 440 (1989)......................................................................................................9

*Seifert v. Winter*,
    555 F. Supp. 2d 3 (D.D.C. 2008) .................................................................................6

*Shelby Cty. v. Holder*,
    270 F.R.D. 16 (2010) ....................................................................................................5

*Union of Concerned Scientists v. Wheeler*,
    954 F.3d 11 (1st Cir. 2020).........................................................................................19

*W. Org. of Res. Councils v. Bernhardt*,
    362 F. Supp. 3d 900 (D. Mont. 2019) ........................................................................27

## TABLE OF AUTHORITIES
### (CONTINUEED)

**PAGE(S)**

**CASES**

*Western Org. of Res. Councils v. Bernhardt*,
   412 F. Supp. 3d 1227 (D. Mont. 2019)....................................................................25

**STATUTES**

2 U.S.C. § 1534(b) ............................................................................................... *passim*

5 U.S.C. app. §§ 1–16............................................................................................ *passim*

**REGULATIONS**

41 C.F.R. § 102-3.60(b)(3) ...............................................................................19, 20

41 C.F.R. § 102-3.70(a)(3)–(4)..................................................................................24

41 C.F.R. § 102-3.120.................................................................................................25

41 C.F.R. § 102-3.150(a) ...........................................................................................27

41 C.F.R. § 102-3.150(a)(5).......................................................................................25

41 C.F.R. § 102-3.150(b) ...........................................................................................27

**RULES**

Fed. R. Civ. P. 56, 2010 advisory committee note .......................................................5

Fed. R. Civ. P. 56, 2009 advisory committee note .......................................................5

Fed. R. Civ. P. 56(a) ....................................................................................................4

**OTHER AUTHORITIES**

*Commissioners*, U.S. Dep't of Justice, https://www.justice.gov/ag/presidential-
   commission-law-enforcement-and-administration-justice/commissioners (last
   updated Apr. 9, 2020) .............................................................................................10

Dep't of Health & Hum. Servs., *The Federal Advisory Committee Act and the*
   *UMRA Section 204 Exemption: Department of Health and Human Services*
   *(HHS) Frequently Asked Questions* 4,
   https://www.cdc.gov/tribal/documents/tac/HHS-UMRA-FACA-EXEMPT-
   GROUP-FAQs-508.pdf (last updated Mar. 11, 2019)...............................................12

**TABLE OF AUTHORITIES**
(CONTINUEED)

**PAGE(S)**

**OTHER AUTHORITIES**

Exec. Order 11,236, 30 Fed. Reg. 9,349 § 2 (July 23, 1965) ........................................................23

Exec. Order 13,896 .................................................................................................... *passim*

Press Release 20-401, Dep't of Justice, Off. of Public Affairs, President's
Commission on Law Enforcement and the Administration of Justice
Completes Teleconferences on Crime Reduction and Begins Hearing on
Reentry (Apr. 27, 2020), https://www.justice.gov/opa/pr/president-s-
commission-law-enforcement-and-administration-justice-completes-
teleconferences .....................................................................................................................14

U.S. Dep't of Justice, *Presidential Commission on Law Enforcement and the
Administration of Justice*, https://www.justice.gov/ag/presidential-
commission-law-enforcement-and-administration-justice (last visited May 28,
2020) .......................................................................................................................................26

*Unfunded Mandates Reform Act*, U.S. Gen. Servs. Admin.,
https://www.gsa.gov/policy-regulations/policy/federal-advisory-committee-
management/legislation-and-regulations/unfunded-mandates-reform-act (last
updated Feb. 26, 2019) ..........................................................................................................11

## PRELIMINARY STATEMENT

Congress passed the Federal Advisory Committee Act ("FACA") in 1972 in response to a proliferation of opaque committees used to shape federal policy. One of FACA's principal objectives is to ensure "that Congress and the public remain apprised of the[] existence, activities, and cost" of any federal advisory committees. *Ctr. for Arms Control & Non-Proliferation v. Lago*, No. 05-682, 2006 WL 3328257, at *2 (D.D.C. Nov. 15, 2006), *aff'd sub nom. Ctr. for Arms Control & Non-Proliferation v. Pray*, 531 F.3d 836 (D.C. Cir. 2008). FACA imposes both substantive and procedural requirements on the operations of all advisory committees covered by the statute. They must: be "fairly balanced" in the viewpoints represented, provide timely public notice of any meetings or hearings held, and subject themselves to congressional oversight by filing their charters with the relevant committees of the Senate and of the House of Representatives and the Library of Congress, and by designating a federal officer to convene meetings and serve as a contact for interested members of the public to stay apprised of the committee's work. *See generally* 5 U.S.C. app. §§ 1–16.

At President Trump's direction, Attorney General Barr created the Presidential Commission on Law Enforcement and the Administration of Justice (the "Commission") through an internal memorandum titled Implementation Memorandum for Heads of Department ("Implementation Memo") on January 21, 2020. He tasked the Commission with addressing a wide range of issues related to law enforcement in this country. The Commission's own documents and public records make clear that it is subject to FACA's requirements. Nevertheless, it is operating in direct violation of each of the requirements set forth above.

The Commission's composition is anything but fairly balanced; all of the Commission's members are current or former law enforcement officials, and many have expressed strong opposition to police accountability measures and criminal justice reform. The Commission does

1

not include any civil rights organizations, such as Plaintiff, that work on issues of police violence against vulnerable communities and focus on criminal justice and law enforcement reform. Not one of the Commission's dozens of meetings have been noticed in the Federal Register, as the statute requires—let alone within the requisite time frame. Nor has the Commission filed its charter with all required entities or designated a federal officer to ensure adequate oversight.

The Commission is openly violating several of FACA's requirements—simply because Defendant Barr has declared that the Commission "is not intended to be subject to either the Federal Advisory Committee Act or Administrative Procedure Act." Implementation Memorandum for Heads of Department at 7 ("Implementation Memo" or "Ex. 2") (attached as Exhibit 2 to the Declaration of Natasha C. Merle, sworn to on May 28, 2020, and filed herewith). But the Attorney General cannot unilaterally rewrite FACA's coverage: the Commission is precisely the type of advisory committee to which the statute clearly applies.

There can be no genuine dispute of material facts that the Commission is subject to FACA and has failed to comply with its requirements. Judicially noticeable records establish that the Commission is not fairly balanced, has not provided timely notice in the Federal Register, and has not published a charter or designated a federal officer for the Commission. Thus, Plaintiff is entitled to summary judgment.

## FACTUAL BACKGROUND

### I.    ESTABLISHMENT OF THE COMMISSION

On October 28, 2019, President Donald J. Trump signed Executive Order 13,896, directing Attorney General Barr to establish the Commission. Exec. Order 13,896 § 2(a). The Executive Order made clear that the Commission's work would be directed and facilitated by the Department of Justice: it empowered Defendant Barr to "determine the composition of and procedures for the functioning of the Commission," and facilitate the Commission's work using "resources and

personnel of the Department of Justice." *Id.* §§ 2(b), 3(e). Attorney General Barr's Implementation Memo acknowledges that the Commission "serves exclusively to advise the Attorney General and the President." Implementation Memo at 7.

Defendant Barr exercised this authority on January 21, 2020. He established the Commission and, consistent the terms of the Executive Order, determined its membership and procedures. Defendant Barr appointed eighteen members to the Commission, including a Chair, and determined fifteen subject areas for the Commission's study. Implementation Memo at 3–6. These issues include social problems impacting public safety, police officer health, reduction of crime, victim services, re-entry programs and initiatives, and homeland security. *Id.* at 4–6. And finally, Defendant Barr ordered the Commission to prepare a report of its findings and recommendations by October 28, 2020. *Id.* at 6.

## II.      THE COMMISSION'S OPERATIONS

The Commission began holding hearings on February 27, 2020. This coincided with a post on the Commission's website offering interested members of the public, such as Plaintiff, the opportunity to submit comments regarding any aspect of the Commission's work through May 31, 2020. Dixon Decl.[1] ¶ 6. As of March 13, 2020, this deadline remained unchanged. *Id.* ¶ 7 & Ex. A. However, on March 28, 2020, LDF learned that the Commission abruptly shortened the comment window by two months, requiring all submissions to be made by March 31, 2020. *Id.* ¶ 8. The shortened deadline was not posted in the Federal Register, nor was it otherwise affirmatively communicated to stakeholders; Plaintiff only learned of the new deadline by chance, when it checked the Commission's website. *Id.*

---

[1] Citations to "Dixon Decl." refer to the Declaration of Monique L. Dixon, sworn to on May 28, 2020, and filed herewith.

On March 31, 2020, Plaintiff submitted a letter to the Commission, raising objections about the Commission's lack of balance and its failure to provide meaningful opportunities for transparency, public engagement, or accountability. *Id.* ¶ 9 & Exs. B, C.[2] LDF also expressed its concern that the comment window had been inexplicably shortened, without notice and in the middle of the Coronavirus Disease – 2019 ("COVID-19") pandemic that continues to sweep across the nation, by two full months. *Id.* Finally, LDF urged the appointment of additional Commission members to include academics, representatives of civil rights organizations, individuals directly impacted by policing practices, and public health experts. *Id.*

On April 14, 2020, Defendants Keith and Sullivan responded to LDF in a one-paragraph letter stating that the public comment window had been re-opened to allow for submissions until April 30, 2020. *Id.* ¶¶ 10–11 & Ex. D. But this new deadline for public comment was not posted on the Commission's official website, *id.* ¶ 12, nor was it entered in the Federal Register.

The Commission's first hearing was held on February 27, 2020. Since that date, the Commission has held seven hearings over 25 days. Along with Commission members, these hearings have included many private citizens as participants, including individuals who work in law enforcement advocacy organizations, academics who study mental health, and children's social services organizations. *See infra* at 16–18. These hearings have included substantive discussions on a wide range of topics, including state-level legislative advocacy, how Alcoholics Anonymous meetings should be conducted during a pandemic, and whether the anti-overdose medication naloxone should be widely available. *See infra* at 20–21.

---

[2] Plaintiff submitted a second comment letter on April 29, and filed corrected versions of both the March 31 and April 29 letters on May 20, 2020.

**LEGAL STANDARD**

Summary judgment is appropriate when the pleadings and evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Entry of judgment need not wait till discovery, or even for a responsive pleading; a motion for summary judgment may be made "at any time, even as early as the commencement of the action." Fed. R. Civ. P. 56, 2009 advisory committee note; *accord Shelby Cty. v. Holder*, 270 F.R.D. 16, 17 n.1 (2010). And such judgment is appropriate where undisputed facts in the public record establish part or all of a plaintiff's claim, leaving only a question of law for the court. As such, "early summary judgment motion practice is routine" in cases in which a plaintiff is aggrieved by an agency action, such as for failing to abide by notice requirements. *Clean Air Carolina. Nat. Res. Def. Council, Inc. v. U.S. Dep't of Transp.*, No. 17-5779, 2017 WL 5157469, at *1 (S.D.N.Y. Sept. 14, 2017) (rejecting argument that pre-answer motion for summary judgment was premature). This court has similarly recognized that a pre-answer motion for summary judgment is appropriate when resolution of the motion turns on facts that are part of official government records. *See Shelby Cty.*, 270 F.R.D. at 19–21 (adjudicating pre-answer summary judgment motion when the case could be resolved based on the congressional record).

The burden on a party seeking summary judgment before the filing of a responsive pleading is no different than in any other summary judgment motion: it bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact as to each claim or defense on which it seeks judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Shelby Cty.*, 270 F.R.D. at 18.

It is well-settled that, in resolving a motion for summary judgment, the Court "may take judicial notice of public records . . . ." *Kennedy-Jarvis v. Wells*, 195 F. Supp. 3d 230, 234 n.2

(D.D.C. 2016). Such public records include documents published and maintained on federal agencies' official websites. *See, e.g.*, *Herron v. Fannie Mae*, No. 10-943, 2012 WL 13042852, at *1 (D.D.C. Mar. 28, 2012) (granting motion for judicial notice of documents maintained on agencies' websites because "the public records of federal agencies are a proper subject of judicial notice"); *Seifert v. Winter*, 555 F. Supp. 2d 3, 11 n.5 (D.D.C. 2008) (taking judicial notice of agency website and collecting authority on propriety of judicial notice of agency documents).

## <u>ARGUMENT</u>

The undisputed facts—including Defendants' own publications—establish Plaintiff is entitled to summary judgment. The Commission is plainly a "commission . . . established or utilized by one or more agencies . . . in the interest of obtaining advice or recommendations[.]" 5 U.S.C. app. § 3(2)(C). While certain committees may be exempt from FACA's requirements if they are "intergovernmental committees" comprised exclusively of elected governmental officials or their designees and focused solely on the management of existing federal programs that involve intergovernmental administration, the Commission is no such committee. Its meetings have included unelected participants and its discussions have gone far beyond the implementation of existing federal programs that share intergovernmental responsibilities or administration. Indeed, of the 15 topics the Commission is tasked to study, only one—grant programs—arguably pertains to the management of existing federal programs that share intergovernmental responsibilities and/or administration.

Similarly, there can be no dispute that Defendants are violating the requirements of FACA. The Commission's membership does not include the balanced viewpoints necessary to perform its broad function of studying law enforcement and the administration of justice. At a minimum, the Commission requires members, such as Plaintiff, who have sought to address police violence against vulnerable communities and study law enforcement reform.

Further, the Commission has violated the statute's notice, charter filing, and federal officer designation requirements. FACA's requirements are clear: an advisory committee may not meet or take any action without a properly filed charter and a designated federal officer to facilitate public involvement in the committee's operations. Nor may an advisory committee meet without providing timely notice in the Federal Register. Yet this is precisely what the Commission has done for months—and continues to do, as Defendants' own public documents make clear.[3]

## I.     THE COMMISSION IS AN "ADVISORY COMMITTEE" SUBJECT TO FACA

By its plain terms, FACA applies to any "committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof" that is "established or utilized by" a federal agency. 5 U.S.C. app. § 3(2). In determining whether a body constitutes an "advisory committee" under the statute, courts consider two threshold questions: first, whether the group has sufficient formality and structure to constitute a defined "group," and second, the degree of involvement the agency has in creating or directing the work of the group. *See generally Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 914 (D.C. Cir. 1993). If both conditions are met, the committee may only be excused from complying with FACA if it can demonstrate that it fits within the narrow exceptions contained in FACA itself, or if it is an "intergovernmental committee" as defined in the Unfunded Mandates Reform Act ("UMRA"). *See* 5 U.S.C. app. § 3(2); 2 U.S.C. § 1534(b).

Public record evidence demonstrates that the Commission is a structured and formal entity designed to produce a formal report containing recommendations for executive policy. The

---

[3] Because of the importance of resolving this case on an expedited basis, Plaintiff seeks pre-answer summary judgment based on judicially noticeable facts. Plaintiff reserves all rights to seek discovery on all claims while this motion is pending. If the Court denies this motion in whole or in part, Plaintiff reserves its right to seek further discovery on any issue on which the Court finds the existence of material factual disputes.

evidence also demonstrates that the Commission fits within neither FACA's own exception nor the safe harbor provided by the UMRA.

A.      **The Commission Has Sufficient Structure and Formality to Constitute an Advisory Committee.**

Three criteria are relevant to determining whether a group has the formality and structure necessary to be deemed an advisory group, including whether it has: "1) an organized structure, 2) a fixed membership, and 3) a specific purpose." *Freedom Watch, Inc. v. Obama*, 930 F. Supp. 2d 98, 101 (D.D.C. 2013), *aff'd*, 559 F. App'x 1 (D.C. Cir. 2014) (internal quotation marks omitted). The Commission plainly meets all three criteria.

In his memorandum establishing the Commission, Attorney General William Barr created an organizational hierarchy, with a clear division of responsibilities for various individuals. *See* Implementation Memo at 2–4. The Commission includes members who participate in each hearing. *Id.* It is also empowered the Commission to create working groups to study specific issues. *Id.* Defendant Barr also delineated the questions for the Commission to study, after which it is expected to prepare a formal report with its conclusions and recommendations. *Id.* at 4–6. This is more than enough to establish that the Commission is sufficiently formal and structured to constitute an advisory committee. *See, e.g.*, *Freedom Watch, Inc v. Obama*, 807 F. Supp. 2d 28, 34–35 (D.D.C. 2011) (finding that group's fixed membership and issue area of focus—health care reform—was enough, even without organizational structure or public meetings, to constitute an advisory committee under FACA).

B.      **Defendant Barr "Established" the Commission.**

An agency head "establishes" an advisory committee when he or she directly forms it. *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 736 F. Supp. 2d 24, 32 (D.D.C. 2010) (quoting *Food Chem. News v. Young*, 900 F.2d 328, 332 (D.C. Cir. 1990)). Courts take "an expanded sense

of the word 'established'" for purposes of determining a committee's obligations under FACA. *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 462 (1989); *accord Miccosukee Tribe of Indians of Fla. v. Southern Everglades Restoration All.*, 304 F.3d 1076, 1085 (11th Cir. 2002) (giving "established" a "broad understanding" and rejecting "restrictive, artificial" limitations on its meaning). As such, this Court has held that an agency "establishes" an advisory committee within the meaning of FACA when it "identifie[s] the members of the team, contract[s] directly with them for their services, pa[ys] them, and provide[s] them with initial questions to answer." *Heartwood, Inc. v. U.S. Forest Serv.*, 431 F. Supp. 2d 28, 34 (D.D.C. 2006).

There can be no dispute that Attorney General Barr and the Department of Justice "established" the Commission. In Executive Order 13,896, President Trump directed Defendant Barr, in his capacity as Attorney General, to "establish" the Commission, including by "determin[ing] the composition of and procedures for" the Commission." Exec. Order 13,896 § 2(a), (b). Defendant Barr then exercised his authority as Attorney General, appointing the eighteen members of the Commission, creating a hierarchy of leadership for the Commission, and creating fifteen working groups to study specific questions. Implementation Memo at 2–6. Indeed, Defendant Barr himself has recognized his establishment of the Commission. *Id.* at 1 ("The [Executive] Order empowers the Attorney General to *establish the Commission and determine its membership and procedures*. . . . This memorandum undertakes these actions consistent with the terms of the Order." (emphasis added)).

## C. None of the FACA's Exceptions Apply to the Commission.

Because the Commission is a structured advisory group established by Department of Justice, FACA's requirements apply unless the Commission fits within one of its "narrow statutory exceptions[.]" *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 736 F. Supp. 2d 24, 28 (D.D.C. 2010). As relevant here, FACA exempts from the definition of "advisory committee" two types of

groups: "(i) any committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government, and (ii) any committee that is created by the National Academy of Sciences or the National Academy of Public Administration." 5 U.S.C. app. § 3(2).

The Commission does not fall within either of these exceptions. Eleven of the Commission's eighteen members—over half—are from state and local law enforcement agencies. *See* Implementation Memo at 3–4.[4] These eleven Commissioners are serving "in their official capacities"—i.e., in their capacities as *state and local* officials. Exec. Order 13,896 § 2(d). And neither the National Academy of Sciences nor the National Academy of Public Administration have been involved in the creation of the Commission, which is. *See generally* Exec. Order 13,896 § 2(a) (directing only the Attorney General to establish the Commission); Implementation Memo at 1.

### D. The Commission Is Not an "Intergovernmental" Committee Exempt from FACA.

Documents published by Defendants on the Commission's official website make clear that the Commission does not—and cannot—meet the requirements of the FACA exemption for intergovernmental committees under the UMRA. The UMRA exemption's purpose is narrow: to facilitate intergovernmental consultations on federal regulations by "promot[ing] the free communication between the federal government and state, local, and tribal governments."[5] To qualify as a FACA-exempt "intergovernmental" committee under the UMRA, a committee must

---

[4] These eleven Commission members are: James Clemmons Jr., Frederick Frazier, Robert Gualtieri, Gina Hawkins, Ashley Moody, Nancy Parr, Craig Price, Gordon Ramsay, David Rausch, John Samaniego, and James Smallwood Implementation Memo at 3 –4; *Commissioners*, U.S. Dep't of Justice, https://www.justice.gov/ag/presidential-commission-law-enforcement-and-administration-justice/commissioners (last updated Apr. 9, 2020).

[5] *Unfunded Mandates Reform Act*, U.S. Gen. Servs. Admin., https://www.gsa.gov/policy-regulations/policy/federal-advisory-committee-management/legislation-and-regulations/unfunded-mandates-reform-act (last updated Feb. 26, 2019).

satisfy a two-part test set forth in 2 U.S.C. § 1534(b): its meetings must be held *exclusively* between federal officials and state, local, or tribal elected officials (or their designees), *and* it must be convened *solely* to discuss Federal programs that "explicitly or inherently share intergovernmental responsibilities or administration[.]" (emphasis added). Public records maintained on the Department of Justice's website—and thus subject to judicial notice by this Court—clearly demonstrate that the Commission cannot satisfy either part of this test.

> 1.    The Commission's Meetings are Not Held "Exclusively Between" Covered Officials.

First, to invoke this exemption, an intergovernmental committee's meetings must be "held *exclusively between* Federal officials and elected officers of State, local, and tribal governments (or their designated employees with authority to act on their behalf) acting in their official capacities[.]" 2 U.S.C. § 1534(b)(1) (emphasis added). Reflecting the UMRA exemption's narrow purpose, courts interpreting § 1534(b)(1) have emphasized the high bar for its applicability. *See, e.g.*, *Idaho Wool Growers Ass'n v. Schafer*, 637 F. Supp. 2d 868, 876 (D. Idaho 2009) (holding that a single non-covered meeting participant was sufficient to defeat the UMRA exemption); *Miccosukee Tribe of Indians of Fla. v. United States*, No. 08-21747-CIV, 2008 WL 11332079, at *3 n.2 (S.D. Fla. Sept. 26, 2008) (observing that the UMRA exemption would apply *only if* "the various scientists and engineers [who participated in committee meetings] were *all* affiliated with State, local, and/or tribal governments and . . . had authority to act on behalf of their respective government employers") (emphasis added). A court considering the UMRA exemption "cannot ignore" Section 1534(b)(1)'s "clear limiting requirement." *Idaho Wool Growers*, 637 F. Supp. 2d at 876 n.10.

Other federal agencies have conformed within the clear narrow parameters of UMRA when holding intergovernmental meetings. For example, the U.S. Department of Health and Human

Services ("HHS") has published FAQs specifying that members of the public who wish to attend the meetings of a federal-tribal intergovernmental committee "can only observe the meeting and not participate in any way . . . because the purpose of the UMRA exemption is to facilitate consultations exclusively between federal officials and elected tribal officials acting in their official capacities (or designated employees with authority to act on their behalf) on intergovernmental shared responsibilities."[6] And, although the HHS guidelines allow intergovernmental committee members to bring a "technical advisor" to meetings to provide them "discreetly and directly" with "non-disruptive" private counsel, such technical advisors "are not allowed to . . . speak to other members during the meeting." *Id.*

The Commission, by contrast, has included in all of its meetings except one participants who are neither "Federal officials[,]" "elected officers of State, local, and tribal governments[,]" nor "designated employees [of such elected officers] with authority to act on their behalf[.]" *See* 2 U.S.C. § 1534(b)(1). These non-covered individuals have provided testimony in Commission meetings, entered into verbal colloquies with Commission members, answered questions, and fully participated in the meetings.

It has been the Commission's normal practice to have non-covered individuals attend and actively participate in its hearings. For example, in both parts of the Commission's Hearing 2, conducted by teleconference, individuals participated who are not covered officials (nor their designees) under 2 U.S.C. § 1534(b)(1). During the first part of the hearing on March 24–26, such

---

[6] Dep't of Health & Hum. Servs., *The Federal Advisory Committee Act and the UMRA Section 204 Exemption: Department of Health and Human Services (HHS) Frequently Asked Questions* 4, https://www.cdc.gov/tribal/documents/tac/HHS-UMRA-FACA-EXEMPT-GROUP-FAQs-508.pdf (last updated Mar. 11, 2019).

participants included John Snook, CEO of Treatment Advocacy Center, Merle Decl.[7] Ex. 3 at 3–4, and Dr. Shannon Robinson, Principal of Health Management Associates, *id.* at 8–9. *See also* Merle Decl. Ex. 4. According to the transcripts published on the Commission's website, Mr. Snook and Dr. Robinson participated in the meetings by providing oral and written testimony and responding to questions from Commission members. Merle Decl. Ex. 5 at 8–12, 19, 21–22, 25, 27, 32, 36–38 (Snook); Merle Decl. Ex. 6 at 15–18, 23–26, 28–34 (Robinson). In addition, Jamila Bey, who identified herself as "one of the writers on the project," spoke during the March 24 hearing, asking questions of the panelists and interacting with the Commissioners. Merle Decl. Ex. 5 at 37–38. Ms. Bey stated that she was "writing on Mental Health," and that her questions related to "something I'm researching right now to put into the report." *Id.* at 38. She also discussed the possibility of "a legislation fix." *Id.* at 37.

During the second part of Hearing 2 on March 31–April 2, 2020, non-covered participants included John Ashmen, President of Citygate Network, Merle Decl. Ex. 7 at 3–4; and Carson Fox, CEO of the National Association of Drug Court Professionals, *id.* at 11. *See also* Merle Decl. Ex. 8. According to the April 2, 2020 meeting transcript, Mr. Fox participated in the Commission's meeting by providing oral testimony and responding to questions from Commission members. Merle Decl. Ex. 9 at 4–7, 18–20, 24–27, 31–34. Defendants have not yet provided the transcript of Mr. Ashmen's testimony to the public.

Similarly, during the Commission's Hearing 3 on crime reduction, held by teleconference in three parts on April 7–9, 14–16, and 21–22, numerous individuals who are not covered officials (nor their designees) under 2 U.S.C. § 1534(b)(1) participated in the meetings. Such participants

---

[7] Citations to "Merle Decl." refer to the Declaration of Natasha C. Merle, sworn to on May 28, 2020, and filed herewith.

included Kim Garrett, CEO of Palomar, Merle Decl. Ex. 10 at 3–4; Chuck Cohen, Vice President

of the National White Collar Crime Center, *id.* at 11; Joyce Bilyeu, Director of Client Services for

the Sacramento Regional Family Justice Center;[8] Adrianna Griffith, SA/DV Specialist/Lived

Experience Expert for the Women's Center - Youth and Family Services, *id.*; and Natasha

Alexenko, Founder of Natasha's Justice Project. *Id.*

According to transcripts published on the Commission's website, Ms. Garrett, Ms. Griffith,

and Ms. Alexenko participated in the Commission's meetings by providing oral testimony and

responding to questions. Merle Decl. Ex. 11 at 9–14, 27, 30–31 (Garrett); Merle Decl. Ex. 12 at

16–24, 36–38 (Griffith); *id.* at 29–35, 38–40 (Alexenko). Mr. Cohen and Ms. Bilyeu provided oral

testimony during the meetings but did not receive questions. Merle Decl. Ex. 13 at 12–16 (Cohen);

Merle Decl. Ex. 12 at 8–15 (Bilyeu).

Thus, the Commission's own records establish that its meetings are not "held exclusively

between" covered officials, as required by 2 U.S.C. § 1534(b)(1). For this reason alone, the UMRA

exception is inapplicable, and FACA applies to the Commission and its operations.

2.  *The Commission's Hearings and Substantive Areas of Inquiry Are Not Solely Related to the Management or Administration of Federal Programs.*

The Commission also fails the second prong of the UMRA exemption, which requires that

the committee's meetings must be held "*solely* for the purposes of exchanging views, information,

or advice *relating to the management or implementation of Federal programs* established pursuant

to public law that *explicitly or inherently share intergovernmental responsibilities or

administration*." 2 U.S.C. § 1534(b)(2) (emphasis added). This restrictive language is clear: the

---

[8] Press Release 20-401, Dep't of Justice, Off. of Public Affairs, President's Commission on Law Enforcement and the Administration of Justice Completes Teleconferences on Crime Reduction and Begins Hearing on Reentry (Apr. 27, 2020), https://www.justice.gov/opa/pr/president-s-commission-law-enforcement-and-administration-justice-completes-teleconferences.

committee's meetings must be "solely for" the covered purposes. *Id.* Section 1534(b)(2)'s plain text, like that of Section 1534(b)(1), calls for a straightforward reading that "give[s] effect" to all of its terms, including the limiting word "solely." *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (rejecting reading of statute that would render words superfluous).

Public documents make clear that the Commission does not meet Section 1534(b)(2)'s substantive limitation. In directing Defendant Barr to create the Commission, President Trump broadly stated that the Commission would be created to "study issues related to law enforcement and the administration of justice . . . and submit a report and recommendations to the President on actions that can be taken to prevent, reduce, and control crime, increase respect for the law, and assist victims." Exec. Order 13,896 § 3(a). Defendant Barr's Implementation Memo similarly defines the Commission's scope in broad terms, stating that "the Commission will focus on the national issues that most impact the efficacy of American law enforcement to safeguard the public and maintain a positive relationship with their communities." Implementation Memo at 1. The Implementation Memo explicitly situates the Commission as a successor to the 1965 President's Commission on Law Enforcement and Administration of Justice ("Katzenbach Commission"), tasking the Commission with "a modern fresh evaluation of the salient issues affecting American law enforcement and the communities they protect." *Id.*

Consistent with this expansive directive, Defendant Barr created working groups to study fifteen topics identified in the Implementation Memo; fourteen of those fifteen topics far exceed the UMRA exemption's permissible scope. *See id.* at 5–6.[9] For example, the working group titled

---

[9] Only one of the Commission's working groups, titled "Grant Programs" and tasked with "review[ing] the efficacy of federal grant programs in aiding state, local, and tribal law enforcement," would even arguably fall within the bounds of the two-part test's second prong. *Id.* at 4.

"Respect for Law Enforcement," according to the Implementation Memo, "shall focus on the trend of diminished respect for law enforcement and the laws they enforce." *Id.* at 5. The working group is also tasked with "evaluat[ing] how to increase respect for law enforcement, how to improve community relations, and how a lack of respect for law enforcement impacts public safety and the rule of law." *Id.* In addition, the "Business & Community Development" working group is instructed to "assess the role and influence of commercial businesses and community development organizations in fostering efforts to cultivate prosperous and safe communities." *Id.* These working groups and the subjects they are tasked with addressing for the Commission establish that the Commission's meetings are not held "solely for the purposes of exchanging views, information, or advice relating to the management or implementation of Federal programs[.]" 2 U.S.C. § 1534(b)(2).

Indeed, the Commission's meetings have included substantive discussions that are completely irrelevant to the management of federal programs, including advocacy for or against changes in federal and state law that could only be accomplished through legislation, purely local policy changes, and actions to be taken by the private sector. For example, during the Commission's hearings held to date, Commissioner Rausch mused about whether individuals with mental health issues and drug addictions should "go cold turkey" or practitioners should "try breaking them down off of this stuff," Merle Decl. Ex. 6 at 24; Commissioners Bowditch and Sullivan engaged in a colloquy with a panelist about state-level decriminalization of marijuana, *id.* at 9, 12–13; Commissioner Rausch asked how Alcoholics Anonymous programs should be conducted during a pandemic, Merle Decl. Ex. 14 at 22; Commissioner MacDonald expressed interest in passing state-level legislation instituting 24/7 treatment centers, *id.* at 23; and

Commissioner Samaniego asked a panelist "how effective the AA would be within a jail facility," *id.* at 25.

Further discussions unrelated to the management of federal programs include Commission Parr asking a panelist about "the red flag laws that are being passed by state legislatures around the country," Merle Decl. Ex. 1 at 19; Commissioner Moody expressing the belief that individuals with "multiple drug offenses" can only be "[kept] accountable" by "a judge and a court system, and the prospects of more stringent penalties," and "[t]hat this movement o[f] decriminalization as opposed to intensive treatment with divergence is dangerous," Merle Decl. Ex. 9. at 20–21; and Commissioner MacDonald expressing disapproval of state-level laws "reducing [drug] crimes to misdemeanor level," *id.* at 30. Commissioner Parr even expressed "great concern about the increased availability of Narcan," *id.* at 51, referring to the brand name of naloxone, a medication that can help reverse an opioid overdose. According to Commissioner Parr's statements during the April 2 meeting, "when it's been increased for almost anybody to be able to get Narcan, then there is no isolated world, there's no incentive for people who are overdosing at home or with their friend, if their loved ones and their friends are to have the Narcan, and just are going to revive them for that day because there's just going to be this ever ending cycle." *Id.*

None of these topics discussed at Commission hearings relate "solely" to the "management or implementation of Federal programs established pursuant to public law that explicitly or inherently share intergovernmental responsibilities or administration." 2 U.S.C. § 1534(b)(2). Thus, the Commission fails the second prong of the two-part test as well.

*      *      *

17

The public record evidence makes clear that there can be no material dispute that the Commission is an advisory committee that does not fall within the statutory exemptions of FACA or the protection provided by UMRA.

## II.    THE COMMISSION'S COMPOSITION AND OPERATIONS VIOLATE FACA

Because the Commission it subject to FACA, it must comply with the statute's safeguards to ensure its objectivity and transparency to the public. This requires, among other things, that the Commission's membership be "fairly balanced in terms of the points of view represented and the functions to be performed[,]" 5 U.S.C. app. § 5(b)(2); that the Commission file its operating charter with other branches of the federal government and appoint a designated federal officer to ensure adequate oversight, 5 U.S.C. app. §§ 9(c), 10(e); and that the Commission timely notice all of its meetings in the Federal Register, 5 U.S.C. app. § 10(a)(2). Public records confirm that the Commission does not comply with any of these requirements.

### A.    No Genuine Factual Dispute Exists That the Commission's Membership Is Not "Fairly Balanced."

The Commission's membership violates FACA's requirement that the Commission be, *inter alia*, "fairly balanced in terms of the points of view represented and the functions to be performed . . . ." 5 U.S.C. app. § 5(b)(2). The mandate of "balanced membership" applies "to all types of advisory committees," including the present Commission. *Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Private Sector Survey on Cost Control*, 711 F.2d 1071, 1073 n.1 (D.C. Cir. 1983). The primary purpose of FACA's "fairly balanced" requirement is "to ensure that persons or groups directly affected by the work of a particular advisory committee would have some representation on the committee." *Id.* at 1074 n.2 (citation omitted).

Thus, courts evaluating claims under FACA's "fairly balanced" mandate "consider the functions assigned to each individual committee in evaluating whether its balance is fair." *Union*

*of Concerned Scientists v. Wheeler*, 954 F.3d 11, 20 (1st Cir. 2020). Because "[t]he concepts of fairness, balance, and influence are not foreign to courts," the FACA's plain text provides meaningful standards by which to evaluate committee balance. *Id.* at 19. In addition, courts may review the balance of a committee's membership by applying the standards in FACA's implementing regulations. *Physicians for Soc. Responsibility v. Wheeler*, 956 F.3d 634, 643 (D.C. Cir. 2020). Notably, these implementing regulations require the committee's appointing authority to "ensure that, in the selection of members for the advisory committee, the [appointing authority] will consider a cross-section of those directly affected, interested, and qualified, as appropriate to the nature and functions of the advisory committee." 41 C.F.R. § 102-3.60(b)(3); *see also Nat'l Anti-Hunger Coal.*, 711 F.2d at 1074 n.2 (describing these provisions' purpose as ensuring "that persons or groups directly affected by the work of a particular advisory committee . . . have some representation on the committee").

Here, the Commission is "a deliberative body tasked with improving American policing." Implementation Memo at 2. Its function is to "study issues related to law enforcement and the administration of justice and make recommendations to the Attorney General, who shall submit a report and recommendations to the President on actions that can be taken to prevent, reduce, and control crime, increase respect for the law, and assist victims." *Id.* at 1 (quoting Exec. Order 13,896 § 3). The Commission's working groups also study a wide array of questions including "how to improve community relations," "the role and influence of . . . community development organizations in fostering efforts to cultivate prosperous and safe communities," and "the integration of education, employment, social services, and public health services into efforts to reduce crime and ease the burden on law enforcement, courts, and corrections systems." *Id.* at 5–6. Plaintiff and other civil rights organizations and the communities they represent are "directly

affected, interested, and qualified" in connection with all of these functions. *See* 41 C.F.R. § 102-3.60(b)(3); *Nat'l Anti-Hunger Coal.*, 711 F.2d at 1074 n.2.

A fair balance of viewpoints, in light of the Commission's assigned function, therefore, would require that a cross-section of civil rights groups, policing-reform advocates, community organizations, and other "persons or groups directly affected by [the Commission's work] have some representation on the committee." *Nat'l Anti-Hunger Coal.*, 711 F.2d at 1074 n.2. Yet, the Commission's membership includes no such perspectives.

Instead, the Commission's membership represents only one institutional viewpoint: that of law enforcement. Defendant Barr's Implementation Memo appointed the following 18 members to the Commission:

- o *Chair:* Phil Keith, Retired Police Officer and Director, Office of Community Oriented Policing Services;

- o *Vice Chair:* Katharine Sullivan, Principal Deputy Assistant Attorney General, Office of Justice Programs;

- o *Commissioners:*

  - David Bowdich, Deputy Director, Federal Bureau of Investigation;

  - James Clemmons, Sheriff of Richmond County, North Carolina;

  - Chris Evans, Chief of Operations, Drug Enforcement Administration;

  - Frederick Frazier, City Councilman at Large of McKinney, Texas;

  - Robert Gualtieri, Sheriff of Pinellas County, Florida;

  - Gina Hawkins, Chief of the Fayetteville, North Carolina Police Department;

  - Regina Lombardo, Acting Director, Bureau of Alcohol, Tobacco, Firearms, and Explosives;

  - Erica MacDonald, United States Attorney for the District of Minnesota;

  - Ashley Moody, Florida Attorney General;

  - Nancy Parr, Commonwealth's Attorney, Chesapeake, Virginia;

  - Craig Price, South Dakota Secretary of Public Safety;

  - Gordon Ramsay, Chief of the Wichita, Kansas Police Department;

20

- David Rausch, Director of the Tennessee Bureau of Investigation;

- John Samaniego, Sheriff of Shelby County, Alabama;

- James Smallwood, Police Officer, Metropolitan Nashville Police Department; and

- Donald Washington, Director, United States Marshals Service.

Implementation Memo at 3–4.

Biographical information published on the Commission's website identifies all 18 of these

Commission members as current or former law enforcement professionals. Specifically:

- **Thirteen (72%)** are current or former police officers, sheriffs, state troopers, or special agents;[10]

- **Six (33%)** are current officials in leadership positions of federal or state law enforcement agencies;[11] and

- **Five (28%)** are current or former prosecutors.[12]

---

[10] These 13 members include: Chair Phil Keith (retired police officer), Commissioner David Bowdich (former FBI special agent), Commissioner James Clemmons (Sheriff, Richmond County, NC), Commissioner D. Christopher Evans (former DEA special agent), Commissioner Frederick Frazier (police officer), Commissioner Robert Gualtieri (Sheriff, Pinellas County, FL), Commissioner Gina Hawkins (Chief of Police, Fayetteville, NC), Commissioner Regina Lombardo (former ATF special agent) Commissioner Craig Price (former state trooper and special agent), Commissioner Gordon Ramsay (Chief of Police, Wichita, KS), Commissioner David Rausch (former police officer), Commissioner John Samaniego (Sheriff, Shelby County, AL), and Commissioner James Smallwood (police officer). U.S. Dep't of Justice, *supra* note 3.

[11] These six members include: Commissioner David Bowdich (Deputy Director, FBI), Commissioner Chris Evans (COO, DEA; also listed above as a former DEA special agent), Commissioner Regina Lombardo (Acting Director, ATF; also listed above as a former ATF special agent), Commissioner Craig Price (Cabinet Secretary, SD Department of Public Safety; also listed above as a former state trooper), Commissioner David Rausch (Director, TN Bureau of Investigation; also listed above as a former police officer), and Commissioner Donald Washington (Director, United States Marshals Service). *Id.*

[12] These five members include: Vice Chair Katharine Sullivan (former state prosecutor), Commissioner Erica MacDonald (U.S. Attorney, D. Minn.), Commissioner Ashley Moody (former federal prosecutor), Commissioner Nancy Parr (Commonwealth's Attorney, Chesapeake, VA), and Commissioner Donald Washington (former U.S. Attorney, W.D. La.; also listed above as Director, United States Marshals Service). U.S. Dep't of Justice, *supra* note 3.

Of the Commission's 18 members, **none (0%)** represent a civil rights organization or community-based organization, such as Plaintiff, that focuses on law enforcement reform and advocates on behalf of impacted communities. In light of its function, this shortcoming renders the Commission's membership imbalanced and unfit for the function it has been directed to perform.

Defendants cannot dispute that the Commission's membership lacks a balance of diverse viewpoints and backgrounds, nor that such a balance is necessary to establish the Commission's functional competence. Indeed, in the Implementation Memo, Attorney General Barr recognized that "[a] diversity of backgrounds and perspectives is important for gaining an effective understanding of these problems and formulating sound solutions." *Id.* at 2. Further, in his statement concerning the Commission's formation, Defendant Barr was even clearer: "[I]t is important that we hear from voices and consult perspectives outside of law enforcement. Civil rights organizations, civic leaders, defense bar associations, victims' rights organizations, and community organizations, should and will help this important mission." Merle Decl. Ex. 16. Yet despite recognizing the importance of these varied perspectives, Defendant Barr did not select a single Commission member with any of these backgrounds.

Defendant Barr has specifically invoked the Katzenbach Commission as a model for the present Commission. Implementation Memo at 1. But this comparison only serves to underscore the extent to which the present Commission is imbalanced in its membership and unfit for its function.

The Katzenbach Commission was tasked with the similar the similar function of studying law enforcement in this country, as this Commission:

- Inquire into the causes of crime and delinquency, measures for their prevention, the adequacy of law enforcement and administration of justice, and the factors encouraging respect or disrespect for law, at the national, State, and local levels, and make such

studies, conduct such hearings, and request such information as it deems appropriate for this purpose.

- Develop standards and make recommendations for actions which can be taken by the Federal, State, and local governments, and by private persons and organizations, to prevent, reduce, and control crime and increase respect for law, including, but not limited to, improvements in training and qualifications of personnel engaged in law enforcement and related activities, improvements in techniques, organization, and administration of law enforcement activities, improvements in the administration of justice, improvements in correction and rehabilitation of convicted offenders and juvenile delinquents, promotion of better understanding between law enforcement officials and other members of the community, and promotion of greater respect for law throughout the community.

Exec. Order 11,236, 30 Fed. Reg. 9,349 § 2 (July 23, 1965).

In light of the complex function it was called to perform and the broad array of considerations relevant to the study of law enforcement policy, the Katzenbach Commission drew its members from diverse sources, each contributing to the balance of viewpoints represented on the commission and establishing its functional competence. The Katzenbach Commission's members included not only law enforcement professionals but also representatives of civil rights organizations, including the president of the League of Women Voters of the United States and the executive director of the National Urban League. Merle Decl. Ex. 17 at 309–11; Merle Decl. Ex. 18 at 6.

A commemorative report prepared by the U.S. Department of Justice in 1997 observed that the Katzenbach Commission's membership included "distinguished Americans who brought a wide range of backgrounds: a former Republican Attorney General, the publisher of the Los Angeles Times, a Federal judge, the attorney general of California, and leaders from business, law, civic activism, State government, and science." *Id.* Yet, despite aligning itself with the Katzenbach Commission and having a similar function in terms of the topics it is supposed to study, the members of the current Commission have a singular viewpoint: that of current law enforcement officials.

23

Expertise from civil rights organizations such as Plaintiff is necessary for an objective and competent deliberative process in light of the function the Commission must perform. In the absence of such a balance, the Commission lacks functional competence—and is in violation of FACA's "fairly balanced" requirement.

**B.      There Is No Genuine Factual Dispute that the Commission Has Failed to Comply with the Federal Oversight Requirements of FACA.**

As this Court has recognized, "FACA compliance is achieved largely by direct congressional oversight." *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 541 F. Supp. 2d 95, 97 (D.D.C. 2008). As such, FACA requires all advisory committees to file their charters with numerous federal offices and employ a Designated Federal Official ("DFO") to call meetings, keep records, and respond to requests for information. By doing neither, the Commission has effectively thwarted federal oversight of its operations.

*1.      The Commission Has Not Filed Its Charter with Necessary Entities.*

FACA dictates that "[n]o advisory committee shall meet or take any action until an advisory committee charter has been filed with . . . the head of the agency to whom any advisory committee reports and with the standing committees of the Senate and of the House of Representatives having legislative jurisdiction of such agency." 5 U.S.C. app. § 9(c). The statute's implementing regulations further require that an advisory committee's charter must be filed with the Library of Congress and the Secretariat. *See* 41 C.F.R. § 102-3.70(a)(3)–(4).

These strictures are far from formalist; rather, FACA's charter requirement "ensures that [an advisory committee] does not proceed with its study without appropriate Congressional oversight." *Akzo-Nobel, Inc. v. United States*, No. 00-30834, 2001 WL 34772206, at *3 (5th Cir. May 25, 2001). As such, the failure to follow FACA's charter-filing obligation is a "foundational" violation that "goes to the very creation and existence of the advisory committee," warranting

broad injunctive relief. *W. Org. of Res. Councils v. Bernhardt*, 412 F. Supp. 3d 1227, 1232, 1242–43 (D. Mont. 2019). When an advisory committee violates these rules, the remedy is clear: "it should not be permitted to meet further." *Id.* at 1244.

Here, there can be no factual dispute that the Commission has not filed its charter—if one even exists—with the Library of Congress, the Secretariat, or the relevant standing committees of Congress, which utilize the FACA Database maintained by the General Services Administration for oversight of advisory committees. Merle Decl. Exs. 19, 20, 21. Plaintiff is therefore entitled to summary judgment on this claim. *See Cargill, Inc. v. United States*, 173 F.3d 323, 328–29, 341 (5th Cir. 1999) (holding advisory committee violated this provision of FACA even where, unlike here, agency introduced evidence that charter had been properly filed with agency head, Secretariat, and Library of Congress, but was accidentally filed with the wrong standing committee of Congress).

### 2. *The Commission Does Not Employ a Designated Federal Official.*

FACA further requires that "[t]here shall be designated an officer or employee of the Federal Government to chair or attend each meeting of each advisory committee." 5 U.S.C. app. § 10(e). A committee's DFO is responsible for calling meetings of the committee, approving the agenda for all committee meetings, attending meetings, and adjourning any meeting when the DFO determines it to be "in the public interest[.]" 5 U.S.C. app. § 10(e)–(f). Further, the DFO serves as the primary contact point for members of the public who seek more information about the advisory committee's meetings and hearings. 41 C.F.R. § 102-3.150(a)(5). The responsibility for selecting a committee's DFO rests with the head of the agency employing the advisory committee. 41 C.F.R. § 102-3.120. Given the DFO's importance, FACA provides that "[n]o advisory committee shall conduct any meeting in the absence of that officer or employee." 5 U.S.C. app. § 10(e); *accord Elec. Privacy Info. Ctr. v. Drone Advisory Comm.*, 369 F. Supp. 3d 27, 45 (D.D.C. 2019) (noting

that FACA and its interpreting regulations "require that agencies designate a DFO to call and adjourn meetings, approve agendas, and chair meetings as requested, for *every* advisory committee and subcommittee" (emphasis in original)). As such, if an advisory committee lacks a DFO, it "shall not hold any meetings[.]" 5 U.S.C. app. § 10(f).

Defendants have not published any information naming the Commission's DFO in either the FACA Database maintained by the General Services Administration's Secretariat or in the Federal Register—where advisory committees must provide the name and contact information for a DFO. Merle Decl. Exs. 19, 20. Nor has the Commission made any reference to the existence of a DFO on its own website. *See* U.S. Dep't of Justice, *Presidential Commission on Law Enforcement and the Administration of Justice*, https://www.justice.gov/ag/presidential-commission-law-enforcement-and-administration-justice (last visited May 28, 2020).

The only reasonable inference to be drawn from this telling absence is that the Commission does not currently have a DFO, in violation of FACA. Given the Defendants have not named a DFO to be the contact point for members of the public, Plaintiff is entitled to summary judgment on this issue as well.

### C. The Commission Has Failed to Provide Adequate Notice of any of its Hearings in the Federal Register.

FACA embodies the principle that federal advisory committees must make all reasonable efforts to guarantee "transparency and public participation as to future agency decisions . . . ." *Mickelsen Farms, LLC v. Animal & Plant Health Inspection Serv.*, No. 15-0143, 2018 WL 4259225, at *2 (D. Idaho Sept. 6, 2018). An advisory committee that "cut[s] the public out of the process . . . [is a] direct threat[] to that interest." *W. Org. of Res. Councils v. Bernhardt*, 362 F. Supp. 3d 900, 909 (D. Mont. 2019). As such, FACA requires that "timely notice of each such meeting [of an advisory committee] shall be published in the Federal Register . . . ." 5 U.S.C. app.

§ 10(a)(2). The statute's implementing regulations define "timely notice" as "at least 15 calendar days prior to an advisory committee meeting . . . ." 41 C.F.R. § 102-3.150(a).[13] Under "exceptional circumstances," less notice may be given—but only so long as such circumstances are detailed in the advisory committee meeting notice eventually published in the Federal Register. 41 C.F.R. § 102-3.150(b).

Defendants cannot dispute their complete failure to publish *any* notice of the Commission's hearings in the Federal Register—let alone the fifteen days' advance notice required by FACA and its regulations. The Commission has held at least twenty-five days of hearings since its establishment on January 21, 2020. *See* Dixon Decl. ¶ 16. Not one of these hearings was noticed in the Federal Register. *Id.* ¶ 15; *see also* Merle Dec. Ex. 19. In fact, to this day, no record of the Commission's hearings exists within the Federal Register. *Id.* No additional evidence would contradict that Defendants have violated FACA's Federal Register notice requirement. *See, e.g.*, *Nw. Forest Res. Council v. Espy*, 846 F. Supp. 1009, 1013–14 (D.D.C. 1994) (failure to file any notice in the Federal Register establishes FACA violation). Therefore, Plaintiff is entitled to summary judgment on this claim.

---

[13] The regulation also specifies the information that must be provided in the notice, including the name of the advisory committee; the time, date, and location of the hearing; a summary of the agenda and/or topics to be discussed; whether any portion of the hearing will be closed to the public, and an explanation of why any such closure is necessary; and contact information for the committee's DFO. 41 C.F.R. § 102-3.150(a)(1)–(5).

## **CONCLUSION**

For the reasons stated above, there can be no genuine factual dispute that Defendants are subject to the requirements of FACA and have failed to comply with multiple provisions of FACA, including their duties to: (1) ensure fairly balanced membership of the Commission; (2) file a charter with the required entities; (3) designate a DFO; and (4) provide timely notice in the Federal Register. Plaintiff is therefore entitled to summary judgment.

Moreover, because the Commission must make its recommendations no later than October 28, 2020, Plaintiff respectfully requests that this motion be adjudicated on an expedited basis. If the Court grants summary judgment, Plaintiff respectfully requests an expedited briefing schedule with respect to the proper remedy for Defendants' FACA violations. Plaintiff also reserve all of its rights to pursue discovery if the Court determines that there are material disputed facts about whether Defendants are subject to, or have violated, FACA.

Dated:  May 28, 2020
    New York, NY       Respectfully submitted,

             /s/ Natasha C. Merle
             Samuel Spital, Bar No. SS4839
             Natasha C. Merle*
             Ashok Chandran*
             Steven Lance**
             **NAACP LEGAL DEFENSE &**
             **EDUCATIONAL FUND, INC.**
             40 Rector St., 5th Floor
             New York, NY 10006
             Tel.: (212) 965-2200
             Fax.: (212) 226-7592
             sspital@naacpldf.org
             nmerle@naacpldf.org
             achandran@naacpldf.org
             slance@naacpldf.org

             *admitted *pro hac vice*
             ** *pro hac vice* application pending