# EXHIBIT 3

**U.S. DEPARTMENT OF JUSTICE**

**President's Commission on Law Enforcement and the Administration of Justice**

# HEARING TWO (Days 1-3)
# SOCIAL PROBLEMS IMPACTING PUBLIC SAFETY
March 24 – March 26, 2020

## Summary

### Call to Order and Welcome

Mr. Phil Keith, Chair, welcomed the attendees to the second hearing of the President's Commission on Law Enforcement and the Administration of Justice. On behalf of Attorney General Barr and his leadership team, Chair Keith expressed appreciation for everyone's ability to navigate through the various challenges due to the COVID-19 virus. As such, planned hearings are now being held via teleconference. Chair Keith greeted and thanked everyone for attending and supporting the teleconference.

### Opening Statements by Commissioners

Chair Keith opened, explaining that the three days of hearings, March 24 through March 26, would focus on social problems impacting public safety, including how mental illness, substance use, and homelessness impact public safety. The first day's hearing focused on Mental Illness. Witnesses for the hearing include Sherriff John McMahon, San Bernardino County; Mr. John Snook, Executive Director, Treatment Advocacy Center; and Sergeant Sarah Shimko, Madison, Wisconsin Police Department, Mental Health Unit.

Note: Prior to the hearing, panelist biographies and written testimonies were delivered to the Commissioners for their consideration and review.

> **The Dilemma**
>
> *"In 2018, my department led an effort to address a large homeless encampment on the Santa Ana riverbed. The encampment exceeded 1,000 people, many of whom were mentally ill and drug addicted. We worked with our Federal court to mitigate the issue and clean up the riverbed within a span of a few months. In remediating the riverbed, we collected 14,000 used hypodermic syringes. This staggering number is a direct result and consequence of the decriminalization of drugs."*
>
> *Sheriff Barnes*

> "These inmates have no business being in jail with this severe mental illness, except they committed a crime and ended up there, and there's no other place for them."
>
> *Sheriff John McMahon*

- Jail has an average daily population of about 6,000 people.
- In California, like other states, a criminal defendant cannot be tried for a criminal offense as a result of a mental disorder since they're unable to understand the nature of their charges.
- Population in county jails just continue to swell – to the point where hundreds of inmates that were incompetent to stand trial are waiting to go to a state hospital.
- Between 2015 and 2019, the Sheriff's Department budget was increased by $9 million to fund additional correctional mental health staff.
- The California Department of State Hospitals is responsible for providing treatment to individuals deemed incompetent to stand trial, but they have a shortage of treatment beds. This shortage has created a tremendous backlog and as a result many wait 3 to 6 months to begin treatment.
- Through a partnership with the State, a jail-based competency program can get these inmates ready to stand trial.
    - The California Department of State Hospitals, currently can pay in excess of $20 million a year to cover the costs of the mental health services offered in the program.
- They stay in the program as long as needed to be restored to competency.
    - In 2019, 621 inmates were admitted into the program.
    - At the end of 2019, out of that 621, 601 were discharged and able to attend their court hearings. Their cases were ultimately adjudicated.
    - The National Association of Counties, along with the National Sheriffs' Association and the Major County Sheriffs of America, determined that about 64% of inmates in custody have some type of major mental health illness.
    - Fifty-three percent have drug dependency or abuse.
    - Forty-nine percent have a combination. And that is out of a total of 740,000 inmates that are in custody in this country on any given day.
- Recent jail trends include more and more people with mental illness, with the spike in methamphetamine use and other illegal drugs.

*Second Panelist: John Snook, Executive Director, Treatment Advocacy Center*

*Highlights:*
- This pandemic puts into stark relief the consequences of forcing our law enforcement officers on the front lines of mental healthcare, and it makes clear that the answer is not a criminal justice system better able to address mental illness, but instead a mental illness treatment system that keeps people from being arrested in the first place.
- The reality is that the U.S. is in the midst of a mental illness crisis.

> "There are an estimated 8.3 million adults in the United States who are living with a severe mental illness. Approximately half go untreated every year."
>
> *John Snook*

- What does going untreated look like? Families are told their loved ones have to be violent before they can access care. And when they do deteriorate to that point, they're told to call 9-1-1.

- Since 1999, we've lost 35% of the total psychiatric treatment beds in the United States. Now, only four countries in the developed world have fewer beds per capita than the United States. In context, we have about 20 public and private beds per hundred thousand population. The worldwide average is 71.

- So, what happens when those beds aren't available? Those in need fall to the systems that can't say no. They languish for weeks in our emergency departments waiting for a treatment bed.

    o They fill our homeless shelters – cycling in and out of crisis – and they overwhelm our law enforcement and our jails and prisons.

- It's important to recognize that approximately a third of people with serious mental illness have their first contact with mental health treatment through a law enforcement encounter.

- A 2019 survey, done with the National Sheriffs' Association, found that a fifth of law enforcement staff time is spent responding to and transporting people with serious mental illness at an annual cost of nearly $1 billion dollars.

- There are now 10 times as many people with serious mental illness behind bars than are receiving treatment in a state hospital.

- We actually have fewer state hospital beds now than at any point since 1850.

    o That doesn't include the 90,000 pretrial inmates who've been found incompetent to stand trial, but who are sitting in jail waiting for one of the 9,000 forensic beds that can to serve them.

*Recommendations:*

- Resist the urge to force greater responsibilities on law enforcement.

- Require the mental health system to do its part to prioritize care for the most seriously ill, and end the use of jails and prisons as a pressure relief valve, especially for the most seriously ill. Treatment must come before arrest.

- Embrace Intercept Zero that ensures that systems are held accountable to serve those with serious mental illness before they are arrested.

    o Look to the example of states like Ohio, which has been a leader in this crisis and implementing the sequential intercept model, including focusing on Intercept Zero.

- Support the elimination of the Medicaid Institutions for Mental Disease (IMD) exclusion, which prevents the government from reimbursing States for treatment beds.

- Encourage the Trump administration's efforts to use the Medicaid 1115 Waiver Authority to allow states to fund treatment beds.

- Support federal grant funding for assisted outpatient treatment which provides for civil court-ordered care for individuals with a history of repeated hospitalizations.

- Support the creation of integrated crisis response systems that minimize law enforcement.

- End the Medicaid Inmate Exclusion Policy. For inmates with serious behavioral and public health conditions, the current Federal policy of not allowing reimbursement for Medicaid reimbursable services and treatment for individuals detained but in pretrial status results in poor health outcomes and hinders efforts to maintain health, and mental health stability, thus creating an environment for decline, relapse, and ultimately, return to custody.
    - Ending this exclusion policy, particularly for pre-trial inmates, will enhance efforts to reduce recidivism.
- End the decriminalization of drugs.
    - California's experiment with drug decriminalization has resulted in tragic consequences.
    - In California, possession of drugs results in nothing more than a misdemeanor citation.
    - This minimal criminal consequence and the criminal justice system perpetuates addiction, resulting in more dangerous health consequences for the users and impacts upon the community.
- Treatment programs during incarceration have proven to change behavior.
- Systems that lack individual accountability exacerbate the problem by encouraging bad behavior.
- Remove marijuana as a Schedule 1 narcotic so that its negative effects can be better researched and understood.

### *Second Panelist: Dr. Shannon Robinson, Principal Consultant at Health Management Associates*

*Highlights:*
- Trauma, mental illness, substance use disorders and homelessness have bidirectional influences upon each other.
- To stop the multi-generational effects of these issues and the ever-increasing resource utilization, treat mental health and all substance use disorders with evidence-based treatments, including motivational interviewing, cognitive behavior therapy, contingency management, and medications for addiction treatment.
    - Sixty-three percent of jail inmates have drug-use disorder, but only about 25% of them get treatment while they're incarcerated.
    - Traditionally, risk and needs assessments have been used to place patients in treatment programs, while incarcerated.
    - These assessments look at criminal history and are designed for law-enforcement supervision purposes.
    - Risk and needs assessments are not diagnostic tools and shouldn't be used to determine clinical treatment needs.
- Legal child services and correctional partners must allow decisions about medication and level of care or treatment to be determined by clinical providers with shared decision-making from the patient and that specific medications not be listed in legislation as new medications are FDA-approved all the time and there are evidence-based changes over time.
- Eighty-five percent of people in an abstinence-based treatment program for opioid use disorder relapse within a year.

> *"The current risk of death upon release from incarceration is 129 times that of the general population."*
>
> *Dr. Shannon Robinson*

- Historically, we forced people to withdraw from medications for addiction treatment when incarcerated, despite knowing that patients remaining on methadone, while incarcerated, are twice as likely to attend a narcotic treatment program, post release.

- Patients who are started on methadone, while incarcerated, are more likely to attend a narcotic treatment post release than those who have not started on medications and are referred to that same narcotic treatment program.

- There have been significant decreases in death rates, both during incarceration and post-incarceration, when medications are continued or initiated during incarceration.

- With the release of the Jail-based Medication Assisted Treatment Promising Practice Guidelines, and litigation that has mandated medications for addiction treatment in some jurisdictions, many jails and prisons are successfully starting MAT programs.

- Most are focused on opioid use disorder, not opioid use disorder and alcohol use disorder, despite the fact that alcohol use disorder kills way more people over the long term.

*Recommendations:*

- Implement substance use disorder treatment programs, not just opioid use disorder treatment programs.

- Decrease the influence of gangs, which currently are inhibiting members from accessing medications for addiction treatment while incarcerated.

- Work outside of incarceration.

- Stop the practice in some jurisdictions in which judges, lawyers and child-service workers recommend and even mandate discontinuation of medications for addiction treatment.

- Eliminate unnecessary barriers to MAT.

- Streamline the process of certification for jails and prisons to narcotic treatment providers.

- Mandate training programs for all healthcare providers, including currently licensed providers and for correctional custody, judicial and child support service staff.

- Stop Federal, state, and local funding of alcohol and substance use disorder treatment and care, which is not evidence-based.

- Incentivize in-reach into jails and prisons to prepare for smooth transitions to the community.

- Increased access to evidence-based treatment for substance use disorders and mental health disorders will lead to huge improvements in health with resulting decreases in homelessness and recidivism.

### *Third Panelist: Sheriff Paul Penzone, Maricopa County, Arizona*

*Highlights:*

- Law enforcement has inadvertently become the primary respondent to these complex issues, responsible for de-escalating, mitigating, resolving, restraining, investigating, and providing ongoing care for the ill, unhealthy and unwell members of our society while in custody.

- The demands have long ago exceeded law enforcement abilities, resources and its core mission.