# EXHIBIT 4



U.S. DEPARTMENT OF JUSTICE

# President's Commission on Law Enforcement and the Administration of Justice

## Mental Illness and Mental Health

March 24 - 26, 2020

**Teleconferences related to Social Problems Impacting Public Safety: Mental Illness**

**Panels:**

- **March 24, 3:30pm to 4:30pm, Eastern Time – Panel on Mental Illness**
    - Sheriff John McMahon, San Bernardino County
    - John Snook, CEO, Treatment Advocacy Center
    - Sergeant Sarah Shimko, City of Madison Police Department Mental Health Unit (WI)

- **March 25, 4:00pm to 5:00pm, Eastern Time – Panel on Mental Illness**
    - Sheriff Donald Barnes, Orange County, CA
    - Dr. Shannon Robinson, Principal, Health Management Associates (former Chief Psychiatrist for California Department of Corrections and Rehabilitation)
    - Sheriff Paul Penzone, Maricopa County, AZ

- **March 26, 2:00pm to 3:00pm, Eastern Time – Panel on Mental Health**
    - Dr. Keith Humphreys, Professor and Section Director for Mental Health Policy in the Department of Psychiatry and Behavioral Sciences, Stanford University

U.S. DEPARTMENT OF JUSTICE
President's Commission on Law Enforcement and the Administration of Justice

# John Snook

Chief Executive Officer and President



John Snook serves as executive director of the Treatment Advocacy Center. The Treatment Advocacy Center's original research on issues such as the criminalization of mental illness has reshaped the national narrative on the treatment of severe mental illness. Mr. Snook has more than 15 years of policy and advocacy experience at both the federal and state levels. Prior to joining the Treatment Advocacy Center, John worked on policy issues at the Mortgage Bankers Association (MBA) and at Habitat for Humanity International. John's true passion has always been mental health reform. His focus on the issue began in law school, as he saw a loved one struggle with untreated mental illness. John championed mental illness reform, working first with the West Virginia Supreme Court on mental health issues and then at the Treatment Advocacy Center as an advocate for state mental health reform.

Written Testimony
John Snook, Executive Director
Treatment Advocacy Center

The impact of homelessness, mental illness, and/or substance use
on law enforcement and the administration of justice.

**The problem:**

Sixty years of failed mental health policies and misplaced incentives have forced law enforcement onto the front lines of mental illness crisis response. Jails and prisons are now our de facto mental health institutions, as psychiatric bed capacity has reached its lowest point in our nation's history.

Law enforcement officers do not sign up to be mental health practitioners and using them as such wastes precious resources, damages law enforcement-community relationships, unnecessarily criminalizes a medical issue and ultimately ill serves both the person in need and the system attempting to provide care. Calls to "train our way out of the problem" are well intentioned, but fail to address the systematic issues that incentivize the neglect of those with the most severe mental illness.

**The scope of the crisis**:

An estimated 8.3 million adults in the United States live with a severe mental illness (SMI). Approximately half go untreated every year.[1] The consequences of failing to care for the most severely ill are devastating and have significant implications for law enforcement and the effective administration of justice.

As a result of limited community treatment options and a dire shortage of psychiatric treatment beds, those in need of mental illness care frequently only receive care once a crisis occurs that necessitates law enforcement involvement. Though numbering somewhat fewer than 4 in every 100 adults in America, individuals with SMI generate no less than 1 in 10 calls for police service.[2] Approximately one-third of individuals with SMI have their first contact with mental health treatment through a law enforcement encounter.[3]

People with SMI are also more likely to be arrested if they live in communities with limited treatment options. Officers sometimes resort to "mercy bookings" (using low-level misdemeanor charges) to get individuals in psychiatric crisis off the street and into treatment.[4] Studies have found that in some parts of the country, psychiatric treatment is more accessible in jail than in the community.[5]

Requiring law enforcement to respond to mental health crises raises a safety risk to both the officer and the individual in crisis. Our research shows that people with untreated mental illness are 16 times more likely to be killed during a police incident than for other civilians approached or stopped by officers.[6] Such incidents, especially when involving the use of deadly force, are also traumatic and damaging to officers and can impact police-community relations. No officer wants to resort to deadly force, especially in an incident involving someone obviously in the throes of untreated SMI.

**Unconsidered costs**:

Utilizing law enforcement to address what are medical crises also exacts massive, often unconsidered, costs for law enforcement and county budgets. Such encounters use at least 90% more resources than encounters not involving mental illness, even when statistically controlling for type of response.[7] Our 2019 survey with the National Sheriffs Association on the role and impact on law enforcement of transporting individuals with SMI found that at least one-fifth of total law enforcement staff time was used to respond to and transport individuals with mental illness, at an estimated cost of $918 million.[8] The survey showed that law enforcement

officers drove a total of 5,424,212 miles to transporting individuals with serious mental illness in 2017 — **the equivalent of driving around the Earth's equator more than 217 times**.[9]

Officers transporting someone in crisis are forced to travel an average of five times farther to reach a medical facility than a jail. If officers do reach a medical facility, they wait significantly longer — almost 2.5 hours longer, per our survey results.[10]

As a consequence, it is unsurprising that jails have a steady churn of people with SMI coming through their doors. It is estimated that two million people with serious mental illness are booked into jails each year, part of a revolving door of criminalization, homelessness, and emergency department visits, with the insurmountable costs associated.[11]

**Jails as de facto mental health institutions:**

As officers find treatment facilities unavailable or unwilling to accept those in need, jails have become our de facto mental health institutions. People with SMI occupy at least 1 in 5 of America's corrections beds.[12] There are now 10 times more people with severe mental illness behind bars than receiving treatment in a hospital.[13]

In 44 states, a jail or prison holds more mentally ill individuals than the largest remaining state psychiatric hospital; in every county in the U.S. with both a county jail and a county psychiatric facility, more seriously mentally ill individuals are incarcerated than hospitalized.[14]

This poses a significant financial burden on law enforcement and county budgets. Mentally ill inmates cost more than other prisoners for a variety of reasons, including increased staffing needs. In Broward County, FL in 2007, it cost $80 a day to house a regular inmate but $130 a day for an inmate with mental illness. In Texas prisons in 2003, "the average prisoner costs the state about $22,000 a year," but "prisoners with mental illness range from $30,000 to $50,000 a year."[15] Psychiatric medications are a significant part of the increased costs. The cost of settling or losing lawsuits stemming from the treatment of mentally ill inmates also adds considerable costs.

In addition, jails across the country are grappling with a deluge of at least 90,000 pretrial defendants every year who have been found incompetent to stand trial (IST), but who remain in jail owing to a lack of available beds.[16] Pretrial inmates represent the largest and fastest-growing segment of the US jail population and at least a fifth have a mental illness.[17] However, in 2016, state psychiatric hospitals reported having just 5.5 forensic beds per 100,000 population. Approximately half of those were reserved for patients found not guilty by reason of insanity, leaving just 8,800 beds for all other forensic patients, including the 90,000 IST defendants.[18] As a result, states across the country have seen litigation challenging bed waits, hospital facing loss of accreditation, or state officials being threatened with contempt of court for delays in bed availability for this population.[19]

**The underlying causes of the crisis**:

Misplaced incentives discourage serving the most severely ill, forcing law enforcement to pick up the slack. Chief among these is the elimination of necessary treatment beds. Without the availability of beds as part of a full continuum of treatment options, those with SMI have effectively been trans-institutionalized, moving from long-term stays in institutions to jails and prisons.

A primary factor in the loss of treatment beds is the discriminatory IMD exclusion, which prevents Medicaid reimbursement for adult psychiatric care in facilities with more than 16 beds. This preclusion effectively

makes inpatient treatment a cost borne wholly by the state. As a result, such beds have experienced devastating cuts since the 1970s.

In 2016, the Treatment Advocacy Center documented that the US now has fewer state hospital beds per capita than at any point since 1850.[20] Since 1999, there has been a 35% decrease in the number of total psychiatric beds in the US. The US now has 20 public or private beds per 100,000 population -- only four countries in the developed world have fewer beds. The worldwide average is 71 beds per 100,000 population.[21]

That shortage has given rise to a host of problems beyond direct criminalization, including what Dr. Steven Sharfstein termed "micro-hospitalizations" or exceedingly short stays in inpatient facilities that diminish opportunities for full recovery, contributes to the high-risk of suicide after hospitalization, and hampers transition to the community that may lead to increased contact with law enforcement as a consequence of symptomatic behaviors.[22]

Without treatment beds, those with SMI frequently wait in emergency departments receiving limited or no treatment. According to a survey by the American College of Emergency Physicians, over 90% of emergency physicians say psychiatric patients board in their emergency departments. And more than 21% of these physicians reported waits of two to five days for an inpatient bed.[23]

As detailed by HHS Assistant Secretary Elinore McCance-Katz, mental health treatment standards that require crisis or violence also directly contribute to the criminalization of those with SMI. Such outdated standards unnecessarily force individuals who are non-violent to decompensate before receiving care, leaving families helpless until their loved one poses a risk of harm to themselves or others. At that point, law enforcement intervention is often required, heightening the risk to the officer and the individual and increasing the likelihood of arrest.

Additionally, a majority of treatment systems have yet to develop integrated crisis response care. As a consequence, individuals often find that care is separated into sick enough for the hospital or on-your-own on the street. When released from a facility, individuals often report difficulty in finding housing, coordinating care in the community or even securing appointments for treatment.

Similarly, communities are just beginning to adopt a zero-intercept philosophy for law enforcement engagement. Zero-intercept incorporates the idea that diversion following arrest is too late and that resources and efforts should be marshalled to deflect people with SMI from being arrested in the first place, by limiting the involvement of law enforcement and increasing access to crisis services and the availability of treatment beds.

**Recommendations & identifying promising practices**:

First, I strongly recommend this honorable Commission review the recommendations of the Interdepartmental Serious Mental Illness Coordinating Committee (ISMICC), on which I serve. In addition, the recommendations of the All Sheriffs' Authority mental health report should strongly be considered as a concurrent roadmap to reform.

My overarching recommendation is to support polices that allow a person with SMI who is in crisis to receive adequate mental health care without requiring law enforcement contact. The recommendations below further that goal.

<u>Eliminate the IMD Exclusion</u>: The Commission should also strongly support the wholesale elimination of the IMD exclusion to increase the availability of treatment beds, as recommended by both the ISMICC and the

3

All Sheriffs' Authority. In the interim, the Commission should recommend that every state pursue IMD 1115 waiver authority made available by President Trump's Administration.

Support grant funding for Assisted Outpatient Treatment (AOT) programs: To support the treatment of individuals who have a history of repeated hospitalizations and incarceration, this Commission should strongly support AOT grants funded by SAMHSA and recommend their national expansion to all 50 states.

Data from the first 17 AOT grantees across the country showed reductions in rates of incarceration, in incidents of repeated hospitalization, substance abuse and homelessness. Both Reno, Nevada and Baldwin County, Alabama reported more than $1M in savings after implementing the program.[24] These results echo those of communities across the country, from Bexar County, TX to Brooklyn, NY to Nevada County, CA. The American Psychiatric Association will be launching free AOT training modules through its SMI Adviser tool later this year, which will provide law enforcement and communities with free training tools to learn about and implement the program.[25]

Support zero-intercept efforts nationally: Both the DOJ and HHS have prioritized programs that support zero-intercept strategies as a means of reducing law enforcement involvement in mental illness treatment.

Support the creation of integrated crisis response systems that minimize law enforcement response: As recommended by both ISMICC and CIT International, a crisis response system should include services such as 24/7 access to crisis line services staffed by clinicians; warm lines staffed by certified peer specialists; non-law enforcement crisis response teams able to respond independently to nonviolent crisis situations and to co-respond with law enforcement when needed; and dedicated crisis triage centers.

Support a change to the MIEP policy: The federal Medicaid Inmate Exclusion Policy (MIEP) should be updated to allow pretrial detainees to receive their federal benefits while in jail. Currently, pretrial detainees are denied federal benefits, including Medicaid, Medicare, CHIPS and access to Veteran's benefits, despite their pretrial status and presumption of innocence.

Support a non-law enforcement response to crisis as called for by the evidence: Ideally, crises involving individuals with SMI can and should be resolved without the need for law enforcement involvement. Especially as communities adopt treatment standards that shift away from requiring a finding of danger to self or others, all possible efforts should be made to remove law enforcement from response whenever possible.

This change is supported by the evidence. Law enforcement respondents to our 2019 survey reported that in 65% of all law enforcement transports in 2017, the officer did not perceive the individual to be a risk of harm to others.[26] Presumably, the majority of those responses could have been provided by non-law enforcement resources. This finding is echoed in CIT International's 2019 Best Practice Guide, "The majority of mental health calls for service received by emergency communication centers do not require a law enforcement response."[27]

Ensure law enforcement is prepared to respond when warranted: Recognizing that even the perfect crisis system will not address every mental health issue, law enforcement and other first responders should be prepared to respond safely and effectively when the situation warrants. Every member of law enforcement should receive training on mental illness and on how to de-escalate emotionally charged situations. Just as officers receive training on blood-borne pathogens or domestic abuse, training on mental illness should begin in the academy and continue throughout the career of the officer. We strongly support combining this baseline of training with additional training and specialization as recommended by CIT International.

[1] Treatment Advocacy Center. (2017). Serious mental illness and treatment prevalence. Arlington, VA. Retrieved from https://www.treatmentadvocacycenter.org/storage/documents/backgrounders/smi-and-treatmentprevalence.pdf

[2] Chappell, D. (Ed.). (2013). Policing and the mentally ill: International perspectives. Boca Raton, FL: CRC Press.

[3] Adelman, J. (2003). Study in blue and grey, police interventions with people with mental illness: A review of challenges and responses. Vancouver, BC: Canadian Mental Health Association, BC Division.

[4] Torrey, E. F., Stieber, J., Ezekiel, J., Wolfe, S. M., Sharfstein, J., Noble, J. H., & Flynn, L. M. (1998). Criminalizing the seriously mentally ill: The abuse of jails as mental hospitals. Washington, DC: DIANE Publishing.

[5] Lamb, H. R., Weinberger, L. E., & DeCuir Jr., W. J. (2002). The police and mental health. Psychiatric Services, 53(10), 1266–1271.

[6] Fuller, D. A., Lamb, H. R., Biasotti, M., & Snook, J. (2015). Overlooked in the undercounted: The role of mental illness in fatal law enforcement encounters. Arlington, VA: Treatment Advocacy Center. Retrieved from https://www.treatmentadvocacycenter.org/overlooked-in-the-undercounted

[7] Charette, Y., Crocker, A. G., & Billette, I. (2014). Police encounters involving citizens with mental illness: Use of resources and outcomes. Psychiatric Services, 65(4), 511–516. doi:10.1176/appi.ps.201300053

[8] Sinclair, E., et al. (2019). *Road runners: The role and impact of law enforcement in transporting individuals with severe mental illness, A national survey.* Arlington, VA: Treatment Advocacy Center. Retrieved from https://www.treatmentadvocacycenter.org/storage/documents/Road-Runners.pdf

[9] Ibid.

[10] Ibid.

[11] Gingrich, N. & Jones, Van. (2015, May 27). Mental illness is not a crime. *CNN*.

[12] Treatment Advocacy Center. (2016). Serious mental illness (SMI) prevalence in jails and prisons. Arlington, VA. Retrieved from https://www.treatmentadvocacycenter.org/storage/documents/backgrounders/smi-in-jails-andprisons.pdf

[13] Torrey, E. F., Kennard, A. D., Eslinger, D., Lamb, R., & Pavle, J. (2010). *More mentally ill persons are in jails and prisons than hospitals: A survey of the states.* Arlington, VA: Treatment Advocacy Center.

[14] Ibid.

[15] Treatment Advocacy Center. (2016). *Serious mental illness (SMI) prevalence in jails and prisons.* Arlington, VA. Retrieved from https://www.treatmentadvocacycenter.org/storage/documents/backgrounders/smi-in-jails-andprisons.pdf

[16] Fuller, D. A., Sinclair, E. A., Lamb, H. R., et al. (2017). *Emptying the 'new asylums:' A beds capacity model to reduce mental illness behind bars.* Arlington, VA: Treatment Advocacy Center. Retrieved from https://www.treatmentadvocacycenter.org/new-asylums

[17] Wagner, P., & Rabuy, B. (2015). Mass incarceration: The whole pie. Retrieved from https://www.prisonpolicy.org/reports/pie2016.html

[18] Fuller, D. A., Sinclair, E., Geller, J., Quanbeck, C., & Snook, J. (2016). Going, going, gone: Trends and consequences of eliminating state psychiatric beds, 2016. Arlington, VA: Treatment Advocacy Center. Retrieved from https://www.treatmentadvocacycenter.org/going-going-gone

[19] Fuller, D. A., Sinclair, E. A., Lamb, H. R., et al. (2017). *Emptying the 'new asylums:' A beds capacity model to reduce mental illness behind bars.* Arlington, VA: Treatment Advocacy Center. Retrieved from https://www.treatmentadvocacycenter.org/new-asylums

[20] Fuller, D. A., Sinclair, E., Geller, J., Quanbeck, C., & Snook, J. (2016). Going, going, gone: Trends and consequences of eliminating state psychiatric beds, 2016. Arlington, VA: Treatment Advocacy Center. Retrieved from https://www.treatmentadvocacycenter.org/going-going-gone

[21] Organization for Economic Cooperation and Development. (2014). Making mental health count: The social and economic costs of neglecting mental health care. Retrieved from http://www.oecd.org/publications/making-mental-health-count9789264208445-en.htm

[22] Glick, I. D., Sharfstein, S. S., & Schwartz, H. I. (2011). Inpatient psychiatric care in the 21st century: The need for reform. *Psychiatric Services, 62*(2), 206-209. Retrieved from https://www.ncbi.nlm.nih.gov/pubmed/21285100

[23] American College of Emergency Physicians. (2016). Physician poll on psychiatric emergencies, October 2016. Retrieved from newsroom.acep.org/download/PsychEmergencyPollOct2016.pdf

[24] Substance Abuse and Mental Health Services Administration. (2020). 2018 Report to Congress Section 224 of the 2014 Protecting Access to Medicare Act Assisted Outpatient Treatment grant program.

[25] SMI adviser: A clinical support system for serious mental illness. Retrieved from https://smiadviser.org/

[26] Sinclair, E., et al. (2019). *Road runners: The role and impact of law enforcement in transporting individuals with severe mental illness, A national survey.* Arlington, VA: Treatment Advocacy Center. Retrieved from https://www.treatmentadvocacycenter.org/storage/documents/Road-Runners.pdf

[27] Crisis Intervention Team International. (2019). Crisis Intervention Team (CIT) programs: A best practice guide for transforming community responses to mental health crises. Retrieved from http://www.citinternational.org/bestpracticeguide

U.S. DEPARTMENT OF JUSTICE
President's Commission on Law Enforcement and the Administration of Justice

# Shannon Robinson, MD
Principal, Health Management Associates



Dr. Shannon Robinson is board certified in Psychiatry and Addiction Medicine, a Fellow of American Society of Addiction Medicine, and now working as a Principal for Health Management Associates, a national healthcare consulting firm. She was the Director of the Alcohol and Drug Treatment Program at the San Diego, Veterans Administration (VA) where she initiated Medications for Addiction Treatment, expanded assess to evidenced based psychotherapies, as well as assisted with the development of the VA's national educational materials for Alcohol Use Disorders, Opioid Use Disorders, Pain Management and Treatment of Insomnia.

She served as the Chief of Addiction Service for California Correctional Healthcare Services where she initiated Medications for Addiction Treatment within primary care and assisted with the development of enhanced substance use disorder treatment throughout California Department of Corrections and Rehabilitation. This program will eventually cover screening and assessment of 127,000 inmates with psychosocial treatment and FDA approved medications for Opioid and Alcohol Use Disorders for those in need at California's 35 prisons.

Dr. Robinson has two decades of teaching experience with mental health, primary care, pharmacy and nursing staff, which includes curriculum development, in person presentations and interactive webinars for all healthcare disciplines, nonhealthcare staff, patient, family and lay persons. Dr. Robinson has also provided direct care and supervised Telepsychiatry, TeleMedicine and TeleAddictions programs in the Veterans Administration and California Department of Corrections and Rehabilitation.

# HEALTH MANAGEMENT ASSOCIATES

March 11, 2020

To: Dr. Laura Wyckoff
The President's Commission on Law Enforcement and Administration of Justice
Laura.Wyckoff2@usdoj.gov

From: Shannon Robinson, M.D.
Fellow American Society of Addiction Medicine
Principal Consultant
Health Management Associates

Dr. Wyckoff and Commissioners:

I am honored to speak to the workgroup on Social Problems Impacting Public Safety for the President's Commission on Law Enforcement and Administration of Justice.

While working at the University of California and Veterans Administration in San Diego, and California Department of Corrections and Rehabilitation my career has concentrated on research and treatment of mental health (MH) and substance use disorders (SUD), in addition to, research and treatment of MH and SUD within primary and specialty care clinics. Specifically, I participated in research and expanded access to evidence-based psychotherapy and pharmacotherapy for trauma, substance use disorder, co-occurring MH and SUD, along with co-occurring HIV and/or hepatitis C and MH and SUD. My current position is as a principal healthcare consultant working for Health Management Associates, a national healthcare consulting firm, where I predominantly work on increasing evidence-based treatment for substance use disorders within the criminal justice system, across our nation. I will focus my testimony on how government resources (e.g. education and health services) can tackle SUD to reduce crime and improve resource utilization and morale for law enforcement. Although evidence in this testimony focuses on SUD, similar evidence can be presented for MH. I realize there is also a Criminal Justice workgroup, as well as a Re-Entry workgroup and I hope my written and verbal testimony will be shared with these workgroups.

## Overview

Trauma, mental illness, substance use disorders and homelessness have bidirectional influences upon each other; collectively MH and SUD are frequently referred to as behavioral health. Increased numbers of childhood adverse events are associated with increased drug use and homelessness (1,2). 80-90% of homeless individuals have a history of trauma (3). 20-50% of homeless individuals have a serious mental illness and 74% of people with an episode of homelessness have a lifetime diagnosis of SUD (4). Adverse childhood events, include having parents who are absent due to incarceration, witnessing or being a victim of violence and experiencing neglect, are more likely when drugs and alcohol play a key role in your formative years.  It is easy to see that violence, MH and SUD not only effect the "patient" but are

---

3/11/2020
Page 2

multigenerational due to the impact on the children and on the older generation often left to care for children whose parents are unable to adequately care for them. This sets up the next generation to be more likely to experience MH and SUD, homelessness and incarceration.

63% of sentenced jail inmates have a drug use disorder, although only 22-28% percent get treatment while incarcerated (5). In the United States, risk and needs assessments have been used to place patients in treatment programs; risk and needs assessments look at criminal history and are designed for law enforcement supervision purposes. It must be kept in mind that risk and needs assessments are not diagnostic tools and should not be used to determine clinical treatment needs. It is imperative that legal, child services and custody partners allow decisions about medication and level of care (outpatient, intensive outpatient, residential) to be determined by the clinical provider with shared decision making from the patient.

71% of deaths within 2 weeks of release from incarceration are due to overdose (6); of those who do not perish, those with SUD are more likely to reoffend than those without a SUD (7). In order to stop this cycle we need to provide evidence based MH and SUD treatment.

We have very clear evidence of what does not work for people with substance use disorder. Over 90% of people with opioid use disorder (OUD), in abstinence-based treatment, fail within one year (8). Historically, forced withdrawal from medications for addiction treatment has occurred upon admission to incarcerated settings; yet patients remaining on methadone while incarcerated were twice as likely to attend a narcotic treatment program (NTP) post release as those who were forced to discontinue medication (9). Similarly, patients who were initiated on methadone while incarcerated were more likely to attend a NTP post release than patients who received counseling or counseling and referral to NTP but no medication (10).

In addition to improved retention in treatment for those continued or initiated on MAT while incarcerated, there are widespread beneficial effects of MAT- such as reductions in illicit opioid use, HIV & hepatitis risk behaviors, criminal behavior (not only while incarcerated but also when not incarcerated), 75% decrease in mortality related to addiction and safer and healthier communities (11-13). When Rhode Island jail and prison systems implemented all three FDA approved medications for OUD there was a 61% decrease in overdose deaths upon release form incarceration and an 12% decrease in the overall overdose death rate in the state (14). In England a 75% decrease in all-cause mortality was seen within the first month post release associated with MAT (13) and in New South Wales, Australia a 74% lower all-cause mortality was seen while on opioid substitution compared to incarcerated persons not on opioid substitution (15). MAT consistently shows a decrease in mortality providing us an opportunity to intervene and rehabilitate individuals during this high-risk time period.

With this information combined with the National Sherriff's Association and the National Commission on Correctional Healthcare's publication of *Jail Based Medication-Assisted Treatment- Promising Practices, Guidelines and Resources for the Field (2018)* along with recent litigation won based on violations of 8th amendment MAT programs are being implemented in some jails and prisons. Recent efforts have focused on increasing access to FDA approved medications for OUD within incarcerated populations, targeting the 15-25% who regularly use heroin (5). Improved outcomes can also be seen with MAT use for alcohol use disorder (AUD); this significantly increases the total population who would benefit from MAT, as not everyone with an AUD also has an OUD. In general, programs are not yet funded to

address the entire incarcerated population with OUD and funding requests to target AUD have generally not started.

Despite recent improvements in MAT access within incarcerated populations with OUD we have much work to do in order to get the entire criminal justice system in sync with evidence-based practices. In some jurisdictions, judges, lawyers and child welfare workers continue to recommend, or mandate, discontinuation of MAT in order to have custody of children.

Operation Relentless Pursuit and the President's Initiative to Stop Opioid Abuse and Reduce Drug Supply and Demand target gangs and their drug distribution networks, as these jeopardize the safety of our communities. The safety of those incarcerated persons, who would like to take the opportunity they have been given to rehabilitate themselves, is also jeopardized by gangs prohibiting members from accessing MAT. We need to utilize lessons learned from desegregation of housing units (or other prior initiatives) within incarcerated settings to proactively address this issue.

Prior to or upon release from incarceration we need to assure access to MAT by eliminating unnecessary barriers currently present. These include eliminating the 8 to 24 hours of training required to prescribe buprenorphine, restriction on the number of patients that can be treated by each provider and restrictions on telehealth and prescribing MAT. In France where these barriers do not exist, there was a 79% percent decrease in overdose deaths nationally upon implementation of buprenorphine (16). Furthermore, we need to streamline processes for NTP certification in jails and prisons.

We need to ensure education for healthcare providers who are in training and mandate education for providers who are already licensed. Currently it is not required for all doctors to learn about substance use disorders, only psychiatrists. In order to successfully curtail the SUD epidemic in the United States, treatment cannot be relegated to specialists and must be tackled by all healthcare and mental health care providers. Addiction education could be mandated for medical schools, residencies, nurse, social work, psychology, pharmacy and other training programs. Moreover, a comprehensive strategic workforce development plan will include an increase in community health workers, substance use disorder navigators, and peer recovery coaches.

In addition to all healthcare providers receiving education, our law enforcement colleagues need to be educated about the neurobiology of SUD, evidenced based treatments (both psychosocial and pharmacological treatments) and that treatment for these chronic brain diseases is a decision between the patient and the provider. Legislation should not mandate which FDA approved medications for addiction treatment are available for person involved in the criminal justice system; we do not legislate which medication for other disorders will be available in jails. Nor should a child welfare worker be able to remove a child solely because someone is on MAT. Stable brain chemistry is good and is more likely to result in good parenting. Instability, resulting from a decrease or discontinuation of medication, is NOT good for parenting and may lead to relapse and death, leaving a child to be brought up in the foster care system.

In our nation, jails and prisons are our largest behavioral health treatment facilities. Treatment of MH and SUD result in safer communities and therefore a long-term decrease in costs to the state and federal government (17). During incarceration, there are no food scarcity concerns or transportation barriers interfering with treatment, making this an ideal time to intervene.

3/11/2020
Page 4

While building addiction education into existing training programs and mandating continuing education on addiction to health care, mental health care providers, correctional, legal and child services workers it is imperative that we assure this education, and ultimately treatment, is not directed solely at OUD, but all substance use disorders. The federal government has recently expanded the focus of Comprehensive Opioid Abuse Program to Comprehensive Opioid, Stimulant and Substance Abuse Program, which hopefully will guarantee that alcohol use disorders are addressed as alcohol continues to kill more people than opioids or amphetamines; alcohol just kills more slowly. As there are no medications which are FDA approved for substances other than opioids and alcohol, it is critically important that evidence-based psychotherapies also be available. Adequate training in and access to evidence-based psychotherapies including motivational interviewing, cognitive behavior therapy, and trauma informed person centered medical and behavioral healthcare will lead to improved outcomes and decreased recidivism.

In line with the focus on evidence-based treatments for SUD, the president has an initiative to stop opioid abuse that includes ensuring at least half of all federally employed healthcare providers adopt best practices for opioid prescribing within two years, with all of them doing so within five years. Starting with federal employees is an excellent first step; however, most healthcare providers do not work for the federal government. Consideration should be given to ensuring all federally and state funded MH and SUD care is evidence based. Many providers and programs are delivering care that is not well grounded in science, which is a waste of resources and leaves providers, patients, family and law enforcement disillusioned with lack of progress and success, negatively impacting morale. Programs not utilizing evidence-based psychotherapy and pharmacotherapy should not be eligible for federal or state funding. Another funding issue that could improve outcomes for persons involved in the criminal justice system is allowing utilization of federal dollars during the last month of incarceration. This would incentivize in reach from post release providers of physical, MH and SUD care, which has shown to increase retention in treatment post release.

**In summary** trauma, mental illness, substance use disorders and homelessness have bidirectional influences upon each other. Although evidence presented in the above testimony focused on SUD, similar evidence can be found for MH disorders. To stop the multi-generational effects of these issues and ever-increasing resource utilization we can treat MH and SUDs with evidence-based treatments including motivational interviewing, cognitive behavioral therapy, contingency management and MAT; an opportune time to do this is while persons are involved in the criminal justice system. We need to allow medication and level of care of treatment decisions to be made by clinical providers with shared decision making from patients, provide education for all medical and behavioral healthcare staff, along with custody, judicial and child service staff, address gangs preventing access to MH and/or SUD services, eliminate unnecessary barriers to MAT, stop federal, state and local funding of care which is not evidence based and incentivize in reach to prepare for smooth transitions to the community. These steps will improve outcomes, including decreases in recidivism, and improve morale of providers, patients, family and law enforcement, and ultimately decrease costs to our federal, state and local governments.

3/11/2020
Page 5

**For additional information:** Substance Abuse and Mental Health Services Administration: Use of Medication-Assisted Treatment for Opioid Use Disorder in Criminal Justice Settings. HHS Publication No. PEP19-MATUSECJS Rockville, MD: National Mental Health and Substance Use Policy Laboratory. Substance Abuse and Mental Health Services Administration, 2019.

Sincerely,

Shannon Robinson, M.D.

Fellow American Society of Addiction Medicine

Principal Consultant

Health Management Associates

srobinson@healthmanagement.com

619-633-8431

References:

1. Brown, DW et al. Adverse childhood experiences and the risk of premature mortality: *Am J Prev Med*. 2009;37(5):389-96.
2. Woodhall-Melnik J. et al. Men's experiences of early life trauma and pathways into long-term homelessness. *Child Abuse Negl*. 2018;80:216-225.
3. Buhrich, N. Lifetime Prevalence of Trauma among Homeless People in Sydney. *Australian & New Zealand Journal of Psychiatry.* 2000; 34:6, 963-966.
4. Greenberg, G. A., & Rosenheck, R. A. Correlates of past homelessness in the National Epidemiological Survey on Alcohol and Related Conditions. *Administration and Policy in Mental Health,* 2010; 37, 357–366.
5. Bronson, J et al. *Drug use, dependence, and abuse among state prisoners and jail inmates, 2007-2009.* Bureau of Justice Statistics 2017.
6. Bingswanger, I. A., et al. Release from prison – a high risk of death for former inmates. *New England Journal of Medicine,* 2007;356: 157-165.
7. Foster, S E. Behind Bars II Substance Abuse and America's Prison Population, 2010.
8. Healthresearchfunding.org(2019) https://healthresearchfunding.org/24-opiate-addiction-recovery-statistics/ 24 Shocking Opiate Addiction Recovery Statistics.
9. Rich, J. et al. Methadone continuation vs forced w/d on incarceration in a combined US prison and jail: a randomised, open-label trial. *The Lancet*. 2015: 686: 9991, 350-9.
10. Kinlock, T. et al. A Randomized Clinical Trial of Methadone Maintenance for Prisoners: Results at Twelve-Months Post-Release. *J Subst Abuse Treat*. 2009; 37(3): 277–285.
11. National Sherriff's Association and the National Commission on Correctional Healthcare's. *Jail Based Medication-Assisted Treatment- Promising Practices, Guidelines and resources for the Field.* 2018.
12. Schranz, A. et al. Challenges Facing a Rural Opioid Epidemic: Treatment and Prevention of HIV and Hepatitis C**.** *Curr HIV/AIDS Rep.* 2018; 15(3): 245–254.
13. Marsden, J. et al. Does exposure to opioid substitution treatment in prison reduce the risk of death after release? A national prospective observational study in England. *Addiction* 2017; 112 (8): 1408-18.
14. Green TC, Clarke J, Brinkley-Rubinstein L, et al. Post-incarceration Fatal Overdoses After Implementing Medications for Addiction Treatment in a Statewide Correctional System. JAMA Psychiatry. 2018; 75 (4): 405-7.
15. Larney, S. et al. Opioid substitution therapy as a strategy to reduce deaths in prison: a retrospective cohort study. *BMJ Open* 2014;4(4).
16. Auriacombe M, et al. French field experience with buprenorphine. *Am J Addict*. 2004;13 Suppl 1:S17-28.
17. National Institute on Drug Abuse. *Principles of drug addiction treatment: A research-based guide (third edition).* Bethesda, MD. 2018.