# EXHIBIT 5

Company:          **FBI ACS ONLY ACCOUNT**

**Conference Title:  Social Problems**

Conference ID:     **7138014_1_e7ByFq**

Moderator:         **Dennis Stoika**

Date:              **March 24, 2020**

Operator:  Good day and welcome to the Social Problems conference call. Today's conference is being
recorded. At this time, I would like to turn the call over to Mr. Phil Keith; please go ahead, sir.

(Phil Keith):   Thank you Travis. Good afternoon. And thank you for joining us today. I like to call the
President's Commission on Law Enforcement and Administration of Justice to order. On behalf of
Attorney General Barr, we thank you for joining us today for this important commission
teleconference meeting.

As we all know and discussed last week, we are experiencing unprecedented times and
challenges beyond our experience. We certainly appreciate your continued willingness and
understanding as we navigate the challenges of conducting the important work of the
commission. At this time, I'd like to ask for a roll call of Commissioners.

(Rob Chapman):  Thank you doctor.  I'll do a quick roll call proceeding through each commissioner and in
alphabetical order - please indicate if you are on the call. And I'll start with Commissioner
Bowdich -- his office.

Female 1:  Yes, sir Commissioner Bowdich will be here any moment. Thank you.

(Rob):  Great.  Commissioner Clemmons?

(James Clemmons):  Present.

It's amazing, when you look at the number of folks that we deal with that have either medical or mental health or a combination thereof. I don't see any end to this. I think, in our state -- we're pushing real hard on our state officials to increase the number of beds available to treat that population, both in custody as well as out of the custody.

I'm pretty convinced that what we see in the way of illegal drug use -- and especially in some of the areas where some of that's been either decriminalized or the penalties have been greatly reduced -- that we're seeing more and more mental illness. With the spike in methamphetamine use and other illegal drugs, we're seeing an up in bizarre behavior that we've all seen on TV -- and certainly makes the folks in our communities a bit nervous.

This is a challenging problem, but I think we're seeing law enforcement agencies across this country rise to the occasion and coming up with creative programs like TEST, making sure that all of our folks are trained in CIT as well as the program like JBCT that's inside of our jails -- helping solve the state problem with their help financially so that these folks can get into the court system and get their cases adjudicated, and ultimately out of a correctional setting, into treatment long term. And these inmates have no business being in jail with this severe mental illness, except they committed a crime and ended up there and there's no other place for them.

So, I think some of these programs and others that we may hear today will help shed some light on this problem and hopefully give us some better ideas on how to solve it. I am happy to answer any questions.

(Phil Keith):   Thank you Sheriff McMahon for your testimony. Please remain on the line as questions will be coming soon. Our next panelist is John Snook. He is the CEO at Treatment Advocacy Center. Mr. Snook, you are recognized.

(John Snook):   Thank you very much, sir. Can you all hear me?

(Phil Keith):  Yes, sir.

Female:  Yes.

(John Snook):  Perfect.

(Rob Chapman):  Yes, we can hear you.

(John Snook):   Thank you very much for having me and for focusing on these important issues during these unprecedented times Commissioners. My name is John Snook, and I run the Treatment Advocacy Center.  We're the only national nonprofit that works exclusively to eliminate barriers to the treatment of serious mental illness. I want to first recognize the impact the COVID-19 is having on our healthcare and our criminal justice systems.

This pandemic puts into stark relief the consequences of forcing our law enforcement officers on the front lines of mental healthcare, and it makes clear that the answer is not a criminal justice system better able to address mental illness, but instead a mental illness treatment system that keeps people from being arrested in the first place. Because the reality is that the U.S. is in the midst of a mental illness crisis. There are an estimated 8.3 million adults in the United States who are living with a severe mental illness. Approximately half go untreated every year.

What is untreated going -- what does going untreated look like? Families are told their loved ones have to be violent before they can access care. And when they do deteriorate to that point, they're told to call 9-1-1, instead. And so, crisis becomes our standard for treatment. And as you already heard, these problems can be largely traced back to the decimation of our treatment bed capacity.

Since 1999, we've lost 35% of the total psych beds in the United States. Now, only four countries in the developed world have fewer beds than the United States. In context, we have about 20 public and private beds per hundred thousand population. The worldwide average is 71.

So, what happens when those beds aren't available? Those in need fall to the systems that can't say no. They languish for weeks in our emergency departments waiting for a treatment bed. They fill our homeless shelters -- cycling in and out of crisis -- and they overwhelm our law enforcement and our jails and prisons -- the topic, which we're here to discuss today.

I want to give you a few stats to set the stage.  It's important to recognize that approximately a third of people with serious mental illness have their first contact with mental health treatment through a law enforcement encounter. In our 2019 survey we did with the National Sheriffs' Association found that a fifth of law enforcement staff time is spent responding to, and transporting people with, serious mental illness at an annual cost of nearly $1 billion dollars.

An officer surveyed reported that he was being forced to travel, on average, five times further to reach a medical facility than a jail. And if they did reach a medical facility, they waited on average, two and a half hours longer than if booking that person into a jail.

And so, it's unsurprising that you always become our mental health institutions. We now have 10 times as many people with serious mental illness behind bars than we do receiving treatment in a state hospital. We actually have fewer state hospital beds now than at any point since 1850. And as you just heard, that doesn't include the 90,000 pretrial inmates who've been found incompetent to stand trial, but who are sitting in jail waiting for one of the -- just 9,000 forensic beds that we have to serve them.

Now, the reality is this is a crisis, but at the same time, none of it needs to happen. My written testimony highlights a number of common-sense recommendations to help address this crisis, but

my overarching recommendation is that this commission must resist the urge to force greater responsibilities on the law enforcement. We simply can't train our staff our way out of this crisis. The reality is that the solution has to come upstream. We have to require the mental health system to do its part to prioritize care for the most seriously ill and end the use of jails and prisons as a pressure relief valve, especially for the most seriously ill. Treatment must come before arrest.

Law enforcement across the country has embraced this concept as Intercept Zero, as part of the sequential intercept model. And this commission should strongly embrace that concept and implement recommendations to ensure that systems are held accountable to serve those with serious mental illness before they are arrested.

I'd strongly recommend looking to the example of states like Ohio, which has been a leader in this crisis and implementing the sequential intercept model, including focusing on Intercept Zero. Ohio has strongly come out in favor of assisted outpatient treatment. They have a dedicated, strong use of crisis intervention training, strong partnerships between (NAMI), the mental health department, the courts, and philanthropic leadership from groups like Peg's Foundation. I think it's a model that this commission should strongly look at.

In terms of specific policy recommendations -- as you just heard -- the system simply needs to have access to treatment beds.   To that end, this commission should strongly support the elimination of the IMD exclusion, which prevents the Federal government from reimbursing States for desperately needed treatment beds. In the meantime, this Commission should also encourage the Trump administration's efforts to use the 1115 waiver authority to allow states to fund treatment beds in the meantime. And I note that this change has widespread bipartisan support and was included in the All Sheriffs Authority Mental Health recommendations that were released in December 2019.

The Commission should also strongly support federal grant funding for assisted outpatient treatment, which I mentioned it's working very well in Ohio. That program provides for civil court-ordered care for individuals with a history of repeated hospitalizations, incarcerations and/or homelessness. The federal AOT grantees have seen reductions in arrests and incarcerations and hospitalizations through the program, and it has strong support from the Department of Justice, the National Sheriffs' Association, IACP, and the American Psychiatric Association, among others.

This Commission should also support the creation of integrated crisis response systems that minimize law enforcement. The reality is, we need to encourage the use of non-law enforcement response to crisis whenever possible. Again, this process has widespread support. I note that CIT International recognized it in its 2019 Best Practices Guide, as did the Interdepartmental Serious Mental Illness Coordinating Commission, which is a Federal coordinating committee that I sit on.

And again, the most successful systems are ones that are held accountable to address all the clients, including those with serious mental illness, and to not use law enforcement as a pressure relief valve. And I encourage the Commission to recognize that and strongly encourage policies that do that.

I appreciate the Commission's time and attention, and also welcome the opportunity to answer any questions that you all have. Thanks very much.

(Phil Keith):   Thank you Mr. Snook for your testimony and I ask you to please stay on the line for questions. Our next panellist is Sergeant Sarah Shimko. She's from the city of Madison, Wisconsin Police Department, Mental Health Unit.

(Sarah Shimko):   Thank you, sir; and honorable Commissioners, thank you for the opportunity to be able to speak with you today. I have served as law enforcement -- a law enforcement officer with the

Major County Sheriffs of America -- the document that was put together there on this topic, specifically, there's about 11 million people that are admitted into jails throughout this country annually, with an average daily population of about 740,000, and out of that number, 64% of them have some type of major mental health illness; 53% have drug dependency or abuse and then 49% have a coexisting mental health and substance abuse issue.

So, that 64% number is even a bit higher than we are in our county but significant across this entire country in the corrections world. And, out on the street, it's the same, as well as with folks providing CIT training and trying to equip their officers with the best skills possible to deal with this challenging population.

(Regina Lombardo):   Thank you, Sheriff. You seem to have a really good grasp of the situation and I would say thank you for the work that you do.

(John McMahon):  You're very welcome.

(David Rausch):  This is David Rausch.  Could I ask a question?  Am I heard?

Female:  Yes, I think we can hear you David.

(David Rausch):   Okay.  This question is actually for three panellists, in terms of training.  Sheriff, you mentioned training CIT as a pre-service requirement. Just a question regarding that - - is that an effective way of doing it? You know, there's some belief that CIT should be just a specialized team, but just curious from the three panelists what the perspective is on that?

(John McMahon):  I can start, and I do believe that CIT training -- at least, the initial 40 hours, when our deputies graduate from the academy, before they actually take their positions inside of our correctional facilities is absolutely a must. Now, inside of our facilities, those deputies assigned to

our units -- housing units -- that deal specifically with the incompetent to stand trial or severely mental ill population -- their training is above and beyond that. Out on the street with our homeless outreach proactive enforcement team that's partnered up with behavioral health employees, they actually receive additional training, as well.

So, where we're at, is 40 hours a minimum for all of our staff and enhanced training is required for those that deal specifically with those populations.

(John Snook):  And to follow up on that, this is John Snook. I think I would very much agree. We often say that the CIT program is more than just training. It's an ability to coordinate with programs in the community and engage that even beyond the training.

So, we often advocate for -- just as officers receive blood-borne pathogen training or domestic abuse training in the academy because they're going to see it every day. They're going to see mental illness every day.

So, training should begin at the academy and continue, but that specialized training for officers who have that sort of temperament and want to become CIT trained officers is also a benefit, but every officer should receive significant amounts of mental illness training, just because they're going to see it regardless of whether or not they want to.

(Sarah Shimko):  I'll sum it up as well.  I agree with what the other individuals have said. We had the privilege of having our own academy and certainly follow the state of Wisconsin requirements, but go above and beyond in our academy to ensure that our officers understand how to adequately identify, respond to, and then come up with an appropriate disposition for people suffering from mental illness.

But the one thing that we face in North Carolina that is different from the larger communities and the largest sheriff's offices, is that we are a lot of small agencies, and we don't have the availability to have academies.

We're relying on the community college system here and with me being old-school going through the academy when North Carolina had it, the community college doesn't seem to be reaching those officers as it pertains to the mental health issue, and that's why we're dealing with CIT programs and the crisis intervention teams that we call.

And we have to do that as an intervention before we go to the magistrate for that involuntary commitment order. If you called the intervention team first, they come out and try to handle everything.

 But if you go to the magistrate first, it locks everybody out, then we're confined with that individual. In North Carolina, now the average may be eight hours waiting on a bed, or what we've experienced in my county, is as much as 28 days that we had to stay with the respondent until they could find a facility.

My question is after that statement is, is to Mr. Snook.  Who are the players that you would invite? Who are those interested people that we should invite to the table for the state, for our agencies to try to develop a program here that's going to be advantageous to all of us? Because like I said before, we don't have the availability that larger communities do.

(John Snook):  That's a great question. Thank you very much Sheriff. I think one of the nice things about some of the programs that we have highlighted in our testimony is that they have succeeded and they aren't New York City, Chicago the places that have -- even though they're doing these good things there, they're not as translatable to smaller communities.

A place like Tucson, Arizona or many of the communities in Ohio, they have models that I think have been very successful. If you look at Tucson's model. They have a very successful drop-off that takes all clients. It doesn't matter what they come in with; if it's a medical concern; if it is drugs; if it is mental illness -- the officer doesn't need to be a doctor. He just knows the person needs something that isn't jail.

And they pride themselves on having a quicker release time than it is to book. They also have a specialized drop off for law enforcement that has a special printer and a bathroom, and a refrigerator that's just for law enforcement that they can then drop that person off. And that came about as a result of a series of meetings with the city and the county bringing together all the key stakeholders and saying, "How do we get this done?

We all know where we want to go from A to B. How do we get there?" And the nice thing about both Ohio and Tucson is they've been willing to take that model and share it around the country. So, I would highly recommend this commission reach out to those programs, have some conversations -- because I think these are pretty translatable solutions that any community can use.

(Clemmons):   Alright, thank you. And the other reason that I ask that is based upon what Sheriff McMahon said also and I think it was one of the sergeants -- Sergeant Shimko was stating that how our facilities are being used, as that first line of defense for mental health such as our jails.

And the cycle that we have to break with the community is that they're frustrated for the lack of mental health facilities and the lack of mental health that they can get. So, they are going to the magistrates to take out these warrants and these violations to get them in our facility.

And then, the phone call we get next is, "Well look, so and so is in your jail sheriff. He or she needs mental help. Can you make that happen?" See, by that time, we don't have a large enough facility to deal with that. We don't have doctors that are coming in. We have an on-duty nurse to handle those situations. And if we have an event, we get them to the hospital or whatever.

But the community is frustrated also too with the inability of our state and dealing with the mental health facilities. They look at our jails as that opportunity to get them out of their houses and out of their faces, and then they call us demanding, warning, questioning, begging for mental health at that point. So, it's definitely an issue that all of us are dealing with. But I thank you for your comments and the work that you're doing and the testimony that all three have given thus far.

(Nancy Parr):  This is Nancy.  Can I ask a question -- my turn?

(Phil Keith):  Go ahead Nancy.

(Robert Chapman):  Commissioner Parr.  All right, proceed.

(Nancy Parr):  Okay. I have a question for all three. Can you all hear me?

(Phil Keith):  Yes, ma'am.

Female:  I can hear you Nancy.

(Nancy Parr):  I have actually two.   The first one is about funding.  And for the sheriff, in particular, in your written statement you stated that between 2015 and 2019 your budget was increased by $9 million.

So, my specific question about that - was that like grant money, local money, state money, federal money? Like, where did that money come from? And then for Mr. Snook, if you could talk about any - where are funds where people can search for funding for the assisted outpatient treatment that you spoke about. And then, my second question -- different area - is for all three of you too, is -- everybody, we all need data to rely on, and so many times I know when people go, "well where is the data?"

It's not there because -- we don't -- we're not very good at collecting it, and that might be because we're not really sure what we're supposed to be collecting or looking for. So, if you could talk about what data we should be looking for people to ask for funding.

(John McMahon):   This is John McMahon, I can start as it relates to your first question about the $9 million. We have a unique situation occurring in California with the criminal justice reform, which ultimately shifted the responsibility of a lot of inmates that used to go to the state prison system to the county jails.

That was as a result of overcrowding in the state prison system, ultimately resulting in a consent decree.  After that shift occurred in October of 2011, those inmates began living in the county jails, which increased the length of stay past the year and increased our medical mental health requirements, as well.

And now, all of the county jails -- with the exception of a couple -- have been now sued by the same law firm. And so, we're now under a consent decree to provide a constitutional level of mental health medical care.

So, the additional $9 million -- to sum it up -- came from the county's general fund. We continue to pour money into our medical requirements as well as our mental health, and so there is $9 million just in mental health care, and we're not done yet.   The program I talked about before

where individuals are restored to competency that's partnered up with state hospitals --that $20 million comes from the state for us to provide 146 beds to restore people to competency. That's a separate program. But the $9 million is general fund dollars that is out of the county to help offset the cost of this new population.

(Nancy Parr):  Okay.

(John Snook):  And this is John Snook to follow up with your second question, with regards to the AOT -- the Assisted Outpatient Treatment program. The Federal government has done a series of grants.

The second round of those grants is coming out probably, in a couple of months, but I do think that this commission would do well to encourage further funding to make that a national program because you can't have a successful program rely on grants alone.

And I think the Federal government should have seen really significant benefits reducing criminalization, arrests, and hospitalizations.  A number of the programs reach the $1 million savings mark in their grant program periods.

So, I think it's an opportunity to really engage people in a way that we simply haven't before, and this Commission would do well to encourage further use of that program.

(Nancy Parr):  Thank you.  Any comments or thoughts about the collection of data?

(Phil Keith):  Sergeant, any comments for you?

(Shimko):  Yes, I guess I just wanted to point out the documents that I added in my submission. And a lot of what we've been talking about today is really covered in the National Guidelines for

(Nancy Parr):  Thank you.

(Phil Keith):   Thank you sergeant. And Mr. Snook, can I ask you to respond to Commissioner Parr's question about your testimony about 24/7 access to crisis line services staff clinicians. And can you expand on what that looks like for?

(Snook):  Sure. I think the -- honestly the hardest part of this work so far has been figuring out the crisis portion of this. I think the sergeant was spot on and saying that we have struggled with funding that. We have struggled with prioritizing it. And we have struggled with coordinating it with law enforcement with, you know, the conversations about having separate 9-1-1 numbers, etcetera. How does that work into making these systems work?

I think the reality is that as law enforcement starts to really advocate and engage in that conversation, it makes the conversation that much easier. We have seen a number of communities across the country who have now been able to set up really effective crisis emergency rooms, crisis lines, etcetera, full continuum of service care, because law enforcement has said this is a priority that we need to not be the responders.

And the really good thing that we are seeing -- all sorts of national law enforcement entities take up the push, as well. So, the National Sheriffs' Association, the All Sheriffs Authority material, CIT International, etcetera. I think everyone is coming to the same point that this isn't a world where we want law enforcement to be the first responders for most mental health calls.

Our research -- our survey -- looked at this and we found that 65% of the calls that officers went on, they didn't find the person to be dangerous to anyone else -- that they didn't feel that they needed to be called out -- that it could have been a non-law enforcement response. And that's the sort of reality we're seeing across the country.

So I think as we stand up crisis care there's a recognition that we are getting away from having to respond with law enforcement in the same way. And that really reduces both the burdens on law enforcement, and the criminalization of mental illness that invariably comes from forcing law enforcement on to those front lines.

(Phil Keith):  Commissioner Parr, does that answer your question?

(Parr):  Yes, it does. Thank you.

(Katie Sullivan):  I have a question. This is Katie Sullivan. I'm calling - I'm asking, I guess the officers first - but Sheriff McMahon, you talked about the number of civil commitments, and I'm wondering how many of those civil commitments the officer responded to -- was it because there was a crime committed or were they responding just to have the first touch on a civil commit?

(John McMahon):  Hi Katie, John McMahon. They're not civil commitments. If you're referring to the JCBT or the -- or those folks that were incompetent to stand trial. They've all at some point committed a crime in the community.

(Katie Sullivan):  Right.

(John McMahon): either in our county - the other 30.

(Katie Sullivan):  Right.  No, I meant 5150, did you talk about? - So I misunderstood.  I'm glad I cleared that up. So, my understanding was you were talking about how your officers came into contact with X number of mentally ill and many of them ended up with a civil commit. That is not the case, yes.

because these folks don't work at night from DBH -- but the deputies dealt with an individual who was known to the behavioral health employee -- and she said, "I didn't realize he was off his meds or we were having problems with him. I'll contact him today and we'll get that resolved." So, it is actually working. It works very well for us.

(David Rausch):  Okay. Curious from Mr. Snook on your submitted testimony, you stated that you had in there, talking about the number of law enforcement respondents to a survey 2019 that 65% of all law enforcement transfer ports and that 17 of the officers didn't perceive an individual as being a risk or harm to others. So, who would you suggest responding to those calls if law enforcement doesn't respond?

(John Snook):  Thank you for the question. We've seen a number of different models. I think Salt Lake City has been one of the leaders in this and has moved to an all non-emergency transport, which allows law enforcement to serve as backup if there's a call that the individual has a firearm, those sorts of things -- law enforcement can be called out right away to sort of act as a co-responder.

But the reality is that for most of these calls, we are able to treat as a typical medical call, and you are able to respond with either emergency first responders, ambulance, or in some cases, non-ambulance services, such as Salt Lake City has done. And that has been really successful in reducing a lot of the concerns.

Now, other communities have gone the other way and have set up law enforcement teams that are trained entirely to do these calls and only respond to them with mental health support teams is one model that you often see. That's another way to go. But it does have the burden of having a law enforcement officer have to go to those calls and increasing the risk to both the officer and the person of having a law enforcement response. So, there are proven models that use a non-law enforcement response, especially in communities out West.   I'm happy to send more information to the Commission after this.

And as an example, one of the stations out on the Arizona border -- close to Arizona -- it's a challenge in a community of 4,000 people to find staff that's willing to do that. But when it's up and running, it works very well. They're available after hours. We just call them, and they'll respond and help the deputies out.

(Craig Price):  Okay, very good. Thank you.

(Phil Keith):  Thank you Commissioner Price and thank you Sheriff.   Other Commissioners with questions?

(Chris Evans):  This is Chris Evans. Question for the Sergeant and also Mr. Snook. You both have talked about -- and I've looked at your written testimony in regards to the single-entry point for the credits resource center. And I'm glad you covered that earlier.

The one thing I didn't see was whether there is any recommendations or highlights on programs that if you think are models for this. And in particular, for medium to rural areas. As I understand, ((inaudible)) larger cities and things of that nature. Can you talk a little bit about smaller communities and how that can be applied in that resource, in that situation?

(Shimko):  Sure, this is Sergeant Shimko.  We are looking at different models currently at our county level, and one of the models we're looking at is the Tucson model that was referred to earlier. Connections Health Solutions is noted in a lot of the materials, and they do have a lot of different resources and provide assistance in different ways -- and are able to help scale different needs to different communities.

So that's the one that I am most knowledgeable about, but there are certainly a number of different models. Dr. Balfour is cited in the number of research and documents and seems to be quite a good resource. So, that's one of the main ones that we're looking at currently.

(John Snook):  This is John Snook.  I'd echo the Sergeant's - those are really good. I think RI International has done some good work, as well. They have a successful program that they've been pushing in the Georgia area, in addition to Phoenix.

And that has been successful with sort of - the way they talk about it is sort of an air traffic controller model; trying to utilize that. I would say that this has been the - as Ohio has sort of built out its entire mental health system and coordinated with law enforcement really well. The hardest part of this process has been successfully figuring out the crisis response and the one stop shop.

So, I would say that this commission isn't alone in having questions on that. I would say that there have been a lot of good studies and work done. So, you wouldn't have to reinvent the wheel to get some answers on what's out there. And I would definitely recommend reaching out to the Ohio folks because I think they brought in basically every expert from around the country and walked through this process -- trying to figure out some of those solutions.

(Evans):  Thank you very much for your time; appreciate it.

(Phil Keith):  Thank you for your question Commissioner Evans. I know we have some Commissioners who have prior commitments, and we certainly appreciate you being with us today. We're going to extend on for another six minutes. So, thank you for joining us today and Commissioners questions, please continue.

Operator:  We do have a question.

(Phil Keith):  Thank you Travis.

(Jamila Bey):  Hi.  ((Inaudible)) Commissioner here.  I'm (Jamila Bey).  I'm one of the writers on the project and my question is for the panelists. I have to admit I'm a bit of a policy wonk and, you know, every problem to me looks like something that needs a legislation fix. As we were recognized and each of you said explicitly or at least – that this mental health issue in various communities have to be addressed to a public health kind of lenses.  Is therefore anything that exists today anywhere on the planet -- you need to use an international model, that's fine too.

But is there anywhere that we can make to look at? Here is a place where people are getting mental health care that they need. Even if it's an in ((inaudible)) or if it's more of a financial consideration - more than just hoping is where you have adequate funding and bed space. Is there anywhere that any of you could point ((inaudible)) these folks do it right. And, you know, these people ((inaudible)) healthcare -- the mental help they need. And hopefully in a way that is ((inaudible)) efficient I don't know if that exists in the U.S. Thank you.

(John Snook):  Sure, this is John. I can touch on that. One really interesting thing we've seen is how alike much of the world is in dealing with these issues. We have, what we call sort of an international beds consortium, that looks at how these issues are - impact each other around the world.

And Australia, very interestingly, has very good community services; has universal healthcare, etcetera. They found that as they got to a certain level of, just cutting their own beds, and reducing bed availability, they suddenly had a problem with people being arrested and people filling the ERs.

And so, I think there are international models that actually look to these issues in a really nice way. If the commission has access to Health Affairs, there's a really good piece in this month's

Health Affairs that looks at France, Canada and a number of different countries, and just compares the systems -- and what works well / what works poorly.

And I think one of the things everyone comes back to is this idea that there's a baseline level of treatment beds you need to have for the system work. You wish you were a little bit more complicated than it is, but at the end of the day, it's not brain science. You need to have places to get people treatment in order for them to get better.

And, if you keep them there for too short a period of time, they don't get a chance to get better. And that doesn't care what language you speak or what country you're from.

(Phil Keith): Other questions from commissioners?  Okay, if the Commissioners think of other questions, please let our staff know of your question. We can follow up the panelists. And let me one more time ask, are there any final questions from commissioners?

(Crosstalk)

Male 3:  I'm sorry, which Commissioner?

(Jamila Bey):  I'm on (Barry Bratburd's) team.  I'm one of the writers on the project. And I'm writing on Mental Health, so this is something I'm researching right now to put into the report.  So, speaking bluntly -- and this is just for my own research purposes here.   Is it possible to have this conversation without recognizing what the conversation has to lead into - at least conversation around universal health care, ((inaudible)) thing?  ((Inaudible)) where we have to recognize that?

(Phil Keith):  Well, I think we can certainly put that in the arena for maybe executive session for the Commission to discuss. Any Commissioner want to respond to that?