# EXHIBIT 6

**Company:**          **FBI ACS ONLY ACCOUNT**

**Conference Title:**  **Mental Illness**

**Conference ID:**     **3273867_1_MYV9zA**

**Moderator:**         **Dennis Stoika**

**Date:**              **March 25, 2020**

Operator:   Good day and welcome to the President's Commission on Law Enforcement and the Administration of Justice Hearing on Mental Health Conference call. Today's conference is being recorded. At this time, I would like to turn the conference over to Phil Keith. Please go ahead sir.

Phil Keith:  Thank you, good afternoon and thank you for joining us today. I'd like to call the President's Commission on Law Enforcement and the Administration of Justice to order. On behalf of Attorney General Barr, we thank you for joining us again today for this important commission teleconference. At this time, I would to ask the commission's Executive Director, Dean Kueter, to call to roll the commissioners.

Dean Kueter:  All right, Commissioner Bowdich? Commissioner Clemmons?

James Clemmons:  Present.

Dean Kueter:  Commissioner Evans?

Christopher Evans:  Here.

Dean Kueter:  Commissioner Frazier?

Frederick Frazier:  Present.

Dean Kueter:  Commissioner Bob Gualtieri?

Phil Keith:  Thank you Sheriff Barnes, for your testimony. Do any commissioners have questions for Sheriff Barnes?

(Crosstalk)

Female:  Oh, go ahead, go ahead.

(Dave Bowdich):  Hey, this is Dave Bowdich. Sheriff Barnes, good to hear from you and, very nicely done, very thoughtful presentation. The question I have goes a little off to the side, but I think it is very relative. Your discussion on the decriminalization of drugs, unfortunately, this – the – society's attitude seems to be changing across the nation towards marijuana. I have not seen the studies that you cited here but are they able to differentiate between the use of marijuana and meth and other drugs that marijuana is the overriding problem here that they do believe is causing some of this psychosis? That's one question.

The second question is, is there anything at the state and local level whether it's within California or throughout the nation, where there is a concerted well-developed effort to begin to educate our legislators and the public about that problem that you cited?

Don Barnes:  So thank you Dave, nice to hear a friendly voice. First, the psychosis. There are new studies coming out about the direct correlation between use of high toxicity of cannabis or THC to psychosis. And those may be referenced in your findings. There is obviously this direct correlation between marijuana use and other narcotics. We saw what happened with the narcotic analgesics OxyContin and hydrocodone that has morphed over into the use of heroin and now fentanyl throughout the nation. You know we're dealing with the COVID-19 issue and we're losing thousands of people to overdose every year and it's not seen as a pandemic, which I think is underestimating the impacts of this problem.

For their narcotics, specifically, and just in Orange County, we had interdicted in 2016 1 pound of pure fentanyl. In 2017, 4.4 pounds of pure fentanyl, in 2018, 40 pounds of pure fentanyl, and last year, over 170 pounds of pure fentanyl. It is a trend that is going the wrong direction. That pure fentanyl, just last year, represents 500 million doses of fentanyl -- potential lethal doses. So, as far as education goes there have been efforts that we have had through the legislator. They don't want to hear it because California's anti-incarceration movement through the state to bring the state prison population down, but it's being done at the expense of our residents, families, kids, as we see these trends going the right direction. And in comparison, going back to one of the CDC studies in 2013, the dominant substance for overdoses in that year -- up 4% was fentanyl, 2017 four years later 40% was fentanyl and the dominant substance for overdoses. It's a movement that, as we are losing control of, and so, for the education efforts, absolutely lacking, maybe because there's a resistance to hear the facts. And that's been my experience, at least in California.

Dave Bowdich:  Okay, thanks, that was really, really helpful. That is - this one really stood out to me and the DEA certainly has the lead on the enforcement aspect of this. I'm just wondering if there's more that the Federal government could do to help educate our future generations. And before this industry starts to become a Goliath that we cannot slay -- and when I say this industry, I'm talking about the marijuana industry -- it's already getting there quickly, but is there something we the Federal government could do to really put this message out to try to help with the situation? Thanks Don.

Don Barnes:  Yes, I - just on that one comment, real quick on marijuana, the one thing I believe the Federal government can do is to advocated for removing it as a Schedule 1 narcotic. But, being Schedule 1 never prevents the Federal government from testing for the per se limit of a nanometer per deciliter. So, without those tests that we have for DUI alcohol, for example the .08, there's not a metric that results in the admin per se, of marijuana or THC, in the blood, which makes prosecuting these crimes very, very difficult because you have to rely on expert testimony of the officer DREs,

Katie Sullivan:   Second question, just quickly you talked about accountability. So, it sounds like -- and I don't want to make assumptions -- but it sounds like policy is the first place where you say that people need to be held accountable that is, you know, criminal statutes and criminal justice policy. Where are the points of accountability that you might see in the system that you think would help reverse the trend that you're seeing in California? And thank you so much, Sheriff Barnes. Your testimony is excellent. Thank you.

Don Barnes:   Thank you. So, if you look at the system and I think you have a copy of our integrated services plan, but there's a system. And, in the middle of that system is my jail. Everybody, at some point in the system will cycle through the jail. So, I look at pre-custody, in custody treatment, post-custody, and maintenance of these issues. So, on the mentally ill, specifically there's a lot of people who decline. They don't decline to the point of criminality. They decline to the point of not having appropriate interventions, strategies and services to get them mentally health stable, plus the lack of ability on some of these 5150 holds in California for those who are in crisis to get them into services against their will, if necessary, to get them stable.

So, before they even get here, hopefully there's off-ramps to get them off that highway to the jail. And that's true for the drug addiction issues, as well. We have a big issue in California, you know, the rehab Riviera. That is a national place and there's a lot of criminal enterprise that takes place in these drug rehab enterprises where people are being almost human trafficked here, sometimes sex traffic, abused, reintroduced to narcotics, getting them in the system, and medical fraud. It's a huge issue I think, almost specific to Southern California. So my goal and my testimony, I hope, is heard this way, is that law enforcement should be the last people many of these people are encountering. I think, by default of failures and programs before the court system, before the judicial system and before incarceration that system is significantly lacking. So, and I talk about accountability, accountability is also that carrot stick approach to force people into getting treatment.

With the decriminalization, in California, what that's resulted in is there's no incentive for people to go into treatment, as a result of any type of judicial plea or pleading. We always had PC 1000 drug courts, Prop 36 -- all these intervention strategies for drug use. There's nothing to entice people to want to voluntarily participate in those programs because prior to 2014, there was a felony conviction you could dangle in front of them and force them or at least entice them into getting some form of treatment. That enticement does not exist anymore. Most people are getting into jail, doing five days, credit time served, leaving without probation or entail any type of post-release supervision and walking right back into narcotics use. I'm sorry I spoke really fast. I apologize.

Phil Keith:  Thank you Sheriff. Do you have time for one more question?

Don Barnes:  One more and I have to run out the door.

Phil Keith:  Yes sir. Commissioner's one more question.

Erica MacDonald:  I have a question, this is Commissioner MacDonald, US Attorney MacDonald. Am I good to go?

Phil Keith:  Yes ma'am.

Erica MacDonald:  All right. Thank you very much, first off Sheriff – I really appreciate your testimony, as well. It was excellent. I'm really interested in these crisis stabilization units. Prior to being a US Attorney, I was a judge as well with a few of my other commissioners, Moody and Sullivan. And we really do need these types of centers that keep them from, you know, having to go to the court system necessarily. Can you talk to me more about what that looks like? You said you're going to be opening up three yourself in 2020 and a couple more, as early as 2021. Are there protocols that

Medicaid or whatever, it might be and then tying them to post release programs, so that we can maintain their success, post release, hence, ending the cycle of re-incarceration or recidivism. I don't know if I answered your question specifically. I hope I did.

Erica MacDonald:  You did. Thank you very much. I appreciate it.

Don Barnes:  Thank you. Thank you to the commission.

Phil Keith:  Thank you, Sheriff Barnes, for joining us today and stay safe and we'll continue to have your first responders in our thoughts and prayers.

Don Barnes:  Thank you very much.

Phil Keith:  Our next panelist is Dr. Shannon Robinson, who is Principal at Health Management Associates. Dr. Robinson is also a former Chief Psychiatrist for the California Department of Corrections and rehabilitation. Dr. Robinson, you're recognized.

Dr. Shannon Robinson:  Thank you. Well, it's exciting to go after Sheriff Barnes, since we were both in California, and as a healthcare provider, I never know exactly if I'm on the same page as our law-enforcement colleague, so that was really exciting. And one of the things that he brought up I'm also going to bring up, so that is a good segue into my talk.

So, I am a board-certified psychiatrist. I'm also board-certified in addiction medicine. I spent my - the beginning of my career at the University of California, San Diego in the Veterans Administration in San Diego, followed by the California Department of Corrections and Rehabilitation. I've concentrated on research and treatment of mental health and substance use disorders, as well as the treatment of mental health and substance use disorders in primary and specialty care clinics like HIV and hepatitis C clinics. I've done research and expanded access to evidence-based

psychotherapy and pharmacotherapy for trauma and substance use, co-occurring medical mental health and substance use disorders. And I'm currently a healthcare consultant at a national healthcare consulting firm doing more of the work that I have done over the last 25 years.

Trauma, mental illness, substance use disorders and homelessness have bidirectional influences upon each other. To stop the multi-generational effects of these issues and the ever-increasing resource utilization, we need to treat mental health and all substance use disorders with evidence-based treatments, including motivational interviewing, cognitive behavior therapy, contingency management and medications for addiction treatment. 63% of sentenced jail inmates have a drug use disorder, but only about 25% of them get treatment while they're incarcerated. Traditionally, risk and needs assessment have been used to place patients in treatment programs, while incarcerated. These assessments look at criminal history and are designed for law-enforcement supervision purposes. Risk and needs assessments are not diagnostic tools and shouldn't be used to determine clinical treatment needs.

It's imperative that legal, child services, and correctional partners allow decisions about medication and level of care or treatment to be determined by clinical providers with shared decision-making from the patient. And that specific medications not be listed in legislation, as new medications are FDA approved all the time, and are evidence-based changes over time. We clearly know what does not work. Eighty five percent of people in an abstinence base treatment program for opioid use disorder relapse within a year, yet historically, we forced people to withdraw from medications for addiction treatment when incarcerated, despite knowing that patients remaining on methadone, while incarcerated, are twice as likely to attend a narcotic treatment program, post release. And the patients who are initiated on methadone, while incarcerated, are more likely to attend a narcotic treatment post release than those who have not started on medications and are referred to on that same narcotic treatment program.

Whether we're looking at Rhode Island, England, New South Wales, or Australia, all have seen significant decreases in death rates, both during incarceration and post-incarceration, when medications are continued or initiated during incarceration. We can't rehabilitate deceased people. The current risk of death upon release from incarceration is 129 times that of the general population. With the release of the *Jail Based Medications-Assisted Treatment Promising Practice Guidelines*, which I helped to write, and litigation that has mandated medications for addiction treatment in some jurisdictions, some jails and prisons are starting MAT programs. Yet, most are focused on opioid use disorder, not opioid use disorder and alcohol use disorder, despite the fact that alcohol use disorder killed way more people, long term.

Additionally, as all of you know, I'm sure the amphetamine epidemic is fast on the heels of the opioid epidemic and stimulants don't respond to medications for addiction treatment, but they do respond to evidence-based psychotherapy. So what I'm trying to say is we need to be implementing substance use disorder treatment programs, not just opioid use disorder treatment programs. We also need to decrease the influence of gangs, which currently are inhibiting members from accessing medications for addiction treatment while incarcerated. So, I was glad that Sheriff Barnes already brought that issue up because we certainly have seen that in Orange County, but this is not going to be isolated to Orange County. This problem is going to exist in a lot of places. And we need to get out in front of this issue by using lessons that we learned from prior criminal justice projects.

Additionally, we have to work outside of incarceration. In some jurisdictions, judges, lawyers and child service workers continue to recommend and even mandate discontinuation of medications for addiction treatment. We need to eliminate unnecessary barriers to MAT. Why is there an eight-hour training course to prescribe buprenorphine when there's no training course required to prescribe any other opioid or other medicine for that matter? Why are there caps on the number of patients we can treat with buprenorphine when there are no caps for patients who could be treated with any

other medication? And why are there restrictions to use telehealth to prescribe medications for addiction treatment?

Now, those restrictions for telehealth were listed in the face of COVID-19. But, I am very concerned that they're going to be reinstated, upon resolution of the pandemic. And, we need to streamline the process of certification for jails and prisons to become narcotic treatment programs. From an education perspective, education could be mandated for all healthcare training programs and mandated for currently licensed providers and for custody, judicial and child service staff.

Right now, education on addiction is only required for psychiatry, not psychologists, social workers, primary care doctors. And regarding resources, some resources are definitely being wasted. We need to stop Federal, state and local funding of care, which is not evidence-based. And we need to incentivize by reaching into the jails and prisons to prepare for smooth transitions to the community -- another issue, which Sheriff Barnes brought up. In summary, education of criminal justice and healthcare professionals, regarding evidence-based psychotherapies and medications for addiction treatment, along with increasing access to evidence-based treatment inside the wire and outside will improve outcomes and thereby improve the morale of providers, patients, family and law enforcement, as well as, ultimately, decrease the cost of our Federal state and local governments. Yes, there are upfront costs, but long term, if we do some of the things that they're obviously doing in Orange County, which is not being stuck inside their own silo and looking at this as everyone's problem. It's not my problem or your problem, it's everybody's problem.

Although the evidence I have presented really focuses on substance use disorder, there is an equal amount of evidence that could have been presented for mental health disorders and its treatment. So, I believe that increasing access to evidence-based treatment for substance use disorders and mental health will lead to huge improvements in health with resulting decreases and homelessness and recidivism. Thank you.

David Rausch:  Sure. So this is for Dr. Robinson. One is, thank you. I agree 100% with you in terms of we need to use fact-based evidence-based information to treat the issues that we're dealing with. I always say fact not, feelings is how we get things fixed. So, part of what I had a little bit of concern only because of the - what we've seen in the Appalachia region. You know, to the opioid crisis we know, was created by big pharma and bad medical providers, quite frankly, and because of that, caps were put on those programs, in terms of opioid prescribing.

That's also why caps had been put on the treatment because of the bad actors, right? So, they are big money makers. We've seen them here in the, you know, in the East Tennessee ,as well as other parts of the Appalachia region, where there are bad actors in the field, as well as where they are overprescribing and improperly prescribing the buprenorphine drugs.

Our concern - and we're also seeing the issue, quite frankly, in our state prisons, here in Tennessee. It's known, as prison heroin because of its use. We've been - you know, they were told upfront that you couldn't abuse it. Well, we know that's not true.

So, my question, though, is in terms of medical assisted treatment is, you know, with those who are using that form of treatment, what's the end game of, you know, I mean, when do we get off of this stuff? I mean, I agree with you, don't just make them go cold turkey, but when do we try breaking them down off of this stuff? It shouldn't be a life sentence, you know, to have to constantly ever – always have to use it. I understand it's treating a disease, but I don't see it the same as treating high blood pressure.

Dr. Shannon Robinson:  Well I am glad you've given me the opportunity to address that with you. So I'm not going to relate it to high blood pressure, but I'll relate it to, probably, the other most common thing, which is diabetes. And I actually grew up in Louisville, Kentucky, and so, I know those hills of Appalachia and there – you are right, there are people especially people who have set up cash clinics who have been in a – who have inappropriately prescribed buprenorphine. But, we have

people inappropriately prescribing lots of other meds too, so that's one issue. But, let's relate this back to how long do you need treatment?

So I - say I'm seeing a diabetic. When someone comes in and they have Type II diabetes, which is the majority of people who have diabetes -- they get it as they age, we do dietary education when the person is first diagnosed and we talked to them about medication. And based on the severity of their illness, we determine if they need a medication right away or if we're just going to use dietary interventions, what I refer to as psychosocial interventions or lifestyle changes. So the same thing happens if you get someone into treatment early enough for opioid use disorder.

If you bring somebody in who has a mild opioid use disorder, your first thought isn't to put them on buprenorphine, certainly not for long term. Now, how many people know family members or friends who have diabetes and were able to get rid of their diabetes and not take medication? So, most of the education that I do is in healthcare forums, some with law enforcement. But, so usually, if I'm speaking to 100 people or even 200 people, there might be one or two people who raise their hand and say that they have had a patient in their entire career who was able to modify their diet and stop eating all complex carbohydrates and not require medication for their Type II diabetes.

And, so I bring up this example because that may be the case with a lot of people for opioid use disorder. A lot of people may need medicines for long term. But I want to go one step further and say that we know there are neural chemical changes in the brain that happen when you you've been using substances of abuse -- huge release of dopamine and changes, structural changes in the brain. It takes a couple of years for those changes to stabilize in your brain, once you've been on medications okay? So, we definitely know that you need more than 12 months of treatment.

Without having the treatment -- so in the old way, we know that, you know, 85% of people relapse within a year -- even if you detox somebody, a lot of people quickly relapse -  a majority of people

and even if you had someone on treatment for six months or so. So one of the things that we need to do is we need to improve the psychosocial treatment that has occurred.

And one of the reasons there is so much stigma about MAT is because most people, when they think about MAT, they think about a methadone clinic from 20 years ago. And previously, methadone clinics - and they still are harm reduction approaches, very focused on harm reduction. However, once you have someone's brain stabilized, you can actually engage them in cognitive behavior therapy. You can engage them in contingency management and motivational enhancement and these things that we know that work.

So, we need a combination approach. I'm not saying that medication is the cure because it is not the cure. You're right, if it is something that will help them control their disorder. But then if you take the medication away, the disorder is likely to come back. So, you must do both. You must do psychosocial treatment, along with the medications. And, we may need to even improve our psychosocial treatments. Hopefully, that answers your question.

Paul Penzone:  If I could add to that, if you don't mind -- and I apologize for interrupting, but I just want to speak about a program here we have in Maricopa County. So, we have a drug recovery program, and just to give you some background. Before I took this office, it was known for being a facility called Tent City where the mentality was if we're abusive and put, you know, inmates outside in the heat, that their behavior would change because they're being punished, you know, more aggressively than the normal detention. When I took office, I got rid of Tent City and we converted the one physical structure there into two dormitories. There was one for the ladies and one for the men and we established a drug recovery program, much like what the doctor's speaking about where the chemical element was absolutely a part of the process to determine those most in need and if there was a high probability of increased success if it was incorporated in their therapy.

It's a seven week program inside the jail. It is directly aligned with the release date. And when they're released, there is an additional seven weeks of the program outside the walls, once they are out in the community, to make sure that is ongoing. We have – and the other elements to it are social development, are about ownership over their own decisions or behaviors. It's about promoting self-esteem, as they stabilize. And I would tell you, I would never pretend to be an expert in this field, as I'm a cop, I'm not a doctor. But having spent six years in narcotics and going to a lot of trainings, absolutely, there is a doctor speaking about this becoming a chemical imbalance.

For those who are drug addicted, they are adversely impacting the normal chemical balances within their brain, which are altered sometimes, you know, permanently, sometimes they can recover from that. But without some type of chemical support in this, you know, traumatic or crisis state, their ability to just go cold turkey and recover is a low probability. And our program, which again, is seven weeks and in seven weeks out does have a chemical element to it that we has seen -- and I started this 2-1/2 years ago -- we have seen a 20% reduction in recidivism by those who go through the program versus their peer group with similar circumstances who do not have access to it.

Now I'm not going to pretend that that's enough runway to say that scientifically, it means it cured them forever. I will tell you that we see the greater success rate now. And I think 2-1/2 years is a decent time frame to have a measurable. So, I do think that we have to base our decisions on science, find the best practices and not that we want to transfer you from one drug to another but we have to recognize that if your brain or body is altered in some way, it may be dependent on something that addresses that void or that need to help you stabilize, so that you can be productive in life.

Dr. Shannon Robinson:  And the sheriff brings up...


David Rausch:  Thank you Sheriff.


Dr. Shannon Robinson: A number of really important points that I think are worth highlighting which is that there is continuity of care. There's treatment – while they're incarcerated and upon release. One of the things I would encourage people to start thinking about though is that, you know, we know that our patients can't engage in the psychosocial treatment while they're, you know, either high or in withdrawal and constantly having changing levels of neurochemicals. How can we expect them to participate in educational programs or job readiness programs? So, I personally would really encourage you to – I would advocate that we need access to treatment for incarcerated patients throughout the duration of incarceration. That doesn't mean someone gets treatment the whole time but we need to stabilize people's brain chemistry, as soon as possible, right when they walk in the door because then, with stable brain chemistry, they can get their GED, they can engage in trade school.


And one of the things that the Sacramento County program has seen and they've been doing MAT for five years now and have five-year recidivism data, or you know, long term recidivism data is that people transferring into jobs, jobs they can actually get paid a living wage, you are much less likely to go back into the drug trade or sex trafficking, if you are able to put a roof over your head. And so, I think the transition is super, super important.


And that was the one thing that all three of us brought up today was warm handoffs. And, so we need not only to be thinking about where is this person going to get their treatment when they leave incarceration but do they have a roof over their head and do they have food in their belly? You know, how can we expect somebody to show up for treatment especially if it's mandated at 5 o'clock in the morning if they don't have a place to plug in their phone and they don't have an alarm clock

which is on most of our phones, you know, and they don't have transportation to the treatment program?

So, we really got to think holistically about this. But, I would say that, you know, substance use underlies 85% of incarceration, with at least 65% of people in jails having a substance use disorder. And, so if we don't treat that substance use disorder, we will continue this revolving door.

Phil Keith:  Thank you. Other questions from commissioners?

Gordon Ramsay:  Yes, this is Chief Ramsay, just a quick question. Could you talk real quick, both of you about state funding and Federal funding? And, I say this based on comments the AG had made about his first appointment under Bush and how, in the criminal justice system, mental health was hardly ever talked about. Now, today it's a priority for criminal justice. And your comments on funding state and Federal would be appreciated.

Dr. Shannon Robinson:  Well, when discussing my testimony with some other people previously, I asked for input about whether I should bring up the Federal funding issue. So, I'm glad that you're bringing it up because I didn't put it in my verbal or written testimony. So, there is a rule that exists that says, you know, federal dollars cannot be used for incarcerated persons. But, unfortunately, the situation that that creates is that then there is no incentive from a community provider to do in-reach into the incarcerated population. So, that rule really impairs this warm handoffs that we're all striving for or even hot handoff, as some people have called.

I mean, we know that when you meet the person that you're –going to take care of you before you leave incarceration, that your likelihood of attending that first appointment is way higher than if you don't meet that person before incarceration. And, so one of the things a few of us have brought up is these silos. And the Sheriff from Orange County brought up the fact that the hospital association is chipping in for part of their program because the hospital association realizes that it impacts

them. And, so if we could break down all the silos -- and that's part of people thinking about it as your patient or my patient or, you know, somebody else's problem is that, you know, the jail has county funding and all the outpatient places have Federal and state funding.

And, we just we have to break down the silos between mental health and substance use disorder and primary care, but also emergency departments and hospitals and federally qualified healthcare clinics, if all of the money was in a single pool, it would make doing what's right for our citizens so much easier. That's my perspective in addition to evidence-based treatment and making sure that the treatment people get is actually evidence-based and not just quote treatment.

(Crosstalk)

Katie Sullivan:  I just have one quick question. You both used the term, warm handoffs and I - one of the concerns I have after running a county court and, you know, this not being part of the Federal grant making system and now being part of the federal grant making system running the Office of Justice Program I - that term is not one I had heard. And I think I've heard it be used very differently in different contexts. So, could I understand the idea so the warm handoff, so does the warm handoff happen when someone is first approached or warm handoff handing, you know, what exactly - that seems to be a term that'd been picked up, and yet has many different definitions, depending on the person who was using it. So could…

(Crosstalk)

Katie Sullivan:  you be more specific about that?

Dr. Shannon Robinson:   Yes, definitely. I first used the word warm handoff when I was an inpatient psychiatrist. And I expected my residents to be in communication with the doctor who was going to receive their patient when the patient left the locked inpatient psychiatric unit. And the same thing

occurred in prison. So, in an ideal world, the jail doesn't send the prison - a patient with or without records, often, fortunately without records right now, but the jail sends the patient with the record and if there is anything that needs to be addressed on day one, meaning anybody on any medication that you actually know that ahead of time, so that you know that you have the medication that the patient needs when the patient arrives there.

And the same thing when the patient transfers from one prison to another prison or goes back out to jail because they need to testify in another trial or goes to the Department of State hospitals or then eventually goes out to the community, so that the person who's caring for the patient right now is actually in communication with a person who is going to care for the patient tomorrow. That's what I mean by warm handoffs. Sheriff, what do you mean?

Paul Penzone:  Similar, but I want to go back to the previous question also, which, you know, the question was, do we have Federal or state funding? We do not get any federal funding and our state funding is what the support funding that used for our system. But, as it ties into a warm handoff, you know, the biggest difference or the biggest challenge jails versus prisons is, as I told you, we have 100,000 people go through our jail system annually. So, they're - the dynamics are so fluid that oftentimes you can't catch up to them. But, on the way out, one of the things that needs to be resolved is the warm handoff, whether or not if it's a drug program.

That means that we're going to have a caretaker that that individual who has likely led an irresponsible life, has had their challenges and now requires some form of stability. They're usually incapable of managing their own schedule, their own needs, and they're own life. So, we want to make sure that if it is housing, if it's medical needs, if it's mental health needs, whatever it is that needs to be addressed, that there is someone who acts somewhat as a caretaker to ensure that their services inside the jail system continue, once they leave the jail system. And if that occurs they're more likely to make their court dates, less likely to be violated and return to the jail system itself.

But, when it comes to funding when someone is in our custody we pay for their care to the tune of about $340 day, one, when they're booked because of all the comprehensive evaluations and $125 every day thereafter to keep them in custody. But, the day they step out of the jail system, if they're not on what we would call access here, if they don't have some form of insurance to continue to provide for their needs, whether it is medical, whether it is mental health service, whatever it is, - everything was in vain. You know, all the services were provided become wasteful because they're not continuing that continuity of service.

So, not only do we need to make sure that there's coming up, for lack of a better description, a caretaker, we need to make sure that there is a funding source that meets the needs to continue their services, so that they can stay stabilized. So, a warm handoff is more than a person to receive them and help them going forward. A warm handoff means, is there a financial support system for insurance or other needs to ensure that what it needs to be accomplished for the best interest continues.

Dr. Shannon Robinson:  And, that the insurances…

(Crosstalk)

Katie Sullivan: like a case manager sort of? We're talking about making sure we have someone that's helping people who have either done treatment or been in jail and how do they re-enter society basically correct?

Dr. Shannon Robinson:  Correct.

Paul Penzone:  Correct, and…

Dr. Shannon Robinson:  Yes.

Paul Penzone:   …you know, more often than not those are going to be, you know, non-profit NGOs and private organizations who just through their mission and their kindness, want to be the ones to be the, you know, the connector for those needs. But, we need to find a more stable force that we can work with collaboratively so that every day that is their requirement and their responsibility.

Katie Sullivan:   And understanding that this doesn't take care - and this goes into a speaker we have tomorrow, this doesn't necessarily take care of the financial and health insurance and those types of things that we'll talk about through re-entry, but also get - engaging the peer support community, that can also be a way especially out of a jail make sure…

(Crosstalk)

Katie Sullivan….make sure someone gets to a meeting, gets immediately engaged and is that something that could be positive?

Dr. Shannon Robinson:  Yes, yes and has been documented as being positive. And the more - the closer the - I'll call them inmate, the closer the inmate is to the person who's helping them and what I mean by that is that it has been shown I believe to be more effective if that person doing the case management has a lived experience compared to if that person doesn't have a lived experience because the inmate or recently released person is much more likely to reach out to somebody who's had a lived experience then to say, because they're going to think what in the hell does she know about coming out of jail? She doesn't know anything about coming out of jail.

And then the other thing I would add is, it's super important for their not only to be a funding source but another huge barrier is the activation of the funding needs to be present immediately upon walking out the door, and not just the activation but that the person is already enrolled in a plan.

You know, that can be a huge barrier. If you're not enrolled in a plan sometimes you can't even get an appointment with a person to provide aftercare or you at least can't get a date and a time because the insurance isn't inactivated and the person is enrolled in a plan.

Nancy Parr:  Can you all hear me?

Katie Sullivan:  Yes.

Nancy Parr:  Hi. This is Nancy and I apologize. I missed roll call. My chief judge called me right at 3:59 and I had to talk to him but I've been on here. I have been listening. So, I just wanted to let you all know that I was here and I have heard all of the testimony and the questions. Thank you all very much.

Katie Sullivan:  Phil? Phil Keith are you still on?

Phil Keith:  Yes, I'm still here.

Katie Sullivan:  Oh great.

Phil Keith:  Let me close by thanking our panelists -- Sheriff Barnes, Dr. Robinson and Sheriff Penzone once again for your time and most valuable testimony and responses to questions from our commissioners on behalf of Attorney General Barr and all the commissioners, your contributions provided today are most sincerely appreciated and will assist the commission in their deliberations and decisions.

Katie Sullivan:  Thank you…

(Crosstalk)