# EXHIBIT 8



U.S. DEPARTMENT OF JUSTICE

# President's Commission on Law Enforcement and the Administration of Justice

## Homelessness, Federal Programming, and Substance Use Panels

March 31 - April 2, 2020

# TABLE OF CONTENTS

Agenda ................................................................................................................. 3
Tuesday, March 31, 2020 ...................... ..................................................................... 4
Mike Brown Biography  ................................................................................................ 5
Mike Brown Testimony  ........................................................................................... 6-10
John Ashmen Biography  ............................................................................................ 11
John Ashmen Testimony  ....................................................................................... 12-15
Brian Redd Biography  ............................................................................................... 16
Brian Redd Testimony  .......................................................................................... 17-21
Wednesday, April 1, 2020 .......................................................................................... 22
Christopher Patterson Biography  ................................................................................ 23
Christopher Patterson OpEd        ................................................................................ 24
Matt Miller , Ph.D. Biography  ..................................................................................... 25
Matt Miller, Ph.D. PowerPoint Presentation............................................................26-47
Robert Marbut, Jr. Ph.D Biography  ............................................................................ 48
Robert Marbut, Jr. Ph.D Hand Out. ............................................................................. 49
Thursday, April 2, 2020 ............................................................................................. 50
Carson Fox Biography  .............................................................................................. 51
Carson Fox Testimony  .........................................................................................52-55
Michael Sena Biography  ........................................................................................... 56
Michael Sena Testimony  .....................................................................................57-61
Peter Koutoujian Biography  ...................................................................................... 62
Peter Koutoujian Testimony  .................................................................................63-68
Michael Stuart Biography  ......................................................................................... 69
Michael Stuart Testimony  ....................................................................................70-78
Michael Stuart Attachments.................................................................................79-85
Sue DeLacy Biography  ............................................................................................. 86
Sue DeLacy Testimony  ........................................................................................87-91

**Teleconferences related to Social Problems Impacting Public Safety:
Homelessness, Federal Programming, and Substance Use Panels**

- **Tuesday, March 31st, 2:00pm to 3:00pm, Eastern Time – Homelessness Panel**
    - Chief Mike Brown, Salt Lake City Police Department
    - John Ashmen, Citygate Network
    - Chief Brian Redd, Utah Bureau of Investigation

- **Wednesday April 1st, 3:00pm to 4:00pm, Eastern Time – Federal Programming Panel**
    - Christopher Patterson, Regional Administrator, U.S. Department of Housing and Urban Development; National Lead, Foster Youth to Independence Initiative
    - Dr. Matthew Miller, Director for Suicide Prevention, Department of Veterans Affairs
    - Dr. Robert Marbut, Jr., Executive Director, U.S. Interagency Council on Homelessness

- **Thursday, April 2nd, 2:00pm to 4:00pm, Eastern Time – Substance Use Panel**
    - Carson Fox, CEO, National Association of Drug Court Professionals
    - Michael Sena, Director, Northern California High Intensity Drug Trafficking Area
    - Sheriff Peter Koutoujian, Middlesex County
    - *3:00 pm: 15 minute Break*
    - Michael Stuart, United States Attorney, Southern District of West Virginia
    - Sue DeLacy, Chief Deputy, Orange County Probation Department

U.S. DEPARTMENT OF JUSTICE
President's Commission on Law Enforcement and the Administration of Justice

# John Ashmen

Citygate Network (formerly the Association of Gospel Rescue Missions)



John Ashmen is President and CEO of Citygate Network (formerly known as the Association of Gospel Rescue Missions). Founded in 1913, the organization has been tracking with the tragic conditions of desperate and disenfranchised people in North America. Members of Citygate Network have been on the sidewalks and in the face of what, to many, has been a faceless problem. Citygate Network-member facilities have a reputation for being havens of hope for all who enter.

For nearly 15 years, John served in a COO role at Christian Camp and Conference Association, where he oversaw publications, educational events, technical resources, and marketing for the national association. He was the originator, lead writer, and executive producer of the multi-award-winning Cairn Series$^{TM}$ professional training CDs, widely considered the definitive work on Christian camp and conference history and leadership orientation.

John holds a Bachelor of Science degree in Bible with a Social Work emphasis from Cairn University, and a Master of Organizational Management from the University of Phoenix. His writings have appeared in numerous books, journals, and websites, and he continues to preach and teach countless ministry management seminars internationally. Many consider John's latest book, *Invisible Neighbors* (published by Cross Section), a how-to manual for followers of Jesus who are serious about meaningful engagement with those who are poor and powerless. He was instrumental in the establishment of the Global City Mission Network, a nexus of faith-based organizations serving those in abject poverty in the largest cities around the world.

**Written Testimonial**

**Provider:** John Ashmen
**Title:** President/CEO
**Organization:** Citygate Network (formerly the Association of Gospel Rescue Missions)
**Focus:** The Impact of Homelessness on Law Enforcement and the Administration of Justice

---

Thank you for the opportunity to address law enforcement and the administration of justice as they relate to our sheltered and unsheltered homeless population—a rapidly growing segment in many urban areas of our country. And in these locations, it's not just growing in size, but also in exigency, the combination of which has produced anxiety and outrage in other local residents and business owners, pushing law enforcement engagement off the charts.

I serve as the president of Citygate Network, North America's oldest and largest nexus of autonomous, faith-based crisis shelters and life-transformation centers. In most U.S. cities, one of our ± 300 member organizations is the largest homeless services provider, and in some cities, it is the *only* homeless services provider. In many communities, they are called gospel missions or rescue missions, although not all use these words in their name. Regardless of what name they go by, these places are open 365 days a year, 24 hours a day, offering help and hope to those who find themselves in destitute conditions and desperate situations.

To be more specific, Citygate Network member organizations work with chronically homeless individuals and families, as well as those simply experiencing homelessness for a brief time. We're talking about a segment of the population experiencing low self-esteem and high stress. Addiction and mental illness are common in these individuals. In fact, in some urban areas, our members report that upwards of 70 percent of the single adults seeking services are under the influence or recently under the influence of alcohol or drugs, and as many as half suffer from some form of mental illness. So, as you can imagine, many of the guests who turn to our member organizations have crossed paths with law enforcement.

**The number of people who are homeless**

Official 2019 data from the U.S. Department of Housing and Urban Development put the number of people experiencing homelessness in the United States at approximately 568,000. However, 2020 statistics from the U.S. Interagency Council on Homelessness (USICH) count every person who is on the streets or dependent on the government or a non-government entity for housing, and their number comes in at just over 1,000,000. This includes the unsheltered and those who are using emergency shelter beds, as well as transitional housing beds, Rapid Rehousing beds, and permanent-supportive housing beds. When these new statistics are seriously considered—and they should be if we want to see the complete picture—it confirms that homeless services providers and the law enforcement community need to collaborate like never before.

**Reasons for homelessness**

Entrenched bureaucrats in multiple agencies will primarily (and sometimes only) point to the lack of affordable housing as the reason for the homelessness epidemic in America. The solution that has gone hand-in-hand with this assessment is Housing First. At Citygate Network, we believe that the lack of affordable housing contributes to the problem, but equally to blame are the lack of education and job skills, wage disparity, mental illness, recreational marijuana, alcohol and drug addiction, human trafficking, family dysfunction, young people aging out of the foster care system (who do not have the ability, desire, or means to launch into the next phase of life), LGBTQ youth escaping domestic persecution, and the list goes on. One of the reasons elbowing its way to the front of the line is misplaced compassion leading to lax local laws. This is "creating a new class of 'untouchables,' permanently disconnected from the institutions of society."[1] The truth is, homelessness is a multifaceted problem that needs a multifaceted solution. And by not acknowledging that fact, we are making it worse.

[1] *The Moral Crisis of Skid Row*, *City Journal*, Winter 2020

To be clear, Citygate Network believes that Housing First is an important note on the solution scale, and that it saves lives every day. But the government, up until now, has pretty much only played that one note. We need rich chords to experience a symphony of success in our country. This really isn't an issue of partisan politics fighting for philosophical control. It has more to do with ability and capability to address underlying causes. You see, the government can do —and actually does—something about corporeal poverty; but it's not in the government's purview to address relational and spiritual poverty—which are why so many people fall into destitution in the first place or remain poor and powerless. The strong lines of supportive friends and a deep spiritual mooring can keep people from going adrift. This is what the faith community can bring to the table that the government can't.

**The intersection of homelessness and law enforcement**

The missions and similar ministries that make up Citygate Network interact with members of the law enforcement community every day. Police bring people wandering the streets to these facilities and help them get situated. They come back when there are disturbances inside or nearby. It goes with the territory. But so many of our members are saying that the type of work and the amount of work that law enforcement officers are now being asked to do because of the homelessness epidemic is wearing them down. They can see it in their faces. And I am not just talking about major cities in Southern California, it's becoming a concern everywhere.

**Recommendations for the Commission**

<u>Don't criminalize homelessness but do enforce the law.</u>
Not prosecuting quality of life crimes, as is now the practice in places like San Francisco, is nothing short of lunacy. Not to charge someone for public urination or defecation, prostitution, public camping, littering, and the like lowers the bar on acceptable behavior to a new low. It results in physical disease and can quickly lead to societal decay. Such ordinances have to be overturned, quickly.

And giving minor citations for major offences needs to be revisited. The leaders at many of our missions and ministries say it's not uncommon to see "slaps on the wrist" for obvious crimes. One mission CEO told me about a man beating a woman and dragging her by the hair down the street. The man received a misdemeanor charge and was back on the street threatening others within hours. This shouldn't happen in a civil society.

Look at establishing more Homeless Diversion Courts.
One model to consider was started in Dallas, Texas. It is primarily for those addicted to alcohol and drugs or who are mentally ill. It is intended to help such individuals stay out of jail and get the services they need. Participation is voluntary, but given the alternative, it's often chosen. Prior to appearance before a judge, an individual cited for public intoxication enrolls in an addiction recovery program; or perhaps undergoes a mental health assessment and medical treatment if the illegal behavior is being driven by a mental condition. A Homeless Diversion Court can be held in a social service agency or at one of our member missions or ministries, which would eliminate clogging the court system with homeless-related cases.

More police officers need to be trained in Trauma Informed Care.
When a disturbance requires police to show up at or near one of our member missions or ministries, it's not uncommon that the responding officers are not prepared to deal with or don't immediately recognize that the person is someone experiencing physical, emotional or mental health issues. Our members say that Crisis Intervention Team (CIT) training for more officers would help deescalate situations more quickly and eliminate the need for assistance from back-up units in many cases.

Don't make police officers into sanitation workers.
We are hearing more reports from our member organizations saying that police officers are being ordered to follow the trail of homeless people and pick up clothing, trash, discarded needles, human waste, and more. This detracts from actual law enforcement and is demoralizing. Cities that allow homeless people to do as they please should be mandated to include street sanitation in their budgets. One of our member CEOs suggested that mayors and city officials should be required to serve on pick-up and sanitation patrols, which would likely result in laws to improve the situation being enacted rather quickly.

**Examples of what's working**

Mission familiarity visits.
In one city, newly employed officers spend an afternoon and evening at the local mission to observe intake and better understand the most common issues people have when they arrive. This first-hand homelessness awareness can prove invaluable.

"Man Down" program.
In another city, our member mission has two ambulances. When a homeless person is seen laying on the street—especially on cold evenings—the police respond to make sure a crime has not been committed. If not, and it's apparent that the person is inebriated, high or experiencing mental illness, they call the mission. Mission staff arrive with their ambulance and trained medical personnel to take the homeless person back to the mission for treatment and services.

Mission Drop-offs.
This program is similar to the above and happens in many cities because of an established partnership. Homeless people picked up by the police for minor infractions are given two options: the holding cell or the mission. The mission team is trained in counseling and can offer better alternatives for the future—which is why that option is selected four out of five times.

Show of affirmation.
When a formerly homeless person graduates from an addiction-recovery program or a new life program, they get a framed certificate from the mission showing their success. In one of our member organizations in the Midwest, the local police present a certificate of accomplishment and good citizenship at the same time. We're told that this certificate holds just as much meaning, especially when presented by the officer who initially arrested the individual or brought him or her to the mission.

**Eliminating a barrier to cooperation**

In some cities, the faith component at our missions makes city officials reluctant to engage with them. But faith-based organizations have been on the streets and dealing with these problems— successfully— for decades. Recent statements from within the administration or put forward by the administration show that there is a strong belief that if we are going to solve our homelessness crisis, the faith community will need to play a major role. As far as Citygate Network is concerned, the faith community is willing, able, and ready.

The life-transformation work that Citygate Network members do can be described with seven "S" words: **saved** (making choices that will keep them from chronic illness and physical death, and making the decision that will keep them from spiritual death); **sober** (no longer controlled by stimulants or depressants); **stable** (mentally and emotionally balanced and enjoying good health); **skilled** (being academically credentialed and set on a career path); **secure** (able to provide financially for themselves and their loved ones); **settled** (benefitting from having the same safe place of their own to stay every night); and **serving** (giving back to the community through missional living).

Thank you for this opportunity to give testimony. We look forward to bringing the faith community forward to assist as needed.

John Ashmen
Citygate Network
2153 Chuckwagon Rd, Ste 100
Colorado Springs, CO 80919
719-266-8300
jashmen@citygatenetwork.org
www.citygatenetwork.org

U.S. DEPARTMENT OF JUSTICE
President's Commission on Law Enforcement and the Administration of Justice

# Carson Fox

CEO, National Association of Drug Court Professionals



Carson L. Fox, Jr., J.D., is the chief executive officer of the National Association of Drug Court Professionals. For nearly 20 years, Mr. Fox has been a leader in the drug court field, providing unmatched expertise in the development and operations of drug courts, DWI courts, tribal healing to wellness courts and veterans treatment courts.

Prior to assuming the role of CEO, Mr. Fox served as NADCP's chief counsel and chief operating officer. In his time at NADCP, Carson has developed curricula and policy for adult, family and juvenile drug courts, DWI courts, tribal healing to wellness courts, veteran's treatment courts and, more recently, the Justice for Vets National Mentor Corps Boot Camp. As the lead architect of the NADCP Annual Training Conference and the visionary behind the development of the *Adult Drug Court Best Practice Standards*, Carson has been a driving force in advancing the drug court field from promising experiment to the most successful intervention in the history of the American justice system.

Before joining NADCP, Mr. Fox served as a prosecutor in the Eleventh Judicial Circuit of South Carolina. While there, he helped create the first drug court in South Carolina, serving as its coordinator after being established. Mr. Fox holds a Bachelor of Arts from the University of South Carolina Honor's College (1990), and a Juris Doctor from the University Of South Carolina School Of Law (1993).

The President's Commission on Law Enforcement and the Administration of Justice

"Invited Witness Testimony"

Statement of Carson Fox
CEO, National Association of Drug Court Professionals

March 19, 2020

To Chairman Keith, Vice-Chair Sullivan, and distinguished members of the commission, thank you for your outstanding leadership on this issue and for the invitation to present today. I am honored to have the opportunity to submit my testimony on behalf of this nation's over 4,000 treatment courts and the 150,000 people who they will hold accountable in the form of close supervision and rigorous addiction and mental health treatment this year. For three decades, treatment courts, including adult, family, juvenile and tribal drug courts, DWI courts and veterans treatment courts, have proven that the administration of justice for people with substance use and mental health disorders is most effective when it combines accountability with evidence-based treatment and community-based support. Given the urgent and growing need for solutions to the addiction epidemic that promote both public safety and public health, it is my honor to share with you insight from my two-decade career in treatment courts.

I began my career as a prosecutor in rural South Carolina, where I saw firsthand the devastation, crime, and exorbitant cost associated with addiction. Time and again, the same individuals would appear before the courts for crimes committed in service of their addiction, with the courts, law enforcement, and taxpayers bearing the greatest burden. It was clear that this cycle needed to change, but there was no remedy.

The first drug court was established in 1989 in Miami-Dade, Florida by justice professionals experiencing similar frustrations. The court system was on the brink of collapse due to the overwhelming number of cases stemming from the crack cocaine epidemic. Drug court provided an alternative that used the leverage of the justice system to not only get people into treatment but keep them in treatment long enough to bring about real and permanent change. When I became prosecutor in South Carolina's first drug court in 1996, there were 139 programs across the country. In the three decades since the first generation of drug courts were established, the model has become not only the researched criminal justice intervention in American history, but it has proven to be among the most successful.

Drug courts are made up of teams represented by justice and treatment stakeholders. In drug court, the judge, prosecutor, defense attorney, probation officer, law enforcement, and case managers collaborate with counselors and treatment providers. Together, they identify the specific supervision and treatment needs for every individual in the program and work together to ensure they are followed. Drug court typically lasts 12-18 months, with participants appearing frequently in court for the team to assess their progress, modify their treatment, reward positive behavior, and sanction non-compliance. This community-based approach allows drug courts to identify and meet individual needs beyond clinical treatment, from education, employment, and housing assistance to family reunification, restitution and healthcare.

Law enforcement plays a critical role in the success of drug courts. Research shows that the involvement of law enforcement on a drug court team is associated with an 88 percent reduction in recidivism relative to courts that do not have law enforcement representation. As someone who has trained programs across the country and seen thousands of drug courts, law enforcement participation is not only necessary but a key indicator of program success. We see that working effectively in many of the counties you represent – Pinellas County, FL and Shelby County Alabama are just two of the many examples.

Over the last decade, research has confirmed the target population for drug courts. First and foremost, drug courts serve individuals who have extensive involvement in the justice system directly related to their addiction or mental health disorder. But it is important to note that low-level offenders, drug possession cases for example, are often best served by a less intensive program. Drug courts are designed for, and work best with, individuals whose substance use or mental health disorder has contributed to more serious crimes for which they face long-term incarceration. Typically, these charges include theft, burglary, forgery, and DWI. Before drug court, there were few sentencing options, and most of these cases resulted in continued recidivism at great cost to taxpayers and continued damage to offenders' families. Offenders in drug court often have longer criminal histories and repeated unsuccessful attempts at treatment.

By successfully diverting these cases from jail and prison, and transitioning individuals to lives of productivity, drug courts achieve their greatest impact. The Government Accountability Office, the non-partisan research arm of Congress, examined over 30 scientifically rigorous studies involving more than 50 drug courts throughout the country. They found re-arrest rates for drug court graduates to be up to 58 percent below comparison groups, and cost-benefit as high as $47,852 per participant.

The GAO identified the Department of Justice National Institute of Justice Multi-Site Drug Court Evaluation (MADCE) as "the most comprehensive study on drug courts to date." This five-year study confirmed drug courts reduce recidivism and save money, and identified additional benefits including increases in employment, education, family functioning and financial stability.

This success directly translates to more resources focused on community safety. For example, in 2011, Georgia expanded drug courts across the state. Following this expansion, the overall prison population in Georgia declined, even as the percentage of violent offenders in prison increased.

The adult drug court model has expanded to serve specialized communities, including repeat DWI offenders, parents whose children have been removed from the home due to substance abuse, juveniles facing criminal charges, tribal communities, and veterans. Together, these programs refer more people to treatment than any other intervention, approximately 150,000 each year.

Perhaps the most significant expansion came in 2008 when a judge in Buffalo, New York began seeing an increase in the number of veterans coming before the courts. The judge

recognized that many were struggling with substance use disorders, mental health disorders, and trauma, and not enough was being done to connect them to the local, state, and federal benefits they earned as servicemembers. Veterans treatment court economized resources by clustering veterans onto a single docket where they would go through the treatment court process surrounded by their peers. The single docket allowed representatives from the local VA medical center to be a part of the team and make immediate referrals to treatment.

To date, over 400 veterans treatment court programs have launched. They annually connect 15,000 veterans to treatment. In addition to reducing re-arrests and saving resources, an analysis by the Department of Veterans Affairs found veterans referred to VA services from veterans treatment court had better housing and employment outcomes as compared to other justice-involved veterans. These outcomes are crucial for ensuring long-term success.

The opioid epidemic has brought to the forefront the need for public-health oriented interventions. Like law enforcement and other first responders, the courts are on the front lines. Approximately 98 percent of drug courts currently service individuals with opioid use disorder. Drug courts have responded by improving access to FDA-approved medications to treat opioid addiction. By administering these medications under the watchful eye of the team, drug courts are able to limit diversion and reduce risk of fatal overdose.

In 2013, NADCP released the *Adult Drug Court Best Practice Standards*. The standards incorporate more than a quarter-century of research defining appropriate practice for drug courts across a spectrum of highly researched principles, including target populations, team member roles, equity and inclusion, evaluation and others.

Since their release, the effect of the standards on the drug court field has been profound. New drug courts are using the standards as the foundation for building a successful program, and existing courts are using them to adopt new policies, retool old ones, and expand capacity. A majority of states have adopted the standards, are receiving training and technical assistance from NADCP to do so or are incorporating them into their state guidelines for drug courts. Moreover, federal grants to treatment courts require fidelity to the standards as a condition of the award.

Approximately 95 percent of individuals with a substance use disorder return to drug use upon release from prison. For those in the community, evidence-based substance use disorder treatment can be expensive and too often unavailable, putting it out of reach of the people who need it most. Drug courts ensure that jurisdictions have an evidence-based response that promotes public health while reducing crime and protecting public safety. Moreover, drug courts prove that the justice system can provide an intervention that saves lives, reunites families, reduces crime, and strengthens communities.

With law enforcement on the front lines of this epidemic, NADCP has made it a priority to ensure they have the resources to effectively coordinate with drug courts. Armed with the research and guided by the standards, NADCP examined this issue and concluded it is critical that law enforcement identify standard operating procedures, recognize the importance of both

the multidisciplinary approach and the implementation of community policing, and understand the impact of vicarious trauma within the law enforcement community.

With support from the Bureau of Justice Assistance, last year we worked with law enforcement officers to develop and pilot test a new curriculum. We found an overwhelming response and interest in training and education in the following areas:

- The importance of cross-system linkages, identifying unmet needs outside of court and treatment services, and service referrals to enhance long-term recovery and reduce recidivism.
- The characteristics of a good working relationship with team members from probation, treatment, and community members struggling with opioid addiction or on the path to recovery.
- Understanding of the impact of secondary trauma and subsequently the importance of officer wellness systems.
- Using the Crisis Intervention Model as an evidence-based community engagement tool and look at its effectiveness with specialized populations such as combat veterans, trauma victims, and individuals diagnosed with a mental health disorder.

NADCP is implementing the curriculum across the country this year and look forward to sharing the results with BJA.  However, it is clear from the response we have received that there is great interest and need for further education training in these areas.

My recommendation for the Commission is straightforward:  Encourage law enforcement to be active members in their drug court and work closely with the prosecutors to ensure the target population is served; and encourage at the national level the continued education on drug court best practices.

NADCP stands ready to provide any additional information to the committee that may further understanding of drug courts and other treatment courts. Once again, I am honored to participate on this critical panel and look forward to ongoing collaboration.