# EXHIBIT 9

Company:        **FBI ACS ONLY ACCOUNT**
Conference Title: **Substance Use**
Conference ID:   **3220280_1_k14MbL**
Moderator:      **Dennis Stoika**
Date:           **April 2, 2020**

Operator:  Good day and welcome to the President's Commission Law Enforcement and Administration of Justice conference call. At this time, I like to turn the call over to Director, Phil Keith. Please go ahead.

Phil Keith:  Thank you and good afternoon. Thank you for joining us today. I like to call the President's Commission on Law Enforcement and Administration of Justice to order. On behalf of Attorney General Barr, we thank you for joining us today for this important commission teleconference meeting.

As I said last week, we're all facing challenges beyond our experience and each day seems like the number of infections ((inaudible)) is growing. I think we're all particularly concerned about the increased exposure to our law enforcement professionals.

And like us on the call today they can't stay at home or can't telework and can't social distance. As I said earlier this week, they have a storm and I know commissioners share my concern as we keep the brave men and women of law enforcement in our thoughts and prayers.

And to the commissioners Vice Chairman Sullivan and I certainly want to express our appreciation for your continued willingness and understanding as we navigate the challenges of conducting the important work of this commission. At this time is the Executive Director, Dean Kueter to call to conduct our roll call of commissioners.

Phil Keith:  Thank you. Our focus continues today on social problems impacting public safety and today will be hearing from key leaders regarding substance abuse. All commissioners should receive the agenda about the written testimony of today's panelists. Thank you and thank our panel today.

We'll be modifying our program slightly. Sheriff Koutoujian needs to leave the call at 3 o'clock at the break time. After he concludes his testimony we'll move to the question and answer portion break - and then we'll take a break.

The commissioners are encouraged to make notes for questions during the panelists' presentation and then we'll hold all questions until the panelists have provided their testimony. With questions we will move now to our first panelist. We have Carson Fox who's the CEO of the National Association of Drug Court Professionals. Mr. Fox, thank you for joining us today and you're recognized.

Carson Fox:   Thank you. Chairman Keith, Vice Chair Sullivan and distinguished members of the commission I want to thank you for the opportunity to speak with you today. My name is Carson Fox and I am the Chief Executive Officer of the National Association of Drug Court Professionals.

NADCP is the membership training and advocacy organization for the over 4000 treatment courts across the United States including but not limited to adult, juvenile, DWI and veterans' treatment courts. I commend the commission for your leadership impacting in the critical issue of substance use. And I stand ready to offer whatever ongoing support you deem necessary.

Today I'll talk with you about the crucial role law-enforcement plays in the success of treatment courts around the nation. As we all know law-enforcement is on the front lines of this nation's addiction epidemic, and therefore to stop the crisis, the role of law enforcement is paramount. This includes the ongoing support and partnership with law enforcement in implementing and supporting treatment solutions.

There may be no better example of this than treatment courts where law enforcement works side-by-side with other criminal justice and public health professionals to ensure individuals before the courts with substance use disorders are held accountable while receiving treatment and other services to get their lives back on track.

In many communities where treatment court thrives it is the support of law enforcement that makes the key difference. I'm grateful and honored that members of this Commission are making just that difference supporting treatment courts in your communities and across the nation.

In one example I recently spoke to Kate Rodriguez the manager of the successful Pinellas County, Florida treatment drug program who told me of all the wonderful support of Commissioner Sheriff Robert Gualtieri including his commitment to recovery, to community and veterans. She said and I quote, "We wouldn't be able to do what we do without him."

The impact of this support cannot be understated. Research shows that the involvement of law enforcement and a prudent core team is associated with an 80% reduction of recidivism relative to courts that do not have law enforcement representation. When preparing to speak with you today I wanted to tell you a story on graduates. But given the thousands of graduate stories I've witnessed and read I struggled to choose one that best demonstrated the symbiosis between law enforcement, treatment courts and the community.

I've decided to tell you about a young man who entered the Charleston, South Carolina drug court in 2012. This young man was struggling with addiction and he broke into a home in a quiet suburban neighborhood outside of Charleston. Ironically, he later discovered the home belongs to none other than the Charleston Chief of Police. The young man was arrested and it was determined he had a substance use disorder and he was given an opportunity to participate in drug court.

This treatment court program has a long history of law enforcement support and the chief followed the young man's progress as he participated in intense substance use treatment and was subjected to close supervision and strict accountability. With help from the program the young man got a job. Instead of sitting in jail costing taxpayers' money he became a contributing member of society.

A little over a year later on his graduation day the chief was in court to congratulate him. The young man surprised the chief by handing him a restitution check for over $1100 to cover the damages from the break-in. This young man represents just one of thousands of treatment court graduates and his story represents just one of thousands of examples of law enforcement's role in strengthening the justice system's response to addiction and crime.

The National Association of Drug Court Professionals has always been strong ((inaudible)) supporters of law enforcement. At our core we are a membership organization representing and working with practitioners. And our board of directors mirrors those professionals including leaders in law enforcement. Past board members include former Algonquin, Illinois Police Chief, Russell Laine and former National Narcotic Officers Association Coalition President, Ron Brooks. Georgetown Kentucky's Police Chief, Mike Bosse currently sits on the board.

In fact, Chief Bosse wrote an article about law enforcement's role in his local treatment court and NADCP included that article as an attachment to the written testimony we provided to the commission before today's hearing. NADCP is committed to ensuring law enforcement has the necessary training to be critical members of the treatment court team.

With support from the Bureau of Justice Assistance last year we worked with law enforcement officers to develop and pilot test a new curriculum to train law enforcement on the fundamentals of treatment courts, crisis intervention, building community linkages and understanding and addressing secondary trauma. Once the COVID-19 pandemic ((inaudible)) we look forward with working with ((inaudible)) in piloting this new and thriving curricula.

There are no easy solutions to the problems of drug additions and related crimes but with the strong leadership of this commission and with law enforcement across the nation committed to ensuring public safety and implementing effective ((inaudible)) management such as treatment courts I know we are positioned to make our greatest impact.

Therefore my recommendation for the commission is straightforward. Continue to encourage law-enforcement to be active members of their treatment court and work closely with the treatment court teams to ensure the total population is served, and encourage at the national level the continued education on treatment court best practices so that all treatment courts follow the research to achieve the best possible outcomes and recognize the invaluable contribution and partnership law enforcement plays in the success of these programs.

I would be remiss if I didn't give Vice Chair Sullivan a shout out. Last summer she brought down the house at the NADCP conference when the 6000 attendees learned the Director of OJP was one of their own, a former treatment court judge. Thank you, Vice Chair Sullivan.

On behalf of the NADPC staff and board of directors and of the 4000 treatment courts nation-wide I appreciate the opportunity to address the commission today and welcome any questions you may have. And finally, in these unprecedented times I want to thank all of you and all law enforcement across the nation for the work that you're doing nationally and in your community.

Phil Keith:  Thank you Mr. Carson ((inaudible)). Now you'll hear from Director Michael Sena. He is Director of the Northern California High Intensity Drug Trafficking Area. Director Sena, thank you for joining us today. You're now recognized.

Mike Sena:   Thank you Mr. Chairman, Madam Vice Chair and members of the commission, really appreciate your invitation to day to talk to about this issue and the ongoing challenges to protect

We appreciate the opportunity to testify today. Thank you for your consideration of these recommendations and we are at your service, and are as committed to this issue as you are. And I am happy to answer with my colleagues that have also presented any questions you may have. Thank you.

Phil Keith:  Thank you Sheriff for your ((inaudible)) service. Let the record reflect that Commissioner Ramsay joined our call earlier as well. Commissioners we're now open for questions for the first three panelists. If I could request, with commissioners with a question, please state your name prior to your question and direct your question to a specific panelist you have a question for, or if it's for response to the entire panel please, state so. Just as a reminder to commissioners your mics are hot at all times. Thank you. Commissioners with questions please ask.

Ashley Moody:  This is Ashley Moody out of Florida. I have a question for Carson Fox.

Phil Keith:  Yes commissioner?

Carson Fox:  Yes.

Ashley Moody:  And I really appreciate also the testimony from Michael Sena, the Director of HIDTA especially when he talked about the decriminalization in certain areas and how that might affect opportunity for addicted individuals to actually get intensive treatment. And as a former prosecutor and a judge for over a decade I saw how successful alternative courts, drug courts could be in assessing lives of those that due to an addiction could not conform to drug laws.

And so I wondered if you might have information of jurisdictions or areas where you feel like there were missed opportunities for treatment for individuals because a certain area was decriminalizing drugs offenses and therefore there was no longer any oversight or impetus for these individuals to get treatment?

Carson Fox:  Thank you Commissioner Moody. I love that question. What it really brings me to, is there's this large issue that the treatment courts are facing where they need to get the right people into treatment. They need to get folks into treatment, they need to identify them.

And it's difficult to say but I've seen jurisdictions where someone does not have access to treatment because when I talk to the folks ((inaudible)) as I go around the country in treatment courts, and I think everybody on the call probably has seen this, that and some of the panelists - I think all of those panelists ((inaudible)) as well and - or we earlier alluded to it, most of the folks that we're seeing, they're not using one substance. They're polysubstance users. And they might be arrested for one thing but they're using, and they'll talk in treatment about they're using everything out there.

And then also more likely than not -- and SAMHSA has this information, as I'm sure we've all heard -- that more likely than not a huge percentage of these folks have a co-occurring mental health disorder. So to go directly to your question it's hard to say because it's like – it's almost like trying to prove the negative.

But I can say that there's concern, there's some concern out there that sometimes they might not be able to identify the right folks, but that could be when I hear some of the stories from the front lines, it could be for a variety of reasons. And there's a lot of concerns particularly about youth, and for the juvenile drug courts they're not able to get young people into the program for one reason or another.

One of the things that's been interesting is that and - I've heard this from several jurisdictions is that there's – it might not be ((inaudible)) they're thinking about drug crimes specifically as other crimes. They're - if people aren't identified then they might not be - I don't know, it's a difficult question. I'm trying to figure out how to answer.

I guess it's one of those things where especially with youth, juvenile drug courts are so tremendously successful when working with young people and averting people out of having any other involvement in the justice system.

And getting them into treatment is so important and so having that focus on youth and having officers - and I can't say juvenile drug courts are the only answer out there and I think that we all know when we're dealing with our youth, or we're dealing with the problem of the youth being introduced to drug use that we have to use every arrow in our quiver. And juvenile drug courts are only just one of those arrows.

And so I think that the question is a fantastic question, and it's one of those things where my information is more aimed at ((inaudible)). And like I said that the jurisdictions wrestle with that commissioner ((inaudible)) but it's hard for them to say again because when they'll talk to me about it, they're trying through the negative. And it's hard to say who is not coming into the justice system. They have a difficult time teasing that out, but there definitely is concern.

And what I hear concern about is about the youth, and just being able to ramp up programs for youth specific with juvenile drug courts, but also programs and other programs in the justice system, and like we said on this call, programs that keep you from ever getting into the justice system. I hope that answers your question.

Ashley Moody:  Yes somewhat. I think many times when we see multiple drug offenses it appears the only thing that people are accountable for treatment, because certainly if they had someone or something that was outside the system that could keep them accountable to treatment it would've been done.

So when the only thing that you keep them accountable is a judge and a court system, and the prospects of more stringent penalties, it appears to me that this movement or decriminalization as

opposed to intensive treatment with divergence is dangerous. And so I wondered if you might have statistics related to them. But I do appreciate the answer and thank you for that.

Peter Koutoujian:  Mr. Chairman this is Peter Koutoujian. I thought I got cut off. I didn't hear the obligatory applause when I finish my presentation, so I didn't know if I cut myself off or lost it, but I'm back here to answer any question you may have.

Phil Keith:  Thank you sheriff.

Katie Sullivan:  Hey this is Katie Sullivan. I have a question for – about OD mapping. And so it sounds like that there would be a request - I guess the thing I'm not understanding of the ODMAPs is first of all it's only as good as the people putting it in which are typically first responders right? And then that they may have some kind of safety or other concerns.

And then do we know exactly the narcotic, do we know the type of narcotic that's responsible for the OD? Because the methamphetamine problem has taken over so much, and are we able to really use that ODMAP to be tracking where meth is an issue, where we're getting ahead of the opioid issue through this mapping.

And is there any kind of notification function for local and federal narcotics investigators? So I just - I see some issues with the OD mapping and the usefulness of it. Are some of those improvements, could that make them more viable or I don't know what your thoughts are on that?

Mike Sena:  Well ma'am, it's Mike Sena on the phone. So just to give you kind of an idea because the ODMAP is really kind of that canary out there in the coal mine indicating that there was a potential overdose or suspected overdose. So it just gives you that indication. It doesn't say what type of drug it - that may be.

Katie Sullivan:  Okay ((inaudible)). So my question is this, you had a recommendation in a different panel - that was a panelist who was a researcher, talked about the research behind drug courts and things like that. Basically the recommendation was that BJA create some kind of a list of protocols not – and I asked this just a little bit on the 10 Key components and said, "You know, we already have the 10 Key components."

And I said, "Right, but how they are actually being implemented from court to court?" One of the things that came up was the importance of the judge, so then also that fine line that a judge walks in a drug court between the respect, like General Moody was talking about, kind of respect for the criminal justice system.

That they are in the criminal justice system and also making it a treatment-centered environment and how some judges have gone, you know, sort of too far away from, you know, really maintaining criminal justice type of things.

So I'm wondering - I'm remembering this actually wasn't a panellist, this was a subject matter expert that talked to my working group. But his recommendation is we started to come up with some actual protocols. So if that was to happen, where do you see those protocols being necessary and if you agree with the recommendation?

Carson Fox:  Thank you. First of all, Vice Chair Sullivan I appreciate the question. For adult drug courts really I think the protocols are meshed, already meshed in the adult drug court best practice standards that were put together.

Those standards are two volumes of the standards that were put together. And you know this, that they've had the discussion BJA, has been working, and SAMHSA, working with us training drug

courts across the country on those standards. The whole development of the standards, the idea behind them was that the ten key components having those in place ((inaudible)).

And then BJA back in 1990s, that with all the research that came out. And the research shows just a tremendous amount of success from drug court that shows that drug courts were the most successful ((inaudible)) intervention as far as the researchers were concerned ever. Particularly in the population in adult drug court because it showed that adult drug court was successful for the population that no other intervention had ever been successful with.

So we – when you look at that 15, 20 years of research - we put together the adult drug court benchmarking standards. And what we've done since then, is we've worked with the researchers and with the Bureau of Justice Assistance and SAMHSA at crosswalking them the best they can to their other court models ((inaudible)). So crosswalking them over to - and working with researchers on - okay so which of these standards that most applies to adult drug court then therefore we can crosswalk in these would also apply to veteran treatment court.

And the reason we have to do that is because there's been so much research done on adult drug courts it's – there's so much that it's very difficult to find researchers who are even interested in researching treatment courts because what they'll tell you is the research is unequivocal - they work. And they'd rather work on something that is more questionable. And so there's not nearly as much research on to the treatment court models as there is on the adult drug court model.

(OJJDP) did under OJP did work on, and we have great best practices now, put together for juvenile drug courts and for family treatment courts so I think those are there. So I think in some way I love the suggestions from subject matter expert. But I believe the protocols are already embedded in those examples.

And because specifically to some of those protocols, and the question you raised you mentioned the judge's role. And the best practice standards there's actually a specific standard on the role of the judge because there's been so much research done on that particular role.

And there are some very specific protocols within the standard on things that the judge should do. The amount of time that a judge, for example, spends interacting with someone is directly related to the success of the program. That's just one example. How long the judge presides over the court seems to have - well not seems to - the research has a direct correlation to how well that court performs.

That, for example, was tremendously important because for years there were courts in the country where judges rotated in and out of the court every few months. And what they found in the research was those - the performance of the graduates in those courts - were not nearly as good as the courts who had judges that maintained the docket for a longer period of time.

So I think the protocols are in place. And I think that we could do some more work on the additional treatment court models and working on doing some more cross walking. And there's always room for more research into the models that don't have as much as the adult drug courts - for example veteran treatment courts. They - there's always more research ((inaudible)). And then as research continues to come on board, I will say that when we developed the best practice standards, we had folks from OJP on the panel, we had folks from SAMHSA on the panel.

And we all recognized that there was still areas there where deficits, where there wasn't enough research in certain areas. And so I think that there's also time to look at those and there's time to ((inaudible)) looking at where did they need some more research and I looked at one example of that.

One thing that we've seen across programs, and this is not just in treatment programs, is a very much enhanced use of mentors in all different capacities. I mean veteran treatment courts have mentors. There's also mentors who help people in substance abuse treatment, and getting some research, and helping us figure out exactly what protocols are there specifically, so that folks can use those to the maximum capacity. But I really appreciate the question. I think it's a fantastic question.

And I think that the leadership that OJP has had in this particular area has been tremendous on the growth of just that. And I think the more, now that we've had those protocols in place, the more that we can have its helpful so that court can have when the starting the treatment court or continuing their treatment court they can rely on those because the whole reason they were put together was that the courts that do those things have been proven in all this research that they have the best possible outcomes. So thank you for that question.

David Rausch:  ((inaudible)) Rausch.

Phil Keith:  Commissioner Rausch, go ahead.

David Rausch:  Hey sheriff, I appreciate your testimony. And I have a question based on kind of what were ((inaudible)) appears and from other panelists and even Director Sena today talking about - talking to individuals who experience addiction. And the statement that I thought was pretty significant was they fear that the ability of intervention, that it will be lessened as we continue to go forward with some of the reforms that we're seeing.

So quite frankly saying going to prison and getting treatment was what saved them. So then also getting the impression that we no longer are really detention centers, they're really treatment centers anymore. And that has an impact on your staffing and who you have working in your

turning out people that are, you know, ((inaudible)) day one their first day that they come to our facility their entry plan starts on that day.

We don't wait for any time. We just put them through a rigorous number of programs to address their risk and need factors, stabilizing mental health, addressing substance use but many other things in an effort to put them out a little bit better than when they came in. And that's really the mission has changed significantly, and this is where we can do our most good.

And by the way when we turn people out better than they came in, we make our communities safer, we hopefully don't have to have them incarcerated again so we can save more money. They get their jobs. They tend to their family. They're not on social programs, their families are not on social programs, they tend to their family, they have a job, they're earning wages, and they're paying taxes.

And if you get - by the way if you extend that one generation then imagine the good that you can do because the children of incarcerated individuals have a much higher level, you have school, ((inaudible)) schools, failures in education, sociopathic behavior and greater and higher levels of incarceration as well.

Erica MacDonald:  This is Erica MacDonald. Am I permitted to ask a question or two?

Phil Keith:  Yes Commissioner.

Erica MacDonald:  Okay, and I got ((inaudible)) Katie ((inaudible)) but I think ((inaudible)) two here but it's all to Carson Fox. First, I want to and so ((inaudible)) help all our law enforcement on the front line. Thank you ((inaudible)) for out there just bluntly that you guys don't have the option of teleworking and you are out there fighting for all of us and we deeply and greatly appreciate it.

With respect to drug court, prior to being the United States Attorney here I was the ((inaudible)) judge over eight years. And I was one of our drug court judges as well as one of our ((inaudible)) and court judges as well as with our ((inaudible)) court judges that dealt with child protection. And when I think the American population sometimes I think it's a war on drugs and I tried to explain to ((inaudible)). We see our ((inaudible)) because parents suffering from their addictions just aren't able to parent appropriately.

So here is my thoughts about drug court and I want to hear your thoughts Mr. Carson is first is to follow-up on General Moody's question. You know, as those crimes are reduced to misdemeanor crimes and so for – in Minnesota for example in order - our intake is in order to qualify for drug court you have two prior ((inaudible)) session ((inaudible)) there.

A, first wouldn't because to take there is no incentive to go into drug court. It's only that fear of prison really is ((inaudible)) stand before me say, "I'm only doing this because I want to go to prison. I just don't know who to ((inaudible)) my last hope." And so, you know, we've got to get the word out there and what can we do this misplaced in reducing these crimes to misdemeanor level offenses we're not going to reach the population we need to reach before they kill themselves or they do more damage.

So that's first. The reduction of crime working at this and we talked about just this morning on an earlier call is this reclassification of crimes is really started as a crime. Second, ((inaudible)) reform I want to hear your thoughts on that to the extent that there is ((inaudible)) we're just going to let people out. You know, a lot of times ((inaudible)) I can stabilize someone and get them to where they need to be ((inaudible)) decisions themselves but also to be able to get into drug court. I had to have them ((inaudible)) treatment. And so this idea that when they're released them ((inaudible)) without stabilizing them frightens me to no end.

And then the third question that I have is, as a drug court judge I - speaking drug court judge in a pure drug court. And when I was as ((inaudible)) one of the drug court judges there was no funding for me to go into treatment ((inaudible)) to get the training. And what I was told and what we've been told ever since is that, you know, the funding goes to train judges who are new or they're setting up their courts. I really have to be able to – what can we do about funding to make sure that all judges are certified if you will before they ((inaudible)) court judge? Those are my three parts.

Carson Fox:  Thank you Commissioner, that's a lot to bite off. Okay so I'll but first of all and I know I just know that ((inaudible)) Commissioner Moody's question as well. There are a lot of jurisdictions that are struggling over just reclassification shortages. And one thing I can tell you that they've been real successful, and that a lot of jurisdictions have gone there before, is just looking at the whole population ((inaudible)) as people are coming into drug court because we all know drugs and alcohol ((inaudible)) the criminal justice system.

And they – they're – I speak to all ((inaudible)) different groups. And I - and, you know, we know that depending on the state or the jurisdiction the number's always the same between 75% and 85%. But I'll ask folks all around the country I'll say about what percentage of the folks in your justice system here ((inaudible)) by drugs and alcohol? And they'll always consistently say that they will be 80%, 85%, 88% 92%.

And so what they're doing is - and this was in the Presidential ((inaudible)) information report that came out a couple years ago there was only a couple recommendations specifically in drug court. And one of them was for drug courts to look at probation revocation cases because probation revocation cases and for many folks there - we all know that as a judge you're ((inaudible)) on this group when a judge places somebody on probation ((inaudible)).

(Crosstalk)

And so they place them on probation ((inaudible)) called safety. What we have found and this is from watching BJA and OJP is there's this tremendous number of cases. In some states it was 55% to 85% of the cases of people who were terminated from probation, were terminated for not complying with the terms of treatment or testing positive.

And there was a drug court in their community and for whatever reason they were not referred to the drug court. And those were the people who were the most high-need and high-risk people and for whatever reason more.  To the present commissioner ((inaudible)) commissioner a couple of years ago made that recommendation and sent ((inaudible)) tremendous ((inaudible)) and (BJA) is and ((inaudible)) has some huge leaders in this.

And just leading, getting ((inaudible)) to look at that ((inaudible)) approach and to bring people in to drug courts who are high risk and high ((inaudible)) because those are the (restitutions) ((inaudible)) programs.

But then also looking at the ((inaudible)) and we talk about the ((inaudible)).  And this is something that I tell people all the time.

Drug courts have always traditionally, their ((inaudible)) is taking in drug funds.  By far when you go out and when I go out across the country, drug court's taking funds that aren't drug funds.  I mean I've been in drug court for ((inaudible)) and they brought $100,000 for restitution via the court.

I've been in the drug court in a ((inaudible)) a couple of years ago and their ((inaudible)) populations did not even include drug funds.  And South Carolina has not had any recurrent issues because what they were looking at was drug-driven funds.  That was what was impacting their community.

So that is a focus a lot of these communities are looking at because again, the people who work in drug courts and people who make up the ((inaudible)), they're not in the Legislative Branch.  They're

in the Judicial and Executive Branch.  And so they're looking at how we respond to these changes in the law and they've realized and got the population to vote who are in dire need.

And if you look at the statistics, over half the people in prison in the country are people who are there on probation violations and a tremendous – the tremendous bulk of those people were people who were originally adjudicated by a judge on probation.  So they were determined to not do drugs in their community and are basically now in jail for status offenses on their probation.

Hope that kind of - that answers I hope several of the questions you have and if you remind me of the last question.

Female 1:  ((inaudible)) funding for judges per training when you have new judges (coming) ((inaudible)).

Carson Fox:  What – so obviously that's critical.  We offer training in concert with BJA every year and judges should know.  When judges don't know, that's on us because we have it on our website.  We have materials that we produce in cooperation with BJA that are always available.   We're always available with technical assistance to assist judges and we've got a host of webinars online that we can do.

But there's also – there are trainings available nearly every year.  Sometimes it's every year, and sometimes it's not, depending on the (amounts) that we apply for.  There's a judicial training we have.  And those training have had sometimes they're for a (year) and there's sometimes a hundred judges there.

And the judges will tell me it's like drinking through a fire hose.  It's exactly – when you're mentioning about training – exactly the kind of things you're looking for.  And it's something that we've done  in cooperation with the National Judicial College, and judges go there and they spend five days and

they learn about all this stuff.  They learn about drug court.  They learn about ((inaudible)).  They learn about drug testing.

And it's a tremendously well ((inaudible)) training.  I mean, it's probably one of the most popular training that we have.  But I can say that we have new judges in there, but new judges from an existing court are probably half of the group, because we recognize that those are folks who get – you come into a court just like you say.

You come into a court that's been operating and ((inaudible)) with guys who spent years and you ((inaudible)) the judge.  And then you come up to see it.  So we offer that.  And when the judges can't get into that training, we'll do whatever we can do.

But I've ((inaudible)) personally out to court myself and sat down and talked with the judge and worked with them to do everything I can possibly do to bring them up to speed and you can probably tell from just from what I'm talking about here this is my passion.  This is my life work.  It's what I do.  And so at least (I'm ready) ready to help ((inaudible)) judges in the country.

Anybody who calls me – anybody who contacts an ((Inaudible)) who is looking for training in drug care and probation officers and their new treatment providers, whatever and they've been assigned to the drug courts and they need information, we will get it to them if it's the last thing I do.

And so I want to assure you of that, that we are a resource and we work seven days a week, 365 days a year to do that.  And it is ((inaudible)) to do it because as you know, it's been mentioned on this panel already.

The folks working in drug court, they're doing the Lord's work.  I mean it is not easy work and they make such a difference.  So we do everything that we can do to make their world a little easier.  So thank you for that question.

Phil Keith:  Yes Nancy ((inaudible)).

Nancy Parr:  This is for Mr. Stuart.  I – first off, I would like to thank my local U.S. Attorney's Office.  I am in Chesapeake, Virginia so mine is the Eastern District of Virginia, for their level of cooperation with my city on drug investigation.

One of the things especially in Virginia that we have looked for our U.S. Attorney's Offices for a lot of help and I'm saying this because I would like to see this expanded or maybe more cooperation throughout the country is under our laws in Virginia it is very, very difficult for us to prosecute the dealers for deaths resulting from their drugs.  We've tried to get our General Assembly to change it four years in a row and they've killed it each year.

So we really rely on our U.S. Attorneys to take those cases for us.  And I think that that is a very important area and one type of cases that, I think the U.S. Attorney's Offices would play a great role in helping local law enforcement and prosecutors on.

The other thing is I'm really intrigued by this involuntary treatment aspect that you mentioned and because for a couple years I have had great concern about the increased availability of Narcan.  I mean I want to save as many lives as we can possibly save.

But when it's been increased for almost anybody to be able to get Narcan, then there is no in my isolated world, there's no incentive for people who are overdosing at home or with their friend, if their loved ones and their friends are to have the Narcan, and just are going to revive them for that day because there's just going to be this ever ending cycle.

And I know we heard in Miami the law, the impact of law enforcement having to go back three or four times and reviving the same person.  And I mean I heard from reliable sources that there are dealers who when they sell the heroin, they're selling the Narcan along with it.