# EXHIBIT 10

U.S. DEPARTMENT OF JUSTICE

# President's Commission on Law Enforcement and the Administration of Justice

## HEARING FIVE (Days 4-6)
## REDUCTION OF CRIME
April 14 – April 16, 2020

Summary

### Call to Order and Welcome

Chair Phil Keith welcomed the attendees to the fifth hearing of the President's Commission on Law Enforcement and the Administration of Justice. On behalf of Attorney General Barr and his leadership team, Chair Keith expressed appreciation for everyone's ability to attend the hearing. Chair Keith greeted and thanked everyone for attending and supporting the teleconference.

### Opening Statements by Commissioners

Chair Keith opened by explaining that the three days of hearings, April 14 through April 16, would focus on crime reduction, including domestic violence and sexual assault; technology issues encountered by law enforcement; and leveraging technology to reduce crime. The first day's hearing focused on Domestic Violence and Sexual Assault. Witnesses for the hearing included Matthew Gamette, Laboratory System Director, Idaho State Police; Ms. Kim Garrett, CEO of Palomar, Oklahoma City's Family Justice Center; Richard Hertel, Prosecutor for Ripley County, IN; and Robert Hawkins, Chief of Police, Muscogee Creek Nation.

Note: Prior to the hearing, panelist biographies and written testimonies were delivered to the Commissioners for their consideration and review.

> **The Dilemma**
>
> "I've chased contraband cell phones in our prisons in snowstorms, deserts and half across the country. Criminals do not stop being criminals when they are incarcerated."
>
> *Chief Todd Craig*



- Fund more scientists, bigger facilities, and the use of technology like the National Institute of Justice (NIJ) West Virginia University (WVU) FORESIGHT tool, which combats DNA backlog by calculating the lab staff needed to get a desired turnaround time;
- Evaluate submission policies collaboratively (triage teams, labs, investigators, and prosecutors) to determine what is needed for investigation and prosecution in order to control backlogs;
- Employ all forensic disciplines, such as standard toxicology testing for drug-facilitated sexual assault, rather than just DNA analysis;
- Develop an electronic data exchange between law enforcement, labs, and court case management systems, so labs know when investigations have stopped or ended.
- Require and fund state accreditation of forensic providers and certification of forensic scientists;
- Exploit forensic data for criminal intelligence by creating focus groups to develop infrastructure that shares data from labs with fusion centers, High Intensity Drug Trafficking Area's (HIDTA), and state and federal agencies;
- Consider the recommendations of the recent OJP report on Promising Practices in Forensic Lab Intelligence to mine forensics for criminal intelligence;
- Create working groups for sexual assault in each state with more trained sexual assault nurse examiners (SANE) and sexual assault response teams (SART), and funding for state-level SANE and SART coordinators;
- Ensure evidence collection for sexual assault are done by trained nurses;
- Develop sexual assault kit tracking systems in each state;
- Perform an independent audit of how many kits each has, where those kits are located, and the lab status of every kit;
- Develop a mechanism to notify survivors of their kit location and testing status;
- Create national standardization of rape kits to eliminate state-to-state variations;
- Develop lab infrastructure to process all kits, test all probative evidence per kit, and enter all eligible samples into the Combined DNA Index System (CODIS), which is done in public laboratories; and
- Document law enforcement actions to follow up and resolve CODIS hits.

> "As identified in the NIJ 2019 Forensic Lab Needs Assessment Report to Congress, forensic labs require a minimum of an additional $640 million annually to balance incoming requests with reports."
>
> *Matthew Gamette*

***Second Panelist: Kim Garrett, CEO and Founder of Palomar, Oklahoma City's Family Justice Center***

*Highlights:*

- The family justice center model began in San Diego in 2002 and rapidly grew into a best practice and evidence-based model. There are more than 130 family justice centers across the United States.
- In 2015, Oklahoma City Police Department brought agencies together, under one roof, to form the first integrative collaborative in the community to help victims of domestic violence, sexual assault, and stalking. Previously, professionals working the same case did not work together or even meet and families were unintentionally falling through the cracks, which created more cases.
- The collaborative model brought diverse professionals together, such as: prosecutors, child and animal welfare, mental health, local police departments, sheriff's offices, the U.S. Attorney's office, U.S. Marshalls, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and dozens of non-profits including advocates, civil/legal groups, food and basic needs organizations, child care, therapy, and medical and forensic services working collaboratively in one building.

U.S. DEPARTMENT OF JUSTICE
President's Commission on Law Enforcement and the Administration of Justice

- Partners have said that what used to take seven weeks of coordinating between professionals now takes seven minutes, thanks to physically working in the same location.
- High-risk team meetings are conducted regularly to ensure a rapid collective response on cases with high lethality.
- Law enforcement leadership was directly related to a high level of success and the city recently approved a $38 million expansion for this model.
- Partnering in 2018 with the U.S. Attorneys' office, Western District, allowed for these initiatives:

> "If one person in the family chooses to use violence, within four generations, 18 people will continue the cycle."
>
> *Kim Garrett*

  - Enforcing implementation of Title 18, Section 922 which federally prohibits domestic violence abusers who are subject to a victim protective order or have been previously convicted of a misdemeanor of domestic violence, from possessing a firearm. This is significant as the presence of a gun in a domestic violent situation increases the risk of a homicide by 500 percent.
  - Revitalization of Project Safe Neighborhoods (PSN), a grant that was used to reduce violent crime. It was used to develop "Operation 922" that brought together Assistant United States Attorney (AUSA), ATF, U.S. Marshalls, local law enforcement, state prosecutors, and non-profit advocates.
  - PSN funds paid for the state prosecutor who is cross-deputized as an AUSA. Other funds were used to cross designate a law enforcement officer with ATF.
  - Outcomes to date include 99 cases charged, with 85 found guilty and an average sentence of 81 months. Thirty-five percent of those offenders were known gang members and more than 153 firearms were seized.
  - There are dozens of successes and lives have been saved because of this partnership because federal entities can move for detention immediately until trial, so defendants are not able to bail-out and harass, intimidate or injure their victims. Since the prosecution is based on possession of a weapon, victims do not have to cooperate or testify, which reduces their trauma while simultaneously increasing their safety.
- Federal funding requires many agencies to collaborate, but there are direct policies preventing or greatly restricting information sharing. An example was a recent triple homicide in Oklahoma that was domestic-related. ATF reached out to advocates to see if the victim disclosed anything that could be helpful in the investigation. Advocates could not have predicted this request and, since they did not specifically have a release for ATF, they could not share information.

*Recommendations:*

- Make the family justice center model a priority for long-term federal funding, ideally including the use of multi-agency teams, which include a prosecutor, therapist, civil/legal attorney, detective, and advocate;
- Develop and fund a federal task force of diverse leaders from professions who interface with crime victims, including law enforcement, attorneys, medical professionals, advocates, and therapists;
- Work together to develop a shared informed consent and information sharing policies and rules for collaborative models; and
- Increase federal resources to support state and local efforts in combatting domestic violence through PSN.

### Third Panelist: Chuck Cohen: Vice President, The National White Collar Crime Center

*Highlights:*

- Offenders gravitate to and will seek out platforms where their intended victims spend time.

- Dark web technologies are being used with increasing frequency during the normal course of business, state, local, territorial, and tribal law enforcement and inadvertently encounters the sexual exploitation and trafficking of children.

- Unbeknownst to some financial institutions, they are used by offenders to conceal proceeds of unlawful activity and launder money.

- Offenders routinely use communication, image hosting, video sharing, file hosting, gaming, dating and social media apps to exploit and traffic children. With one million iOS apps available in the Apple App Store and 2.8 million Android operating system apps available in the Google Play Store, it is often not possible for law enforcement to identify or locate the person, people or business that created the app or might retain information associated with the use of the app. This leaves law enforcement with no one to whom an emergency disclosure request can be made or on whom legal process can be served.

> "What I've seen over the preceding decade is a systemic and seismic closure of avenues that are available to police for the identification and location of victims and offenders and the collection of evidence in a forensically sound manner when investigating these types of child victimization"
>
> *Chuck Cohen*

*Recommendations:*

- Update the Communications for Assistance to Law Enforcement Act (CALEA) to require internet service providers to provide assistance to law enforcement similar to that which CALEA currently requires for landline and cellular carriers;
- Increase on a large scale funding and availability of consistent and high quality training and technical assistance for state, local, territorial, and tribal law enforcement that is related to issues outlined in this testimony;
- Implement regulations and laws that require internet service providers and companies providing commercial virtual private networking services to retain certain records, including articulating record retention periods; and
- Make a resource that provides current and correct contact information for apps offered in the Apple App Store and Google Play Store readily available to law enforcement.

### Fourth Panelist: Bryan Stirling, Director, South Carolina Department of Corrections

*Highlights:*

- There was a case in South Carolina where a correctional officer, Captain Robert Johnson, who worked at the Lee Correctional facility, was targeted and shot in his home at point blank range because he was doing his job to find contraband cell phones. The hit was ordered from prison via a contraband illegal cellphone.