# EXHIBIT 11

| | |
|---|---|
| **Company:** | FBI ACS Only account |
| **Conference Title:** | Presidential Commission on Law Enforcement and the Administration of Justice |
| **Conference ID:** | 4278911 |
| **Moderator:** | Dennis Stoika |
| **Date:** | April 14, 2020 |

Operator: Good day and welcome to the President's Commission on Law Enforcement and the Administration of Justice Conference Call. At this time, I would like to turn the conference over to Director, Phil Keith. Please go ahead.

Phil Keith: Thank you and good afternoon, and thank you for joining us today. I call the President's Commission on Law Enforcement and Administration of Justice to order. On behalf of Attorney General Barr, we thank you for joining us today for this important commission teleconference meeting.

Certainly hope that everyone had a healthy and safe Easter weekend. We also appreciate your continued patience and understanding as we continue to work on the commission.

We're starting our fourth week of teleconferences and we've just - they will continue this method of convening through the remainder of April and perhaps into May. As the landscape changes, we will certainly keep you informed to the best of our ability.

And on to business. So, the commission at this point, I would ask Executive Director, Dean Kueter, to conduct the roll call of commissioners.

Dean Kueter: Thank you, Mr. Chairman. And before I call the roll, I just, once again, like to remind

Finally, this commission should recommend more federal research and development funding and a federal research strategy for forensic science in the United States. Most forensic science laboratories cannot do foundational or applied research or technology transfer. More must be done on the federal level to support the practice of forensic science by bolstering foundational research and finding more efficient ways to implement validated technologies in the laboratory.

I appreciate the time that I've had to present today and the attention of the commission to these important issues.

Phil Keith:    Thank you, Director Gamette for your valuable testimony and your service. Our next panelist is Kim Garrett who is the CEO of Palomar which is Oklahoma City's Family Justice Center. Miss Garrett, thank you for joining us today. You're recognized.

Kim Garrett:   Thank you for this opportunity. My name is Kim Garrett. I'm the CEO and founder of Palomar. I'm a licensed, mastered social worker with 20 years experience in working with crime victims, and I've worked within two law enforcement agencies -- Oklahoma City Police Department and Reno Police Department.

The impact of domestic violence is significant. We know that in the U.S. there are more than 10 million victims annually of domestic violence. And in 2018, Harvard declared domestic violence a U.S. public health epidemic.

We know that you cannot have safe communities if you do not have safe homes, and domestic violent crimes have a tremendous fiscal impact on law enforcement agencies. A conservative estimate in Oklahoma City showed a fiscal impact of over $9 million in one year for dispatch, patrol, crime scene investigation, homicide, detectives, and other resources.

And while those costs are significant, it does not include incarceration, social services, and the long-term impact on families and children.

We know that 75% of children who witness domestic violence will grow up to repeat the same behavior. If one person in the family chooses to use violence, within four generations, 18 people will continue the cycle.

Generational violence is multiplying rapidly and it's too big of an issue for any one profession to combat alone. So, we've got to come together to improve outcomes.

The family justice center model began in San Diego in 2002 and rapidly grew into a best practice and evidence-based model. And there are over 130 family justice centers across the United States.

In 2015, Oklahoma City Police Department brought agencies together, under one roof, to form the first integrative collaborative in our community to help victims of domestic violence, sexual assault, stalking.

Law enforcement's leadership was directly related to our level of success and the city recently approved a $38 million expansion for this model.

Prior to our development, many of these professionals had never worked together, or even met, despite the fact that they worked on the same cases. Agencies were giving out brochures and phone numbers for coordinating services. And families were unintentionally falling through the cracks, creating more cases.

Our collaborative model brought diverse professionals together such as prosecutors, child and animal welfare, mental health, local police departments, sheriff's office, the U.S. Attorney's office, U.S. Marshalls, ATF and dozens of non-profits including advocacies, civil/legal groups, food and basic needs, child care, therapy, and medical and forensic services into one building working collaboratively.

Partners have said that what used to take seven weeks of coordinating between professionals now takes seven minutes, thanks to physically working in the same location. High-risk team meetings are conducted regularly to ensure rapid collective response on cases with high legality.

And the outcomes we've seen to date are undeniable. With on-site forensic exams and support services for survivors, detectives have improved casework with an increase of 38% of cases being filed with the district attorney's office.

We've seen an 8.4% reduction in domestic-related calls to 911. And literally, lives have been saved. For the past 20 years, Oklahoma's consistently ranked in the top worst states for women killed by men. And in 2018, we went down to 20th, our best ranking ever.

We know that violence is predictable. And if it's predictable, it's preventable. It's a matter of resources and priorities.

So, my recommendation number one is family justice center models need to be elevated as a priority for long-term federal funding, ideally develop funding opportunities specifically for multi-agency teams within a family justice center to create new positions including a prosecutor, therapist, civil/legal attorney, detective, and advocate.

Recommendation number two is develop shared consent to share information. For victims who choose to get wraparound services in a collaborative model, there should be an option of shared consent.

Current federal funding policies and rules are not written in consideration of collaborative models. At the same time, while federal funding required many agencies to collaborate, they have direct policies preventing or greatly restricting information sharing.

We recently had a triple homicide in our state that was domestic-related. ATF reached out to advocates to see if the victim disclosed anything that could be helpful in their investigation.

Advocates could not have predicted this request. And since they did not specifically have a release for ATF, they could not share information.

We recommend the federal level develops a task force of diverse leaders from professions who interface with crime victims including law enforcement, attorneys, medical, advocates, and therapists, and work together to develop a shared informed consent for collaborative models.

My third recommendation is increasing federal resources to support state efforts in combatting domestic violence through "Project Safe Neighborhoods", or PSN.

Oklahoma County has a high prosecution caseload with 1800 domestic cases being filed in 2018. They only have three state prosecutors.

We expanded our partnerships to a federal level and reached out to the U.S. Attorneys' office,

Western District, in May of 2018. They found Title 18, Section 922, which federally prohibits domestic violence abusers who are subject to a victim protective order or have been previously convicted of a misdemeanor of domestic violence, from possessing a firearm. This is significant as the presence of a gun in a domestic violent situation increases the risk of a homicide by 500%.

At the same time, the U.S. Attorneys' offices were tasked with revitalizing PSN, a grant to reduce violent crime. "Operation 922" was born and brought together -- AUSA's, ATF, U.S. Marshalls, local law enforcement, state prosecutors, and non-profit advocates.

PSN funds have been used to pay for a state prosecutor who is cross-deputized as an AUSA. And other money was used to cross designate a law enforcement officer with ATF.

Outcomes to date include 99 cases charged, 85 guilty with an average sentence of 81 months. Thirty-five percent of those offenders were known gang members and they've seized over 153 firearms.

There are dozens of successes and lives have been saved because of this partnership. Since federal entities can move for detention immediately until trial, defendants are not able to bail-out and harass, intimidate or injure their victims.

Further, since the prosecution is based on possession of the weapon, you do not need to have a victim cooperate or testify, thus it reduces their trauma while simultaneously increasing their safety.

I recommend increasing federal resources to support state and local efforts through "Project Safe Neighborhoods."

Thank you for your time and consideration and feel free to contact me if you need more information.

Phil Keith: Thank you, Ms. Garrett, for your informative testimony and service to the Oklahoma City community. Our next panelist is Mr. Richard Hertel, who is the elected Prosecuting Attorney for Ripley County, the 80th Judicial Circuit in Indiana. Thank you, Mr. Hertel, for joining us. You're recognized.

Richard Hertel: Thank you, Mr. Commissioner. My name is Rick Hertel. I am the Prosecuting Attorney in Ripley County, southeast Indiana. My jurisdiction is rather rural and small, about 30,000 people. We only have four attorneys in the office. I try a lot of cases. My jury trials' about 85 at this point in time. I do a fair amount of teaching throughout the country for state organizations as well as the National District Attorneys Association.

I screen cases, I meet with victims. I handle arraignments, plea hearings, sentencings, the whole gamut at this point in time with the small office that I work in.

Just briefly, domestic violence cases are obviously very different. I don't mean to reiterate some of the things that the group knows at this point in time, but in domestic violence cases, we are dealing with much more witness intimidation than generalized crimes. We're dealing with a power and control dynamic that is not in any other types of crimes.

Many times -- in fact, most times -- the victim still is in love and loyal to his or her perpetrator. We're dealing with recantation and we're dealing with the idea of evidence-based prosecution.

days later after the arrest. It's better that the law enforcement agency does it out on the scene and making that assessment then, but at times we cannot get all law enforcement to do it. If it was a requirement I think that would be beneficial.

Nancy Parr:     All right. Thank you.

Kim Garrett:    Hi, this is Kim. I'd like to say something. In Oklahoma, a few years back, we actually implemented it as a state law. Which I'm sure that contributes to our high success of LAPs being done by law enforcement but it implemented the 11 initial questions from the original study and connects survivors on scene immediately with advocates if they screen to a certain level.

I think it's been really helpful for detectives also to get some of the information from the LAP assessments as far if, like, if children were involved they can, you know, add another charge, different things like that. And I believe it's directly increasing victim safety by connecting them with the resources on site.

I will say, a backlash to it is some officers don't like people using their cellphones on scene. That is something I've heard universally from officers so I don't know how you could troubleshoot that if departments could give officers, you know, department-issued cellphones or things like that I think that would be helpful but that's been our experience.

Nancy Parr:     All right. Thank you very much.

Kim Garrett:    You're welcome.

Craig Price:    Director Keith, this is Craig Price, I have a question.

Page | 27

under stay at home orders -- especially this past month. How is - has this situation exacerbated the condition for victims who are at home with abusive partners? So that's kind of the first question.

And pretty much, do you have any recommendations on what we can learn in real-time to better protect the victims of domestic violence, especially during this pandemic. But also, you know, would you imagine perhaps in the future? Anybody who can maybe offer some guidance, or comments, suggestions. I'm open to that. Thank you.

Richard Hertel:  This is Rick Hertel. My only comment is it is a tragedy that happened in Indianapolis. Some of the smaller jurisdictions like mine have seen a small bump in the domestic violence calls since the stay at home order went into effect. I know that our local shelter that covers about six regional counties has been out in full force with radio ads, newspaper ads, and pushing that they are still open, they are still accepting victims of domestic violence so I think that's one start to make sure that the centers are still taking people and accepting people given the time that we live in.

Also, even though there is - I don't know about a reluctance. There is minor hesitation about making arrests on all sorts of crimes now by bringing someone into the jail who may be infected. If there are domestic situations they are the highest charged of really about everything, emotionally-wise, we're still encouraging the officers to make that arrest and let the judge make that determination at an initial hearing or arraignment whether or not there should be an OR, a bond set, and what sort of protective order should be given. So, that's our push from my jurisdiction.

Kim Garrett:     I'll say it from Oklahoma City, we've seen a 28% increase in calls to 911 that are

domestic-related in the past few weeks. We've really had to pivot to respond to that with closures for COVID and so we've implemented texting services, drive-up, where clients can get basic needs, forms, anything like that that they need. We've also partnered with law enforcement and advocate groups to do a video to say we're still here. We're working harder than ever to make sure you can connect with resources and we're actually contacting intentionally every day different news outlets to run stories to keep it at the forefront of people's mind that we're all still here and providing resources.

Regina Lombardo: Well, I appreciate both the answers. Like I said it's been -- even for our own agency and questions in trying to put out, you know, good guidance for our workforce as well. So I appreciate that. Thank you.

Phil Keith: Other commissioners with questions?

Ashley Moody: This is Ashley Moody from Florida. I have a question for Professor Gamette.

Phil Keith: Yes ma'am you are...

Ashley Moody: Director Gammett, I really appreciated your testimony I thought it was extremely valuable and over the past few decades our technology has advanced. It's been imperative that our labs keep up both with staffing and training. And one of the major challenges I see that as new technologies are developed by private companies, vetting of such technologies is having to be done - I know it's probably being done through federal labs but on a state by state basis, determining whether they're good technology - specifically related to digital forensics. And I think if anything comes out of this area in terms of our commission I think a recommendation on how best federal labs and state labs can work in a way that is more efficient and how we are better