# EXHIBIT 12

**Company:**                **FBI ACS Only account**

**Conference Title:**       **President's Commission on Law Enforcement and the Administration of Justice**

**Conference ID:**         **4278911**

**Moderator:**              **Dennis Stoika**

**Date:**                   **4-22-20**

Operator:     Good day and welcome to the President's Commission on Law Enforcement and the Administration of Justice conference call. Today's conference is being recorded. At this time I would like to turn the conference over to Director Phil Keith. Please go ahead sir.

Phil Keith:      Thank you and good afternoon and I thank everyone for joining us today. I'll call the President's Commission on Law Enforcement and the Administration of Justice to order. And on behalf of General Barr we thank all of you joining us today for this important Commission teleconference meeting.

This is our second call of the week and at this time I would ask our Executive Director, Dean Kueter to conduct our roll call of Commissioners.

Dean Kueter:    Thank you Mr. Chairman and before I call the roll, I would just once again like to remind everybody that today's event is open to the press and for any members of the media on the call. If you have questions or need clarification on anything, please contact Kristina Mastropasqua in the Justice Department's Office of Public Affairs.

And with that I'll begin the roll call. Commissioner Bowdich.

Commissioner Bowdich: I'm here.

Dean Kueter:    Commissioner Clemmons.

Commissioner Clemmons:    Here.

today's topics are going to be something extremely challenging and provide real life experiences.

So before we begin, on behalf of all of the commissioners, we want to say thank you to our panel for joining us and for sharing with us your experiences. We have incredible appreciation for how hard it is and often understand it can reopen wounds. So thank you for joining us today.

Our first distinguished panelist is Joyce Bilyeu, who is the Director of Client Services at the Sacramento Regional Family Justice Center. Dr. Bilyeu, thank you for joining us today and you are recognized.

Joyce Bilyeu:      Thank you. Good afternoon members of the Commission. I would like to thank you for inviting me to testify today on this crime prevention on behalf of victims of domestic violence. I am the Director of the Sacramento Regional Family Justice Center, but I'm also a survivor of domestic violence.

And so I'm here today to share a little bit about my personal story of domestic violence and the impact that it had on me and my children and then to offer some suggestions and recommendations.

I was married for 10 years and had two beautiful children and throughout my relationship, my husband physically, mentally and sexually abused me. He abused me during my pregnancies, broke my jaw and ribs. He sexually assaulted me and he would often strangle me to near unconsciousness.

There were many times that I had to go to the hospital for medical treatment. Not one time when I went to the hospital was I ever assessed for domestic violence or treated for strangulation. I was never even asked about it. I tried to leave the relationship many times throughout the 10 years, but every time I tried to leave, he would threaten me or threaten to kill me or he would find me.

At that time, I had no self-esteem and was very isolated and felt awfully alone. There was many times throughout the 10 years that I called law enforcement, but they would never do anything to him. They would come out and they would just tell him to calm down or to sober up or they threatened to take him to jail.

And once law enforcement would leave, his violence would become more severe and then he'd threaten to kill me and the cycle just started all over again.

Leaving an abusive relationship is really often the most dangerous time for victims and I understand this very much because the more control I would start to take in my life, the more out of control he would become. For example, when I finally did find the courage to leave, he broke into my house with an M16 automatic weapon which he had 20 rounds in it.

One of the bullets had my name on it that he had printed on there. He chased me down the street shooting at me and he shot three rounds with the third round going through my hair and knocking me on the ground because the gun jammed on that third round. He did all of this in front of our two small children. He was arrested that night and later released, but he was never sentenced for any jail time for his crime.

There's been many studies out there that have shown that some of the highest risk factors that lead to intimate partner homicide include for example a perpetrator's direct access to guns which my husband did, previous non-fatal strangulation - I was strangled several times throughout my 10 years, previous rape of victim - he did that, threats with a weapon, demonstrating having controlling behaviors, and threats to harm himself, myself or others. My husband displayed all these risk factors, however, law enforcement never assessed for my safety or for my children's safety, nor did they provide me with any resources regarding safe housing or safety planning.

And I truly believe that if law enforcement, when they came out, the many - any one of the many times that they were called, if they had given me some resources, assessed for the lethality and connected me with a victim advocate, I might have gotten out of the relationship a lot sooner than later.

The impacts on domestic violence - domestic violence is very, very serious and potentially a lethal public health problem. It's a problem that affects the lives of Americans all around the country and people just all around the world.

It could affect your - it might be affecting your daughter, your mother, your sister, your brother, your grandchild or your neighbor right now. The trauma that's caused by domestic violence permeates the entire family. And not only the entire family, but anybody that is a support network for the survivor.

If you think about it, law enforcement, healthcare providers, 911 dispatchers, judges - just the overall criminal justice system - they are routinely in contact with victims of violence who are at risk for an increase in severity and frequency on the abuse spectrum, with the most severe being murder.

It's often impossible for survivors to realize the danger they face after reporting the assault to law enforcement. And if you had - if I had known this knowledge, it could have meant the difference for many, not just myself, between life and death. Victims don't always recognize the potential for abuse to escalate. I know I didn't.

And nor do authorities always do enough to help victims to fully recognize the danger because they haven't been trained to identify the indicators.

One of the things that I would really like to recommend or to consider is support funding for

training, development and implementation of a lethality assessment and safety protocol for law

enforcement and first responders. And I recommend this for a couple of reasons, 1) because this is one

way to better assess the risk in which a victim finds him or herself is by asking better questions.

There is a lethality assessment program or a tool called LAP. It was created in - by the

Maryland Network of Domestic Violence in 2005, and is an innovative strategy to prevent domestic

violence, homicides and serious injury. And so, what it does, it provides really an easy and effective

method for law enforcement, and/or other professionals, to identify those victims who are at the highest

risk of being seriously injured or killed by their partners, such as in my case.

It also allows them to get victims connected immediately to a victim advocate or to a family justice

center or to a domestic violence agency. So they can work with that victim on creating safety planning

and educating them on the dynamics of domestic violence.

So here's how it works. The process begins when an officer arrives at a scene for example on a

call. And once the scene is secure and an investigation of the incident is complete, the officer is

encouraged to activate the lab. In other words, they will ask these 11 questions if you will on the lethality

screen.

There's a shorter one that's five questions based off of that one, depending on time constraints.

Once they ask the questions, then they have the opportunity to get the victim connected to a referral or to

a victim advocate right away.

Several law enforcement agencies around the country are using this and they are trained how to

identify the indicators and they've implemented this tool. The questions on the assessment tool were

developed using research conducted by Dr. Jacquelyn Campbell. Some of you might know her. She's a

professor at John's Hopkins University School of Nursing.

Her and her colleagues found that were women were 20 times more likely to be killed by their partner if their partner had threatened to use a weapon on them or had hurt them with a weapon, and nearly 15 times more likely to be killed if their partner had threatened to kill them, and were 10 times more likely to be killed if their partner ever tried to strangle them, such as in my case.

Although I may not have believed at the time in my situation that the violence could turn deadly, I think having an assessment would have flagged my case as high risk based on the information and the criminal complaint against my husband, and that would have gotten me connected to a victim advocate sooner than later.

The second thing that's really amazing about an assessment tool is the result of using one. You know when officers are trained on it, and trained on safety planning - there's a safety planning protocol that goes along with it. It can increase victim cooperation and trust and satisfaction with the criminal justice system.

I had no trust with them because every time a law enforcement came out you know, nothing was ever done. This one benefit alone, I think should encourage everyone in the criminal justice system to want to implement this assessment tool and safety planning, and just the way that they respond to victims.

Also, there's also evidence that more highly informed trained officers write better reports, thus getting intake prosecutors more information to assess the likelihood of successful prosecution. When an officer writes a really, really good report, the chances of prosecuting are really good. Most - a lot of district attorneys offices don't want to prosecute unless it's a sure thing.

And so if officers are really, really trained on report writing it's a win/win for all. Anything law enforcement can do to write a better report, increase prosecution, educate victims, provide more effective services and increase self-protective behaviors while reducing returned calls for services should radiate, like a win/win scenario for all of us.

The lethality assessment tool and the screening protocol are both equally important components. You can't use one without making sure that you don't have a safety plan because if a victim scores high out of the 11 questions, they are at a great risk for getting seriously hurt or killed. So you really do want to get them connected to someone who can do a safety plan with them.

Can you just imagine - I would like to take it a step further. If you could just imagine if that call comes in to 911 and that dispatcher is trained on that assessment tool, even if it's the five question one, asking, you know, are there weapons involved? Have you ever been strangled?

Asking these five high risk questions and they're putting it into the computer system for when law enforcement go out to the call, they already have that information in the system. You know, it can possibly help to secure the officer's safety, as well as the victims and possibly save their lives. We have too many officers who've died as a result of responding to domestic violence.

The second thing that I would like to recommend is to consider more funding and support for family justice centers. And I'm not just saying this because I work at a family justice center, I know personally myself as a victim I tried to leave my abusive relationship to find safety and support, and it was so overwhelming and so traumatizing. I had to go to multiple agencies, not just one or two.

Now you go to the court, you go to the shelter, you go to find food, you go to find clothing, you go

to health care provider, you go to all these agencies and law enforcement half the time won't even do anything unless you have a restraining order. And in California, a restraining order is like 50 pages long and it takes two to three to four hours to get it even done.

Child Protective Services, will use scare tactics also. Like if you don't get a restraining order, we're going to take your child away from you. So as a survivor trying to leave, I had to talk with law enforcement, counseling centers and all of these different agencies, while at the same time being harassed and stalked by my abuser.

And this does not include like talking to hotline workers or your pastor or your family or your friends. If there had been a family justice center, I could have gone there and got all of the services and support I needed in one place, not have to repeat my story over and over and over again and be able to start the healing process a lot sooner than later.

Because family justice centers focus on reducing the number of times a victim has to tell her story, his or her story, and the number of places victims must go for help. And they look to increase access to services and support for victims. They're very, very, cost effective because it's a collaborative model.

You have all of these agencies supporting - donating some of their time to be onsite - where a victim can go in and maybe get a forensic exam if she's been strangled, or they can receive counseling, they can receive financial education - all of these kinds of things along with safety planning.

Documented and published outcomes of family justice center - if you look at San Diego and Alameda for example, there was a reduction in homicides and it increased the victim's safety. Sacramento had like 13 homicides just a few years ago with 8 of those being children involved in

domestic violence.

In addition, the Family Justice Center model has been identified as the best practice in the field of domestic violence intervention or preventative services by the United States Department of Justice.

In conclusion, you know there are a couple of resources if you'd like to know more about the Family Justice Center or a lethality assessment. One you can go the Alliance for Hope International's website. You can go to the Lethality Assessment Program. org and also there's a really great book that I would encourage all of you to read.

It's called No Visible Bruises by Rachel Louise Snyder. There's a lot more to domestic violence than bruises. There's a lot there that you can't see. So in conclusion, I would like to personally thank you for allowing me to share my own story with you and for at least considering my recommendations.

And thank you for also doing your part in creating pathways to help for so many who have lost their hope. You hold the key right now in domestic violence has been around way, way, way, way too long and people are still dying at high rates. And it just needs to stop. So thank you.

Phil Keith:        Thank you Director Bilyeu for your testimony and certainly for your commitment of service to help victims of domestic violence. Our next panelist is Adrianna Griffith. Ms. Griffith works with victims at the Women's Center for Youth and Family Services in Stockton, California.

She too has been a victim and is using her experiences to help others who may find themselves in similar situations. Thank you for joining us Ms. Griffith. You're recognized.

Adrianna Griffith:          Thank you. So first of all just thank you for the opportunity to speak with you all today. I appreciate it. I'm honored and I'm absolutely humbled to be on this panel today.

So to start off, again my name is Adrianna Griffith and I'm a lived experienced expert in the areas of domestic sex trafficking and incarceration. As you said, I currently work for the Women's Center, Youth and Family Services in Stockton, California. And so we provide direct services to victims of domestic violence, sexual assault, human trafficking, as well as runaway and homeless youth.

So the primary purpose of my testimony today is really to just share my personal experience, in addition to providing a little bit of insight and some recommendations for hopefully to improve our justice system when it does come to interacting with potential crime victims.

So from myself, I have experienced multiple victimizations throughout my life. Everything from you know gang violence to gun violence to physical violence and sexual violence. I think there's not a victimization that I have not experienced in some way, shape or form.

I think the most important factor, however, in my story isn't necessarily in the experiences of my victimizations, but what those victimizations ultimately led to, which ultimately you know led to my incarceration as a direct result of my victimizations.

So it started, I was in a relationship - mostly I've been in a lot of relationships. The most recent was about 10 years ago and I was in a relationship and it was characterized by domestic violence. And so and then it became a very exploitive - so it became an exploitive relationship.

And at that particular time, I had already been through, as I said multiple victimizations up until this point. So within this relationship there was a lot of physical violence, there was a lot of manipulation,

there was a lot of sexual violence, on both ends of the spectrum. So ultimately it led to my being incarcerated as an adult. I was 22 at the time.

And because I was not a minor, I was seen as an accomplice in things like that involved in sex trafficking. And so from the minute I got involved with the criminal justice system, from the day I was arrested, based off of everything that I had been through up until that point, I really believed and hoped that finally I guess somebody was going to finally see me and kind of pay attention and see everything I had been through up until that point.

I was very depressed and depleted at this time in my life. And so I really just kind of hoped that this would kind of be the end to it and somebody would see me for who I really was and what was really going on.

However, from the time I entered into it, I was referred to as a victim offender and the term really never made sense to me. Just because I did not fully believe that I was treated as a victim of a crime, only as an offender. So for my first contact with law enforcement, the goal was always to punish and to hold someone accountable for what had happened.

The goal was not about healing or rehabilitation for myself or any other parties that were involved. I was incarcerated within our county jail in Stockton, California for about two years. And during this time, there were no intervention services offered to me. There were no victim services that were provided to me. No mental health services, no therapy services to help me make those connections.

I wasn't able to make the connections between my past victimizations and my present circumstances until I had - came home from being incarcerated. So while I was incarcerated, I remained

in sort of confused state for much of the time, not really knowing how to identify myself. Here I am, I am incarcerated, I have a prison identification number, but I'm also at the same time, being told that I've been a victim of sex trafficking. That I've been a victim of domestic violence, that I've been a victim of sexual assault, but it didn't make sense to me.

I did not have the things that were in place to help me make those connections. When I came home ultimately in 2015, and I started to work with the Women's Center in 2016 with the victim services and going through multiple trainings and things like that.

It wasn't until then where I was really fully able to understand how I had been victimized and how those victimizations influenced my decision-making process and my thought process in the way that I think and the way that I carried myself.

Just based off of the sexual assaults that I had experienced, you know, going into a mindset of "I'm going to say yes because I don't want somebody to take advantage if I say no." And so thinking that if I just say, "Yes," that I would, in-a-sense, be making myself less safe when in actuality, I'm making myself, you know, or I thought I would make myself safer. In actuality, it made me more less safe; putting myself in very, you know, vulnerable situations that set me up to be victimized.

And just going through that repeatedly -- so multiple, multiple layers of trauma -- a lot of poly-victimization going on. And so when I discovered all of these studies about poly-victimization, and one particular study that I found really helpful with, you know, the clients that I work with, including my own journey to healing was the ACEs Study. And it's the Adverse Childhood Experiences study, and it basically provides information about trauma that folks go through during their childhood. And so it ranges from everything from, you know, witnessing violence in the home

or your community to having a family member being incarcerated or to experiencing neglect and abuse yourself as a child.

And so all of these things adding up, and then also two studies about the brain and trauma, and how the brain has changed and how your decision-making is hindered because of the trauma that you have gone through. So all of these things really just started to kind of really make sense for me. So the more I read into that and looked into that, my ultimate circumstance of being incarcerated, it made sense because it's one of the outcomes of adverse childhood experiences -- when the trauma goes unaddressed -- is potentially incarceration, potentially victimizing others yourself, as well as, you know, health problems associated like cancer, heart disease, you know, including, you know, suicide. And also being involved in other victimizations so involvement in sex trafficking, becoming a victim and being re-victimized by all these other things. You have such a greater risk of re-experiencing these things when you've already been through it.

And so everything just really, really made sense for me. And so I started to really look at how I can incorporate all of these things into my daily job and what I do. So again, just with my personal experience, I found it to be really helpful to acknowledge all of those past hurts as well as acknowledge the responsibility that I carried for the decisions that I made, regardless of whether they were right or wrong or whatever it was why I made the choice -- just acknowledging that choice, acknowledging the decision for what it was and moving forward. But also acknowledging and accepting my victimization so that I could move past it was such a relief for me -- personally.

And so when I think about, you know, how the criminal justice system and how law enforcement all kind of plays a part in this, just from my very first interaction with law enforcement, had I, you know, been seen as a victim and not been approached with, you know, "You have to, you know, you have to tell us what's going on or you have to tell on somebody in order to get the help." Had

I been approached from a different perspective -- a more trauma-informed perspective -- as like, "What's going on with you? How can we help? How can we help you be healthy, how can we help you make better choices? What is it you need?" Stuff like that, while also holding folks accountable.

I think it would have helped me a lot more and I think I would have healed a lot sooner and been able to take responsibility for my actions a lot sooner than I did in reality.

Also too, just, you know, not just for me for myself, but just for anybody else who has a similar story to mine, coming home from prison and now still being, you know, considered a victim-offender, but not having access to victim services. So for instance, when I came home, there was a lot of - there was some conflict with some of the folks that I had harmed. And I was not able to access, you know, certain services because of the fact that I was on parole. I wasn't able to access victim services because on paper I'm the offender, and so I didn't qualify for those types of things. Like many others like myself, when you have gone through the criminal justice system as an offender, you become a little bit more at risk of, you know, having other people perpetuate crime against you.

And so, that being said, there is specific legislation -- especially in California when it comes to our Victim Compensation Fund -- that provides emergency funding for victims of crime, you know, to provide things like, you know, potential shelter, potential housing assistance, and therapy services to address the pain and the trauma of what happened. Folks that are on parole or probation are even in the gang database in California aren't able to access those funds -- even if they are victims of crime.

And so as we're talking about victim's rights and, you know, really seeing a reduction in crime

and, you know, speaking to victims and being there for victims, you know, we cannot forget that there are many, many victims of crimes who have also been offenders. And, you know, I really think that we deserve, you know, to be seen and to be heard as well. Not to make excuses and not to brush aside the harm that we have caused, but just to acknowledge the fact that we have been victimized as well, and to provide that service.

We know through various studies that access to mental health services and victim services like counseling and therapy, it really reduces, you know, recidivism and crime rates because people are able to acknowledge and to address some of the traumas that they've experienced throughout their lifetime. And so really just speaking to that, I think it's really important as we move forward when we talk about how the justice system can be improved when it comes to interacting with victims. This is just one way of improving that.

Also, you know, when we do have to incarcerate -- because I understand that we will have to, you know, because I had to be incarcerated. Obviously, you know, and I don't look at that time as a burden. I actually look at that and I'm thankful for that time. However, I do believe that we can institute better approaches for folks for people that have been victimized inside, as well as outside, to make sure that they have better access to victim services while they're, you know, at the same time holding themselves accountable.

So, you know, one of the suggestions that I have would be to establish some sort of nationwide trauma-informed intervention program for individuals that have been charged for the first time with violent crimes where, you know, it didn't result in someone's death, but it was a violent crime. But maybe there's other circumstances as to why, and how we can help that person address that trauma and potentially that anger that they are dealing with.

As well as I think it's important to establish and to increase the trauma training that we have for our law enforcement and our corrections officers to more effectively deal with suspects and victims who have experienced multiple forms of trauma, as well as establishing a 9-1-1 emergency phone line for mild-to-severe mental health emergencies so that law enforcement does not have to be the first line of defense for, you know, mental health emergencies that are not necessarily crime-related. But I think that having some sort of emergency phone line that we can call, you know, and get somebody to respond when they're having a mental health crisis, whether that be because of PTSD or past traumas, we have somebody that is trained and equipped to respond to that person, and to provide that mental health first aid and get them to a stable place. And then if law enforcement is still needed, to bring them in after the fact, so they don't have to carry the burden of not only providing, you know, law enforcement services but also mental health services, you know, to relieve some of that burden.

In addition to what my fellow panelists have said, I also agree and think that we should increase funding to organizations that are providing direct services to victims of crime. I think that, you know, again, not just because I work for an agency that does provide that service, but because I see that the majority of the folks that come for services are really looking for ways to make better and healthier decisions. And a lot of them have also done harm in our communities. And so we need to be able to be equipped, and have the funding to be able to provide those services to our community members, you know, whether they have experienced trauma or whether they have caused the trauma.

We need to be very intentional about how we address that and I think that we have to act intentionally with the goal of healing, as opposed to, you know, mass incarceration when it comes to reducing crime. You know, I think that, you know, victimization is not a one-size-fits-all. Victimization happens in various forms and in many different ways for many different people, and

so I think it needs to be addressed in the same way from many different angles and from many different approaches.

And in my experience and opinion, I really do believe that 100% of the people that have been harmed as children in some way, shape or form are, you know, the 25% of the world's population that we see that are incarcerated at this time. You know, so I think that if we really just start to focus on trauma-informed approaches when it comes to our justice system and how we're rolling out justice, I think that we will see - we will definitely see - a significant reduction in crime when we're addressing people's pain and trauma so that they can get it out. And they can learn new ways of coping and expressing themselves.

I know for what worked for me and when I finally found alternative ways of expressing my anger or my frustrations, it really, really helped dial back a lot of the anger that I was expressing in unhealthy ways. And so understanding that there are healthy ways and unhealthy ways of expressing anger. And I think that if we can teach people that, we really will see a reduction in, you know, domestic violence especially. And even with domestic sex-trafficking, I think that we would also see a significant reduction in that if we are looking to alternative forms in trying to help folks to develop better ways of coming out of poverty, and dealing with not being able to maybe get to have access to employment because of a criminal record. And so I think that if remove a lot of the barriers that folks face, we will see a significant reduction in crime across the board -- not just with violent crime.

And that's it. I think that's it that I have for today. But again, I just want to thank you for allowing me the time to kind of speak and share a little piece of myself and my experience. And I just hope that we can, you know, move forward and really just be really intentional about when it comes to serving victims. And really just see and understand that, you know, these terms that we use --

victim and offender -- they are really just used to kind of put people in boxes. And I think that we have to remove the boxes so that we can really see people for who they are and what they've been through and their struggles, so that we can really just address that trauma head-on, and like I said, and reduce, you know, incarceration rates, recidivism, and crime rates as well.

(Phil Keith):    Thank you (Ms. Griffith), for your sharing your story with us and certainly your testimony and recommendations today.

(Ms. Griffith):    Thank you.

(Phil Keith):    Our next panelist is Bella Hounakey who is the subject matter expert for the United States Advisory Council on Human Trafficking. She's also a survivor and was brought to the United States by criminal traffickers. Ms. Hounakey, thank you for joining us today, and you are recognized.

Bella Hounakey:    Thank you. Hello everyone, good afternoon. My name is Bella Hounakey. Members of the Commission and the Administration of Justice, thank you for including me in today's event. Thank you for your advocacy effort to support victims of crime.

I am speaking to you today as a trafficking survivor and also, as was mentioned, a member of the U.S. Advisory Council on Human Trafficking. The Council is composed of survivors of trafficking -- both sex and labor. But today I'm going to share my personal trafficking story with you and will conclude with recommendations when engaging with survivors.

I was originally in Western Africa - Togo. At nine years old, my aunt -- my maternal aunt -- wanted me to continue my education in the U.S. Because she was a family member, my parents allowed

My question specifically is for Miss Griffith. And I wanted to ask you about your first two

recommendations and hope for a healing system. And specifically those recommendations as it

relates to establishing nationwide trauma informed diversion programs and intervention

programs. Those first two recommendations seem, like, sound recommendations. I wanted to

know is there any jurisdiction you know that has such a program that we could look at, that we

could model after? And thank you very much everyone.

(Adrianna Griffith):        Absolutely, thank you for that question. I appreciate you so very much. I know

that there are a lot of pocketed diversion programs specifically. I know that these diversion

programs are more targeted for human trafficking cases. And so I know that in Sacramento

County they have a particular program and then in San Joaquin County where I'm located we

have just started to roll out our own diversion programs.

So about a year or so ago we established the Stop Program which is geared toward purchasers

formerly known as the John School. And so they go through 12 weeks of classes where they

learn about the crime of human trafficking. They hear from survivors. They hear from other

members of the community as well as our director of our family justice center in San Joaquin

County. They view her presentation as well on sex trafficking.

And then recently within the last year we've also developed in addition to the program for the

purchasers we also now have a program for the victim or the providers as well. And so the

individuals and this would be for adults. So for the individuals it would be previously would be

arrested and charged and cited with prostitution or solicitation charges and it's their first offense.

They get an opportunity to volunteer for the program.

So whatever side of the coin they happen to fall on they can volunteer for the program. And they

can go through it. Once they get their completion, they have the opportunity to then have that

charge removed from their record. And so they enter in a plea of abeyance. And so once they

obey and go through the whole program and after about a year pick up no new offenses, the

charge gets taken off of their record, and stuff like that.

And so for the female side of things, I am a facilitator for a curriculum called Ending the Game.

And so Ending the Game is a first-of-its-kind curriculum. It's an intervention curriculum specific to

survivors of sex trafficking. And so that is the curriculum that we use here at the women's center.

I've been trained in that curriculum since 2016. And so we have it run simultaneously with the

Stop Program. There's is about 12 weeks. Mine is 10 weeks. And so we really - the curriculum

really speaks to the psychological coercion and the attachments that are associated with the

lifestyle of trafficking.

And what I really love about this particular curriculum is that we have updated the language in the

curriculum, because we do recognize that a lot of - the majority of the survivors of trafficking are

not going to identify as victims. And so what we have done - what they've done with the

curriculum for Ending the Game is they have removed all of the language that would say 'victim'

and they have replaced it with just 'people' or 'persons'. And so it really allows somebody to really

see themselves and then their situation. And not feel, like, it doesn't include them because they

don't identify with a certain term.

And so we're really paying attention to language, and things like that, and how we are handling

these cases and dealing with these clients. And so our program has gone really well. We've

gotten through two rounds of the diversion program already for the women. The first one it was a

little rocky getting it off. But the second one we had about six participants with the second run.

And for the most part everyone was due to complete.

But unfortunately due to what's going on with COVID we had to cancel our last group. And so they would have actually completed last month. And so we've just been kind of working on a one-on-one basis trying to figure out how to get everybody completed, because we're so limited, we're not able to have folks come into the office for groups and things like that. But it is really working really well. Some of my clients who are in the program are now stable, they're in their own apartments and things like that. They're reunited with their children and things like that.

So it's going really well. There will be hiccups and things, like, that but it is going really well. And so hopefully when, you know, we pick back up, we'll get more referrals and be able to grow the program from there.

Phil Keith:          Thank you. Other commissioners with questions.

Gordon Ramsay:          Yes this is Gordon Ramsay.

Phil Keith:          You're recognized commissioner.

Gordon Ramsay:          Thank you. This is a quick thank you to all the panelists today. And I had a quick question for Miss Alexenko on where we stand. Well first I've got to say thank you for all you've done. Your humility is impressive but you have done tremendous work in this area. And have really changed our country for the better in regard to testing of these kits. And when I think of this issue your name comes to mind as someone who has moved us forward. So thank you for that.

My second question is where do we stand today from your perspective as far as making progress on this issue? And how much is related to funding versus lack of understanding on this issue?