# EXHIBIT F

New York Office
40 Rector Street, 5th Floor
New York, NY 10006-1738
T. (212) 965 2200 F. (212) 226 7592
www.naacpldf.org




Washington, D.C. Office
700 14th Street, NW, Suite 600
Washington, D.C. 20005
T. (202) 682 1300 F. (202) 682 1312

April 29, 2020

**Via Electronic Mail** (LE.Commission@usdoj.gov)
**Corrected Version submitted May 20, 2020**

William Barr, Attorney General
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Phil Keith, Director
Office of Community Oriented Policing Services
United States Department of Justice
145 N. Street, NE
Washington, DC 20530

Katherine Sullivan, Principal Deputy Assistant Attorney General
Office of Justice Programs
United States Department of Justice
810 Seventh Street NW
Washington, DC 20531

**RE: Comments on the Work of the Presidential Commission on Law Enforcement and the Administration**

Dear Attorney General Barr, Principal Deputy Assistant Attorney General Sullivan, and Director Keith:

On behalf of the NAACP Legal Defense and Educational Fund, Inc. ("LDF"),[1] I submit written comments on the responsibilities of the working groups of the Presidential Commission on Law Enforcement and the Administration of Justice (the "Commission"). On March 31, after learning that the Commission unexpectedly shortened the public comment period by two months with no public notice, we submitted a statement on the final day of the comment period requesting an extension through June 15, 2020 due to the coronavirus pandemic that has shifted Americans' focus to preventing and protecting themselves from the public health crisis. In response, we received an April 14, 2020 letter from Commission Chair Keith and Vice Chair Sullivan stating that the public comment period was reopened through April 30, 2020, an entire month shorter than the originally advertised May 31, 2020 comment period deadline. To our knowledge, the Commission has not provided public notice of this deadline change. Without adequate notice of the new deadline, members of the public who wish to submit comments may miss the opportunity to do so. Nevertheless, in the interest of meeting the Commission's second revised deadline, we highlight concerns about the tasks of three working groups – Respect for Law Enforcement, Grant Programs, and Data and Reporting – and offer guidance on how to address these concerns.

## I. Respect for Law Enforcement

We wish to express our deep concern with the proposed work of the Respect for Law Enforcement Working Group because it is premised on the unsubstantiated and unexplored assump-

tion that there is a "trend of diminished respect for law enforcement and the laws they enforce." What is described as a "trend" was neither documented nor evidenced by the Attorney General in his announcement of the Commission. Instead, this troubling and expansive claim is stated as fact, and is presented as the platform upon which this Working Group is charged with launching its work.

More troubling is the fact that nothing in the charge to the Working Group, or the witnesses or materials presented to the Commission thus far, appears to engage with decades of well-established research by federal commissions, task forces, and congressional reports exposing rampant police violence against communities of color, which has resulted in pervasive distrust of law enforcement. The nexus between unconstitutional policing, community respect for and trust of law enforcement, and community confidence in our system of laws is a critical and urgent issue for exploration and study. Indeed, the recognition of this reality has led to the embrace of "community policing" models by law enforcements leaders across the country, including the U.S. Department of Justice ("DOJ"), until recently. The failure to engage this well-documented and critically important aspect of public safety, and to frame the Commission's work in the term of "respect" for law enforcement, suggests that this Commission has been constituted and is being conducted for the purpose of affirming the Attorney General's views, and to endorse pre-ordained policy outcomes to be pursued by the DOJ.

Additionally, the working group is tasked with evaluating jurisdictions that allegedly engage in "under-enforcement" of criminal law. This also constitutes an unsubstantiated and undocumented assumption that reflects a conclusory and biased view of how prosecutors should best exercise the vast discretion they are afforded within the context of the U.S. criminal justice system, rather than a statement of neutral fact justifying study by a presidential commission. The decision to state this particular view of prosecutorial discretion as a fact upon which the Working Group should launch its enquiries suggests that the direction of the Commission's examination of this topic has been slanted and skewed in the direction of pre-formed conclusions and recommendations.

We explore our concerns in greater detail below.

**a) Decades of police violence and egregious misconduct towards communities of color caused the current mistrust of police that the Commission has irresponsibly termed "disrespect of law enforcement."**

Attorney General Barr compared this Commission to President Johnson's Commission on Law Enforcement and Administration of Justice (Katzenbach Commission).[2] Yet this Commission is in vast contrast to the Katzenbach Commission. That Commission was established by President Johnson to study and repair the American criminal justice system. It comprised a diverse group of national and local leaders including representatives of civil rights organizations, law enforcement, media, government, and academia who worked over the course of almost two years.[3]

The Katzenbach Commission began its work after numerous incidents of police violence in Black communities occurred, including the 1965 brutal police beating and murder of Jimmie

Lee Jackson for peacefully demonstrating for voting rights in Alabama,[4] and Bloody Sunday in Selma, Alabama, where police attacked 600 peaceful Black demonstrators with tear gas and Billy clubs.[5] The Final Report issued by the Katzenbach Commission acknowledged

> too many policemen do misunderstand and are indifferent to minority-group aspirations, attitudes, and customs, and that incidents involving physical or verbal mistreatment of minority-group citizens do occur and do contribute to the resentment against police that some minority-group members feel.[6]

Consequently, the report included wide-ranging recommendations including the development of programs and activities to improve community-police relations, such as procedures to address citizen grievances against police[7] and procedures to ensure that officers exercise restraint and discretion in policing.[8]

Unfortunately, the recommendations were not sufficient to meaningfully change the centuries of institutionalized violence against Black people that police departments have participated in since American slavery,[9] and throughout Jim Crow,[10] the Civil Rights Era,[11] and mass incarceration.[12] In 1991, following the nationally-circulated video of police brutally beating Rodney King, members of the U.S. Congress held hearings and found that police violence in Los Angeles and multiple jurisdictions across the country continued to reflect racist views and unconstitutional practices.[13] Consequently, Congress passed the Violent Crime Control and Law Enforcement Act of 1994 to give the DOJ more authority to investigate law enforcement agencies to determine if they have engaged in a pattern or practice of unconstitutional or otherwise discriminatory policing.[14]

After dozens of these DOJ investigations[15] and modest reforms,[16] beginning in 2014 the nation once again witnessed highly-publicized videos of police violence against unarmed Black men, women and children across the country: Eric Garner, Staten Island, NY; Michael Brown, Ferguson, MO; Marlene Pinnock, CA; Akai Gurley, Brooklyn, NY; Tamir Rice, Cleveland, OH; Samuel DuBose, Cincinnati, OH; Laquan McDonald, Chicago, IL; Alton Sterling, Baton Rouge, LA; Philando Castile, St. Paul, MN.[17] The graphic videos of these incidents were pervasive, and trust in police reached its lowest level in decades.[18] In response, former President Barack Obama created The President's Task Force on 21st Century Policing ("Task Force") and charged it with a neutral, fact-based inquiry: "to identify the best means to provide an effective partnership between law enforcement and local communities that reduces crime and increases trust."[19] The composition of the Task Force reflected the unbiased, fact-finding nature of the Task Force's work. The membership of the Task Force was bipartisan, and included law enforcement leaders, criminologists, scholars, civil rights advocates, and youth leaders. The Task Force's 2015 final report explored many of the topics considered by the current Commission, such as officer wellness and crime reduction, but also critically acknowledged distrust of police by communities of color due to biased policing practices and racially discriminatory mass incarceration.[20]

Despite this well-documented history, just six years later, Attorney General Barr has created a new Commission comprised almost entirely of law enforcement officials and constituted a Working Group which has been charged to approach its work from one particular perspective—that communities who resist unconstitutional policing are disrespectful of police. What the

Working Group's charge describes as disrespect is actually *mistrust* of police – mistrust created by years of unconstitutional policing, well-documented in investigations led by the Department of Justice, and court-ordered consent decrees.[21] The conflation of the two is dangerous to community members victimized by decades of discriminatory and violent policing, unhelpful to building trust with the community, and ignores the true cause of pain suffered by local communities. It also reveals the true nature of the Working Group's course of work: to justify and support a pre-ordained conclusion, unsubstantiated by a full and fair study of community views about law enforcement and the rule of law.

Further evidence that the Working Group's assignment has been pre-ordained was revealed by Attorney General Barr's alarming warning the same month the Commission was announced that if communities "don't give that support and respect [to law enforcement], they might find themselves without the police protection they need."[22] But community protests that call for fair police treatment and increased police accountability are a direct response to police misconduct, akin to the protests of the Civil Rights Movement that brought light to unjust and racist laws and practices.[23]

It is against this backdrop, of decades of unconstitutional, unchecked, corrupt police practices upon Black and Latinx communities around the country[24] that the Commission should analyze the relationship between communities of color and law enforcement.

Therefore, we contend that the Respect for Law Enforcement working group should be prepared to hear directly from residents from communities victimized by unconstitutional policing; criminologists and local law enforcement leaders, legal scholars, family members of Black and brown victims of police violence, and community advocates, and meaningfully review the origins, current use, and consequences of law enforcement practices in those communities. Only through that lens can the working group develop meaningful recommendations that can build trust between law enforcement and the communities they serve.

**b) Unlawful policing practices, unjust and excessive mandatory minimum sentencing, and countless wrongful convictions have caused prosecutors to reform criminal justice policies to attempt to create a justice system that is fair and nondiscriminatory.**

Prosecutors enjoy vast discretion in determining which crimes they will aggressively prosecute;[25] whether and how harshly to charge certain crimes;[26] whether to drop charges;[27] how harsh a sentence they should recommend;[28] and whether they will accept a plea deal.[29] These decisions are described as prosecutorial discretion for the simple reason that they are decisions that fall squarely within the authority of prosecutors and reflect the prosecutor's view of the appropriate priorities for her office in a particular jurisdiction. The exercise of this discretion is particularly appropriate where prosecutors are elected – often on a platform that sets out the candidate's proposed priorities to voters, who then elect a prosecutor with the express expectation that those priorities will be pursued. The Commission's charge to the Working Group oversimplifies this entire complex area of prosecutorial discretion and instead mischaracterizes it as the "under-enforcement of the criminal law." Attorney General Barr has expounded on this view in

other public remarks and speeches in which he has taken the unusual step of commenting on and disparaging the exercise of prosecutorial discretion by elected local district attorneys.

An examination of how prosecutorial discretion is exercised would be a worthy area of study for the President's Commission. Our criminal justice system and the DOJ would benefit from a clear, balanced, and neutral analysis of how the priorities of prosecutors contribute to crime reduction, mass incarceration, and policing practices. In fact, the U.S. incarcerates more of its residents than any other country in the world due, in part, to overly aggressive policing and sentencing practices, particularly for low-level offenses.[30] Consequently, criminal justice officials at the federal and state levels have taken steps to correct these injustices. For example, some police departments have reformed law enforcement practices by prioritizing the most serious crimes, not low-level so-called "quality of life offenses," such as loitering.[31]

Federal, state, and local prosecutors have also acknowledged bias in every step of the criminal legal system and have taken steps to remedy these biases.[32] Indeed, in an effort to eliminate disparities in mandatory minimum sentencing that result in racial disparities in sentencing for drug and other nonviolent offenses, former Attorney General Eric Holder directed U.S. Attorneys to decline to charge for an offense that triggers mandatory minimum sentences in certain circumstances.[33] Though the Trump Administration quickly abandoned this practice,[34] it later acknowledged the disparities in mandatory minimum sentences by signing the First Step Act, which reduced several federal mandatory sentences, resulting in the release of over a thousand federal prisoners.[35]

Even sentences for serious offenses have been doled out in a racially discriminatory manner. Individuals receiving death sentences are disproportionately Black and frequently experience trials and sentencing rife with racial bias.[36] For example, LDF recently represented Duane Buck, a former death row prisoner sentenced to death after the prosecution's expert testified before the jury that Buck's race, which is Black, increased his risk of future dangerousness.[37] Mr. Buck's case went to the U.S. Supreme Court, which ruled that Buck's death sentence was unconstitutional because it was based on his race.[38] In another case, *Flowers v. Mississippi*, a Black man named Curtis Flowers was tried before a jury, for the same crime, six separate times by the same lead prosecutor for the State.[39] The U.S. Supreme Court found that the State was motivated in substantial part by a discriminatory intent because in Mr. Curtis' six trials combined, the State used preemptory challenges to strike forty-one of the forty-two eligible prospective Black jurors; struck five out of six eligible Black jurors in the sixth trial; disparately and vigorously questioned Black prospective jurors in stark contrast to white prospective jurors; and struck a prospective Black juror who was similarly situated to a white juror who was not struck.[40] Because the criminal legal system continues to be infected with rampant racial bias at every stage, some prosecutors have now refused to recommend a death sentence.[41]

All of these matters are worthy of serious and dedicated study at the highest levels of government. The DOJ's attention to these issues is particularly warranted. The convening of a Presidential Commission is an extraordinary undertaking. It should have the confidence of the public that its work will be conducted in a matter that demonstrates fairness, mastery of the subject matter, deep engagement with the most important aspects of the problem, and participation by affected members of the public and a range of experts. This Commission – and the charge

given to its Working Groups – cannot inspire that confidence. We encourage the Department to re-imagine how this Commission might expand and modify its work to engage in more balanced, fact-bound analysis and review of the critical issues it purports to study.

## II. Grant Programs

The Grant Programs working group is tasked with "review[ing] the efficacy of federal grant programs in aiding state, local, and tribal law enforcement entities and constructively evaluate optimal use of federal funding for local law enforcement."[42] This assignment, however, omits the important responsibility of federal agencies to ensure that recipients of federal funds comply with federal anti-discrimination civil rights laws, such as Title VI of the Civil Rights Act of 1965,[43] Section 504 of the Rehabilitation Act of 1973,[44] and the Omnibus Crime Control and Safe Streets Act of 1968.[45]

As administrators of federal grants to law enforcement, the DOJ and other agencies must investigate complaints of discrimination and conduct compliance reviews to ensure law enforcement grant recipients are complying with civil rights laws. In carrying out these responsibilities, the DOJ has found that many law enforcement agencies that receive federal funding also engage in discriminatory activities in violation of civil rights laws, and required them to reform policing practices to comply with anti-discrimination civil rights laws.[46] The Grants working group must examine the extent to which federal agencies have investigated complaints against law enforcement agencies and conducted compliance reviews to ensure compliance with civil rights law, and make recommendations for improvement. Indeed, a database created by the Thurgood Marshall Institute of LDF suggests that tens of millions of federal dollars in the form of grants from the DOJ are currently bestowed on police departments that have a troubling record of discriminatory and otherwise unconstitutional policing.[47] The potential use of federal dollars in violation of the non-discrimination requirements of Title VI of the Civil Rights Act of 1964 warrants investigation and study.

Additionally, the working group should examine ways federal funding has and should be awarded to community-based organizations working to advance public safety, particularly in jurisdictions with a history of unlawful policing practices, to build community trust and reduce crime. Indeed, the coronavirus pandemic demonstrates the need for federal funding to advance a public health and economic approach to public safety rather than one premised on rigorous enforcement of non-violent and low-level offenses. This is especially true for communities already grappling with effects of being strategically excluded from many basic necessities. Struggling communities need food, access to housing, an attainable living wage, quality education, treatment programs for substance abusers and those with mental and behavioral health concerns, healthcare, and compassion.[48] Because law enforcement is not qualified to lead most of these areas,[49] social and public health experts should take the lead in addressing these social concerns. Therefore, in reviewing grant programs the Commission and its working groups should realign grant priorities with the fact that neither police, nor the aggressive "punishment centered" enforcement practices they are trained on, are the answer for many public health and most social problems.

Finally, the Grants working group should also address the dearth of information about incidents involving police use of force and other police activities by conditioning receipt of federal funds on the collection and public reporting of certain data, such as traffic and pedestrian stops, and anti-bias and de-escalation training, to improve policing services and build community trust. Indeed, members of Congress have introduced legislation, including the End Racial and Religious Profiling Act of 2019 (ERRPA)[50] to require this type of data collection and training.

## III. Data and Reporting

The Data and Reporting working group's mandate is to "identify any gaps in needed data that is not being collected of relevance to the well-being of law enforcement and crime prevention methods." We strongly recommend that this working group examine gaps in the collection of data mentioned in the section above, particularly police use-of-force data.

Currently there is no nationally required census on law enforcement's use of force or traffic stops.[51] Recognizing the urgency of collecting such data, the FBI created a National Use of Force Data Collection program.[52] However, because the database is voluntary, law enforcement agencies that unlawfully use excessive force can easily escape public scrutiny and avoid accountability. In fact, less than 37% percent of an estimated 860,000 federal, state, local, and tribal law enforcement officers contribute to the National Use of Force Data Collection.[53] Worse, because the FBI reportedly will not release statistical reports until law enforcement participation is at least at 40%, the public does not even have access to the data agencies voluntarily report to the national database. [54]

Additionally, Congress passed the Death in Custody and Reporting Act ("DICRA") in 2014, which requires states that receive funding under the Omnibus Crime Control and Safe Streets Act of 1968 to report to the Attorney General demographic information regarding the death of any person while detained, arrested, en route to incarceration, or already incarcerated. Yet, DICRA has not been fully implemented, enforced, or evaluated.[55] Together, this means that the majority of U.S. law enforcement agencies can avoid public oversight and scrutiny. Accordingly, the Data and Reporting working group should recommend mandatory data collection and reporting to the FBI national database, full implementation of the DICRA data collection requirements, and passage of ERRPA.

Thank you for considering our comments and recommendations. Please do not hesitate to contact Monique Dixon, Deputy Director of Policy at mdixon@naacpldf.org, or me with any questions.

Sincerely yours,

Sherrilyn A. Ifill

Sherrilyn Ifill
President and Director Counsel
NAACP Legal Defense and Educa-

tional Fund

---

[1] Since its founding in 1940, LDF has used litigation, policy advocacy, public education, and community organizing strategies to achieve racial justice and equity in the areas of education, economic justice, political participation, and criminal justice. It has been a separate organization from the NAACP since 1957. For 80 years, LDF has consistently worked to promote unbiased and accountable policing policies and practices at the national, state, and local levels.

[2] The President's Commission on Law Enforcement and the Administration of Justice, better known as the Katzenbach Commission, was established by President Lyndon B. Johnson to study and reform the American criminal justice system. Over the course of almost two years, the Katzenbach Commission called three national conferences, conducted five national surveys, held hundreds of meetings, and interviewed thousands of people, ultimately making thousands of wide-ranging recommendations for reform. Nat'l Criminal Just. Reference Ctr., The Challenge of Crime in a Free Society, Report of the President's Commission on Law Enforcement and Administration of Justice (1967), https://www.ncjrs.gov/pdffiles1/nij/42.pdf.

[3] *Id.*

[4] Assia Johnson, *Jimmie Lee Jackson: The Murder that Sparked the Selma to Montgomery Marches of 1965*, NAT'L UNDERGROUND RAILROAD FREEDOM CTR.: VOICES, https://freedomcenter.org/voice/death-sparked-selma-montgomery-marches-1965 (last visited Apr. 22, 2020).

[5] Report of the Nat'l Advisory Comm. on Civil Disorders, NAT'L CRIM. JUST. REF. CTR., 20, (1967) https://www.ncjrs.gov/pdffiles1/Digitization/8073NCJRS.pdf; *see also* Selma-to-Montgomery March: Nat'l Historic Trail & All-Am. Rd, NAT'L PARK SERV., U.S. DEPT. OF THE INTERIOR, https://www.nps.gov/nr/travel/civilrights/al4.htm (last visited Apr. 22, 2020).

[6] *Id.* at 100.

[7] *Id.* at 103-108.

[8] *Id.*

[9] *See, e.g.*, Otis S. Johnson, *Two Worlds: A Historical Perspective on the Dichotomous Relations Between Police and Black and White Cmtys.*, 42 HUM. RTS. 6, 7 (2016); Victor A. Kappeler, *A Brief His. of Slavery and the Origins of Am. Policing*, E. KY. U. POLICE STUDIES ONLINE, Jan. 7, 2014, https://plsonline.eku.edu/insidelook/brief-history-slavery-and-origins-american-policing. ("The birth and development of the American police can be traced to a multitude of historical, legal, and political-economic conditions. The institution of slavery and the control of minorities, however, were two of the more formidable historic features of American society shaping early policing.").

[10] David Ponton III, *A Protracted War for Order: Police Violence in the Twentieth Century United States*, 16 HIST. COMPASS 12 (2018) ("The creation of less-than-humans through police violence has affected . . . Black Americans in the Jim Crow south. This function has existed across the twentieth century and has assumed the form of racialized stop-and-frisk in major cities, racialized mass incarceration . . . .").

[11] *See* Jonathan Simon, *Policing after Civil Rights: The Legacy of Police Opposition to the Civil Rights Movement for Contemporary American Policing*, *in* 1 THE SAGE HANDBOOK OF GLOBAL POLICING 373, 382 (Ben Bradford et al. ed., 2016).

[12] Clarence Taylor, *Introduction: African Americans, Police Brutality, and the U.S. Criminal Justice System*, 98 J. of African Am. Hist. 200, 202 (2013) ("Historically, police and other law enforcement agencies have targeted African Americans and accused them of violating the law. This targeting led to the incarceration, imprisonment, chain gangs, prison farms and other correctional facilities for tens of thousands of African American men, women, and children.").

[13] *See* House Report No. 102-242, Omnibus Crime Control Act of 1991, Title XII, Subtitle A – Police Accountability Act of 1991, at 135 (Oct. 7, 1991), 1991 WL 206794.

[14] Violent Crime Control and Law Enforcement Act, Pub. L. No. 103-322, 108 Stat. 1796 (1994) (codified as amended at34 U.S.C. § 12601 (2017).

[15] *See* Statement by DEPT. OF JUST. on Police Reform and Accountability Accomplishments (Dec. 4, 2015) (https://www.justice.gov/opa/file/797666/download) (listing investigations, consent decrees, and settlements due to violent, discriminatory, and unlawful police conduct in various law enforcement agencies, including the New Orleans, Puerto Rico, Seattle, Portland, Detroit, Virgin Islands, East Haven, Warren, Albuquerque, Los Angeles County Sheriff Department-Antelope Valley, Cleveland Division, Meridian (MS), and Maricopa County (AZ) sheriff and police departments).

[16] *Federal judge ends LAPD consent decree*, ASSOC. PRESS, Aug. 29, 2017, https://www.dailynews.com/2009/07/17/federal-judge-ends-lapd-consent-decree/; Sheryl Gay Stolberg, *'It Did Not Stick': The First Federal Effort to Curb Police Abuse*, N.Y. TIMES, Apr. 9, 2017, https://www.nytimes.com/2017/04/09/us/first-consent-decree-police-abuse-pittsburgh.html.

[17] Al Baker, David Goodman, and Benjamin Mueller, *Beyond the Chokehold: The Path to Eric Garner's Death*, N.Y. TIMES, June 13, 2015, https://www.nytimes.com/2015/06/14/nyregion/eric-garner-police-chokehold-staten-island.html; Monica Davey and Julie Bosman, *Protests Flare After Ferguson Police Officer Is Not Indicted*, N.Y. TIMES, Nov. 24, 2014, https://www.nytimes.com/2014/11/25/us/ferguson-darren-wilson-shooting-michael-brown-grand-jury.html; Artemis Moshtaghian and Sara Sinder, *$1.5 million settlement for woman beaten by California patrol officer*, CNN, Sept. 25, 2014, https://www.cnn.com/2014/09/25/justice/california-police-videotape-beating/index.html; Jason Slotkin, *Akai Gurley's Family Settles With New York City Over Police Shooting Death*, NPR: THE TWO-WAY, Aug. 16, 2016, https://www.npr.org/sections/thetwo-way/2016/08/16/490155733/akai-gurleys-family-settles-with-new-york-city-over-police-shooting-death; Shaila Dewan and Richard A. Oppel Jr., *In Tamir Rice Case, Many Errors by Cleveland Police, Then a Fatal One*, N.Y. TIMES, Jan. 22, 2015, https://www.nytimes.com/2015/01/23/us/in-tamir-rice-shooting-in-cleveland-many-errors-by-police-then-a-fatal-one.html; Jess Bidgood and Richard Pérez-Peña, *Mistrial in Cincinnati Shooting as Officer Is Latest Not To Be Convicted*, N.Y. TIMES, June 23, 2017, https://www.nytimes.com/2017/06/23/us/raymond-tensing-samuel-dubose-cincinnati.html; Nausheen Husain, *Laquan McDonald timeline: the shooting, the video, the verdict and the sentencing*, CHI. TRIBUNE, Jan. 18, 2019, https://www.chicagotribune.com/news/laquan-mcdonald/ct-graphics-laquan-mcdonald-officers-fired-timeline-htmlstory.html; Richard Fausset and Alan Blinder, *Baton Rouge Officers Will Not Be Charged in Alton Sterling's Killing*, N.Y. TIMES, Mar. 27, 2018, https://www.nytimes.com/2018/03/27/us/alton-sterling-baton-rouge.html; Jay Croft, *Philando Castile shooting: Dashcam video shows rapid event*, CNN, June 21, 2017, https://www.cnn.com/2017/06/20/us/philando-castile-shooting-dashcam/index.html.

[18] Jeffrey M. Jones, *In U.S., Confidence in Police Lowest in 22 Years*, GALLUP, June 19, 2015, https://news.gallup.com/poll/183704/confidence-police-lowest-years.aspx.

[19] Exec. Order No. 13,684, 79 Fed. Reg. 76,865 (Dec. 23, 2014).

[20] *Final Report of the President's Task Force on 21st Century Policing*, WASHINGTON, DC: OFFICE OF CMTY. ORIENTED POLICING SERVS., 2015, https://cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf (*citing* Bryan Stevenson, *Confronting Mass Imprisonment and Restoring Fairness to Collateral Review of Criminal Cases*, 41 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES L. REV. 339 (Summer 2006)).

[21] Letter from Civil Rights Div., Dept. of Just., to Hon. Michael McGinn, Mayor, Seattle on Investigation of the Seattle Police Dept. (Dec. 16, 2011); Civil Rights Div., Dept. of Just., *Investigation of the New Orleans Police Dept.* (Mar. 16, 2011); Civil Rights Div., Dept. of Just., *Investigation of the Baltimore City Police Dept.* (Aug. 10, 2016); Cmty. Oriented Policing Servs., Dept. of Just., *Collaborative Reform Initiative: An Assessment of the S.F. Police Dept.* (Oct. 2016); Consent Decree, *Illinois v. City of Chicago*, 1:17-cv-06260 4994 (N. D. Ill. E. Div. Jan. 31, 2019); Settlement Agreement, *United States v. City of Seattle*, 2:12-cv-01282 (W. D. Wash. July 27, 2012); Memo-

randum of Agreement between U.S. Dept. of Just. and City of Cincinnati, Ohio, and the Cincinnati Police Dept. (Apr. 12, 2002); Settlement Agreement, *Davis v. City of New York*, 1:10-cv-00699 (S. D. N. Y. Jan. 16, 2015).

[22] Owen Daugherty, *Barr warns that communities that don't show respect to law enforcement may not get police protection: report*, HILL, Dec. 4, 2019, https://thehill.com/homenews/news/472946-barr-warns-that-communities-that-dont-show-respect-to-law-enforcement-may-not.

[23] Zeke J. Miller, *Why Martin Luther King, Jr.'s Lessons About Peaceful Protests Are Still Relevant*, TIME, Jan. 12, 2018, https://time.com/5101740/martin-luther-king-peaceful-protests-lessons/; *Social Protests*, CONSTITUTIONAL RIGHTS FOUNDATION, https://www.crf-usa.org/black-history-month/social-protests (last visited Apr. 22, 2020).

[24] *See e.g.*, Phillip Jackson, *At least 20 Baltimore police officers arrested, sentenced or suspended during department's ugly 2019*, WASH. POST, Dec. 27, 2019, https://www.washingtonpost.com/local/public-safety/at-least-20-baltimore-police-officers-arrested-sentenced-or-suspended-during-departments-ugly-2019/2019/12/27/fb7e6938-2122-11ea-86f3-3b5019d451db_story.html; Amina Khan, *Getting killed by police is a leading cause of death for young black men in America*, L.A. TIMES, Aug. 16 2019, https://www.latimes.com/science/story/2019-08-15/police-shootings-are-a-leading-cause-of-death-for-black-men; Lauren Gill, *Chicago police pointed guns at and traumatized children in botched raids, lawsuits allege*, APPEAL, Aug. 14, 2019, https://theappeal.org/chicago-police-raids-guns-ptsd-children/ (noting that, as of 2017, 83% of excessive use-of-force incidents against children involved Black children despite African Americans only making up 1/3 of Chicago's population).

[25] Alana Wise, *D.C. Will Enforce Stricter Prosecution Of Gun Crimes Under New Initiative*, WAMU 88.5 AM. U. RADIO, Nov. 15, 2019, https://wamu.org/story/19/11/15/d-c-will-enforce-stricter-prosecution-of-gun-crimes-under-new-initiative/.

[26] Sari Horwitz and Matt Zapotosky, *Sessions issues sweeping new criminal charging policy*, WASH. POST, May 12, 2017, https://www.washingtonpost.com/world/national-security/sessions-issues-sweeping-new-criminal-charging-policy/2017/05/11/4752bd42-3697-11e7-b373-418f6849a004_story.html.

[27] Katie Benner and Sharon LaFraniere, *Just. Dept. Moves to Drop Charges Against Russian Firms Filed by Mueller*, N.Y. TIMES, Mar. 16, 2020, https://www.nytimes.com/2020/03/16/us/politics/concord-case-russian-interference.html.

[28] Aruna Viswanatha and Byron Tau, *Prosecutors Quit Roger Stone Case After Just. Dept. Seeks Less Prison Time*, WALL ST. J., Feb. 11, 2020, https://www.wsj.com/articles/justice-department-to-ask-for-less-prison-time-for-roger-stone-after-trump-criticism-11581444764.

[29] Matt Zapotosky, *Prosecutors did not break the law in secretly reaching lenient Epstein plea deal, appeals court rules*, WASH. POST, Apr. 14, 2020, https://www.washingtonpost.com/national-security/prosecutors-did-not-break-law-in-secretly-reaching-lenient-epstein-plea-deal-appeals-court-rules/2020/04/14/9427194a-7e99-11ea-9040-68981f488eed_story.html.

[30] CRIMINAL JUSTICE FACTS, Sentencing Project: The Facts, https://www.sentencingproject.org/criminal-justice-facts/ (last visited Apr. 22, 2020).

[31] Jacob Gershman, *Arrests for Low-Level Crimes Are Plummeting, and the Experts Are Flummoxed*, WSJ, Oct. 6, 2019, https://www.wsj.com/articles/arrests-for-low-level-crimes-are-plummeting-and-the-experts-are-flummoxed-11570354201.

[32] Press release, NAACP LEGAL DEFENSE & EDUCATIONAL FUND, ABA-LDF Joint Statement on Eliminating Bias in the Criminal Justice System (July 16, 2015) (https://www.naacpldf.org/press-release/aba-ldf-joint-statement-on-eliminating-bias-in-the-criminal-justice-system/); *see also*, Samantha Melamed, *Philly DA Larry Krasner stopped seeking bail for low-level rimes. Here's what happened next.*, PHILADELPHIA INQUIRER, Feb. 19, 2019, https://www.inquirer.com/news/philly-district-attorney-larry-krasner-money-bail-criminal-justice-reform-incarceration-20190219.html.

[33] Memorandum from the OFFICE OF THE ATTY. GEN. on Dept. Policy on Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases (Aug. 12, 2013) (https://www.justice.gov/sites/default/files/oip/legacy/2014/07/23/ag-memo-department-policypon-charging-mandatory-minimum-sentences-recidivist-enhancements-in-certain-drugcases.pdf). *See also* Dan Merica and Evan Perez, *Eric Holder seeks to cut mandatory minimum drug sentences*, CNN POLITICS, Aug. 12, 2013, https://www.cnn.com/2013/08/12/politics/holder-mandatory-minimums/index.html.

[34] Josh Gerstein *Sessions moves to lengthen drug sentences*, POLITICO, May 12, 2017, https://www.politico.com/story/2017/05/12/mandatory-minimum-drug-sentences-jeff-sessions-238295.

[35] Press Release, OFFICE OF PUBLIC AFFAIRS, DEPT. OF JUST., Dept. of Just. Announces the Release of 3,100 Inmates Under First Step Act, Publishes Risk and Needs Assessment Sys. (July 19, 2019) (https://www.justice.gov/opa/pr/department-justice-announces-release-3100-inmates-under-first-step-act-publishes-risk-and).

[36] *Race and the Death Penalty*, AM. CIVIL LIBERTIES UNION, https://www.aclu.org/other/race-and-death-penalty (last visited Apr. 22, 2020).

[37] *Buck v. Davis*, 137 S. Ct. 759 (2017); *see also* Statement, NAACP LEGAL DEF. & EDUC. FUND, Fed. Ct. Vacates Death Sentence of NAACP Legal Def. Fund Client Duane Buck Following Supreme Ct. Victory Last Month (Apr. 13, 2017) (https://www.naacpldf.org/press-release/federal-court-vacates-death-sentence-of-naacp-legal-defense-fund-client-duane-buck-following-supreme-court-victory-last-month/).

[38] *Buck v. Davis*, 137 S. Ct. 759 (2017).

[39] *See Flowers v. Mississippi*, 139 S. Ct. 2228 (2019).

[40] *Id.*

[41] Jordan Smith, *The Power To Kill: What Happens When A Reform Prosecutor Stands Up to the Death Penalty*, INTERCEPT, Dec. 3, 2019, https://theintercept.com/2019/12/03/death-penalty-reform-prosecutors/; Mark Scolforo, *Prosecutors stake opposite positions in death penalty appeal*, AP NEWS, July 16, 2019, https://apnews.com/2200ea46211b49dea7c5243ab0bdaf47. *See also Virginia Prosecutors Call Death Penalty a "Failed Government Program,"* CRIME REPORT, Feb. 3, 2020, https://thecrimereport.org/2020/02/03/virginia-prosecutors-call-death-penalty-a-failed-government-program/.

[42] *See* Memorandum from OFFICE OF THE ATTY. GEN. on Comm'n on L. Enf. and the Admin. Of Just. (Jan. 21, 2020) (https://www.justice.gov/ag/page/file/1236906/download).

[43] Title VI of the Civil Rights Act, Pub. L. No. 88-352, Title VII, 78 Stat. 241 (1964) (codified as amended in 42 U.S.C. §2000d, *et seq*.).

[44] Rehabilitation Act, Pub. L. No. 93-112, §504, 87 Stat. 394 (1973) (codified as amended in 29 U.S.C. §701).

[45] Omnibus Crime Control and Safe Streets Act, Pub. L. No. 90-351, 82 Stat. 197 (1968) (codified as amended in 34 U.S.C. §10228).

[46] *See, e.g.* Letter from CIVIL RIGHTS DIV., DEPT. OF JUST., to Bill Montgomery, Cty. Atty., Maricopa Cty. on U.S. Investigation of the Maricopa County Sheriff's Office (Dec. 15, 2011).

[47] NAACP LDF THURGOOD MARSHALL INSTITUTE, *Nat'l Police Funding Database*, https://tminstituteldf.org/national-police-funding-database/ (last visited Apr. 28, 2020).

[48] Samuel R. Bondurant, Jason M. Lindo & Isaac D. Swensen, *Substance Abuse Treatment Centers and Local Crime*, 104 J. OF URBAN ECON. 124 (2018) (finding that an increase in the number of treatment facilities in an area

causes a reduction in both violent and financially motivated crime); Hefei Wen, Jason M. Hockenberry & Janet R. Cummings, *The Effect of Medicaid Expansion on Crime Reduction: Evidence from HIFA-waiver expansions*, 154 J. OF PUB. ECON. 67 (2017) (finding that when Medicaid was expanded, both violent and property crime rates fell); Lance Lochner & Enrico Moretti, *The Effect of Education on Crime: Evidence from Prison Inmates, Arrests, and Self-Reports*, 94 AM. ECON. REV. 155 (2004) (finding that schooling significantly reduces the probability of incarceration and arrest).

[49] *See, e.g.*, *City & Cty. of San Francisco v. Shehan*, 575 U.S. 600 (2015) (officers shot woman with schizoaffective disorder multiple times when responding to call to help detain woman and take her to a secure facility); *Albuquerque Police: Man Fatally Shot During Welfare Check*, ASSOCIATED PRESS, Mar. 31, 2020, https://apnews.com/5db215460bfe4049ac8491267f801c8f; Doug Criss, *When a Police Wellness Check Becomes a Death Sentence*, CNN, Oct. 19, 2019, https://www.cnn.com/2019/10/19/us/wellness-check-police-shootings-trnd/index.html.

[50] End Racial and Religious Profiling Act of 2019, S. 2355, https://www.congress.gov/116/bills/s2355/BILLS-116s2355is.pdf.

[51] *See generally* Briefing Report by U.S. COMM'N ON CIVIL RIGHTS on Police Use of Force: An Examination of Modern Policing Practices (Nov. 15, 2018), (https://www.usccr.gov/pubs/2018/11-15-Police-Force.pdf) ("UCLA Law Professor Devon Carbado makes this point clearly: [Sandra] Bland's death, like [Walter] Scott's, is an example of how an ordinary traffic stop can be a gateway to extraordinary police violence . . . Bland was vulnerable to extreme forms of police violence the very moment she got into her car."); Report by BUREAU OF JUST. STATISTICS, OFFICE OF JUST. PROGS., DEPT. OF JUST. on Contacts Between Police and the Public, 2015 (2018) (https://www.bjs.gov/content/pub/pdf/cpp15.pdf).

[52] *National Use-of-Force Data Collection*, FBI, https://www.fbi.gov/services/cjis/ucr/use-of-force.

[53] FBI CRIMINAL JUST. INFO. SERVS. DIV., UCR PROGRAM QUARTERLY 20-1, 29 (Mar. 2020), https://www.fbi.gov/file-repository/ucr/ucr-program-quarterly-march-2020.pdf/view.

[54] Jessica Jaglois, *The Investigators Finds FBI Fell Short in Reporting Office-Involved Shooting Stats*, WMC5 (Jan. 27, 2020), https://www.wmcactionnews5.com/2020/01/28/investigators-finds-fbi-fell-short-reporting-officer-involved-shooting-stats/).

[55] Press Release, LEADERSHIP CONF. ON CIVIL & HUMAN RIGHTS, Civil Rights Orgs. File FOIA Requests with Just. Dept. for Materials Related to Police Reform Efforts (Jan. 4, 2018) (https://civilrights.org/2018/01/04/civil-rights-organizations-file-foia-requests-justice-department-materials-related-policing-reform-efforts/). Avery Martens, *Government Not Counting Deaths in Police Custody*, ACLU OHIO (Oct. 21, 2016), https://www.acluohio.org/archives/blog-posts/government-not-counting-deaths-in-police-custody; *see also* Carissa Miller, *DICRA Works, so Where's the Data?*, DAILY KOS (Sept. 14, 2016), https://www.dailykos.com/stories/2016/9/14/1570002/-DICRA-works-so-where-s-the-data (providing that, though "the Act became law in 2014 . . . data is still not being compiled for public consumption"); *Presidential Election 2020: Thematic Issue Briefs*, AMNESTY INT'L, https://www.amnestyusa.org/wp-content/uploads/2020/03/Amnesty_Presidential-Forum-Booklet_Thematic.pdf (last visited Feb. 24, 2020) ("To date, the DOJ has yet to fully implement DICRA.").