**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC., | ) ) ) ) | |
| *Plaintiff*, | ) ) | Case No. 1:20-cv-1132-JDB |
| *v.* | ) ) ) | |
| WILLIAM F. BARR, in his official capacity as Attorney General of the United States, *et al.*, | ) ) ) ) | |
| *Defendants*. | ) ) | |

**OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................ 1

LEGAL AND FACTUAL BACKGROUND ............................................................. 2

     A.     The Federal Advisory Committee Act and the Unfunded Mandates
           Reform Act of 1995. ..................................................................................... 2

     B.     The Commission on Law Enforcement and the Administration of Justice. ........... 5

     C.     This Litigation. ............................................................................................. 7

STANDARD OF REVIEW ...................................................................................... 8

ARGUMENT ............................................................................................................ 10

I.     PLAINTIFF LACKS STANDING TO ASSERT ALMOST ALL OF
      ITS CLAIMS. ................................................................................................ 10

II.    PLAINTIFF CANNOT PREVAIL UNDER FACA OR THE DECLARATORY
      JUDGMENT ACT, BECAUSE THOSE STATUTES DO NOT PROVIDE A
      PRIVATE RIGHT OF ACTION. ..................................................................... 13

III.   FACA'S FAIR BALANCE AND INAPPROPRIATE INFLUENCE
      PROVISIONS ARE NOT JUSTICIABLE. ..................................................... 14

IV.   PLAINTIFF CANNOT PREVAIL ON ITS FACA CLAIMS, BECAUSE THE
      COMMISSION IS EXEMPT FROM FACA'S REQUIREMENTS. ................... 18

     A.     The Commission Meets the First Prong of UMRA's Exemption from
           FACA. ........................................................................................................ 19

     B.     The Commission Meets the Second Prong of UMRA's Exemption from
           FACA. ........................................................................................................ 23

V.    MANDAMUS RELIEF IS NOT AVAILABLE TO PLAINTIFF. ................... 26

CONCLUSION ........................................................................................................ 27

## TABLE OF AUTHORITIES

**Cases**

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ............................................................................................. 13, 14

*Ali v. Rumsfeld*,
  649 F.3d 762 (D.C. Cir. 2011) ............................................................................... 14

*Am. Civil Liberties Union v. Trump*,
  266 F. Supp. 3d 133 (D.D.C. 2017) .................................................................. 26, 27

*Am. Hosp. Ass'n v. Burwell*,
  812 F.3d 183 (D.C. Cir. 2016) ............................................................................... 27

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................. 8, 9

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................. 8, 9

*Byrd v. EPA*,
  184 F.3d 239 (D.C. Cir. 1999) ............................................................................... 11

*C&E Servs. v. D.C. Water & Sewer Auth.*,
  310 F.3d 197 (D.C. Cir. 2002) ............................................................................... 14

*Cargill, Inc. v. United States*,
  173 F.3d 323 (5th Cir. 1999) .................................................................................. 17

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................................................... 10

*Colo. Envtl. Coal. v. Wenker*,
  353 F.3d 1221 (10th Cir. 2004) (per curiam) ........................................................ 17

*Ctr. for Biological Diversity v. Tidwell*,
  239 F. Supp. 3d 212 (D.D.C. 2017) ........................................................... 10, 13, 21

*Ctr. for Policy Analysis on Trade & Health v. Office of U.S. Trade Representative*,
  540 F.3d 940 (9th Cir. 2008) ...................................................................... 15, 16, 17

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ................................................................................................. 8

*Doe v. Shalala*,
 862 F. Supp. 1421 (D. Md. 1994) ........................................................................ 15

*Dunlap v. Pres. Advisory Comm'n on Election Integrity*,
 286 F. Supp. 3d 96 (D.D.C. 2017) ....................................................................... 13

*Elec. Privacy Info. Ctr. v. Pres. Advisory Comm'n on Election Integrity*,
 878 F.3d 371 (D.C. Cir. 2017) ............................................................................. 11

*Fertilizer Inst. v. EPA*,
 938 F. Supp. 52 (D.D.C. 1996) ...................................................................... 15, 18

*Florida Audubon Soc'y v. Bentsen*,
 94 F.3d 658 (D.C. Cir. 1996) (en banc) ............................................................... 11

*Foretich v. United States*,
 351 F.3d 1198 (D.C. Cir. 2003) ........................................................................... 10

*Fornaro v. James*,
 416 F.3d 63 (D.C. Cir. 2005) ............................................................................... 27

*Freedom Watch, Inc. v. Obama*,
 807 F. Supp. 2d 28 (D.D.C. 2011) ................................................................. 13, 27

*Idaho Wool Growers Ass'n v. Schafer*,
 637 F.2d 868 (D. Idaho 2009) ........................................................................ 21, 22

*In re Cheney*,
 406 F.3d 723 (D.C. Cir. 2005) ............................................................... 13, 21, 27

*Judicial Watch v. Nat'l Energy Policy Dev. Grp.*,
 219 F. Supp. 2d 20 (D.D.C. 2002) ................................................................. 13, 14

*Judicial Watch v. U.S. Dep't of Commerce*,
 736 F. Supp. 2d 24 (D.D.C. 2010) ................................................................. 13, 14

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
 511 U.S. 375 (1994) .............................................................................................. 8

*Lawyers' Comm. for Civ. Rights Under Law v. Pres. Advisory Comm'n on Election Integrity*,
 491 U.S. 440 (1989) ......................................................................................... 2, 13

*Marshall v. Honeywell Tech. Sols. Inc.*,
 536 F. Supp. 2d 59 (D.D.C. 2008) ........................................................................ 9

*Meijer, Inc. v. Biovail Corp.*,
    533 F.3d 857 (D.C. Cir. 2008) ................................................................. 2

*Miccosukee Tribe of Indians of Fla. v. United States*,
    No. 08-21747-CIV, 2008 WL 11332079 (S.D. Fla. Sept. 26, 2008) ....................................... 22

*Moms Against Mercury v. FDA*,
    483 F.3d 824 (D.C. Cir. 2007) ................................................................. 8

*Mori v. Dep't of the Navy*,
    731 F. Supp. 2d 43 (D.D.C. 2010) ............................................................ 10

*Nat'l Anti-Hunger Coalition v. Exec. Comm. of the President's Pvt. Sector Survey*,
    557 F. Supp. 524 (D.D.C.), *aff'd*
    711 F.2d 524 (D.C. Cir. 1983) ................................................................. 3

*Physicians for Social Responsibility v. Wheeler*,
    956 F.3d 634 (D.C. Cir. 2020) ................................................................ 16

*Pro-Football, Inc. v. Harjo*,
    284 F. Supp. 2d 96 (D.D.C. 2003) ........................................................... 10

*Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Food*,
    886 F.2d 419 (D.C. Cir. 1989) ................................................ 15, 16, 17, 18

*Pub. Citizen v. U.S. Dep't of Justice*,
    491 U.S. 440 (1989) ......................................................................... 2

*R. J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*,
    810 F.3d 827 (D.C. Cir. 2016) .................................................. 11, 12, 13

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ........................................................................ 11

*State of W. Va. v. U.S. Dep't of Health & Human Servs.*,
    145 F. Supp. 3d 94 (D.D.C. 2015) ............................................................ 8

*Vanover v. Hantman*,
    77 F. Supp. 2d 91 (D.D.C. 1999) ............................................................. 9

*Warth v. Seldin*,
    422 U.S. 490 (1975) ........................................................................ 11

*Wyo. Sawmills, Inc. v. U.S. Forest Serv.*,
    179 F. Supp. 2d 1279 (D. Wyo. 2001)) .................................................. 24, 25

iv

**Statutes**

2 U.S.C. § 1534 ............................................................................................................ *passim*

5 U.S.C. § 552b ................................................................................................................... 3

5 U.S.C. app § 2 .............................................................................................................. 2, 14

5 U.S.C. app § 3 ................................................................................................................. 21

5 U.S.C. app § 9 ................................................................................................................... 2

5 U.S.C. app § 5 ........................................................................................................... *passim*

5 U.S.C. app § 10 ............................................................................................................... 2, 3

5 U.S.C. app § 12 ................................................................................................................. 3

28 U.S.C. § 2201 .................................................................................................................. 3

31 U.S.C. § 10110 ............................................................................................................... 25

**Legislative Materials**

H. Conf. Rep. No. 104-76 (1995) ...................................................................................... 3

**Executive Order**

Executive Order 13896, 84 Fed. Reg. 58,595 (Nov. 1, 2019) ....................................... 5, 6, 20, 24

**Regulations**

41 C.F.R. § 102–3.40 ................................................................................................... 5, 21, 23

41 C.F.R. § 102–3.120 ....................................................................................................... 18

60 Fed. Reg. 50,651 (Sept. 29, 1995) ............................................................................ 4, 24

**Rules**

Fed. R. Civ. P. 12 ............................................................................................................. 8, 9

Fed. R. Civ. P. 56 .............................................................................................................. 10

**Other Materials**

Memorandum from the Attorney General, The Commission on Law Enforcement and the
  Administration of Justice ...................................................................................... *passim*

5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure
§ 1357 (3d. ed.) ................................................................................................................. 8, 9

Idaho Wool Growers Ass'n Mem. in Supp. of Mot. for Summ. J., *Idaho Wool Growers Ass'n v. Schafer*, Case No 08-cv-00394 (D. Idaho), ECF No. 23-1 ....................................................... 21

Miccosukee Tribe's Resp. to Fed. Defs.' Mot. to Dismiss, *Miccosukee Tribe of Indians of Fla v. United States*, No. 08-21747-CIV (S.D. Fla.), ECF No. 31 ........................................ 22

Dep't of Health & Human Servs., The Federal Advisory Committee Act and the UMRA Section 204 Exemption: Department of Health and Human Services (HHS) Frequently Asked Questions ............................................................................................................................. 23

## INTRODUCTION

Plaintiff, the NAACP Legal Defense & Educational Fund, brings this action based on its belief that the Commission on Law Enforcement and the Administration of Justice ("Commission") is subject to the requirements of the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. §§ 1-16.  But Plaintiff is incorrect.  The Commission fits squarely into the exemption to FACA created by the Unfunded Mandates Reform Act of 1995 ("UMRA") because, as discussed below, the Committee is composed exclusively of "Federal officials and elected officers of State, local, and tribal governments (or their designated employees with authority to act on their behalf) acting in their official capacities," and because the Commission's meetings are "solely for the purposes of exchanging views, information, or advice relating to the management or implementation of Federal programs established pursuant to public law that explicitly or inherently share intergovernmental responsibilities or administration." 2 U.S.C. § 1534(b).  That the Commission falls within UMRA's exemption to FACA is fatal to each of Plaintiff's claims.

Plaintiff cannot prevail for other reasons as well.  At the outset, Plaintiff lacks standing to assert many of its claims, because Plaintiff has not and will not suffer any concrete, cognizable injury as a result of the Commission's operation.  Plaintiff's claims brought under FACA and the Declaratory Judgment Act should also be dismissed because those statutes do not create a private right of action.  Nor is Plaintiff's claim that the Commission is not "fairly balanced" or "free of inappropriate influences" justiciable, because no judicially manageable standards exist to evaluate those arguments.  Plaintiff also fails to meet the demanding standards for mandamus relief, given the availability of judicial review through the Administrative Procedure Act ("APA") and that the Commission is exempt from FACA's requirements.

## LEGAL AND FACTUAL BACKGROUND

### A.    The Federal Advisory Committee Act and the Unfunded Mandates Reform Act of 1995

FACA, enacted in 1972, was born of a desire to assess the need for the "'numerous committees, boards, commissions, councils, and similar groups which have been established to advise officers and agencies in the executive branch of the Federal Government.'" *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 445-46 (1989) (quoting 5 U.S.C. app. § 2(a)) (citation omitted).  Its purpose is "to ensure that new advisory committees be established only when essential and that their number be minimized; that they be terminated when they have outlived their usefulness; that their creation, operation, and duration be subject to uniform standards and procedures; that Congress and the public remain apprised of their existence, activities, and cost; and that their work be exclusively advisory in nature." *Id.*

To achieve these goals, FACA imposes an array of procedural requirements on the creation and operation of "advisory committees."  FACA requires that "[n]o advisory committee shall be established unless such establishment is . . . determined as a matter of formal record, by the head of the agency involved after consultation with the Administrator [of the General Services Administration ("GSA")] with timely notice published in the Federal Register . . . ."  5 U.S.C. App. 2 § 9(a)(2).  An "advisory committee" cannot meet or take any action until a detailed charter is filed with the head of the agency to which it reports and with the House and Senate committees having legislative jurisdiction over the agency. *Id.* § 9(c).  Furthermore, agencies must "designate[] an officer or employee of the Federal Government to chair or attend each meeting of each advisory committee"; "[n]o advisory committee shall conduct any meeting in the absence of that officer or employee."  *Id.* § 10(e).  "Advisory committees shall not hold any meetings except at the call of, or with the advance approval of, a designated officer or employee of the Federal Government."

*Id.* § 10(f). Every "advisory committee" must give advance notice in the Federal Register of any meetings, *id.* § 10(a)(2), hold all meetings open to the public (unless a meeting can be closed in accordance with the exceptions listed in the Government in the Sunshine Act, 5 U.S.C. § 552b(c)), *id.* §§ 10(a)(1), (d), keep "[d]etailed minutes of each meeting . . . and copies of all reports received, issued, or approved by the advisory committee," *id.* § 10(c), make its records available to the public for "inspection and copying at a single location" in accordance with FOIA, *id.* § 10(b), be "fairly balanced in terms of the points of view represented and the functions to be performed," *id.* § 5(b)(2), and "not be inappropriately influenced by the appointing authority or by any special interest." *Id.* § 5(b)(3). Finally, agencies shall "keep records as will fully disclose the disposition of any funds which may be at the disposal of its advisory committees and the nature and extent of their activities." *Id.* § 12(a).

FACA's requirements, however, do not apply to all commissions established by the Federal Government. Criticized as "obscure" and "imprecise," FACA "leaves a myriad of questions unanswered." *Nat'l Anti-Hunger Coalition v. Exec. Comm. of the President's Pvt. Sector Survey on Cost Control*, 557 F. Supp. 524, 530 (D.D.C.), *aff'd*, 711 F.2d 524 (D.C. Cir. 1983). Until the enactment of UMRA, one question that FACA left unanswered was "the extent to which elected officials of State, local, and tribal governments, or their designated employees with authority to act on their behalf, [might] meet with Federal agency representatives to discuss regulatory and other issues involving areas or shared responsibility." H. Conf. Rep. No. 104-76, at 40. To "clarif[y] Congressional intent with respect to these interactions by providing an exemption from FACA for the exchange of official views regarding the implementation of public laws requiring shared intergovernmental responsibilities or administration," Congress enacted 2 U.S.C. § 1534(b) in 1995 as part of UMRA. *Id.* Section 1534(b) provides:

[FACA] shall not apply to actions in support of intergovernmental communications where –

(1) meetings are held exclusively between Federal officials and elected officers of State, local, and tribal governments (or their designated employees with authority to act on their behalf) acting in their official capacities; and

(2) such meetings are solely for the purposes of exchanging views, information, or advice relating to the management or implementation of Federal programs established pursuant to public law that explicitly or inherently share intergovernmental responsibilities or administration.

*Id.*

UMRA also directed the President to "issue guidelines and instructions to Federal agencies for appropriate implementation of [§ 1534(b)]. 2 U.S.C. § 1534(c). At the direction of the President, the Office of Management and Budget ("OMB") issued the required guidelines and instructions in September 1995. Those guidelines and instructions state that § 1534(b)'s exemption from FACA exists "[i]n order to facilitate the consultation process." OMB explained that, "[t]he scope of meetings covered by the exemption should be construed broadly to include any meetings called for any purpose relating to intergovernmental responsibilities or administration." Guidelines and Instructions for Implementing § 204, "State, Local, and Tribal Government Input," of Title II of Public Law 104-4, 60 Fed. Reg. 50,651, 50,653 (Sept. 29, 1995). Consistent with those guidelines, GSA promulgated regulations distilling the UMRA's "[i]ntergovernmental committees" exemption from FACA to apply to "[a]ny committee composed wholly of full-time or permanent part-time officers or employees of the Federal Government and elected officers of State, local and tribal governments (or their designated employees with authority to act on their behalf), acting in their official capacities," provided that "the purpose of such a committee must be solely to exchange views, information, or advice relating to the management or implementation of Federal programs established pursuant to statute, that explicitly

or inherently share intergovernmental responsibilities or administration[.]"  41 C.F.R. § 102–3.4(g).

**B.    The Commission on Law Enforcement and the Administration of Justice**

On October 28, 2019, the President signed an Executive Order directing the Attorney General to establish the Commission.  *See* Executive Order 13896, 84 Fed. Reg. 58,595 (Nov. 1, 2019).  The Commission's mission is to "study issues related to law enforcement and the administration of justice and to make recommendations to the Attorney General, who shall submit a report and recommendations to the President, on actions that can be taken to prevent, reduce, and control crime, increase respect for the law, and assist victims."  *Id.* at 58,595-96.

The Executive Order instructs the Attorney General to determine the composition of and procedures for the functioning of the Commission; however, it sets explicit requirements for whom the Attorney General may appoint.  *Id.* at 58,595.  Specifically, "[o]fficers or employees of the Federal Government designated to the Commission shall be full-time, or permanent part-time, officers or employees of the Federal Government."  *Id.*  In addition, the Executive Order permits the Attorney General, "at his discretion" to "invite elected officers of State, local, and tribal governments (or their designated employees with statutory authority to act on their behalf) to serve on the Commission in their official capacities."  *Id.*

Consistent with the terms of the Executive Order, the Attorney General established the Commission on January 21, 2020.  *See* Memorandum from the Attorney General, The Commission on Law Enforcement and the Administration of Justice (Jan. 21, 2020) ("AG Memo.") (attached as Ex. A).  The Attorney General explained that the Commission "sets out to conduct a modern fresh evaluation of the salient issues affecting American law enforcement and the communities they protect," and that the Commission "will focus on the national issues that most impact the efficacy of American law enforcement to safeguard the public and maintain a positive relationship

with their communities." *Id.* at 1. To that end, the Attorney General directed the Commission to establish working groups on subjects to include fifteen topics, as specified in the Attorney General's memorandum. These subjects reflect the fact that "law enforcement today faces a variety of novel criminal threats, including synthetics opioids, cyber threats, and the digital concealment of criminal activity through encryption and the dark web." *Id.* They also reflect that fact that "law enforcement is frequently tasked with addressing the consequences of social ills—including drug addition, mental illness, and homelessness—for which the criminal justice system is not always the best solution." *Id.* at 2. The Attorney General explained that, "[w]hile facing these challenges, many public voices express distrust and disrespect for the law enforcement community," which has resulted in "a corresponding decline in officer morale and health, as well as the willingness of Americans to volunteer to become law enforcement officers." *Id.*

The Attorney General also emphasized that a "diversity of backgrounds and perspectives is important for gaining an effective understanding of these problems and formulating sound solutions." *Id.* Accordingly, the Attorney General instructed that the Commission "should consist of law enforcement officials from a variety of backgrounds, positions, and areas of expertise," and it should "solicit input and information from various sectors of society." *Id.*

The Commission consists of a Chair, a Vice Chair, and sixteen individual Commissioners, all of whom are either Federal officials or elected officers of State, local, and tribal governments (or their designated employees with authority to act on their behalf) acting in their official capacities. *See id.* at 3-4; *see also* 84 Fed. Reg. at 58,595. The Commission is assisted by its fifteen working groups, which provide advice, counsel, and support on the topics specified by the Attorney General. *See* AG Mem. at 4. Except for Commissioners who serve on working groups, working group members are not part of the Commission and serve exclusively in a consultative

capacity. However, like Commissioners, all working group members are also either Federal officials or elected officers of State, local, and tribal governments (or their designated employees with authority to act on their behalf) acting in their official capacities. *See* Declaration of Dean M. Kueter, Jr. ¶¶ 3-5 ("Kueter Decl.") (attached as Ex. B).

The Attorney General instructed the Chair to submit the Commission's report, "which shall consist of a summary of the Commission's actions to investigate the issues identified, an analysis of the information received by the Commission, and the recommendations of the Commissioners," "[n]o later than October 28, 2020." *Id.* at 6. Within sixty days of receiving the Chair's report, the Attorney General will submit a report and recommendations to the President, following consultation with the Director of [OMB]." *Id.*

### C.     This Litigation

Plaintiff filed this action on April 30, 2020. *See* Compl., ECF No. 1. Plaintiff claims that the requirements of FACA apply to the Commission, and that the Commission is unlawful because it does not meet certain of FACA's requirements. *See* Am. Compl. ¶¶ 172-216, ECF No. 26. Plaintiff seeks a declaration that (1) the Commission is an advisory committee subject to the requirements of FACA; (2) Defendants have violated FACA; and (3) the Commission "is not properly constituted and that any report or recommendation does not reflect the views of a lawfully constituted advisory committee." *Id.*, Prayer for Relief. Plaintiff also asks the Court to enjoin Commissioners Keith and Sullivan and the Commission, and all of its working groups, "from holding further meetings, sessions, or hearings, or conducting any official business whatsoever on behalf of the Commission." *Id.* Plaintiff further seeks an injunction against Attorney General Barr, the Department of Justice, and the Commission "from submitting, accepting, publishing

employing, or relying upon any report or recommendations produced by the [Commission] for any official purpose whatsoever, directly or indirectly." *Id.*

Plaintiff moved for summary judgment on May 28, 2020. *See* Pl.'s Mot. for Summ. J, ECF No. 25. The parties submitted a joint motion for a briefing schedule, *see* Joint Mot. for Briefing Schedule, ECF No. 29, which the Court adopted on June 11, 2020, *see* Minute Order (June 12, 2020). Pursuant to that schedule, Defendants now oppose Plaintiff's motion for summary judgment and cross-move to dismiss or, in the alternative, for summary judgment.

## STANDARD OF REVIEW

Defendants move to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure Counts I, II, IV, and V of Plaintiff's Amended Complaint because Plaintiff lacks standing to assert those claims. To withstand a motion to dismiss under Rule 12(b)(1), the plaintiff bears the burden of establishing that the court possesses subject matter jurisdiction over its claim. *See Moms Against Mercury v. FDA*, 483 F.3d 824, 828 (D.C. Cir. 2007). Courts must keep in mind that "[f]ederal courts are of limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), and should "presume that [they] 'lack jurisdiction unless the contrary appears affirmatively from the record,'" *State of W. Va. v. U.S. Dep't of Health & Human Servs.*, 145 F. Supp. 3d 94, 97 (D.D.C. 2015) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006)).

Defendants move to dismiss under Rule 12(b)(6) all five Counts in the Amended Complaint for failure to state a claim. To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Under *Iqbal* and *Twombly*, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Plausibility" represents something less than "probability," but it does require "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citation omitted). If the well-pleaded facts of a complaint do not suggest more than the mere possibility of a violation, the complaint has failed to show that the plaintiff is entitled to relief and cannot survive application of Rule 12(b)(6). *Id.* Likewise, a complaint cannot substitute conclusions of law and other conclusory assertions for well-pleaded allegations of fact and hope to withstand a motion to dismiss. In particular, conclusions of law are not to be accepted as true. *Id.* By the same token, "bare assertions . . . amount to nothing more than a formulaic recitation of the elements of a . . . claim[,] and therefore are not entitled to be assumed true." *Id.* at 698 (citation omitted).

In deciding a motion to dismiss under Rule 12(b)(6), courts may consider not only the well-pleaded allegations of the complaint, but also materials "incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned; these items may be considered by the district judge without converting the motion into one for summary judgment." *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 867 n.* (D.C. Cir. 2008) (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed.)); *see also Marshall v. Honeywell Tech. Sols. Inc.*, 536 F. Supp. 2d 59, 65-66 (D.D.C. 2008) (document referred to in complaint and central to plaintiff's claim may be considered under Fed. R. Civ. P. 12(b)(6)) (citing *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999)).

In the alternative, Defendants cross-move for summary judgment on all of Plaintiff's claims. Rule 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment." *Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96, 112 (D.D.C. 2003). Rather, the dispute must regard a question of fact that is material, meaning that it is "capable of affecting the substantive outcome of the litigation." *Id.* That is determined by "look[ing] to the substantive law on which each claim rests." *Mori v. Dep't of the Navy*, 731 F. Supp. 2d 43, 45 (D.D.C. 2010). The dispute must also be genuine, meaning that it is "supported by sufficiently admissible evidence such that a reasonable trier-of-fact could find for the nonmoving party." *Pro-Football*, 284 F. Supp. 2d at 112. The non-moving party's opposition must, accordingly, consist of more than unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence setting forth specific facts in order to demonstrate a genuine issue for trial. *See* Fed R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## ARGUMENT

## I.   PLAINTIFF LACKS STANDING TO ASSERT ALMOST ALL OF ITS CLAIMS.

Article III of the Constitution limits the jurisdiction of federal courts to "the adjudication of actual, ongoing cases or controversies." *E.g. Ctr. for Biological Diversity v. Tidwell*, 239 F. Supp. 3d 212, 222 (D.D.C. 2017). "This limitation gives rise to the doctrine[] of standing." *Foretich v. United States*, 351 F.3d 1198, 1210 (D.C. Cir. 2003). Courts consider standing on a

"claim by claim" basis.  *See, e.g.*, *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017).

Plaintiff bears the burden to establish standing.  *Id.*  Standing requires that a plaintiff have "'a personal stake in the outcome of the controversy . . . .'"  *Lawyers' Comm. for Civ. Rights Under Law v. Presidential Advisory Comm'n on Election Integrity*, 265 F. Supp. 3d 54, 63 (D.D.C. 2017) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  "Consequently, a plaintiff cannot be a mere bystander or interested third-party, or a self-appointed representative of the public interest."  *Id.* The elements of standing include (1) "that the plaintiff [has] suffered an 'injury in fact'—an invasion of a judicially cognizable interest which is (a) concrete and particularized, not conjectural or hypothetical"; (2) that there "be a causal connection between the injury and the conduct complained of"; and (3) that "it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Id.*

Here, the allegations in Plaintiff's Amended Complaint do not suffice to show standing with respect to almost all of its claims.  While the D.C. Circuit has recognized that a plaintiff may have so-called "informational" standing when a plaintiff requests information from a commission that it believes it is entitled to under FACA, *e.g. Byrd v. EPA*, 184 F.3d 239 (D.C. Cir. 1999), Plaintiff "must still demonstrate 'a distinct risk to a particularized interest'" with respect to its remaining claims that the Commission does not meet FACA's substantive requirements.  *See R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*, 810 F.3d 827, 829 (D.C. Cir. 2016) (quoting *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc)); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing.").  In *R.J. Reynolds*, the D.C. Circuit held that the plaintiff had not

11

established standing to challenge the composition of an advisory committee based on the agency's alleged failure to properly screen the committee members for conflicts of interest. 810 F.3d at 829-32. The D.C. Circuit squarely held that the prospect of some future action adverse to plaintiff's interest based on the committee's report did not suffice to establish an injury-in-fact for Article III standing. *Id.* ("[T]he appointment of the challenged committee members by no means rendered the risk of eventual adverse FDA action substantially probable or imminent.").

Here, under the same reasoning as in *R.J. Reynolds*, Plaintiff lacks standing to assert its claims that the Commission is allegedly not "fairly balanced," *see* Am. Compl. ¶¶ 172-84, 207-08; that the Commission allegedly violated FACA by not filing an advisory committee charter, *see id.* ¶¶ 185-92; and that the Attorney General allegedly violated FACA by not appointing a Designated Federal Officer ("DFO") for the Commission, *see id.* ¶¶ 209-11.[1] Plaintiff's Amended Complaint contains only the barest explanation of how Plaintiff is purportedly injured by those alleged defects. Plaintiff states only that it "has a direct interest in the integrity, balance, and legitimacy of the Commission, and in preventing the proposal or enactment of any policies that would disproportionally burden African Americans in the criminal justice system," *id.* ¶ 6, and that "Defendants' violations of FACA and the APA have injured Plaintiff by limiting Plaintiff's ability and right to have a representative voice on the Commission on an issue with which Plaintiff is engaged," *see id.* ¶ 214. Nowhere in the Complaint does Plaintiff explain how it will suffer any concrete injury by the composition of the Commission, which itself is tasked only with issuing a report and recommendations, not to take any concrete action on behalf of the government. Nor does Plaintiff explain what gives rise to their purported "right" to a "representative voice," *id.*

---

[1] Defendants do not dispute that Plaintiff has standing to assert its "Public Notice and Access" claims. *See* Am. Compl. ¶¶ 193-204, 211-12. Those claims fail as a matter of law, however, because the Commission is exempt from FACA's requirements. *See* Part IV, *infra*.

¶ 214; even if FACA were to apply to the Commission—which it does not for the reasons explained below—the statute requires only that an advisory committee be "fairly balanced," 5 U.S.C. App. 2 § 5(b)(2), not that any particular organization be given representation.  As in *R.J. Reynolds*, Plaintiff has failed to meet its burden to establish Article III standing for the bulk of its claims.

## II.    PLAINTIFF CANNOT PREVAIL UNDER FACA AND OR DECLARATORY JUDGMENT ACT, BECAUSE THOSE STATUTES DO NOT PROVIDE A PRIVATE RIGHT OF ACTION.

Neither FACA nor the Declaratory Judgment Act provides a private right of action.  The Court should therefore dismiss Counts I, II, III, and V pursuant to Rule 12(b)(6).

In *Alexander v. Sandoval*, 532 U.S. 275 (2001), the Supreme Court held that with respect to causes of action, the "judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy . . . . Without it, a cause of action does not exist and courts may not create one." *Id.* at 286 (citation omitted). Following *Sandoval*, courts in the D.C. Circuit have consistently held that "FACA does not provide a cause of action, given that none is apparent from the statutory text."[2] *Ctr. for Biological Diversity*, 239 F. Supp. 3d at 221; *see also, e.g., Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 286 F. Supp. 96, 99-105 (D.D.C. 2017); *Lawyers' Comm. for Civ. Rights Under Law*, 265 F. Supp. 3d at 66; *Freedom Watch, Inc. v. Obama*, 807 F. Supp. 2d 28, 32-33 (D.D.C. 2011); *Judicial Watch v. U.S. Dep't of Commerce*, 736 F. Supp. 2d 24, 29 (D.D.C. 2010).

---

[2] Prior to *Sandoval*, courts sometimes assumed without elaboration that FACA provides a cause of action.  *See Judicial Watch v. Nat'l Energy Policy Dev. Grp.*, 219 F. Supp. 2d 20, 34 (D.D.C. 2002) (collecting cases), subjected on other grounds to writ of mandamus issued by *In re Cheney*, 406 F.3d 723, 731 (D.C. Cir 2005).

*Sandoval* made "clear that courts cannot read into statutes a cause of action that has no basis in the statutory text." *Judicial Watch*, 219 F. Supp. 2d at 33 (citing *Sandoval*, 532 U.S. at 286). FACA lacks statutory language expressly creating a cause of action. *Id.*; *see also* 5 U.S.C. app. 2. Nor does anything else in the statute indicate congressional intent to create both a "private right" and a "private remedy." *See Sandoval*, 532 U.S. at 286. This Court cannot read a cause of action into FACA. *See Judicial Watch*, 219 F. Supp. 2d at 33. Consequently, the Court should dismiss Plaintiff's purported FACA claims (Counts I, II, and III). *See Judicial Watch*, 736 F. Supp. 2d at 29 (holding that FACA did not provide plaintiff with private right of action based on "determinative" fact that FACA does not explicitly confer private remedy).

Nor does the Declaratory Judgment Act, 28 U.S.C. § 2201, provide a cause of action. *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011); *see also* 28 U.S.C. § 2201. The Declaratory Judgment Act merely provides a remedy if a judicially remedial right otherwise exists. *Id.* Based on the D.C. Circuit's recognition of the "well-established rule that the Declaratory Judgment Act 'is not an independent source of federal jurisdiction,'" *Ali*, 649 F.3d at 778 (quoting *C&E Servs. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002)), this Court should dismiss the purported Declaratory Judgment Act claim (Count V) as well.

## III. FACA's FAIR BALANCE AND INAPPROPRIATE INFLUENCE PROVISIONS ARE NOT JUSTICIABLE.

Plaintiff further contends that the Attorney General and the Department violated FACA's fair balance and improper influence requirements. *See* Am. Compl. ¶¶ 172-84, 207-08; Pl.'s Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. at 18-24, ECF No. 25-2 ("Pl.'s Mem."). However, those provisions of FACA are nonjusticiable precisely because no judicially manageable standards exist for determining committee balance and therefore they cannot form the basis for injunctive relief. *See Public Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Food*

("*Microbiological*"), 886 F.2d 419, 426, 430-31 (D.C. Cir. 1989) (Silberman, J., concurring in the judgment).

First, the "fair balance" provision in section 5(b)(2) does not define "fairly balanced," nor does it specify how a "fairly balanced" membership on an advisory committee is to be achieved, in terms of either the type of representatives or the functions such representatives perform.  As an initial matter, "even before the points of view on an advisory committee can be balanced at all— 'fairly' or otherwise—it must first be determined *which* points of view should be balanced." *Microbiological*, 886 F.2d at 426 (Silberman, J., concurring).  And there is no "principled basis for a federal court to determine which among the myriad points of view deserve representation on particular advisory committees." *Id.*  The "relevant points of view on issues to be considered by an advisory committee are virtually infinite . . . ." *Id.* at 430; *see also Doe v. Shalala*, 862 F. Supp. 1421, 1430 (D. Md. 1994).

There is similarly no "principled way" to determine whether those views are fairly balanced.  *Microbiological*, 886 F.2d at 428 (Silberman, J., concurring).  Such a determination would require the court to make "arbitrary judgments" about "which organizations or individuals qualified as bona fide" representatives of particular policy views.  *Id.* at 428-29; *see also Fertilizer Inst. v. EPA*, 938 F. Supp. 52, 54 (D.D.C. 1996) (finding the "fair balance" provision nonjusticiable because it would raise "difficult questions" such as, "What qualifications must someone have in order to be deemed an adequate representative of the chemical producers?  What if there is a diversity of views among different chemical producers—whose views would then represent the industry?").  Such a task is a "hopelessly manipulable" political question that is "best left to the executive and legislative branches of government."  *Ctr. for Policy Analysis on Trade & Health v. Office of U.S. Trade Representative*, 540 F.3d 940, 945 (9th Cir. 2008) ("*CPATH*").  And even if

Congress intended that there be judicial review of agency compliance with the "fairly balanced" requirement, such review would be constitutionally suspect since Congress may not constitutionally confer on the judiciary the power to make policy choices unguided by statutory standards. *Microbiological*, 886 F.2d at 430 n.6.

Here, wading into what it means to be "fairly balanced" would be particularly difficult. In determining the composition of the Commission, as required by the Executive Order, the Attorney General emphasized that "[a] diversity of backgrounds and perspectives is important for gaining an effective understanding of these problems and formulating sound solutions." AG Mem. at 2. To that end, the Attorney General selected Commissioners "consist[ing] of law enforcement officials from a variety of backgrounds, positions, areas, and expertise" and instructed the Commission to "solicit input and information from various sectors of society, including community organizations, civic leadership, civil rights and victim's rights organizations, criminal defense attorneys, academia, social service organizations, and other entities that regularly interact with American law enforcement and study the issues impacting the administration of justice." *Id.* at 2. Plaintiff, of course, takes the position that the Commission is still not "fairly balanced," but the statute provides no guidance to help determine where to draw the line. *Microbiological*, 886 F.2d at 428. *Compare Physicians for Social Responsibility v. Wheeler*, 956 F.3d 634, 643-44 (D.C. Cir. 2020) (concluding that GSA regulations regarding compliance with federal ethical standards gave the court "law to apply" to determine whether it was arbitrary and capricious for EPA to deviate from those standards).

Nor is the inappropriate influence provision in section 5 of FACA justiciable. Congress also did not define "inappropriately influenced" or "special interest," nor did it specify any procedures to assure that the "advice and recommendations of the advisory committee will not be

inappropriately influenced by the appointing authority or by any special interest," within the meaning of section 5(b)(3).  This Court lacks meaningful standards to measure if this requirement has been met.

To determine whether an advisory committee's advice and recommendations have been inappropriately influenced by the appointing authority or special interests, a reviewing court would need to answer at least three questions.  First, the Court must determine "when an interest is 'special' as opposed to 'general[.]'"  *Microbiological*, 886 F.2d at 430 (Silberman, J., concurring).  But a court does not "have any way to determine what [special interest] means for purposes of judicial review [as] . . . virtually anyone in the United States . . . [c]ould have . . . a special interest with regard to some—perhaps all—advisory committees."  *Id.* at 430-31.  Second, a court must be able to determine when a special interest (or the appointing authority) exerted "inappropriate influence."  *Colo. Envtl. Coal. v. Wenker*, 353 F.3d 1221, 1231 (10th Cir. 2004) (per curiam).  But "[t]he statute does not give us any guidance as to when the line is crossed between appropriate and inappropriate influence."  *Id.*[3]  Third, section 5(b)(3) "on its face, is directed to the establishment of *procedures* to prevent 'inappropriate' external influences on an already constituted advisory committee by outside special interests or the appointing body."  *Microbiological*, 886 F.2d at 430.  A court would thus need to put itself in the shoes of the President or agency administrator and determine how, preemptively, to prevent special interests (which are not defined) from exerting inappropriate influence (which is not defined).  Courts are ill-suited to craft the necessary

---

[3] In reaching its conclusion, the Tenth Circuit broke ranks with the Fifth Circuit, which found section 5(b)(3) to be justiciable.  *See Cargill, Inc. v. United States*, 173 F.3d 323 (5th Cir. 1999).  The Fifth Circuit's explanation, however, was scant.  *Cargill* stated only that section 5(b)(3) is more "objective" than the "fairly balanced" requirement, which it also found to be justiciable, *see id.*at 335.  The explanation for that conclusion, in turn, was hardly persuasive—and, indeed, was rejected by *CPATH*, 540 F.3d at 946 ("[T]he *Cargill* decision offers little explanation *why* FACA's fairly balanced requirement is justiciable.").

safeguards out of whole cloth, as doing so is "really an executive branch function." *Fertilizer Inst.*, 938 F. Supp. at 55.

In sum, FACA provides this Court with no meaningful standards to use to answer any of these questions and, as a result, to determine whether the Commission was inappropriately influenced by the Attorney General, as Plaintiff alleges. *See* Am. Compl. ¶ 39. Accordingly, this claim is nonjusticiable. It would be of no moment if Plaintiff were able to craft a standard that it believes to be wise and reasonable. What is important is that the statute does not set forth meaningful guidance for the Court to follow in answering such questions as what constitutes a special interest, when influence becomes inappropriate, and what sorts of steps must be taken to prevent special interests (or the appointing authority) from exerting inappropriate influence. Resort to any other authority would amount to the Court "mak[ing] a policy judgment, and an arbitrary one at that, as to the optimum character of" the Commission, *Microbiological*, 886 F.2d at 431 (Silberman, J., concurring), which is an "utterly nonjudicial task," *id.* at 427.

## IV. PLAINTIFF CANNOT PREVAIL ON ITS FACA CLAIMS, BECAUSE THE COMMISSION IS EXEMPT FROM FACA'S REQUIREMENTS.

Plaintiff alleges (1) that it was arbitrary and capricious for the Attorney General not to ensure that the membership of the Commission is "fairly balanced" as allegedly required by FACA, Am. Compl. ¶¶ 207-08; (2) that the Attorney General did not appoint a DFO as Plaintiff claims was required by 41 C.F.R. § 102–3.120, *id.* ¶¶ 209-10; and (3) that the Department "failed to ensure that the documents made available to, prepared for, or prepared by the Commission are available through its offices," Am. Compl. ¶¶ 211-12. As discussed above, Plaintiff lacks standing to assert the first two of these claims, *see* Part I, *supra*, and Plaintiff's claim that the Commission is not "fairly balanced" is nonjusticiable, *see* Part II, *supra*. Yet, even if Plaintiff could overcome these hurdles, Plaintiff cannot succeed on the merits, because the Commission meets the

requirements for UMRA's exemption from FACA's requirements, as codified in 2 U.S.C. § 1534(b).  Defendants should therefore prevail on all of Plaintiff's claims.

UMRA reflects the fact that "an important part of efforts to improve the Federal regulatory process entails improved communication with State, local, and tribal governments."  H.R. Rep. No. 104-76, at 40 H.R. Rep. No. 104-76, at 40 (1995) (Conf. Rep.).  UMRA requires "Federal agencies to establish effective mechanisms for soliciting and integrating the input of [state, local, and tribal] interests into the Federal decisionmaking process."  *Id.*  To that end, and in order to encourage the solicitation of the views of other levels of government, UMRA contains an exemption from FACA that allows federal agencies to solicit the views and input of those governmental entities on the implementation of federal programs where there are shared intergovernmental responsibilities or administration.

As noted above, Section 204 of UMRA sets forth a two-part test to determine whether intergovernmental communications are exempt from FACA: (1) whether "meetings are held exclusively between Federal officials and elected officers of State, local, and tribal governments (or their designated employees with authority to act on their behalf) acting in their official capacities"; and (2) whether "such meetings are solely for the purpose of exchanging views, information, or advice relating to the management or implementation of Federal programs established pursuant to public law that explicitly or inherently share intergovernmental responsibilities or administration."  2 U.S.C. § 1534(b)(1), (2).

### A.    The Commission Meets the First Prong of UMRA's Exemption from FACA.

The Commission meets the first prong for the exemption from FACA in § 1534(b), because all of the Commissioners are either "Federal officials and elected officers of State, local, and tribal governments (or their designated employees with authority to act on their behalf) acting in their official capacities."  2 U.S.C. § 1534(b)(1); *see also* 84 Fed. Reg. at 58,595; AG Mem. at 3-4.

19

Indeed, Plaintiff does not appear even suggest otherwise. Rather, they make the exceedingly broad claim that the Commission does not fall within the exemption in § 1534(b) because the Commission has received testimony from and asked questions of third parties to help inform its work. *See* Pl.'s Mem. at 12-14.

Plaintiff's argument rests on the language in § 1534(b)(1) that, in order to meet the requirements for the exemption from FACA, meetings must be "'held *exclusively between* Federal officials and elected officers of State, local, and tribal governments (or their designated employees with authority to act on their behalf) acting in their official capacities.'" Pl.'s Mem. at 11 (quoting 2 U.S.C. § 1534(b)(1)) (Plaintiff's emphasis). Plaintiff interprets the "exclusively between" language to mean that no one other than a Federal or elected State official (or designee) may be in the room and speak when a body covered by § 1534(b) convenes. Plaintiff's overly cramped reading of the statute—that bodies subject to the exemption in § 1534(b)(1) cannot seek input from outside sources to inform their deliberations—defies common sense, and cannot be what Congress intended in § 1534(b)(1). Although the Commission heard testimony from a diverse range witnesses, consistent with the terms of the Executive Order, *see* 84 Fed. Reg. at 58,596 (authorizing the Commission to "host listening sessions and otherwise solicit input from a diverse array of stakeholders in the area of criminal justice), its meetings were still "exclusively between" officials covered by § 1534(b)(1), because the Commission's membership consists exclusively of those types of covered officials, *see id.*; AG Mem. at 3-4.

By analogy, just as a congressional committee that calls witnesses to inform its deliberations remains a congressional committee despite hearing testimony from third parties, soliciting input from third parties did not take the Commission's meetings outside the scope of UMRA's exemption. That reasonable understanding of the statute is embodied in the

implementing regulations, which look to the "compo[sition]" of the committee itself (*i.e.*, its membership), not whether a non-covered party may provide information upon the committee's request. 41 C.F.R. § 102-3.40(g).  It is also consistent with how the D.C. Circuit has interpreted FACA's similar exclusion of committees that are "composed wholly of full-time, or permanent part-time, officers or employees of the Federal government" from the definition of an "advisory committee."  5 U.S.C. app. § 3(2).  For example, in *In re Cheney*, the D.C. Circuit explained,

> "[An] outsider might make an important presentation, he might be persuasive, the information he provides might affect the committee's judgment. But having neither a vote nor a veto over the advice the committee renders to the President, he is no more a member of the committee than the aides who accompany Congressmen or cabinet officers to committee meetings.

406 F.3d at 302; *see also Ctr. for Biol. Diversity*, 239 F. Supp. 3d at 224-25 (finding FACA inapplicable when committee of federal officials heard individual recommendations from "non-federal scientists" because they were functionally distinguishable "from formal members" of the committee).

Plaintiff does not acknowledge these cases.  Rather, Plaintiff relies on *Idaho Wool Growers Association v. Schafer*, 637 F.2d 868 (D. Idaho 2009), to argue that there is a "high bar" for § 1534(b)'s exemption to apply, *see* Pl.'s Mem. at 11.  But that case is easily distinguishable and, in fact, supports Defendants' position.  In *Idaho Wool Growers*, the relevant committee included as a member a foreign ministry.  *See* 637 F.2d at 876 ("[T]he inclusion of the British Columbia Ministry of the Environment *in the Payette Principles Committee* conflicts with UMRA's requirement that meetings be held 'exclusively' between Federal and elected officials for the exclusion . . . to apply." (emphasis added)); Iowa Wool Growers Ass'n Mem. in Supp. of Mot. for Summ. J. at 10, *Idaho Wool Growers Ass'n v. Schafer*, Case No. 08-cv-00394 (D. Idaho), ECF No. 23-1 ("*Idaho* Pl.'s MSJ") (arguing that the relevant "committee included *a member* from the British Columbia Ministry of Wildlife, which is not part of any State, local or tribal government

21

of the United States" (emphasis added).  Also, the plaintiff in that case argued, like Plaintiff in this case, that UMRA's exemption from FACA did not apply because the committee "received input from a private facilitator" and that "attendees of the meeting were not 'designated employers.'" *Idaho* Pl.'s MSJ at 10.  However, the court did not rely on those additional facts in concluding that the commission fell outside UMRA's exemption, focusing instead on the actual membership of the committee. *See Idaho Wool Growers Ass'n*, 637 F.2d at 876.

Plaintiff's reliance on *Miccosukee Tribe of Indians of Florida v. United States*, No. 08-21747-CIV, 2008 WL 11332079 (S.D. Fla. Sept. 26, 2008), is also misplaced.  Plaintiff appears to put great weight on the court's use of the word "participants" in that case.  Pl.'s Mem. at 11 (quoting *Miccosukee*, 2008 WL 11332079, at *3).  Yet, the court was clear elsewhere in the opinion that it denied the government's motion to dismiss because it could not determine whether the relevant body "consisted of" officials not covered by § 1534(b).  *Miccosukee*, 2008 WL 11332079, at *3.  Furthermore, when opposing the government's motion to dismiss in that case, even the plaintiff in *Miccosukee* properly focused on the "members[hip]" of the relevant body when arguing that the UMRA did not foreclose its claim, not merely the presence of a third-party at its meetings. *See* Miccosukee Tribe's Resp. to Fed. Defs.' Mot. to Dismiss at 11, *Miccosukee Tribe of Indians of Fla. v. United States*, No. 08-21747-CIV (S.D. Fla.), ECF No. 31.  Plaintiff is therefore incorrect to suggest that there is any support in *Miccosukee* for its exceedingly broad claim that a committee does not fall within the scope of § 1534(b) simply because it engages in fact-gathering from individuals beyond its membership.

Here, unlike *Idaho Wool Growers Association* and *Miccosukee*, Plaintiff does not dispute that the Committee's actual membership is "composed" exclusively of officials covered by § 1534(b)(1).  41 C.F.R. § 102–3.40(g); *see also* Pl.'s Mem. at 11-14; Kueter Decl. ¶¶ 3, 5.

Plaintiff's concession in that respect is fatal to their argument that the Commission does not meet the first prong of UMRA's exemption.

Plaintiff attempts to save its case by quoting from a frequently-asked-questions document created by the United States Department of Health & Human Services ("HHS").  *See* Pl.'s Mem. at 11-12 (quoting Dep't of Health & Human Servs., The Federal Advisory Committee Act and the UMRA Section 204 Exemption: Department of Health and Human Services (HHS) Frequently Asked Questions at 4, https://www.cdc.gov/tribal/documents/tac/HHS-UMRA-FACA-EXEMPT-GROUP-FAQs-508.pdf ("HHS FAQs")).  The HHS FAQs, however, are of no help to Plaintiff. If anything, they contradict Plaintiff's broad assertion that any third-party participation takes a committee outside of UMRA's exemption.  As Plaintiff points out, the HHS FAQs state that members of the public can attend meetings only if they do not participate.  HHS FAQs at 4; *see also* Pl.'s Mem. at 12.  They also state, however, that a group member may request the attendance of a "technical advisor" who can "provide individual advice to that member," HHS FAQs at 4, which undermines Plaintiff's strict reading of the "exclusively between" language in § 1534(b)(1). The HHS FAQs, moreover, simply do not address whether members of a FACA-exempt committee may solicit input from outside parties to assist with its deliberations, as the Commission did here.

### B.    The Commission Meets the Second Prong of UMRA's Exemption from FACA.

Plaintiff also tries to avoid the application of UMRA's exemption to the Commission by arguing that its meetings are not held "*solely* for the purposes of exchanging views, information or advice *relating to the management or implementation of Federal programs* established pursuant to public law that *explicitly or inherently share intergovernmental responsibilities or administration*."  Pl.'s Mem. at 14 (quoting 2 U.S.C. § 1534(b)(2) (Plaintiff's emphasis)).

Plaintiff's argument lacks merit, and the Commission easily meets the second prong of the UMRA exemption from FACA.

Plaintiff ignores OMB's guidance that the exemption in § 1534(b) should be "construed broadly," 60 Fed. Reg. at 50,553, as well as the court's instruction in *Wyoming Sawmills, Inc. v. U.S. Forest Service*, 179 F. Supp. 2d 1279 (D. Wyo. 2001), that the exemption is "sweeping in scope," *id.* at 1305. Plaintiff also fails to cite a single case in support of its claim that the Commission does not meet the second prong of the UMRA exemption. *See* Pl.'s Mem. at 14-18.

Plaintiff's argument, rather, rests on the unfounded assertion that a subset of the Commission's working group topics, including "Respect for Law Enforcement" and "Business & Community Development," do not touch Federal efforts related to law enforcement. *See* Pl.'s Mem. at 15-17. But that is incorrect. While Plaintiff may prefer to adopt a cramped view of the Federal Government's role with respect to law enforcement, Plaintiff ignores that effective law enforcement often requires a joint partnership between Federal, State, and local officials, and that intergovernmental cooperation extends beyond issues of pure policing. As explained in the Executive Order directing the Attorney General to establish the Commission, "State and local law enforcement benefit from Federal programs and partnerships in the areas of information-sharing, collaborative enforcement operations, training, and technical assistance initiatives, and Federal grants." 84 Fed. Reg. at 58,595. Further, "the Department of Justice has a historically important role in helping to develop, identify, and establish best practices for law enforcement and supporting a range of programs related to the administration of justice." *Id.*

The Department, for instance, provides Federal grants, training, technical assistance, and other resources to support State and local law enforcement through the Office of Justice Programs ("OJP"), among other grant-making Department components. *See, e.g.*, 31 U.S.C. § 10110(1)

(authorizing the Attorney General, through OJP, "to make grants, or enter into cooperative agreements and contracts" to State and local law enforcement organizations).  Those Federal grants support a wide diversity of initiatives related to crime reduction, policing, and public safety, including reducing substance abuse, promoting community, faith-based, and neighborhood partnerships; promoting civil rights; and using technology to fight crime, among other things. Intergovernmental discussion on topics such as "Respect for Law Enforcement" not only relates generally to Federal, State, and local cooperation but also specifically to communities' relationships with law enforcement, which are closely related to OJP's grants in areas such as law enforcement safety.[4]  The inclusion of a working group to address "Business & Community Development'" should also be unsurprising, given the importance of community participation in reducing crime.[5]  The nexus between the purposes of the Commission and the management of Federal programs is therefore more than sufficient to meet the requirements of § 1534(b)(2).  *See Wyo. Sawmills*, 179 F. Supp. 2d at 1305-06 (holding that consultations among representatives from federal entities, and state, local and tribal governments fell within the UMRA exemption because such meetings fulfilled the Forest Service's "obligation under the NHPA to consult with the other Federal, State, and local agencies and Indian tribes with respect to preservation-related activities" in light of § 1534(b)'s "sweeping" scope).

---

[4] *See, e.g.*, Bureau of Justice Assistance, National Officer Safety Initiatives, https://bja.ojp.gov/program/national-officer-safety-initiatives/overview; Bureau of Justice Assistance, VALOR Initiative: Preventing Violence Against Law Enforcement Officers and Ensuring Officer Resilience and Survivability, https://bja.ojp.gov/program/valor/overview.

[5] *See, e.g.*, Bureau of Justice Assistance, Innovations in Community-Based Crime Reduction (CBCR Program), FY 2019 Competitive Grant Announcement at 10, https://bja.ojp.gov/sites/g/files/xyckuh186/files/media/document/BJA-2019-15364.PDF (giving priority consideration in award decisions to applications that propose projects that directly benefit economically distressed communities).

Plaintiff further argues that the Commission does not fall within the second prong of the UMRA exemption because "the Commission's meetings included substantive discussions that are completely irrelevant to the management of federal programs, such as advocacy for or against changes in federal and state law that could only be accomplished through legislation, purely local policy changes, and actions to be taken by the private sector." Pl.'s Mem. at 16-17. Plaintiff is wrong to suggest that those discussions do not relate to the management or implementation of Federal programs. State and local policies, for instance, naturally affect how the Federal Government works with its State and local law enforcement partners. But even putting that aside, Plaintiff would have the Court believe that every single statement or question uttered at an intergovernmental meeting must be strictly on-topic in order for the UMRA exemption to apply. That exceedingly stringent standard would be inconsistent with OMB's broad interpretation of § 1534(b) and would render the exemption meaningless as a practical matter. The Court should reject Plaintiff's narrow construction of the second prong of UMRA's exemption.

*      *      *

Because the Commission falls within the UMRA exemption to FACA's requirements, Plaintiff's claim that the Commission does not satisfy those requirements necessarily fails and Defendants are entitled to summary judgment.

## V.    MANDAMUS RELIEF IS NOT AVAILABLE TO PLAINTIFF.

Insofar as Plaintiff relies on the Mandamus Act to seek to redress Defendants' alleged violations of FACA, *see, e.g.*, Am. Compl., Preliminary Statement, Defendants are also entitled to dismissal of those claims. "Mandamus is a 'drastic remedy, to be invoked only in extraordinary circumstances.'" *Am. Civil Liberties Union v. Trump*, 266 F. Supp. 3d 133, 139 (D.D.C. 2017) (quoting *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005)). The party seeking mandamus has the burden of showing "(1) a clear and indisputable right to relief, (2) that the government agency

26

or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Id.* (quoting *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016)). A plaintiff's failure to meet its burden as any of these requirements means that the plaintiff cannot establish jurisdiction. *Id.* "[I]f there is no clear and compelling duty under the statute as interpreted, the district court must dismiss the action." *See Freedom Watch*, 807 F. Supp. 2d at 34; *In re Cheney*, 406 F.3d at 729. And, "[e]ven when these requirements are met [ ] 'a court may grant relief only when it finds compelling equitable grounds . . . . The party seeking mandamus has the burden of showing that its right to issuance of the writ is clear and indisputable.'" *Am. Civil Liberties Union*, 266 F. Supp. 3d at 139 (quoting *Am. Hosp. Ass'n*, 812 F.3d at 189).

Plaintiff cannot meet its burden here because it can show neither a violation of a clear duty to act nor a clear and indisputable right to relief. Indeed, although lesser showings would be sufficient to defeat a Mandamus Act claim in this case, Plaintiff cannot show that Defendants have any duty to act, that it has any clear right to seek relief, or that no other adequate remedy exists in light of Plaintiff's APA claim (Count IV). Indeed, Plaintiff is not entitled to any relief whatsoever because all of its claims are based on alleged violations of FACA. FACA's requirements do not apply because the Commission is exempt from them under UMRA. *See* Part IV, *supra.*

## CONCLUSION

For the foregoing reasons, Defendants respectfully ask that the Court deny Plaintiff's motion for summary judgment and grant Defendants' cross-motion for summary judgment

Dated: June 29, 2020                    Respectfully submitted,

                                        JOSEPH H. HUNT
                                        Assistant Attorney General

                                        ELIZABETH J. SHAPIRO
                                        Deputy Branch Director

*/s/ Bradley P. Humphreys*
BRADLEY P. HUMPHREYS
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-0878
E-mail: Bradley.Humphreys@usdoj.gov

*Counsel for Defendants*