**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**NAACP LEGAL DEFENSE &**
**EDUCATIONAL FUND, INC.,**

    **Plaintiff,**

    **v.**                                    **Civil Action No.  20-1132 (JDB)**

**WILLIAM P. BARR, in his official capacity**
**as Attorney General of the United States,**
**et al.,**

    **Defendants.**

---

**<u>MEMORANDUM OPINION</u>**

This case involves the confluence of the federal government's statutory obligations to ensure transparency and "fairly balanced" membership in forming advisory committees and the vital subject of policing in America during this time of great turmoil over racial injustice and allegations of police misconduct.  The Court concludes that the government has not satisfied those obligations in forming and conducting a commission in 2020 to examine the sensitive and important issues affecting American law enforcement and the communities they serve.

In October 2019, President Trump directed the Attorney General to establish the Presidential Commission on Law Enforcement and the Administration of Justice ("Commission") to study a broad range of issues regarding law enforcement and the criminal justice system.  After studying the issues, the Commission was to make recommendations to the Attorney General for ultimate submission to the President on actions to address crime, increase respect for the law, and assist victims.  <u>See</u> Exec. Order No. 13,896, 84 Fed. Reg. 58,595 (Oct. 28, 2019).  The Attorney General, in turn, created that Commission in January 2020 in order to "conduct a modern fresh evaluation of the salient issues affecting American law enforcement and

the communities they protect" by focusing on issues that will enable law enforcement "to safeguard the public and maintain a positive relationship with their communities."   See Implementation Memorandum for Heads of Department Components ("Implementation Memo") [ECF No. 25-5] at 1.   Working groups addressing a wide range of fifteen subjects, including "social problems impacting public safety" and "respect for law enforcement," were to assist in the Commission's efforts.   Id. at 4–6.

The Attorney General stressed the need to hear from "[a] diversity of backgrounds and perspectives" such as "community organizations, civic leadership, civil rights and victim's rights organizations, criminal defense attorneys, academia, social service organizations, and other entities that regularly interact with American law enforcement."   Id. at 2.   Despite these stated goals, however, the Commission's membership consists entirely of current and former law enforcement officials.   No Commissioner has a criminal defense, civil rights, or community organization background.   And Commission proceedings have been far from transparent. Especially in 2020, when racial justice and civil rights issues involving law enforcement have erupted across the nation, one may legitimately question whether it is sound policy to have a group with little diversity of experience examine, behind closed doors, the sensitive issues facing law enforcement and the criminal justice system in America today.

But that is not the role of this Court.   Here, the NAACP Legal Defense and Education Fund ("LDF") has challenged the composition and operation of the Commission under the Federal Advisory Committee Act ("FACA").   Passed in 1972, FACA requires, among other things, that covered federal advisory committees be "fairly balanced" in the viewpoints represented, that meetings be open and publicly noticed, that a charter be prepared and filed, and

that a designated federal officer be appointed to ensure compliance with FACA.  See 5 U.S.C. app. 2 §§ 1–16.

LDF has now moved for summary judgment, arguing that the Commission has violated multiple provisions of FACA.  In the face of LDF's challenges, the government does not really defend the composition of the Commission as "fairly balanced" or contest the other transparency and oversight failures.  Instead, the government argues that FACA does not apply to the Commission and that the case should be dismissed on standing or justiciability grounds.  The Court disagrees.  LDF has standing, the case is justiciable, and the exemption from FACA that the government relies upon is not applicable to the Commission.

Hence, the Court will grant summary judgment in favor of LDF on several of its claims and order that Commission proceedings be halted—and no work product released—until the requirements of FACA are satisfied.

## BACKGROUND

### I.  Federal Advisory Committee Act

FACA, enacted in 1972, was "born of a desire to assess the need for the 'numerous committees, boards, commissions, councils, and similar groups which have been established to advise officers and agencies in the executive branch of the Federal Government.'"  Pub. Citizen v. Dep't of Justice, 491 U.S. 440, 445–46 (1989) (quoting 5 U.S.C. app. 2 § 2(a)).  "Its purpose was to ensure that new advisory committees be established only when essential and that their number be minimized; that they be terminated when they have outlived their usefulness; that their creation, operation, and duration be subject to uniform standards and procedures; that Congress and the public remain apprised of their existence, activities, and cost; and that their work be exclusively advisory in nature."  Id. at 446.  FACA, therefore, would "cure specific ills,

3

above all the wasteful expenditure of public funds for worthless committee meetings and biased proposals." Id. at 453.

To achieve these ends, FACA imposes several requirements on "advisory committees." See 5 U.S.C. app. 2 §§ 1–16.  An "advisory committee" is "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof" that is "established" by statute, or "established or utilized" by the President or by one or more federal agencies, "in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government." Id. § 3(2).  While the definition of "advisory committee" is broad, it excludes "any committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government" or that is "created by the National Academy of Sciences or the National Academy of Public Administration." Id.  In addition, the Unfunded Mandates Reform Act ("UMRA"), enacted in 1995, provides an exemption from FACA for "the exchange of official views regarding the implementation of public laws requiring shared intergovernmental responsibilities or administration."   H.R. Rep. No. 104-76, at 40 (1995) (Conf. Rep.).   This limited UMRA exemption—invoked by the government here—applies only if (1) "meetings are held exclusively between Federal officials and elected officers of State, local, and tribal governments (or their designated employees with authority to act on their behalf) acting in their official capacities"; and (2) "such meetings are solely for the purpose of exchanging views, information, or advice relating to the management or implementation of Federal programs established pursuant to public law that explicitly or inherently share intergovernmental responsibilities or administration."  2 U.S.C. § 1534(b).

Among other requirements, an advisory committee subject to FACA cannot meet until a "charter has been filed" with the head of the agency to which it reports and with the House and Senate committees having legislative jurisdiction over that agency.  5 U.S.C. app. 2 § 9(c).  The charter must also be filed with the Library of Congress and the Committee Management Secretariat of the General Services Administration ("GSA").[1]  41 C.F.R. § 102-3.70(a)(3)–(4).  Each committee must also have a "designated [] officer or employee of the Federal Government to chair or attend each meeting."  5 U.S.C. app. 2 § 10(e).  The designated federal officer serves as the primary contact for members of the public who seek more information about the advisory committee's meetings and hearings.  41 C.F.R. § 102-3.150(a)(5).  Moreover, advisory committees must give notice of any meetings in the Federal Register at least fifteen days before the meeting is held.  5 U.S.C. app. 2 § 10(a)(2); 41 C.F.R. § 102-3.150(a).  Meetings must be open to the public, 5 U.S.C. app. 2 § 10(a)(1), and each committee must make its records and drafts publicly available, id. § 10(b)–(c).

As for composition, "the membership of [an] advisory committee [must] be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee."  Id. § 5(b)(2).  Relatedly, the directive establishing an advisory committee must "contain appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment."  Id. § 5(b)(3).

---

[1] Congress tasked the GSA with prescribing regulatory guidelines for advisory committees.  See 5 U.S.C. app. 2 § 7(c); 41 C.F.R. § 102-3.

## II.      Presidential Commission on Law Enforcement and the Administration of Justice

On October 28, 2019, President Trump signed Executive Order 13,896 directing Attorney General Barr to establish the Presidential Commission on Law Enforcement and the Administration of Justice.  Exec. Order No. 13,896, 84 Fed. Reg. at 58,595, § 2(a).  The Commission's function would be to "study issues related to law enforcement and the administration of justice and to make recommendations to the Attorney General, who shall submit a report and recommendations to the President, on actions that can be taken to prevent, reduce, and control crime, increase respect for the law, and assist victims."  Id. § 3(a).  The Executive Order directs that the Attorney General "shall determine the composition of and procedures for the functioning of the Commission."   Id. § 2(b).  "Officers or employees of the Federal Government designated to the Commission shall be full-time, or permanent part-time, officers or employees of the Federal Government" and "[t]he Attorney General may, at his discretion, invite elected officers of State, local, and tribal governments (or their designated employees with authority to act on their behalf) to serve on the Commission in their official capacities."  Id.  § 2(c)–(d).

On January 21, 2020, Attorney General Barr established the Commission along with its membership and procedures.  See Implementation Memo at 1.  Because "diversity of backgrounds and perspectives" is important to the Commission's work, Barr explained, "the Commission, a deliberative body tasked with improving American policing, should consist of law enforcement officials from a variety of backgrounds, positions, areas, and expertise."  Id. at 2.  Further, Barr wrote, the Commission should "solicit input and information from various sectors of society" including civil rights organizations, community organizations, and criminal defense attorneys.  Id.  Attorney General Barr appointed eighteen members to the Commission,

including Phil Keith as Chair and Katharine Sullivan as Vice Chair.  Id. at 3-4.  All the appointed members are either Federal officials or elected officers of State, local, and tribal governments, or have been designated to serve on a mayor or governor's behalf.  Id.  And all members are current or former law enforcement professionals, including police officers, leaders of law enforcement agencies, and prosecutors.  See Am. Compl. [ECF No. 26] ¶¶ 46–47 (citing biographical information published on the Commission's website).  No member has a criminal defense, civil rights, or community organization background.  Id. ¶ 48–49 (citing same biographical information).

Attorney General Barr also explained that the Commission would be "assisted in its deliberations" by fifteen "working groups" that provide recommendations in various subject areas.  Implementation Memo at 4–6.  These subjects include social problems impacting public safety, police officer health, grant programs, respect for law enforcement, business and community development, reduction of crime, victim services, re-entry programs and initiatives, and homeland security, among others.  Id.  "The working groups and their members do not constitute the Commission" and "serve exclusively in a consultative capacity."  Id. at 4.  Further, the memorandum noted, "[t]he Commission serves exclusively to advise the Attorney General and the President" and "is not intended to be subject to either the Federal Advisory Committee Act or Administrative Procedure Act."  Id. at 7.

Attorney General Barr ordered the Chair to submit the Commission's report, "which shall consist of a summary of the Commission's actions to investigate the issues identified, an analysis of the information received by the Commission, and the recommendations of the Commissioners," by no later than October 28, 2020.  Id. at 6.  Within sixty days of receiving the

Chair's report, "the Attorney General, following consultation with the Director of the Office of Management and Budget, will submit a report and recommendations to the President." Id.

The Commission began holding hearings on February 27, 2020. As of the filing of the Amended Complaint, the Commission had held subsequent hearings on 29 days throughout March, April, and May of 2020. See United States Dep't of Justice, Presidential Commission on Law Enforcement, Hearings, https://www.justice.gov/ag/presidential-commission-law-enforcement-and-administration-justice/hearings (last accessed September 30, 2020). None of these hearings were noticed in the Federal Register (or otherwise) and LDF alleges they were not open to the public. See Decl. of Monique L. Dixon ("Dixon Decl.") [ECF No. 25-25] ¶ 15; Am. Compl. ¶¶ 121–35. Many private citizens, including leaders of law enforcement advocacy organizations and social services organizations, academics, and private consultants, participated in these hearings alongside Commission members by providing testimony and asking questions. See Am. Compl. ¶¶ 143–54 (citing hearing transcripts and witness bios). These hearings have covered a wide range of topics related to the working groups' study areas. Id. (citing hearing transcripts).

In February 2020, the Commission posted a notice on its website offering interested members of the public the opportunity to submit comments through May 31, 2020 regarding any aspect of the Commission's work. See Dixon Decl. ¶ 6. But at some point between March 13 and March 28, the Commission shortened the comment window by two months, requiring all submissions by March 31, 2020, without posting notice in the Federal Register. Id. ¶ 7–8. After discovering the new deadline three days before it passed, LDF submitted a letter on March 31, 2020 to Attorney General Barr, Phil Keith, and Katharine Sullivan, objecting to the Commission's imbalanced membership and lack of transparency. See Corrected Comment

Letter (March 31, 2020) [ECF No. 25-28].  LDF urged the prompt appointment of "additional commissioners that would create the balance of viewpoints required by the Federal Advisory Committee Act," such as civil rights leaders, public health experts, and academics.  Id. at 2.  And LDF noted that it and other civil rights organizations were "publicly and robustly engaged in addressing issues of public safety and law enforcement" and had served on President Obama's Task Force on 21st Century Policing in 2014.  Id.  Commission leaders Keith and Sullivan acknowledged the letter on April 14, 2020 and said the comment window had been re-opened through April 30, 2020, but did not address LDF's request to appoint new Commissioners or LDF's other transparency concerns.  See Corrected Response Letter (Apr. 14, 2020) [ECF No. 25-29].

### III.    Litigation History

On April 30, 2020, LDF brought this action against the Attorney General of the United States; the Department of Justice ("DOJ"); the Commission; Phil Keith, in his official capacity as Chair of the Commission; and Katharine Sullivan, in her official capacity as Vice Chair of the Commission, alleging several violations of FACA.  See Compl. [ECF No. 1] at 1.  LDF brought claims against Keith, Sullivan, and the Commission under the Mandamus Act (Counts I, II, and III), against Attorney General Barr and the DOJ under the Administrative Procedure Act ("APA") (Count IV), and against all defendants under the Declaratory Judgment Act (Count V). See Compl.; Am. Compl.  As amended, Count I alleges that the Commission is not fairly balanced, 5 U.S.C. app. 2 § 5(b)(2), or free from inappropriate influence, id. § 5(b)(3).  Count II alleges that the Commission has failed to file a charter.  Id. § 9(c).  Count III alleges that the Commission has not made its hearings open to the public, id. § 10(a)(1), published timely notice of each meeting in the Federal Register, id. § 10(a)(2), or made its records available for public

inspection, id. § 10(b).  Count IV incorporates LDF's fair balance and public records claims against defendants Barr and DOJ, respectively, and also alleges that Barr failed to appoint a designated federal officer for the Commission.  Id. § 10(e); 41 C.F.R. § 102-3.120.  And Count V alleges that LDF is entitled to a declaration that all of the foregoing conduct violates FACA.

Plaintiff has now moved for summary judgment on its claims that defendants have violated FACA by failing to (1) ensure fairly balanced membership of the Commission, (2) file a charter with the required entities, (3) appoint a designated federal officer, and (4) provide timely notice of meetings in the Federal Register.  See Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Br.") [ECF No. 25-2].  Defendants have moved to dismiss Counts I, II, IV, and V of plaintiff's Amended Complaint for lack of standing and all five counts for failure to state a claim.  See Opp'n to Pl.'s Mot. for Summ. J. & Mem. in Supp. of Defs.' Cross-Mot. to Dismiss or, in the Alternative, for Summ. J ("Defs.' Opp'n") [ECF. No. 33-1].  In the alternative, defendants have cross-moved for summary judgment.  See id.  In addition to challenging standing, defendants argue that the Commission is exempt from FACA under UMRA and that plaintiff's fair balance and inappropriate influence claims are nonjusticiable.  Id. at 14–26.  A hearing was held on September 17, 2020, and those motions are now fully briefed and ripe for consideration.[2]

---

[2] LDF has also moved to supplement the record with twelve new documents.  See Mot. to Supp. R. [ECF No. 40] at 2.  That motion is also now fully briefed and ripe for consideration. The Court will grant LDF's motion to supplement the record.  The Court has broad discretion to allow parties to supplement the record.  See Ramsey v. Moniz, 75 F. Supp. 3d 29, 47 (D.D.C. 2014).  And supplementation may be proper even after summary judgment motions have been fully briefed if new relevant facts come to light.  See James Madison Project v. Dep't of Justice, 330 F. Supp. 3d 192, 200–01 (D.D.C. 2018).  Here, LDF obtained relevant materials through a series of public records requests filed shortly after the Court's order holding discovery in abeyance.  See Mot. to Supp. R. at 4. Defendants have not shown that they will be prejudiced by the admission of these documents.  However, although the Court has considered these documents, they ultimately have no bearing on the Court's resolution of the summary judgment motions.

**LEGAL STANDARD**

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination."  Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting Anderson, 477 U.S. at 248).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007).

The party seeking summary judgment bears the initial responsibility of identifying portions of the record that demonstrate the absence of a genuine dispute of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor."  Anderson, 477 U.S. at 255.  The Court must "eschew making credibility determinations or weighing the evidence."  Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).  The nonmoving party's opposition "must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial."  Morales v. Humphrey, 309 F.R.D. 44, 46 (D.D.C. 2015) (citing Fed. R. Civ. P. 56(c)).  If the non-movant's evidence is "merely colorable" or "not significantly probative," then summary judgment may be granted.  Anderson, 477 U.S. at 249–50.

To survive a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), the plaintiff must establish the court's jurisdiction by a preponderance of the evidence.  Judicial Watch, Inc. v. Nat'l Archives & Records Admin., 845 F. Supp. 2d 288, 294 (D.D.C. 2012) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)).  "In order to establish jurisdiction, a plaintiff must establish standing."  Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015).  "The plaintiff must demonstrate standing for each claim . . . and for each form of relief that is sought."  Town of Chester v. Laroe Estates, Inc., 137 S. Ct. 1645, 1650 (2017) (internal quotations marks and citation omitted); see also Davis v. FEC, 554 U.S. 724, 734 (2008).  "The question at this early juncture in the litigation is whether plaintiffs have plausibly alleged standing . . . [;] plaintiffs need not yet establish each element of standing by a preponderance of the evidence."  In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig., 928 F.3d 42, 54 (D.C. Cir. 2019) (citing Lujan, 504 U.S. at 561).

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must contain sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Determining a claim's plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. at 679.  Complaints "are to be construed with sufficient liberality to afford all possible inferences favorable to the pleader on allegations of fact."  Settles v. U.S. Parole Comm'n, 429 F.3d 1098, 1106 (D.C. Cir. 2005).

## ANALYSIS

### I.      Standing

As an initial matter, the government argues that LDF lacks standing to challenge the Commission's allegedly imbalanced membership, failure to file a charter, and lack of a designated federal officer, and moves to dismiss these claims under Rule 12(b)(1).  See Defs.' Opp'n at 10–13.  The now familiar requirements for constitutional standing are an injury in fact, fairly traceable to the challenged conduct, and redressable by a favorable judicial decision.  Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016); Lujan, 504 U.S. at 560–61.  "To survive a motion to dismiss for lack of standing, a complaint must state a plausible claim that the plaintiff has suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits."  Humane Soc'y of the U.S. v. Vilsack, 797 F.3d 4, 8 (D.C. Cir. 2015).  And in order to have suffered an injury in fact, plaintiffs must have suffered "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical."  Spokeo, 136 S. Ct. at 1548 (internal quotation marks omitted).  A concrete injury is "direct, real, and palpable—not abstract."  Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin., 489 F.3d 1279, 1292 (D.C. Cir. 2007).  A particularized injury is "personal, individual, distinct, and differentiated—not generalized or undifferentiated."  Id.  An actual or imminent injury is "certainly impending and immediate—not remote, speculative, conjectural, or hypothetical."  Id. at 1293.  And the Supreme Court has recognized that "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right in vacuo—is insufficient to create Article III standing."  Summers v. Earth Island Inst., 555 U.S. 488, 496 (2009).

The government first contends that LDF has not established injury in fact for three of its claims: imbalanced membership, failure to file a charter, and failure to appoint a designated federal officer.  See Defs.' Opp'n at 12.  The Court is not persuaded.  LDF has suffered injury in fact for all of its claims.  To start, the government concedes that plaintiff has "informational" standing for Count III, which alleges that the Commission has not provided timely notice of or public access to its meetings and has not made its records available for public inspection.  See id. at 11.  Indeed, the Supreme Court held in Public Citizen v. Department of Justice, 491 U.S. 440 (1989), that "refusal to permit appellants to scrutinize [a] Committee's activities to the extent FACA allows constitutes a sufficiently distinct injury to provide standing to sue."  Id. at 449. And as the government conceded at oral argument, Public Citizen specifically held that a committee's failure to file a charter injured interested parties.  See September 17, 2020 Hr'g Tr. [ECF No. 43] at 31:6–13; see also Pub. Citizen, 491 U.S. at 449.  Similarly, because the designated federal officer requirement ensures that regulators and the public can obtain information about committees' operations, the Commission's failure to employ a designated federal officer has injured LDF.  See 41 C.F.R. § 102-3.150(a)(5).

As for LDF's fair balance claim, although this is the closest call, the Court concludes that LDF has also suffered an injury in fact because the government has denied LDF access to a representative voice on the Commission.  LDF has an interest in and is directly impacted by the Commission's function of studying policing.  See Am. Compl. ¶¶ 6, 214.  LDF has "worked in the area of policing reform since its inception" in 1940, and its staff has worked for many years to "develop and promote fair and accountable policing practices."  Dixon Decl. ¶¶ 3–4.  And LDF alleges it was denied access to representation on the Commission.  Because Attorney General Barr appointed the Commissioners at the same time as establishing the Commission, and

14

only selected from those with law enforcement backgrounds, it does not appear that LDF and its representatives had an opportunity to formally apply for Commission membership. But on March 31, 2020, LDF sent a letter to Barr and the Commission requesting the prompt appointment of "additional commissioners that would create the balance of viewpoints required by the Federal Advisory Committee Act," such as civil rights leaders, public health experts, and academics. See Corrected Comment Letter (March 31, 2020). And LDF noted that it was "publicly and robustly engaged in addressing issues of public safety and law enforcement" and served as a witness before President Obama's Task Force on 21st Century Policing in 2014. Id. Commission leaders Keith and Sullivan did not address LDF's request to appoint new Commissioners. See Corrected Response Letter (Apr. 14, 2020).

The D.C. Circuit has previously suggested that denial of access to representation on an advisory committee is a sufficiently concrete harm to constitute an injury in fact. See Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Private Sector Survey on Cost Control, 711 F.2d 1071, 1074 n.2 (D.C. Cir. 1983) (stating, in dictum, that the purpose of FACA is "to ensure that persons or groups directly affected by the work of a particular advisory committee would have some representation on the committee. When the requirement is ignored, therefore, persons having a direct interest in the committee's purpose suffer injury-in-fact sufficient to confer standing to sue."); Physician's Educ. Network, Inc. v. Dep't of Health, Educ. & Welfare, 653 F.2d 621, 623 n.3 (D.C. Cir. 1981) (per curiam) (citing cases in which such allegations were sufficient for standing); see also Wash. Legal Found. v. Am. Bar Ass'n Standing Comm. on Fed. Judiciary, 648 F. Supp. 1353, 1357–58 (D.D.C. 1986) (finding standing for fair balance claim in factual circumstances related to those in Public Citizen). Courts in other circuits to consider challenges under FACA's fair balance provision have likewise found standing. See, e.g., Nat.

Res. Def. Council v. Dep't of Interior, 410 F. Supp. 3d 582, 601–02 (S.D.N.Y. 2019) (noting that "the weight of the caselaw" indicates that "if a party with a direct interest in the committee's work" is "denied access" to membership, then "that party has standing to challenge the denial"); Ctr. for Pol'y Analysis on Trade & Health v. Office of U.S. Trade Representative, No. C05-05177, 2006 WL 8446407, at *3 (N.D. Cal. June 29, 2006), aff'd, 540 F.3d 940, 943 n.2 (9th Cir. 2008), as amended (Oct. 8, 2008); Nw. Ecosystem All. v. Office of U.S. Trade Representative, No. C99-1165, 1999 WL 33526001, at *2–3 (W.D. Wash. Nov. 9, 1999).

The government's primary case arguing otherwise, R.J. Reynolds Tobacco Co. v. FDA, 810 F.3d 827 (D.C. Cir. 2016), is inapposite.  There, cigarette manufacturers sued the Food and Drug Administration ("FDA"), alleging that three of the twelve members of an advisory committee on the health impacts of menthol cigarettes had conflicts of interest.  Id. at 828.  The D.C. Circuit held that the prospect of future action adverse to plaintiff's interests based on the committee's report did not suffice to establish an injury in fact for Article III standing because "the appointment of the challenged committee members by no means rendered the risk of eventual adverse FDA action substantially probable or imminent."  Id. at 830.  But R.J. Reynolds was not a FACA case.  Moreover, the manufacturers did not allege a representational injury (or any other similar injury).  Nor did the manufacturers seek relief against the advisory committee itself or claim that their viewpoints were not represented by the other committee members. Instead, they alleged harms from the likely outcomes of the committee report or subsequent agency action.  Id. at 829.  Here, LDF does not claim its injury is that the report might eventually result in executive action adverse to its interests.  Rather, LDF alleges a representational injury that has already accrued (and continues to accrue).

The government also argues that neither LDF, nor any of its representatives, have an individual right to be appointed to the Commission.  See Def's Opp'n at 12–13.  That may be true, but "the harm arises not because a given individual is entitled to a seat on an advisory committee, but rather because she is entitled to a fair adjudication of her application for membership."  Nat. Res. Def. Council, 410 F. Supp. 3d at 602.

In its reply brief, the government argues for the first time that LDF's injuries are not redressable.  See Defs.' Reply in Supp. of Mot. to Dismiss or, in the Alternative, for Summ. J. ("Defs.' Reply") [ECF No. 38] at 7–8.  The Court disagrees and concludes that both LDF's informational and representational injuries are likely to be redressed by a favorable decision on the merits.  First, LDF's injuries are redressable by mandamus and injunctive relief.  The Court can—and, as explained below, will—order the Commission to file a charter and provide timely notice of meetings; order defendant Barr to appoint a designated federal officer and ensure the Commission has a fairly balanced membership; and order defendants to refrain from publishing any report produced by the Commission until the requirements of FACA are satisfied.  This relief will allow LDF to scrutinize the Commission's activities and will provide access to a representative voice on the Commission, redressing the asserted injuries—that defendants have injured LDF by denying LDF access to information, and thus limiting oversight, and that defendants have "limit[ed] [LDF's] ability and right to have a representative voice on the Commission on an issue with which [LDF] is engaged."  See Am. Compl. ¶ 214.

Even if LDF cannot secure complete relief, these "potential gains are undoubtedly sufficient to give [LDF] standing."  See Pub. Citizen, 491 U.S. at 451.  In Public Citizen, for example, the Supreme Court rejected the argument that plaintiff's injury was not redressable because the meetings and documents plaintiff sought to access might be legitimately closed to

the public.  Id. at 450–51; see also, e.g., Pub. Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods, 886 F.2d 419, 435 (D.C. Cir. 1989) ("[T]here are no problems here with redressability. . . .  The alleged injury from the lack of any consumer representative is easily remedied by the relief requested by Public Citizen—an injunction suspending operation of the Committee until consumers are represented on it. . . . [I]t does not matter that every one of the plaintiffs' preferred viewpoints might not be represented on the Committee or that they might not be afforded the precise extent of representation sought on the Committee.") (per curiam) (Edwards, J., concurring in part and dissenting in part); Elec. Privacy Info. Ctr. v. Nat'l Sec. Comm'n on Artificial Intelligence, No. 1:19-CV-02906 (TNM), 2020 WL 2838568, at *18 (D.D.C. June 1, 2020) (ordering commission to begin providing timely notice of meetings); Nat. Res. Def. Council, 410 F. Supp. 3d at 602–03 (rejecting a redressability challenge because "violations of FACA's fair balance requirement [could] be remedied by 'good faith effort[s]' to appoint a 'properly qualified . . . representative' from the excluded viewpoints" (quoting Nw. Ecosystem All., 1999 WL 33526001, at *8)).

The Court acknowledges that the Commission may have already completed much of its work.  But the Commission has not yet been terminated, and the report based on its work has not yet been submitted to the President.   President Trump's Executive Order provides that the "Commission shall terminate no later than 90 days after submitting its report and recommendations to the Attorney General, unless extended by the President."  Exec. Order No. 13,896, 84 Fed. Reg. at 58,597, § 5.  The Commission is not required to submit its report and recommendations to the Attorney General until October 28, 2020.  See Implementation Memo at 6.  Even if the Commission has, in fact, already done so, the Commission could exist for up to

ninety days after that submission and might be extended by the President.  Thus, at this juncture, LDF's injuries are redressable by mandamus and injunctive relief.

Indeed, even if the Commission were terminated today, LDF's injuries would still be redressable.  The D.C. Circuit has "made it clear that FACA rights are enforceable even after an advisory committee has been disbanded."  Cummock v. Gore, 180 F.3d 282, 292 (D.C. Cir. 1999); see also Byrd v. EPA, 174 F.3d 239, 243–44 (D.C. Cir. 1999) (rejecting argument that plaintiff's injury was not redressable where panel had already completed its work and been disbanded); Judicial Watch, Inc. v. Nat'l Energy Pol'y Dev. Grp., 219 F. Supp. 2d 20, 32 (D.D.C. 2002) (noting that the proposition "that relief can exist beyond the life of the committee . . . is binding on this Court").  In Byrd, the D.C. Circuit held that plaintiff's informational injury, stemming from the committee's failure to release its documents on time, was redressable even though the panel had already been disbanded and plaintiff had already received the documents sought.  174 F.3d at 244.  The court explained that "declaratory relief will redress Byrd's injury because it will provide him with this Court's declaration that the agency failed to comply with FACA; and such a declaration will give Byrd 'ammunition for [his] attack on the Committee's findings' in subsequent agency proceedings that make use of the [report]."  Id. (citation omitted); see also Ctr. for Arms Control & Non-Proliferation v. Pray, 531 F.3d 836, 839 n.* (D.C. Cir. 2008) ("regardless whether mandamus relief is available, a declaration of [plaintiff's] legal right to the materials could form the basis of an injunction against the [agency], which would redress [plaintiff's] claimed injury."); Physicians Comm. for Responsible Med. v. Glickman, 117 F. Supp. 2d 1, 5 (D.D.C. 2000) ("declaratory relief . . . will give [plaintiffs] ammunition for [their] attack on the Committee's findings.  How effective such ammunition will be is not for this Court to say." (internal quotation marks and citation omitted)).

Here, declaratory relief would provide LDF ammunition for any future legal attack on the Commission's findings or any action taken in reliance on those findings.  LDF can point to the Commission's imbalance and failure to satisfy FACA's procedural requirements in challenging the report or future agency actions.  And while the Court will order mandamus and injunctive relief along with a declaratory judgment, ordering declaratory relief alone to redress LDF's informational and representational injuries would not be unprecedented.  In <u>Northwest Forest Resource Council v. Espy</u>, 846 F. Supp. 1009 (D.D.C. 1994), for instance, the court ordered declaratory relief alone to remedy a slew of FACA violations, including failure to file a charter, post timely notice of meetings, and ensure a fairly balanced membership.  <u>See id.</u> at 1013–15.

For these reasons, the Court will not dismiss any of LDF's claims for lack of standing.

## II.    Justiciability

The government contends that LDF's claims that the Commission is imbalanced and inappropriately influenced should be dismissed as nonjusticiable because FACA's "fair balance" and "inappropriate influence" requirements lack judicially manageable standards.  <u>See</u> Defs.' Opp'n at 14.  The Court is not persuaded.

Judicial review is available to challenge government action so long as there are "meaningful standards for defining the limits of the agency's discretion"—in other words, "law to apply."  <u>Physicians for Soc. Responsibility v. Wheeler</u>, 956 F.3d 634, 643 (D.C. Cir. 2020) (brackets and internal quotation marks omitted) (quoting <u>Heckler v. Chaney</u>, 470 U.S. 821, 834 (1985)).  "Judicially manageable standards may be found in formal and informal policy statements and regulations as well as in statutes."  <u>Steenholdt v. Fed. Aviation Admin.</u>, 314 F.3d 633, 638 (D.C. Cir. 2003) (internal quotation marks omitted).  Moreover, the "difficulty of defining the boundaries of a" standard does not make it nonjusticiable.  <u>Cody v. Cox</u>, 509 F.3d

606, 610 (D.C. Cir. 2007).   Indeed, the D.C. Circuit has found meaningful standards even in "permissive and indeterminate language."   Wheeler, 956 F.3d at 643.   For example, a statute requiring only "high quality and cost-effective" care provided a reviewable standard.   Cody, 509 F.3d at 610.   So did a statute allowing a military records board to "excuse a failure to file … if it finds it to be in the interest of justice."   Dickson v. Sec'y of Def., 68 F.3d 1396, 1399, 1404 (D.C. Cir. 1995).

### A.  Fair Balance

Important for the present case is the D.C. Circuit's decision in Public Citizen v. National Advisory Committee on Microbiological Criteria for Foods ("Microbiological"), 886 F.2d 419 (D.C. Cir. 1989) (per curiam).   There, the Circuit deemed FACA's fair balance requirement—the same requirement that the government now argues is nonjusticiable—justiciable.   This is, admittedly, a difficult decision to parse, with each judge on the panel writing separate opinions. Nevertheless, it is clear that two of the three judges thought the fair balance requirement was justiciable.  Judge Edwards explicitly said that it was.   Id. at 433 (Edwards, J., concurring in part and dissenting in part).   And Judge Friedman reached the merits of whether the committee was fairly balanced—thus necessarily deeming the requirement justiciable (because he judged it). See id. at 423–24 (Friedman, J., concurring in the judgment).   In arguing that the requirement is not justiciable, the government relies almost exclusively on Judge Silberman's lone concurrence, in which he opined that there is "no principled basis for a federal court to determine which among the myriad points of view deserve representation on particular advisory committees" or "which organizations or individuals qualif[y] as bona fide" representatives of those views.   Id. at 426–29 (Silberman, J., concurring); see also Defs.' Opp'n at 15–16.   But Judge Silberman's views did not carry the day.

The government contends that Judge Edwards and Judge Friedman, too, "concluded that FACA provides no meaningful standards by which to determine whether an advisory committee is 'fairly balanced' in terms of the viewpoints represented." See Defs.' Reply at 10. That is simply wrong. True, Judge Edwards said that "Congress clearly did not intend courts to inquire into the specific opinions of every committee member in order to determine if a committee is unbalanced." 886 F.2d at 437. But that is because Congress "accepted that a person's viewpoints could be inferred from his or her background and employment status" rather than "professed personal opinions." Id. (emphasis added). For example, "one can presume that industry representatives will tend to represent industry interests." Id.[3] Regardless, Judge Edwards's statements about how to assess viewpoints are irrelevant to the threshold question of justiciability. He clearly thought the "fair balance" provision was justiciable, explaining that even if it "falls short of mathematical precision in application," courts still "have a duty to hear and decide . . . cases" challenging the composition of advisory committees under the provision. Id. at 434.

Similarly, Judge Friedman stated that the determination of how to attain a "fairly balanced" membership "necessarily lies largely within the discretion of the official who appoints the committee." Id. at 424. But he did not say this determination was unreviewable. In fact, he reviewed it. Judge Friedman explained that the "appropriate inquiry in determining whether the Committee's membership satisfies the 'fairly balanced' standard in section 5(b)(2) is whether the Committee's members 'represent a fair balance of viewpoints given the functions to be performed.'" Id. at 423 (citation omitted). Applying this standard, he concluded that because

---

[3] Perhaps Judge Edwards would have rejected LDF's argument that the Commission is not fairly balanced because many Commissioners have issued public statements supporting zero-tolerance law enforcement and skepticism of criminal justice reform efforts. See Am. Compl. ¶¶ 61–69. But LDF's main argument is that the Commission is imbalanced in terms of background because all the Commissioners are current or former law enforcement officials. See id. ¶¶ 43–60.

the committee's function involved "highly technical and scientific studies and recommendations, a 'fair balance' of viewpoints [could] be achieved even though the Committee d[id] not have any members who [were] consumer advocates."  Id. at 424.  That merits determination necessarily rests on an underlying conclusion that the issue is justiciable.

In the face of this precedent, a few judges in this District have nonetheless deemed FACA's fair balance requirement nonjusticiable, favorably citing Judge Silberman's opinion.  See Physicians for Soc. Responsibility v. Wheeler, 359 F. Supp. 3d 27, 44 (D.D.C. 2019), rev'd on other grounds, 956 F.3d 634 (D.C. Cir. 2020)[4]; Fertilizer Inst. v. EPA, 938 F. Supp. 52, 54 (D.D.C. 1996); Pub. Citizen v. Dep't of Health & Hum. Servs., 795 F. Supp. 1212, 1213–23 (D.D.C. 1992).  But this Court will not.

Even leaving aside Microbiological, both the statutory language in § 5(b)(2) and FACA's implementing regulations establish a meaningful standard for review.  First, the statutory language alone suggests that § 5(b)(2) is justiciable.  FACA mandates that the President or agency head establishing a committee "shall" "require the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee."  5 U.S.C. app. 2 § 5(b)(2), (c).  The use of the term "shall" suggests the absence of discretion.  See Mach Mining, LLC v. EEOC, 575 U.S. 480, 486 (2015) ("the word 'shall' admits of no discretion").  And although the term "fairly balanced" may be imprecise, it provides guidance at least in extreme cases.  At a minimum, "this language would provide a standard for a reviewing court to determine whether there had been a deliberate

_____

[4] LDF says the D.C. Circuit "reaffirmed the justiciability of FACA's 'fairly balanced' and 'inappropriately influenced' provisions earlier this year, reversing a district court's determination that neither provision provided meaningful standards for judicial review."  See Pl.'s Resp. in Opp'n to Defs.' Cross-Mot. to Dismiss or, in the Alternative, for Summ. J. and Reply in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Opp'n") [ECF No. 35] at 11 (citing Wheeler, 956 F.3d at 643).  But while the district court held that FACA's "fair balance" requirement was not justiciable, that was not the issue on appeal.  The D.C. Circuit reversed on other grounds.

and explicit effort to avoid the representation of any competing viewpoints on the subject matter of an advisory committee." Nat. Res. Def. Council, 410 F. Supp. 3d at 604. For instance, "it would clearly violate the 'fairly balanced' requirement if the Secretary were to announce that he would exclude all points of view except one." Id. If a statute provides a meaningful standard for review even in extreme cases, it is justiciable. See Mach Mining, 575 U.S. at 488 (holding that the word "endeavor" provides a justiciable standard partly because it can be enforced if the agency did not make any effort whatsoever).

But the Court need not rely on the statutory language alone because FACA's implementing regulations provide further law to apply. These regulations, promulgated by the GSA at the direction of Congress, see 5 U.S.C. app. 2 § 7(c), explain that before establishing a new committee, an agency head must consult with the Committee Management Secretariat at the GSA. 41 C.F.R. § 102-3.60. As a part of that consultation, the agency head must submit a "description of the agency's plan to attain fairly balanced membership" that ensures "the agency will consider a cross-section of those directly affected, interested, and qualified, as appropriate to the nature and functions of the advisory committee." Id. § 102-3.60(b)(3). Moreover, "committees requiring technical expertise should include persons with demonstrated professional or personal qualifications and experience relevant to the functions and tasks to be performed." Id. Finally, the regulations contain an appendix that "identifies key points and principles that may be applied to situations not covered elsewhere." 41 C.F.R. § 102-3, subpt. B, app. A. The appendix lists factors that "should be considered in achieving a 'balanced' advisory committee membership," which include: "(i) The advisory committee's mission; (ii) The geographic, ethnic, social, economic, or scientific impact of the advisory committee's recommendations; (iii) The types of specific perspectives required, for example, such as those of consumers, technical

experts, the public at-large, academia, business, or other sectors; (iv) The need to obtain divergent points of view on the issues before the advisory committee; and (v) The relevance of State, local, or tribal governments to the development of the advisory committee's recommendations." Id. These standards, while perhaps difficult to apply with mathematical precision, are far more precise than other standards, like "in the interest of justice," that the D.C. Circuit has deemed reviewable. See Dickson, 68 F.3d at 1398.

Congress enacted FACA to constrain executive discretion, suggesting it did not intend to preclude judicial review. FACA's "principal purpose was to enhance the public accountability of advisory committees established by the Executive Branch and to reduce wasteful expenditures on them." Public Citizen, 491 U.S. at 459. In particular, the provisions of § 5 (including the fair balance and inappropriate influence provisions) were "designed to counter 'the belief that these [advisory] committees do not adequately and fairly represent the public interest [or] that they may be biased toward one point of view or interest.'" Microbiological, 886 F.2d at 423 (Friedman, J., concurring in the judgment) (quoting S. Rep. No. 1098, 92d Cong., 2d Sess. 4–5 (1972)). Thus, "it is implausible to conclude that Congress simultaneously passed a law designed to constrain executive discretion and ensure Executive Branch accountability, while also wholly precluding judicial review of advisory committee design decisions." Nat. Res. Def. Council, 410 F. Supp. 3d at 604.

This conclusion accords not only with the D.C. Circuit's decision in Microbiological, but also with the majority view among other Circuits. For instance, the First Circuit held earlier this year that "FACA does provide justiciable standards" because the "concepts of fairness, balance, and influence are not foreign to courts, [which] are certainly capable of reviewing agency actions with reference to those concepts in at least some factual scenarios." Union of Concerned

Scientists v. Wheeler, 954 F.3d 11, 19, 22 (1st Cir. 2020).  The Fifth Circuit similarly held that "FACA's requirements that advisory committees be fairly balanced and adequately staffed are justiciable."  Cargill, Inc. v. United States, 173 F.3d 323, 335 (5th Cir. 1999).  The government misleadingly argues that Cargill determined only that the "limited question" of "whether a single industry representative needed to be included on the committee" was justiciable.  See Defs.' Reply at 11.  That is false.  Cargill squarely held that the entire "fair balance" requirement was justiciable, although it concluded that an additional representative on the committee was unnecessary.  See 173 F.3d at 335.  The Tenth Circuit, too, "adopt[ing] the reasoning of the Fifth and D.C. Circuits," determined that "the fair balance requirement of § 5(b)(2) is justiciable." Colo. Env't Coal. v. Wenker, 353 F.3d 1221, 1232–33 (10th Cir. 2004).  Although Wenker concerned a similar provision with "a more precise standard" than FACA, the court said FACA also provided "law to apply" even though it required "ill-defined weighing of interests."  Id. at 1233.  Finally, while the Eleventh Circuit has not directly addressed the justiciability of the "fair balance" requirement, it has strongly suggested that the requirement is justiciable by upholding a district court's injunction imposed to remedy violations of § 5(b)(2).  See Alabama-Tombigbee Rivers Coal. v. Dep't of Interior, 26 F.3d 1103, 1104 (11th Cir. 1994).

Only the Ninth Circuit, departing from its sister circuits, has found the "fair balance" requirement non-reviewable—but then only in particular circumstances.  See Ctr. for Pol'y Analysis on Trade & Health v. Office of U.S. Trade Representative, 540 F.3d 940, 945–46 (9th Cir. 2008).  Citing Judge Silberman's concurrence in Microbiological, the Ninth Circuit held that, in the context of a committee created under the Trade Act of 1974, FACA is "devoid of standards suggesting what Congress intended when it required all advisory committees to be 'fairly balanced.'"  Id. at 945.  But that holding was decidedly "narrow" and limited to Trade Act

committees.  Id. at 947.  The panel emphasized that its conclusion "do[es] not suggest that FACA's 'fairly balanced' requirement is non-reviewable in every circumstance."  Id.  This Court does not think that such a context-specific and tentative decision, especially when read in light of D.C. Circuit precedent and that of every other Circuit, should dictate the conclusion here.

Thus, consistent with the panel in Microbiological, the Court concludes that FACA's fair balance provision is justiciable.

### B.  Inappropriate Influence

For similar reasons as with the fair balance provision, the Court concludes that FACA's inappropriate influence provision is justiciable—though LDF does not seek summary judgment on this claim now.  FACA requires that the directive establishing an advisory committee must "contain appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment." 5 U.S.C. app. § 5(b)(3).  The government contends this provision is nonjusticiable, again relying on Judge Silberman's concurrence in Microbiological.  There, Judge Silberman stated that FACA provides no guidance as to "when an interest is 'special' as opposed to 'general[,]'" or "when its influence is "inappropriate[.]'"  Microbiological, 886 F.2d at 430 (Silberman, J., concurring).  Just as with the fair balance provision, the other two judges disagreed.  Although Judge Edwards focused on the fair balance provision, he stated as a general matter that "claims under section 5 of FACA" are justiciable—and the inappropriate influence provision is in section 5.  Id. at 433 (Edwards, J., concurring in part and dissenting in part).  And Judge Friedman, as with the fair balance provision, reached the merits of whether the committee was inappropriately influenced—thus necessarily deeming the provision justiciable (again, because he judged it).

See id. at 426 (Friedman, J., concurring in the judgment) (concluding that "appellants have not shown that the original Committee was dominated or 'inappropriately influenced' by food industry representatives").

Two of the three other Circuits to consider whether the inappropriate influence provision is justiciable have agreed with the Microbiological majority. The First Circuit squarely held that the inappropriate influence provision (along with the fair balance provision) is justiciable, explaining that courts can "enforce at least the outer boundaries of ranges of this type" because the concept of "influence" is not "foreign to courts." Union of Concerned Scientists, 954 F.3d at 18–19. And the Fifth Circuit in Cargill stated that it would "follow the Microbiological majority and hold that § 5's inappropriate-influence prohibition is justiciable." 173 F.3d at 339 n.30. The Tenth Circuit has disagreed, finding the fair balance provision justiciable, but the inappropriate influence requirement nonjusticiable. Wenker, 353 F.3d at 1231.

Even leaving aside Microbiological and the weight of authority from other Circuits, the court concludes that the inappropriate influence provision offers a meaningful standard for review. Under § 5(b)(3), the directive establishing an advisory committee "shall" "contain appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest." 5 U.S.C. app. 2 § 5(b)(3), (c). Although the terms "special interest" and "inappropriate influence" are imprecise, the statute's use of "shall" suggests the provision is justiciable—just as with § 5(b)(2). See Fed. Exp. Corp. v. Holowecki, 552 U.S. 389, 400 (2008) ("Congress' use of the term 'shall' indicates an intent to 'impose discretionless obligations.'" (quoting Lopez v. Davis, 531 U.S. 230, 241 (2001))). At a minimum, courts can review "whether [an] agency had established any provisions relating to the decisional independence of an advisory committee."

28

Nat. Res. Def. Council, 410 F. Supp. 3d at 607; see also Mach Mining, 135 S. Ct. at 1652. Moreover, courts routinely apply statutes that require "appropriate" conduct.  See, e.g., Michigan v. EPA, 575 U.S. 743, 752–53 (2015) (recognizing that the word "appropriate" was a "classic broad and all-encompassing term that . . . includes consideration of all the relevant factors" and holding that a regulation was not "appropriate" (internal quotation marks and citation omitted)). Finally, as explained above, FACA's purpose was to ensure Executive Branch accountability in order to prevent wasteful expenditures resulting in biased proposals.  It is thus highly unlikely that Congress intended to wholly preclude judicial review of the requirement to guard against inappropriate influence.

Therefore, the Court concludes that FACA's inappropriate influence provision is also justiciable.

## III.     The Commission Is Subject To FACA

The government contends that the Commission is exempt from FACA under section 1534(b) of UMRA, which excludes certain intergovernmental communications from FACA's reach.  See Defs.' Opp'n at 18–26.  It is undisputed that, absent UMRA, there would be no question that the Commission is subject to FACA.  The Commission has sufficient structure and formality to constitute an advisory committee, was "established" by Attorney General Barr, and does not fall within FACA's two statutory exclusions.[5]  See  Pl.'s Br. at 8–10; Defs.' Opp'n at 18–19.

The UMRA exemption is designed to facilitate "input in the development of regulatory proposals containing significant Federal intergovernmental mandates" by state, local, and tribal

---

[5] FACA's definition of "advisory committee" excludes "any committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government" or that is "created by the National Academy of Sciences or the National Academy of Public Administration."  5 U.S.C. app. 2 § 3(2).  Neither is true here.

governments.   2 U.S.C. § 1534.   To this end, intergovernmental communications are exempt from FACA if (1) "meetings are held exclusively between Federal officials and elected officers of State, local, and tribal governments (or their designated employees with authority to act on their behalf) acting in their official capacities"; and (2) "such meetings are solely for the purpose of exchanging views, information, or advice relating to the management or implementation of Federal programs established pursuant to public law that explicitly or inherently share intergovernmental responsibilities or administration."   Id. § 1534(b).   Despite the government's contentions, the Court concludes that the Commission's meetings do not satisfy either part of this test.

## A.   The Commission's Meetings Are Not Solely For The Purpose Of Managing Intergovernmental Programs

The Commission clearly fails the second prong of the UMRA exemption.   To be exempt from FACA, meetings must be "solely" for the purpose of exchanging "views, information, or advice relating to the management or implementation of" a particular category of "established" federal programs.   Id. § 1534(b)(2).   Because UMRA uses "established" as a past participle, those programs must already have been "established."   See id.   And they must have been established "pursuant to public law," meaning federal legislation "approved in each chamber [of Congress] and signed by the President."   Mass. Credit Union Share Ins. Corp. v. Nat'l Credit Union Admin., 693 F. Supp. 1225, 1231 (D.D.C. 1988).   Finally, the federal programs must "explicitly or inherently share intergovernmental responsibilities or administration."   2 U.S.C. § 1534(b)(2).

Here, the purpose of the Commission is not solely to exchange information about the management of existing federal programs established by legislation.   Rather, the purpose of the Commission is much broader: to "study issues related to law enforcement and the administration

of justice and make recommendations to the Attorney General, who shall submit a report and recommendations to the President on actions that can be taken to prevent, reduce, and control crime, increase respect for the law, and assist victims."  Exec. Order No. 13,896, 84 Fed. Reg. at 58,596–97, § 3(a).  The Commission "sets out to conduct a modern <u>fresh evaluation</u> of the salient issues affecting American law enforcement and the communities they protect," not just to manage existing programs.  <u>See</u> Implementation Memo at 1 (emphasis added).  Accordingly, the Commission's working groups study a wide array of subjects from "Respect for Law Enforcement" to "Business & Community Development."  <u>Id.</u> at 5–6.  And its meetings have included discussions unrelated to the implementation of existing federal programs, such as potential changes in federal and state law that could only be accomplished through legislation, local policy changes, and actions to be taken by the private sector.[6]  <u>See</u> Pl.'s Br. at 16 (collecting examples).

The government argues that the UMRA exemption is so broad that "the Commission's meetings satisfy this requirement, because their purpose is specifically to exchange views on law enforcement and the administration of justice—which are the subject of a great number of Federal programs established pursuant to public law and over which Federal, State, local, and tribal authorities have shared responsibilities."  <u>See</u> Defs.' Reply at 18.  For instance, the DOJ is authorized to provide federal grants to state and local law enforcement through the Office of Justice Programs ("OJP"), and these grants support a wide range of initiatives related to crime reduction, policing, and public safety.  <u>See</u> 34 U.S.C. § 10110(1).  But the government does not claim that the sole purpose of the Commission's meetings is to discuss the implementation and

---

[6] It is not the case that "every single statement or question uttered at an intergovernmental meeting must be strictly on-topic in order for the UMRA exemption to apply."  <u>See</u> Defs.' Opp'n at 26.  But the fact that Commissioners engaged in many extended discussions unrelated to the management of federal programs vitiates any claim that the <u>sole</u> purpose of those meetings was managing and implementing established federal programs.

management of particular OJP grants.  Rather, the government says, the "nexus between the purposes of the Commission and the management of Federal programs" is "more than sufficient to meet the requirements of § 1534(b)(2)."  See Defs.' Opp'n at 25.

This reading of the UMRA exemption fails because it has no limiting principle.  It simply cannot be true that all "views" on the vast subject of law enforcement and the administration of justice "relat[e] to" the "management or implementation of Federal programs established pursuant to public law that . . . share intergovernmental responsibilities" simply because law enforcement is the subject of some such programs.  Nearly every broad area of policy is the subject of federal programs established by legislation over which federal, state, local, and tribal governments have shared responsibilities.  As LDF notes, a "construction of § 1534(b)(2) broad enough to cover any issue with a federal nexus would apply to almost any meeting topic."  See Pl.'s Opp'n at 26.  Not just law enforcement, but also education, health care, housing, transportation, agriculture, and energy would fit the bill—to name just a few.  By the government's logic, meetings about any facet of one of these topics would be exempt from FACA, regardless of whether the meetings are about management of particular federal programs. But these are precisely the sort of advisory groups Congress currently regulates through FACA. See   All   Agency   Accounts,   FACA   Database, www.facadatabase.gov/FACA/apex/FACAPublicAgencyNavigation   (listing   approximately 1,000 advisory committees on topics such as "Safe and Drug-Free Schools," "Mental Health," "Travel and Tourism Infrastructure," and "Electricity") (last accessed September 30, 2020).

Thus, as LDF points out, adopting the government's reading would "stretch the exemption to near-universality, carving a far larger gap in FACA's coverage than § 1534(b)(2)'s text supports."  See Pl.'s Opp'n at 26.  As a result, § 1534(b)(2) would do no work within the

UMRA exemption because virtually every committee that satisfied § 1534(b)(1) would be exempt from FACA.   Thus, § 1534(b)(2) would be rendered "insignificant, if not wholly superfluous," contrary to the "cardinal principle of statutory construction" that "no clause, sentence, or word shall be superfluous, void, or insignificant."  See Duncan v. Walker, 533 U.S. 167, 174 (2001) (quotation omitted).

Statutory interpretation "begins with the text."  Ross v. Blake, 136 S. Ct. 1850, 1856 (2016).  As the Supreme Court recently reiterated, judges may not "add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and [their] own imaginations."  Bostock v. Clayton County, 140 S. Ct. 1731, 1738 (2020).  Courts "cannot replace the actual text with speculation as to Congress' intent."  Magwood v. Patterson, 561 U.S. 320, 334 (2010).  Thus, "when the meaning of the statute's terms is plain," this Court's "job is at an end."  Bostock, 140 S. Ct. at 1749.

But to defend its broad reading of § 1534(b)(2), the government looks beyond the statutory text.  First, it cites Office of Management and Budget ("OMB") guidelines that the exemption should be "construed broadly to include any meetings called for any purpose relating to intergovernmental responsibilities or administration," 60 Fed. Reg. 50,651 at 50,653 (1995), as well as a case that relied on those guidelines to call the exemption "sweeping in scope," Wyoming Sawmills, Inc. v. U.S. Forest Service, 179 F. Supp. 2d 1279, 1305 (D. Wyo. 2001).  Wyoming Sawmills, however, wrongly accorded the OMB guidelines Chevron deference.  See 179 F. Supp. 2d at 1304–05.  Because the OMB guidelines lack the force of law, they are not entitled to deference.  See United States v. Mead Corp., 533 U.S. 218, 234 (2001); 2 U.S.C. § 1534(c).  Indeed, the government does not ask this Court to accord the guidelines Chevron

deference.  See Defs.' Reply at 23.  As a result, the Court is not persuaded by Wyoming Sawmills's broad interpretation of the exemption.

The government next argues that the OMB guidelines' instruction aligns with  legislative intent because UMRA aimed to "improve[] communications with State, local, and tribal governments" by requiring "Federal agencies to establish effective mechanisms for soliciting and integrating the input of such interests into the Federal decision-making process."  H.R. Rep. No. 104-76, at 40; see also Defs.' Reply at 19.  Certainly, UMRA aimed to facilitate intergovernmental communications.  But that does not mean the UMRA exemption was intended to sweep in meetings that fall outside its statutory text, swallowing FACA almost entirely. Rather, the exemption merely "clarifies Congressional intent" about "the extent to which elected officials of State, local, and tribal governments, or their designated employees with authority to act on their behalf, may meet with Federal agency representatives to discuss regulatory and other issues involving areas of shared responsibility" without triggering FACA.  H.R. Rep. No. 104-76, at 40.

Finally, the government contends that a broad interpretation of the UMRA exemption is consistent with courts' reluctance to apply FACA liberally.  See Defs.' Reply at 19.  In Public Citizen, the Supreme Court said that a "literalistic reading" of FACA's requirement that a committee be "utilized" by the President would extend FACA "to any group of two or more persons, or at least any formal organization, from which the President . . . seeks advice"—and thus "catch far more groups and consulting arrangements than Congress could conceivably have intended."  491 U.S. at 452, 464.  As the Court put it, Congress could not have intended "to require the filing of a charter, the presence of a controlling federal official, and detailed minutes" whenever "the President seeks the views of the National Association for the Advancement of

Colored People (NAACP) before nominating Commissioners to the Equal Employment Opportunity Commission, or asks the leaders of an American Legion Post he is visiting for the organization's opinion on some aspect of military policy."   Id. at 453.   But Public Citizen predates UMRA and concerns only the meaning of the word "utilized" in FACA, not whether FACA, in its entirety, should be narrowly construed.[7]   And unlike the external organizations used as examples in Public Citizen and the American Bar Association committee at issue there, here the Commission was created by the Attorney General for the sole purpose of providing recommendations to the President.   As the D.C. Circuit has explained, Public Citizen warned against "reading FACA to cover every instance when the President (or an agency) informally seeks advice from two or more private citizens," Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton, 997 F.2d 898, 915 (D.C. Cir. 1993), but certainly not against reading FACA to cover formal, structured commissions created by an agency—like the Commission here.

Therefore, the Court concludes that the Commission's meetings do not satisfy the second prong of the UMRA exemption, and thus the Commission is subject to FACA.

**B.   The Commission's Meetings Are Not Held Exclusively Between Covered Officials**

The Commission also fails the first prong of the UMRA exemption, which requires that "meetings are held exclusively between Federal officials and elected officers of State, local, and tribal governments (or their designated employees with authority to act on their behalf) acting in their official capacities."   See 2 U.S.C. § 1534(b)(1).   It is undisputed that people who are neither federal officials, elected state, local, or tribal officers, nor designated employees have given

---

[7] Additionally, Public Citizen did not actually reject the "literalistic reading" of FACA's utilization requirement, instead refusing to apply FACA on separation-of-powers grounds unique to that case.   See 491 U.S. at 465 ("Weighing the deliberately inclusive statutory language against other evidence of congressional intent, it seems to us a close question whether FACA should be construed to apply to the ABA Committee, although on the whole we are fairly confident it should not.").

testimony, answered questions, and otherwise participated in nearly all the Commission's meetings.  See Pl.'s Br. at 12–14 (noting that participants included, among many others, the CEO of the National Association of Drug Court Professionals, the Vice President of the National White Collar Crime Center, a Principal of Health Management Associates, and the President of CityGate Network); Defs.' Opp'n at 20.  LDF argues that "these admissions alone end the inquiry into the UMRA's applicability" because "exclusively between" means no one other than covered officials may participate in meetings.  See Pl.'s Opp'n at 17–18.  The government counters that the Commission's "meetings were still 'exclusively between' officials covered by § 1534(b)(1), because the Commission's membership consists exclusively of those types of covered officials."[8]  Defs.' Opp'n at 20 (emphasis added).

Both interpretations of § 1534(b)(1) are extreme.  In LDF's reading, soliciting input from a single third party at a single meeting would subject an otherwise exempt committee to FACA's requirements—even if that committee had held many other meetings consistent with § 1534(b)(1).  In the government's view, any meeting convened by a committee is "held exclusively between" its members, even if hundreds of invited third parties regularly provide lengthy testimony and engage in colloquies with committee members.  The Court adopts neither interpretation fully, but merely concludes that, on the facts here, it is clear that the Commission's meetings have not been held exclusively between covered officials.  Perhaps a one-off presentation by a third party would be acceptable, but here more than twenty non-covered participants[9] have given testimony at meetings, and many have asked and answered questions.

---

[8] All eighteen Commissioners are either federal officials, elected state or local officials, or are explicitly listed as serving "[p]ursuant to designation by" a particular governor or mayor.  Implementation Memo at 3–4.

[9] Most of the non-covered participants are leaders of private businesses and non-profit organizations.  See Am. Compl. ¶¶ 143–53.

See Am. Compl. ¶¶ 143–53.  Such participation has occurred at nearly every meeting of the Commission.  Id.

The Court is not persuaded by the government's argument by analogy that "a meeting of a congressional committee remains exclusively between its members, even if non-members are allowed to attend or testify," and "a city-council meeting is still exclusively a city-council meeting, even if citizens are allowed to provide their input."  Defs.' Reply at 14; see Defs.' Opp'n at 20.  The government has not pointed the Court to any legal source stating that such a meeting is "held exclusively between" the members of the congressional committee or city council, and indeed the Court doubts that it would be.  Nor, as far as the Court is aware, do congressional committees or city councils have analogous laws requiring their meetings to be "held exclusively between" congresspeople or city councilmembers.  If there were such a law, then third-party experts could not testify or ask questions without violating that law.  Likewise here, the Commission may invite experts to testify at hearings, but then it is ineligible for the UMRA exemption and must comply with FACA.  This argument, then, does nothing at all for the government's position.

The government also invokes FACA's implementing regulations, which state that "[a]ny committee composed wholly of" covered officials that satisfies § 1534(b)(1) is not covered by FACA.  See Defs.' Opp'n at 4–5 (emphasis added) (quoting 41 C.F.R. § 102–3.40(g)).  Closer inspection reveals that the use of "composed" there is likely the result of imprecise drafting.  The regulation directs readers back to the OMB guidelines, which say: "This exemption applies to meetings between" covered officials.  60 Fed. Reg. at 50,653 (emphasis added).  Regardless, this regulation cannot override UMRA's statutory text.  Congress could have drafted the UMRA exemption to depend on committee composition, as the government would have it, by copying

the language in FACA's internal exemption for "any committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government." See 5 U.S.C. app. 2 § 3(2). That "federal exclusion" turns on committee membership, not meeting participation. See In re Cheney, 406 F.3d 723, 728 (D.C. Cir. 2005).[10] But Congress did no such thing. The fact that Congress used different language in the UMRA exemption suggests "differences in meaning," especially because "Congress passed both statutes to handle much the same task" of excluding some advisory committees from FACA. See Wisconsin Cent. Ltd. v. United States, 138 S. Ct. 2067, 2071 (2018) (quotation omitted).

Next, the government claims that the two (out-of-circuit) decisions interpreting § 1534(b)(1) focus on membership, not meeting participation. See Defs.' Opp'n at 21–24. The Court does not rely on these cases, but if anything, they support LDF's position. Idaho Wool Growers Assoc. v. Schafer, 637 F. Supp. 2d 868 (D. Idaho 2009), held that two committees were not exempt under UMRA because "it cannot be said that the state officials in attendance during the Committees' meetings were either elected themselves, or designated to act on elected officials' behalf," id. at 875–76 (emphasis added).[11] One of the committees was also not exempt due to "the inclusion of" a foreign ministry in the committee. Id. at 876. And in Miccosukee

---

[10] The government claims that In re Cheney supports its position because "[j]ust as an outsider's presence at a meeting does not make that person a member of a committee, mere testimony solicited [] from a witness by committee members does not make a meeting 'between' the witness and the members." See Defs.' Reply at 15. The Court is not persuaded. In re Cheney held that "a committee is composed wholly of federal officials if the President has given no one other than a federal official a vote" because "Congress could not have meant that participation in committee meetings or activities … would be enough to make someone a member." See 406 F.3d at 728. But the fact that committee membership turns on formal voting power instead of participation does not prove that whom "meetings are held exclusively between" turns on membership in the body that convened the meetings rather than participation in the meetings.

[11] Most of the non-elected state officials in attendance were members of the committees. However, the Wildlife Director of the Nez Perce Tribe was not a member, but attended the meeting of one of the committees and provided input. See IWGA's Statement of Material Facts Not in Dispute [ECF No. 23-1] ¶ 3–4. In assessing whether the non-federal officials in attendance were covered officials, the court said, "it is undisputed that non-federal wildlife professionals from the Oregon Department of Fish and Wildlife and the Idaho Department of Fish and Game, in addition to the Wildlife Director of the Nez Perce Tribe, were in attendance." 637 F. Supp. 2d at 876 n.8. This suggests that whom the meeting was "between" depended in part on whether a non-member meeting participant (the Wildlife Director of the Nez Perce Tribe) was a covered official.

Tribe of Indians of Fla. v. United States, No. 08-21747-CIV, 2008 WL 11332079 (S.D. Fla. Sept. 26, 2008), the defendant did not "demonstrate that the UMRA exception applies, for the exact identities of the participants [were] not divulged." Id. at *3 n.2 (emphasis added).  But the court did not clarify whether the UMRA exemption hinged on meeting participants or committee participants, or even whether there were any non-member meeting participants in that case. Neither case, then, supports the government's focus on commission composition rather than meeting participation, and the statutory text is of course focused on the latter.

Finally, other federal agencies have limited non-member participation in intergovernmental meetings in order to come within UMRA, lending further support to LDF's position.  For example, in a "Frequently Asked Questions" portion of its website, the Department of Health and Human Services ("HHS") states that members of the public who attend meetings of a federal-tribal intergovernmental committee may "not participate in any way  . . . because the purpose of the UMRA exemption is to facilitate consultations exclusively between federal officials and elected tribal officials" or designees.  Committee members may bring a "technical advisor" to provide "non-disruptive" private counsel, but technical advisors "are not allowed to . . . speak to other members during the meeting."[12]

Therefore, although the Court does not fully endorse either party's reading of 2 U.S.C. § 1534(b)(1), it is clear here that the Commission's meetings have not been held exclusively between covered officials, and hence the Commission is subject to FACA because the first prong of the UMRA exemption is not satisfied.

---

[12] Dep't of Health & Hum. Servs., The Federal Advisory Committee Act and the UMRA Section 204 Exemption: Department of Health and Human Services (HHS) Frequently Asked Questions 4, https://www.cdc.gov/tribal/documents/tac/HHS-UMRA-FACA-EXEMPT-GROUP-FAQs-508.pdf (last updated Mar. 11, 2019).

## IV.    The Commission Violates FACA

The government does not contest that if FACA applies, and its threshold challenges fail, then the Commission has violated FACA.  There is no genuine dispute that the government has violated FACA's transparency and public access requirements by holding closed hearings without timely notice in the Federal Register.  See 5 U.S.C. app. 2 § 10(a)(2); Am. Compl. ¶¶ 194–201.  And there is likewise no genuine dispute that the Commission has violated FACA's oversight provisions by failing to file a charter for the Commission, 5 U.S.C. app. 2 § 9(c), and that Attorney General Barr has violated FACA by failing to assign a designated federal officer to the Commission to ensure compliance with FACA, id. § 10(e).  See Am. Compl. ¶¶ 186, 209–10, 223.

Moreover, there is no dispute that the Commission is not "fairly balanced."  The government does not attempt to prove or even argue it is, only that FACA's "fair balance" provision is not justiciable.  FACA requires an advisory committee's membership to be "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee."  5 U.S.C. app. 2 § 5(b)(2).  In selecting committee members, the appointing authority should "consider a cross-section of those directly affected, interested, and qualified, as appropriate to the nature and functions of the advisory committee."  41 C.F.R. § 102-3.60(b)(3).  Among other factors, the appointing authority should consider the advisory committee's mission, the ethnic, social, and economic impact of the committee's recommendations, the "types of specific perspectives required," and the "need to obtain divergent points of view on the issues before the advisory committee."  41 C.F.R. § 102-3, subpt. B, app. A.

The Commission is "a deliberative body tasked with improving American policing." Implementation Memo at 2.  Its function is to "study issues related to law enforcement and the administration of justice and make recommendations to the Attorney General, who shall submit a report and recommendations to the President on actions that can be taken to prevent, reduce, and control crime, increase respect for the law, and assist victims." Id. at 1 (quoting Exec. Order No. 13,896, 84 Fed. Reg. at 58,596–97, § 3(a)).  The Commission studies "salient issues affecting American law enforcement and the communities they protect." Id.

LDF and other civil rights organizations are "directly affected, interested, and qualified" with respect to the Commission's function of improving policing. See 41 C.F.R. § 102-3.60(b)(3).  LDF has worked in the area of policing reform for several decades. See Dixon Decl. ¶ 3.  But the Commission includes no members from civil rights groups like LDF.  Nor does it include any criminal defense attorney, academic, civic leader, or representative of a community organization or social service organization.  Instead, all eighteen Commissioners are current or former law enforcement. See Am. Compl. ¶¶ 43–60; Implementation Memo at 3–4.  This is precisely the type of imbalance that FACA sought to prevent.  In introducing the Senate debate on the bill, a Senator explained that "the most important provision here is the one which requires fair representation of different points of view upon any advisory commission, so that they will not all be educators on committees in the Department of Education and will not be all scientists, physicians, or medical men on commissions relating to the Institutes of Health." See Microbiological, 886 F.2d at 437 (Edwards, J., concurring in part and dissenting in part) (quoting 118 Cong. Rec. 16,296 (1972)).  Similarly here, FACA aimed to ensure there would not be all law enforcement officials on a DOJ commission studying the broad subject of policing in America.

To be sure, "the difficulty of determining what precisely constitutes a 'fair balance' may incline courts to be deferential in reviewing the composition of advisory committees and may defeat a plaintiff's claims in a given case." Microbiological, 886 F.2d at 434 (Edwards, J., concurring in part and dissenting in part). But, certainly, this is not such a case. The Commission's function is to improve policing, including relations between law enforcement and the communities they protect. Yet the Commission does not include a single member who represents elements of those communities, rather than law enforcement. Thus, even employing a deferential review, the Court concludes that the Commission's membership is not "fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee." 5 U.S.C. app. 2 § 5(b)(2). Indeed, the Court is hard pressed to think of a starker example of non-compliance with FACA's fair balance requirement than a commission charged with examining broad issues of policing in today's America that is composed entirely of past and present law enforcement officials.

## V.    Relief

LDF is entitled to relief for the Commission's FACA violations. As the government concedes, the APA is an appropriate vehicle for LDF's claims against Attorney General Barr and the DOJ. See Defs.' Opp'n at 27. As for LDF's claims against non-agency defendants, mandamus relief is the appropriate vehicle. The party seeking mandamus has the burden of showing "(1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." Am. Hosp. Ass'n v. Burwell, 812 F.3d 183, 189 (D.C. Cir. 2016).

LDF has met all three requirements. The Commission has a duty to comply with FACA and has failed to do so. Mandamus is the only vehicle for LDF's claims against defendants

Keith, Sullivan, and the Commission because an advisory committee is not an agency subject to the APA and FACA provides no private right of action.  See Freedom Watch, Inc. v. Obama, 807 F. Supp. 2d 28, 33, 37 (D.D.C. 2011).  The government's only argument for why LDF has not established a "clear and indisputable right to relief" is that most of LDF's claims have "threshold defects" and "the Commission is exempt from FACA's requirements."  See Defs.' Reply at 21. Because the government's threshold and exemption arguments fail, so does its challenge to mandamus relief.

LDF is thus entitled to writs of mandamus compelling defendants Keith, Sullivan, and the Commission to file a charter with the necessary entities as required by 5 U.S.C. app. 2 § 9(c) and to provide timely notice of its meetings going forward as required by 5 U.S.C. app. 2 § 10(a)(2). LDF is also entitled to injunctive relief requiring defendant Barr to appoint a designated federal officer as required by 5 U.S.C. app. 2 § 10(e) and 41 C.F.R. § 102-3.120.  Further, LDF is entitled to injunctive relief requiring defendant Barr to ensure the Commission has a fairly balanced membership.  The Court will order the parties to submit briefing on proposed remedial orders to determine the precise content of that injunction and any other relief.  In the meantime, the Court will order that Commission proceedings be halted and that defendants may not submit, publish, or rely on any report or recommendations produced by the Commission until the requirements of FACA are satisfied.

The Court will not, at this time, grant LDF's request to "permanently enjoin" the Commission from conducting any business and defendants Barr, DOJ, and the Commission from "submitting, accepting, publishing, employing, or relying upon any report or recommendations"—in other words, for a "use injunction."  See Am. Compl. Prayer for Relief ¶¶ d–e.  "Because of its First Amendment implications, punitive effect and likely standing

complications, a use injunction should be the remedy of last resort." See Nat. Res. Def. Council v. Pena, 147 F.3d 1012, 1025 (D.C. Cir. 1998).  And without the benefit of briefing on proposed remedial orders, the Court cannot determine that "denial of a use injunction would 'render FACA a nullity.'"  See id. at 1026 (quoting Cal. Forestry Ass'n v. U.S. Forest Serv., 102 F.3d 609, 614 (D.C. Cir. 1996)).

A use injunction might still be appropriate, but only if "FACA's principal purposes—(1) avoidance of wasteful expenditures and (2) public accountability—will be served by granting a use injunction."  Id. at 1026.  A use injunction granted when (as might be the case here) "a committee has completed its meetings and is in the process of wrapping up its affairs will likely produce waste," but the Court must also "consider the magnitude of the waste, the value of the committee's work to the sponsoring federal agency and the effect of the FACA violation on the committee's findings."  Id.  And the Court acknowledges that a use injunction, in some circumstances, could exceed the injury claimed or be inconsistent with separation-of-powers principles.  See Nw. Forest Res. Council, 846 F. Supp. at 1015 (declining to grant a use injunction but granting declaratory relief); see also Nw. Ecosystem All., 1999 WL 33526001, at *8 (declining to grant a use injunction based on "the balance of hardships" but ordering defendants to "make a good faith effort to expedite the appointment of at least one properly qualified environmental representative" to the committee); but see, e.g., W. Org. of Res. Councils v. Bernhardt, 412 F. Supp. 3d 1227, 1244 (D. Mont. 2019) ("Further use of or reliance on the Royalty Committee's recommendations is ENJOINED."); Idaho Wool Growers, 637 F. Supp. 2d at 880 (ordering that the "Committees' findings and/or conclusions are not to be relied upon by the Forest Service with respect to any future agency decisions").[13]

---

[13] Another possibility is a limited use injunction.  For instance, a judge in this District has enjoined an agency from using the reports of disputed committees "without a disclaimer stating that the committees had been

LDF also seeks relief under the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201. Am Compl. ¶ 217–26; Am. Compl. Prayer for Relief ¶¶ a–c.  Under the DJA, the Court "may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a).  This statute "is not an independent source of federal jurisdiction"; rather, "the availability of such relief presupposes the existence of a judicially remediable right."  Schilling v. Rogers, 363 U.S. 666, 677 (1960).  The Court independently has jurisdiction here under the mandamus statute, 28 U.S.C. § 1361, and the APA, 5 U.S.C. § 706, and LDF has a judicially remediable right to have the Commission comply with its duties under FACA.  LDF is thus entitled to a declaratory judgment that the Commission is an advisory committee subject to the requirements of FACA, and that defendants have violated FACA by failing to file a charter for the Commission with the necessary entities, to provide timely notice of its meetings, to select a designated federal officer, and to ensure that the Commission's membership is fairly balanced.

## CONCLUSION

For these reasons, the Court will grant plaintiff's motion for summary judgment and deny defendants' cross-motion to dismiss, or in the alternative, for summary judgment.  A separate order has been issued on this date.


/s/
JOHN D. BATES
Senior United States District Judge

Dated: October 1, 2020

---

convened in violation of FACA.  The effect of this relief is, in many ways, similar to that of the declaratory relief sought.  Arguably, the disclaimer would give plaintiffs 'ammunition' in the arena of public opinion."  Nat. Res. Def. Council v. Abraham, 223 F. Supp. 2d 162, 182–83 (D.D.C. 2002), order set aside in part on other grounds sub nom. Nat. Res. Def. Council v. Dep't of Energy, 353 F.3d 40 (D.C. Cir. 2004).